```
 1                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3      UNITED STATES OF AMERICA,        :
                                         :
 4                  Plaintiff,           :   Criminal Action
                                         :   No. 1:23-cr-00081
 5            v.                         :
                                         :
 6      HAILONG ZHU,                     :   September 5, 2023
                                         :   9:05 a.m.
 7                                       :
                    Defendant.           :   Volume 1 - EXCERPT
 8                                       :
        ............................. :
 9
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10         BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
            UNITED STATES DISTRICT JUDGE, AND A JURY
11
      APPEARANCES:
12
        For the United States:      UNITED STATES ATTORNEY'S OFFICE
13                                   Alexandra Zoe Bedell, AUSA
                                     Stefanie Schwartz, AUSA
14                                   2100 Jamieson Avenue
                                     Alexandria, VA 22314
15
        For the Defendant:          OFFICE OF THE FEDERAL PUBLIC
16                                   DEFENDER
                                     Geremy Kamens, Federal Defender
17                                   Nathaniel Wenstrup, AFPD
                                     1650 King Street, Suite 500
18                                   Alexandria, VA 22314

19                                   AFN LAW PLLC
                                     Angus Fei Ni, Esquire
20                                   504 2nd Ave
                                     14th Floor
21                                   Seattle, WA 98104

22      Also Present:               Zachary Zarambo

23                                   Mandarin Interpreters:
                                     Judith Shapiro
24                                   Renee Wang

25      (Continued)                 Spanish Interpreter:
                                     Ronnie Rodriguez
```

1    (Continued)

2    Court Reporter:              Diane Salters, B.S., CSR, RPR, RCR
                                  Official Court Reporter
3                                 United States District Court
                                  401 Courthouse Square
4                                 Alexandria, VA 22314
                                  Email: Dianesalters.edva@gmail.com
5                                 Telephone: (301) 338-8033

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by machine shorthand.   Transcript produced by
25   computer-aided transcription.

1

## TABLE OF CONTENTS

                                                          PAGE
2    OPENING STATEMENT ON BEHALF OF THE GOVERNMENT        5
     OPENING STATEMENT ON BEHALF OF THE DEFENSE          12
3

4

## EXAMINATION

5

     WITNESS                    DIRECT    CROSS   REDIRECT  RECROSS
6
     ROBERT CAMPBELL
7
          BY MS. BEDELL          17                   94
8         BY MR. WENSTRUP                  75
9    MARISOL MEJIA
10        BY MS. SCHWARTZ        98
          BY MR. KAMENS                   119
11
     ALEX LIU
12
          BY MS. SCHWARTZ       127
13        BY MR. NI                       132

14

## GOVERNMENT'S EXHIBITS

15

     NUMBER                                              PAGE
16
     11-1 through 11-11                                   22
17   16-18 and 16-19                                      33
     16-6 and 16-7                                        40
18   3-2 and 3-3                                         102
     3-4                                                 114
19   3-5                                                 115

20

## DEFENDANT'S EXHIBITS

21

     NUMBER                                              PAGE
22
     15                                                  123

23

24

25

```
 1          THE COURT:  Are we ready to proceed with opening
 2   statements?
 3          MR. KAMENS:  We are, Your Honor.  We'd ask for the rule
 4   on witnesses.
 5          THE COURT:  Yes, I will grant that motion, and we will
 6   have the rule on witnesses.  If there are any witnesses in the
 7   courtroom, you must step out.
 8          I assume that counsel has already spoken with your
 9   potential witnesses and explained to them that they must remain
10   outside the courtroom during the duration of the trial; they
11   cannot discuss their testimony, either before or after they
12   testify, with other witnesses?
13          MS. BEDELL:  Yes, Your Honor.
14          THE COURT:  Very good.
15          Are we ready to proceed?
16          MR. KAMENS:  Yes.
17          THE COURT:  You may bring in the jury.
18          (Jury in at 1:30 p.m.)
19          THE COURT:  Ladies and gentlemen of the jury, welcome
20   back from lunch.  I hope you were able to get something to eat
21   and relax for a little bit.  I want to confirm, as I told you I
22   would every time you come back, that you've been able to heed my
23   instructions and not discuss this matter with your fellow jurors
24   or with anyone else, and that you have not undertaken any
25   independent research or gone out and sought out any information
```

1    about this case; is that correct?

2          I see, by a nodding of the heads, that you've followed

3    the instructions, and I appreciate that very much.

4          We're starting now at 1:30 with opening statements, and

5    we'll hear first from the government, then the defense, and then

6    we'll proceed to the government's case and the calling of

7    witnesses.  Since we took a slightly earlier lunch, we'll try and

8    go until about three o'clock, and then take a 10- or 15-minute

9    break depending on where the lawyers are.  We may stop a little

10   bit earlier or stop a little bit later.  If you need anything in

11   the interim for any reason, just raise your hand and we'll be

12   able to address it.

13         Are the parties ready to proceed?

14         MS. BEDELL:  Yes, Your Honor.

15         MR. KAMENS:  Yes, Your Honor.

16         THE COURT:  Very good.  You may proceed.

17         **OPENING STATEMENT ON BEHALF OF THE GOVERNMENT**

18         MS. SCHWARTZ:  This case is about lies and easy money,

19   about victims who were deceived into wiring money from their own

20   personal bank accounts directly into accounts opened by the

21   defendant, Hailong Zhu.

22         The defendant is on trial today for conspiring to

23   commit bank fraud.  That means that the defendant joined together

24   with others in a scheme to obtain money owned by or in the

25   custody of banks through material misrepresentations.  You'll

*Opening Statement - Government*

1   hear evidence that the defendant and his coconspirators did just

2   that.  They told lie after lie to banks and to victims of the

3   scam to make some easy money.

4          Over the next few days, you're going to hear evidence

5   about how the scheme worked and what the defendant's role was,

6   and you're going to hear it from several perspectives -- from the

7   banks, from the Secret Service investigators on the case, and

8   from the victims themselves -- but what will come through, as you

9   hear the evidence in this case, is that the defendant and his

10  coconspirators were engaged in a scheme that was organized,

11  deliberate, and careful.  The scheme was designed to steal as

12  much money from the victims as they could while ensuring the

13  activity stayed undetected by the banks; and once there was any

14  indications the banks were onto them, get that money out and to

15  overseas accounts.

16         The evidence will show that Hailong Zhu was living in

17  Chicago working in construction.  In the fall of 2022, he learned

18  of a plan to make some easy money.  He traveled from Chicago,

19  Illinois, to Los Angeles, California, and linked up with a group

20  of individuals, one named Joseph Wong and another named Nikki.

21  All he had to do was open up a few fake companies and some

22  business bank accounts, and he would make $70,000; and just like

23  that, the defendant was in.

24         The plan had three phases:  Preparation, scamming, and

25  securing.  First step was preparation.  Chats between Joseph and

7

1    Nikki will show that they had an organized operation involving

2    the defendant and others to open bank accounts in the names of

3    fake business that could be used to receive funds from scam

4    victims.  The defendant himself opened two businesses in

5    September and October:  Sea Dragon Trading and Sea Dragon

6    Remodel, fitting, as the English translation of the defendant's

7    first name, Hailong, means "Sea Dragon."

8              On the documents filed with the California Secretary of

9    State, he claimed the businesses would be used for remodeling and

10   for the distribution of construction materials.  Why?  Because

11   you need a real business in order to open business bank accounts.

12   And just days after those businesses were registered, he did open

13   bank accounts under his namesake businesses at Bank of America

14   and JPMorgan Chase, and later at Wells Fargo and East West Bank.

15             Records from the banks will show that many of these

16   accounts immediately started receiving large wire transfers from

17   banks across the country, often with labels suggesting they were

18   for payment for construction services or goods.  All lies.

19             In the first two months of its existence, just one of

20   the defendant's Sea Dragon accounts received over $650,000 in

21   wire transfers from around the country.  After four months,

22   Hailong Zhu's accounts had received over $2.4 million in

23   deposits.

24             So where was this money coming from?  Phase 2 was the

25   scamming.  Throughout the trial, you'll hear from Marisol,

1    Kwadwo, and Yan.  Each of them will explain they had met a new

2    friend, somewhat serendipitously.  That friend filled up the

3    relationship and trust talking about life, family, their jobs,

4    their work; and after some time, that friend would tell them

5    about an exciting new investment opportunity, cryptocurrency.

6    That friendship would show them a cool, modern trading platform,

7    and walk them through each and every step.  That friend would

8    suggest or convince them to take out loans from their banks to

9    invest even more, but none of it was real.

10          Marisol met her new friend who claimed his name was

11   Daniel on a Facebook dating application, and the two immediately

12   hit it off.  It was only a few weeks into their friendship that

13   he convinced her to start investing in cryptocurrency, sharing

14   stories with her of the amazing profits that he had been able to

15   turn by understanding the trends.  Marisol will tell you that she

16   was hesitant at first, but soon she was convinced to set up an

17   account on an online platform called "Gamma"; and with Daniel,

18   her friend, walking her through each and every step, the profits

19   in her account were growing.  She was making money, or so she

20   thought.  She will tell you soon she was told by the Gamma

21   customer representatives that she needed to put additional money

22   into the platform to withdraw her initial investment.  Once she

23   was convinced to do that, customer service told her she needed to

24   pay taxes on that investment before she could withdraw any of her

25   money.  But her friend Daniel assured her that was normal each

*Opening Statement - Government*

1   time.  He was experienced in this:  And, of course, you need to

2   pay taxes; we do live in America after all.  And, eventually,

3   each time, she believed him.  He even loaned her money directly

4   into the platform, of course, to help her meet some of her

5   investment goals; and when she said she didn't have any more to

6   invest, he told her, Go to your local bank and get a loan.  He

7   had done it many times before himself, and he'd always been able

8   to pay it back.  Each time Marisol was told to deposit more

9   money, she was given instructions on exactly how to wire money

10  from her bank account to the platform.  Chats between her and

11  Gamma supposed customer service representatives will show one of

12  the accounts she was given to wire money to was a Sea Dragon

13  Trading JPMorgan account.  Bank accounts will show the $31,000

14  wire transfer that Marisol made directly from her bank account

15  into a bank account opened by Hailong Zhu.

16          You'll hear from other victims in this case telling

17  nearly identical stories, stories that start with meeting a new

18  friend, having an exciting investment opportunity, some even

19  taking out loans to fund that exciting new investment.  And each

20  story ends with the victims realizing they had been told lie

21  after lie and losing thousands and thousands of dollars.  All of

22  the victims eventually ended up realizing they had been

23  victimized by a scam, but at that point, it was too late.  The

24  money sent to Hailong Zhu's bank account was gone.

25          So what happened with that money?  Next came Phase 3,

1    securing.  Once Hailong Zhu opened the accounts, money started to

2    flow in from scam victims around the country, and Hailong Zhu and

3    the other coconspirators quickly would transfer those funds out

4    of those accounts and to overseas accounts, out of the reach of

5    the U.S. banking system.

6         You'll learn that Hailong Zhu shared the bank account

7    information with his coconspirator, Joseph, who started to handle

8    some of the daily transactions in and out of the accounts.  Chats

9    between Nikki and Joseph will show how the crew sent instructions

10   back and forth telling each other to visit certain bank branches

11   to withdraw and deposit, how much to withdraw and deposit, and

12   exactly what lies to tell the banks to make the transfers and

13   keep the accounts open.  These same chats mention Hailong, the

14   defendant, over and over as Nikki and Joseph discuss his

15   involvement and his accounts.  It's clear from these chats that

16   Nikki and Joseph supervised the defendant's activities, but

17   you'll see that his role did not end when he opened the fake

18   businesses and opened the business bank accounts.  In fact,

19   you'll see evidence the defendant continued to move money between

20   the accounts and to accounts overseas, both his business accounts

21   that he had opened and even some of his personal accounts, into

22   the hands of coconspirators overseas.  Oftentimes he was

23   accompanied by Joseph or another coconspirator in the banks doing

24   transactions together, and you'll see photos and videos of them

25   together in the banks taking steps in furtherance of this

1    criminal conspiracy.

2            The defendant personally made withdrawals, went into

3    branches to send wires of money to domestic and international

4    banks and moved money between the accounts, lying to the banks

5    along the way.  The point was to mislead the banks so they

6    wouldn't know that the accounts in their custody were receiving

7    funds from scam victims to evade detection, avoid scrutiny, and

8    keep the money flowing.

9            As the lies and easy money flowed, the banks did start

10   to catch on.  You'll hear from some of the bank employees who

11   looked into Hailong Zhu's accounts.  A bank investigator will

12   tell you the lies the defendant and his coconspirators told to

13   try to keep the accounts open and then get the money out.  You'll

14   hear from one employee who directly interacted with the defendant

15   and why she refused to process a wire transfer he requested, and

16   another employee who called the defendant directly to ask him

17   about some of the wires in and out of his accounts.

18           As Hailong Zhu and his coconspirators knew accounts

19   were being restricted and closed by the banks, they did their

20   best to get the banks to unfreeze the accounts; and if that

21   didn't work, get their money out of those banks and open new

22   accounts at new banks and start the cycle all over again.

23           But in addition to hearing from the victims in this

24   case, the bank personnel and the Secret Service investigators,

25   you will hear the defendant himself admitted to working with

1    others and opening these accounts.  You will hear how the

2    defendant admitted to registering the fake companies, opening the

3    accounts and withdrawing and depositing money from the accounts.

4    You'll also hear how the defendant knew something was not right.

5    In fact, he admitted that those businesses he opened never did

6    any remodeling or performed any services of any kind.  And the

7    only reason he eventually stopped is because he wasn't getting

8    paid what he was promised.  Even though victim funds were rolling

9    in in the hundreds of thousands, he wasn't getting enough of a

10   cut.  He was telling the lies, but he was not making the easy

11   money.

12          Members of the jury, the government bears the burden of

13   proof to prove to you the defendant conspired to commit bank

14   fraud beyond a reasonable doubt.  The judge will instruct you on

15   the relevant statute and definitions at the end of the trial, but

16   in simple terms, the government must prove that the defendant

17   joined together with others in a scheme to obtain money owned by

18   or in the custody of banks through material misrepresentations;

19   and as you'll see throughout this trial, that is exactly what the

20   defendant did.

21          At the end of the trial, the government will ask you to

22   return the only verdict consistent with the evidence and facts in

23   this case:  That the defendant is guilty.

24          **OPENING STATEMENT ON BEHALF OF THE DEFENSE**

25          MR. WENSTRUP:  What makes the perfect mark for a fall

guy in a financial fraud scheme?  A recent immigrant; someone

who's vulnerable because they don't speak English; someone

without great job prospects who even told an investigator that he

was looking for odd jobs; someone who's willing to use his own

name and his own identity to open bank accounts.  To the real

conspirators in this case, Hailong Zhu was the perfect mark.  He

was used by people who were not his partners.  They were not his

friends.  He was a pawn, and he knew nothing about a plan to take

property from banks.  He knew nothing about trying to convince

people to take out loans.  He was not part of any conspiracy to

commit bank fraud.  He is not guilty.

Last year, Hailong was living outside of Chicago doing

construction and renovation work; and in September of last year,

Hailong was lured to California by the promise of a vacation.  A

man who called himself Zheng Jiahe had a proposition for Hailong:

If Hailong came out to California, opened up new companies and

bank accounts using his own name, Zheng would pay him, set him up

with a place to stay in Los Angeles, take him to Las Vegas where

he would stay at hotels and go gambling.  This is all pretty

exotic to someone from Inner Mongolia who's doing construction

work on the outskirts of Chicago.  Hailong was the perfect mark.

Now, Zheng Jiahe was not that man's real name.  His

name was Joseph Wong.  After Hailong arrived in Los Angeles,

Joseph Wong took Hailong to register two companies in Hailong's

own name.  Joseph Wong then took Hailong to open up bank

14

1    accounts, again, in Hailong's name.

2         So Wong assisted Hailong in filling out all of these

3    forms in English, a language Hailong doesn't speak.  And what

4    you're seeing on the prompter over there is an exhibit you'll see

5    in trial that shows Hailong's name on one of these bank account

6    opening statements.

7         Now, again, while he assisted Hailong in filling out

8    all of this paperwork in English -- because that's a language

9    that Hailong doesn't speak -- and they were using, again,

10   Hailong's real name and Hailong's real identification documents,

11   Wong kept all of the banking information.  He had the passwords

12   to access the accounts.  He kept all of the bank cards.  Wong

13   also had the phone that was used to notify the accountholder of

14   transactions and to make remote wire transfers.  What you're

15   seeing here are all of the bank cards held by Mr. Wong in

16   Hailong's name.  So Wong had all of the account information, and

17   Hailong was his fall guy.

18        Now, unbeknownst to Hailong, Mr. Wong was operating

19   multiple conspiracies:  A cryptocurrency conspiracy, a money

20   laundering conspiracy; and in between, according to the

21   government, a bank fraud conspiracy.

22        So, for starters, there was a cryptocurrency

23   conspiracy.  Scammers were convincing victims to invest in

24   cryptocurrency, but there was no investment and there was no

25   cryptocurrency.  The money was going straight from the victims to

1    the scammers.  Hailong had absolutely no idea about any of this.

2    He wasn't told anything about it.  He never communicated with any

3    of the victims or the people conducting that scam.

4           That brings us to the charged conspiracy, conspiracy to

5    commit bank fraud.  There, some of the cryptocurrency scammers

6    went further and they instructed the victims to take out loans to

7    invest even more in the cryptocurrency conspiracy.  The scammers

8    did not speak to the banks.  The victims applied for the loans.

9    The victims received the loans, and then the victims turned over

10   the money to the scammers.  There is zero evidence that Hailong

11   played any part in the scamming of these victims.  You will see

12   no text messages, no emails, no notes, no meetings, no calls, or

13   anything at all ever showing that Hailong knew about the scams,

14   much less that he would have agreed to the scams.  His role was

15   to open bank accounts and stay in the dark, to be kept in the

16   dark.

17          You will hear that Hailong opened bank accounts,

18   multiple bank accounts, but you will hear numerous times in this

19   trial that opening bank accounts is not a scheme to commit bank

20   fraud because it does not take any money from a bank.  Hailong is

21   here today because he is charged with conspiracy to commit bank

22   fraud, and he's charged because he is the fall guy.

23          Now, the scammers' real use for Hailong was as a part

24   of the take-the-money-and-run part of the conspiracy.  That's

25   where money from the crypto victims was routed through bank

1    accounts, including some of the accounts that Wong set up with

2    Hailong in Hailong's name, and then the money was then

3    transferred through those accounts overseas.  But Hailong wasn't

4    told the real story about this operation either.  That's why,

5    unlike Wong, Hailong used his real name and his real documents to

6    start the companies and to open the bank accounts, because he was

7    the perfect mark.  In a take-the-money-and-run operation, he

8    didn't take much money and he didn't run.

9         You might think that Wong gave Hailong enough money,

10   took him to Las Vegas enough times, but Hailong must have

11   wondered what was going on.  But whether Hailong wondered if

12   something else was going on is not what you have to decide in

13   this case.  What you have to decide is whether Hailong knew

14   about, agreed to, and then sought to further a scheme to take

15   money from banks.  And over the next few days, we ask that you

16   listen to the testimony, listen for any evidence of the charged

17   crime of bank fraud conspiracy.  Did anyone tell Hailong they

18   were taking bank property?  No.  Did anyone tell Hailong they

19   were going to convince people to take out loans?  No.  Did anyone

20   ever ask Hailong about targets or making decisions?  No, because

21   he was just the fall guy.  Hailong, opening bank accounts in his

22   own name and handing the banks the immigration documents that he

23   relied on to work and send money home to his family, Hailong

24   simply had no idea about this fraud scheme perpetrated by

25   Mr. Wong and others.  None of this was a conspiracy to commit

*Campbell - Direct - Bedell*

1    bank fraud, nor did it happen in Virginia, which is a requirement

2    to bring a charge in this courtroom.

3          Hailong is completely innocent of the charge in this

4    case, conspiracy to commit bank fraud.  And at the end of the

5    trial, you will see that what he really was was the perfect mark.

6    He was a name on an account.  Now, he's the name on an

7    indictment, but he has never been a coconspirator.  And at the

8    end of the trial, we will ask that you find him not guilty.

9          THE COURT:  Thank you, Counsel.

10         Government may call its first witness.

11         MS. BEDELL:  The government calls Rob Campbell.

12    (ROBERT CAMPBELL, ON BEHALF OF THE GOVERNMENT, SWORN)

13         (Whereupon, the witness takes the stand.)

14                      DIRECT EXAMINATION

15    BY MS. BEDELL:

16    **Q.**    Good afternoon, Mr. Campbell.

17         Could you please state your name and spell it for the

18    record?

19    **A.**    My name is Robert Campbell, R-O-B-E-R-T; last name is

20    Campbell, C-A-M-P-B-E-L-L.

21    **Q.**    Where do you work?

22    **A.**    I work at JPMorgan Chase.

23    **Q.**    What do you do for JPMorgan Chase?

24    **A.**    I'm an electronic crimes investigator.

25    **Q.**    What does that job consist of?

1   **A.**     I do -- I investigate electronic crimes that take place

2   through Chase and the electronic channels, the cyber channels,

3   and of the online channels; that includes wires, ACHs, and

4   online transactions.

5   **Q.**     Do you have a particular focus within that area?

6   **A.**     I'm sorry, say that again.

7   **Q.**     Do you have a particular focus within that area?

8   **A.**     It's wire investigations.  You know, we're pretty global.

9   **Q.**     How many people does JPMorgan Chase employ in this group?

10  **A.**     Approximately 30.

11  **Q.**     Do you come into contact or work with different sections

12  of the bank in your role?

13  **A.**     Yes, I do.

14  **Q.**     What sections are those?

15  **A.**     All of the online channels, specifically wire and ACH

16  channels, the banking transactional channels.

17  **Q.**     Could you explain what an ACH is?

18  **A.**     An ACH is the Automated Clearing House.  It's similar to

19  a wire.  It takes place through the Automated Clearing House.

20  It's very similar to a wire, though, but it takes place through

21  the fed and the companies called the "Automated Clearing House."

22  **Q.**     Do you work with other investigative units in your role?

23  **A.**     I do.

24  **Q.**     And what other units might that include?

25  **A.**     Within the bank internally, we work with the other wire

19

*Campbell - Direct - Bedell*

1    investigations unit; the claims unit.  Externally, we work with

2    other banks with similar roles, and with law enforcement also.

3    **Q.**    And do you ever work with bankers in the branches?

4    **A.**    Yes, I do.

5    **Q.**    Have you received training in your role?

6    **A.**    Yes, I have.

7    **Q.**    What sort of training?

8    **A.**    I received extensive training in wires, ACHs, all of the

9    online channels.  Those are extensive.  Those include Zelle and

10   all of the other transactional payment systems that the bank

11   uses.  The bank uses several payment systems specific to each

12   transaction.

13   **Q.**    Do you have any investigative training?

14   **A.**    Yes, I do.  I am a certified fraud examiner.  I've

15   received and I've attended and instructed money laundering and

16   fraud investigation.

17   **Q.**    How long have you worked for JPMorgan Chase?

18   **A.**    I worked with Chase for almost ten years.

19   **Q.**    And how long of that has been in the fraud investigator

20   role?

21   **A.**    Nine years of it.

22   **Q.**    What did you do prior to joining JPMorgan Chase?

23   **A.**    I was a financial intel analyst with the office of

24   Foreign Assets Control here in D.C.  It's a unit of the

25   Treasury.

Campbell - Direct - Bedell

1   Q.     I'd like to turn now to the events of this case; how did

2   this matter come to your attention?

3   A.     I had -- I had worked a couple of crypto scam

4   investigations, and several of my colleagues had worked several

5   similar scams; and one of the things we noticed was a pattern

6   that started developing that indicated this was probably a much

7   larger group that was actually conducting this.  These weren't

8   just one-off frauds; this was an organized effort.

9   Q.     What were some of the patterns that you started noticing

10  that defined to you that this was a group?

11  A.     From the -- first of all, the suspect accounts were at

12  JPMorgan Chase, and the victim wires, as they were incoming --

13  this would be the scam victims -- would send wires into these

14  accounts, and I would communicate with those victims to try to

15  find out what was actually going on.  And there were patterns

16  that developed in the crypto scam side of it.  They were similar

17  patterns over and over and over again.

18        And, also, the suspects at Chase all had very similar

19  addresses.  They were all in the same area in Los Angeles.  And

20  the disbursement pattern of the funds, after they came in, were

21  all very similar across numerous suspects that we discovered,

22  once we started looking at it, as a pattern.

23  Q.     So you mentioned the suspects at Chase.  You're referring

24  there to the accounts that were receiving funds from victims.

25  So what were some of the patterns that you noticed at that

Campbell - Direct - Bedell

1    level?

2    **A.**    So at the Chase suspect level, again, the incoming wires,

3    they were not consistent with what was -- what the supposed

4    business was supposed to be doing.  That caused us to look

5    further at them individually and try to seek out some of the

6    victims and actually talk to them about why this sent this

7    person money.  And it was almost never consistent with what the

8    business was supposed to be doing at Chase.

9         And the same thing with the outgoing disbursements as

10   they were going overseas.

11   **Q.**    You mentioned you noticed consistencies in disbursements;

12   what sort of consistencies were you referring to there?

13   **A.**    On the disbursement side, as the funds came out of

14   Chase -- and there were several dozen accounts here -- as the

15   funds would come out of these accounts, they all went to,

16   primarily, four -- three or four different overseas banks and

17   entities; and when I would run that particular overseas entity

18   back through our systems, I would see more suspects and I'd

19   develop the ongoing pattern of the same address was used and

20   they received similar wires from some of the same victims coming

21   into those accounts.

22   **Q.**    Has JPMorgan Chase provided documents to the government

23   as part of this investigation?

24   **A.**    Yes, we did.

25         MS. BEDELL:  Your Honor, at this point, I'd like to

*Campbell - Direct - Bedell*

1    read Stipulation No. 2 into the record.

2              THE COURT:  Is there any objection?

3              MR. KAMENS:  No objection, Your Honor.

4              THE COURT:  You may do so.

5              MS. BEDELL:  "The United States and the defendant,

6    Hailong Zhu, stipulate and agree that the exhibits set forth

7    below are authentic, accurate copies of business records of

8    JPMorgan Chase Bank, N.A., that meet the requirements of Federal

9    Rules of Evidence 902(11) and 803(6).  The defendant reserves his

10   right to object to admissibility on other grounds."

11             The exhibits are Government's Exhibits 11-1, 11-2,

12   11-3, 11-4, 11-5, 11-6, 11-7, 11-8, 11-9, 11-10, and 11-11.  At

13   this time, Your Honor, we would move to admit those exhibits.

14             MR. WENSTRUP:  No objection, Your Honor.

15             THE COURT:  They will be admitted without objection.

16             (Government's Exhibit Nos. 11-1 through 11-11 received

17   in evidence.)

18   BY MS. BEDELL:

19   Q.    Could you turn to Exhibit 11-11, please?

20   A.    What was it again?  Eleven --

21   Q.    11-11.

22             MS. BEDELL:  Your Honor, may we publish those exhibits

23   as well?

24             THE COURT:  You may.

25             (Exhibit published.)

*Campbell - Direct - Bedell*

```
 1    BY MS. BEDELL:
 2    Q.    What is this document?
 3    A.    This is a portion of my notes that I started taking early
 4    on in the investigation.
 5    Q.    And did you prepare this document?
 6    A.    I did.
 7    Q.    And what were you recording in your notes here?
 8    A.    This was the -- this was so I could keep track of all of
 9    the individual accounts.  Typically, I would put the person's
10    name, the signer's name; and then after that, I would put the
11    businesses that were associated with that signer at Chase or at
12    another bank, if I knew of it.
13    Q.    And how did you identify the individuals and companies
14    that you put on this list?
15    A.    These were suspects in our investigation.  When I talk
16    about the suspect accounts receiving fraudulent wires, victim
17    wires, and then disbursing them overseas, this is the primary
18    list that I started with.
19    Q.    Is this a complete list?
20    A.    No, not at all.  This is the list -- this is the list
21    when I started doing this investigation.  This list has probably
22    tripled since then.
23    Q.    I'm sorry, what was that?
24    A.    This list has probably tripled since then.
25    Q.    On page 1, is Hailong Zhu listed here?
```

*Campbell - Direct - Bedell*

1   **A.**      Yes, he is.

2   **Q.**      And what else is listed with his name?

3   **A.**      It has Hailong Zhu, and it has Hailong Zhu Coat; Hailong

4   Zhu, 1140 S El Molino; Hailong Zhu, Sea Dragon Remodel Inc.;

5   Hailong Zhu, Sea Dragon Remodel Inc. at BofA; Hailong Zhu, Sea

6   Dragon Trading Inc.; and Hailong Zhu Sea Dragon Trading LLC at

7   BofA.

8   **Q.**      And what were those items?

9   **A.**      Each of those is another page referenced in my notes, and

10  I usually tend to organize them just like they're shown here.

11  Hailong Zhu, I keep notes specific to him on that page.  The

12  "Coat" is the online history.  El Molino is a list of other

13  suspects and other wires that involved that specific address.

14  And then each of the other businesses has their own page where I

15  try to track the amounts involved with each of the wires.

16  **Q.**      What is the name of the individual and associated

17  companies directly below Zhu on this list?

18  **A.**      Hong Sun.

19  **Q.**      And the companies, please?

20  **A.**      Hong Sun Good Luck Trading LLC; Hong Sun Good Luck

21  Trading LLC at Cathay Bank; Hong Sun Good Luck Trading at BofA;

22  and Hong Sun Hong's Trading LLC.

23  **Q.**      And what were those references to the other banks?

24  **A.**      On Hong Sun?

25  **Q.**      Yes.  You said Hong Sun Trading LLC, Cathay Bank; what

1    was that referring to?

2    **A.**     Anytime when I'm doing the investigation and I see that

3    that business or that individual, whatever the suspect may be,

4    if they have an account at another bank, I make a note of that

5    other bank, because I was working with other banks at the time.

6    We were helping each other find the suspects and each other's

7    accounts.

8    **Q.**     Do you see the name Kangjun Su?

9    **A.**     Yes.

10   **Q.**     What companies are associated with that individual?

11   **A.**     Kangjun Su had PBB International Consulting Corporation;

12   Kangjun Su PBB International Consulting Corporation at BofA;

13   Kangjun Su SKJ Trading LLC; and Kangjun Su SKJ Trading LLC at

14   BofA.

15   **Q.**     The name SKJ Trading, is that a pattern you would see

16   elsewhere?

17   **A.**     Yes.  They typically -- that was common.  One of the --

18   typically, as a whole group, the individual would have accounts,

19   and they would open up two businesses, and each of the business

20   would have an account; and, traditionally, one of the businesses

21   was named something-trading.  Their initials were commonly used

22   when they would put the trading on the name, Trading LLC.

23   **Q.**     Could we look at page 2 of this exhibit, please?  Do you

24   see the name Mingxing Lyu here?

25   **A.**     Mingxing Lyu?

1    **Q.**    Yes.

2    **A.**    Mingxing Lyu had Mingxing Trading LLC.  Mingxing Lyu had

3    Mingxing Tranding Inc., and Mingxing Lyu - Mingxing Remodel LLC.

4    **Q.**    Near the bottom of this list, do you see the name Yunzhu

5    Xie?

6    **A.**    Yes, Yunzhu Xie.

7    **Q.**    Which companies are associated with that individual?

8    **A.**    That would be YZX Trending LLC and Yunzhu Xie had YZX

9    Luxury LLC.

10   **Q.**    Now, did you interview individuals who sent money to

11   these companies and into their accounts?

12   **A.**    Yes, I did.

13   **Q.**    Based on those interviews, what did you do?

14   **A.**    There was -- typically, there was a pattern of the

15   individuals being involved in some type of a crypto scam; that

16   what they thought they were investing in was some type of a

17   cryptocurrency.  And I would presume if they were investing in

18   some type of cryptocurrency, I would need to speak to the actual

19   signer about --

20             MR. WENSTRUP:  Objection; speculation.

21             THE COURT:  Sustained.

22   BY MS. BEDELL:

23   **Q.**    The question is, what did you do after you conducted the

24   interviews?  What did you do with the information you learned

25   there?

*Campbell - Direct - Bedell*

1    **A.**    I typically would note the -- you're talking about the

2    victims that are sending the wires in?

3    **Q.**    Yes.

4    **A.**    When the victims would send the wire in, I would make a

5    report of that.  Some of these victims were our own victims, in

6    other words, Chase customers; and some of them were other banks'

7    victims.

8    **Q.**    Did you ever take action on the accounts that were

9    receiving the funds?

10   **A.**    Yes, I did.  I would restrict the activity on the

11   accounts.  I would restrict -- restrict the activity -- I would

12   restrict the online activity and restrict the account itself so

13   the funds couldn't be moved.

14   **Q.**    And what would trigger you to restrict the activity?

15   **A.**    Say it again.

16   **Q.**    What would trigger you to restrict the activity on the

17   accounts?

18   **A.**    The notification that there was fraud on the account; me

19   speaking with the victims in these scenarios.

20   **Q.**    Were there any other reasons that would trigger you to

21   restrict accounts?

22   **A.**    Yes.  Speaking with the account owner.  If I felt that

23   the information the account owner provided was not consistent

24   with what I believed to be the facts going on in the case, I

25   would restrict the funds, the theory being there to stop the

*Campbell - Direct - Bedell*

1   bleeding.  And we can always -- if I'm wrong, then we can

2   continue on with whatever legitimate payment they were making,

3   but at the time, it's important to stop the overflow of the

4   funds going overseas.

5   **Q.**     Did you ever receive requests from other banks to

6   restrict funds?

7   **A.**     Yes.

8   **Q.**     What are those requests called?  Perhaps, "restricting

9   funds" is not the correct -- did you ever receive requests from

10  other banks related to these accounts?

11  **A.**     Yeah.  They were more or less referrals.  It wouldn't be

12  proper for another bank to ask another bank to just outright

13  restrict them.  They would notify us of something that was going

14  on, and Chase would make our own determination about what was

15  going on in the accounts and restrict them if we felt the need

16  to.

17  **Q.**     And when you restrict an account, what does that mean?

18  **A.**     We stop the -- we place a restriction on the --

19  physically on the account.  So at the branch level, if the

20  person walks into the branch, that's the first thing that the

21  teller is going to see.

22          Same thing when they call in, that's typically the

23  first -- if the suspect were to call in, that's the first thing

24  that the call screener is going to see, is that the account is

25  restricted and that there's fraud involved.

*Campbell - Direct - Bedell*

```
1              I also restrict the online profile of the person so they

2       can't go online and neither see that account or make

3       transactions on that account.

4       Q.     So can the accountholder access the money in the account

5       if the account is restricted?

6       A.     No.

7       Q.     Can they make withdrawals?

8       A.     No.

9       Q.     Can they make transfers out of the account?

10      A.     No.

11      Q.     Can they receive additional funds into the account?

12      A.     Not typically.  There are situations.  Typically, it's an

13      ACH that will force its way into the account; but,

14      traditionally, that's the purpose of restricting it, is to

15      keep the -- to limit the inflow and the outflow of the funds,

16      but it is possible for an ACH to force its way in there just

17      because it can't go back; it just has to go forward.

18      Q.     Now, you mentioned that you would sometimes receive

19      notifications from other banks and you would make your own

20      assessment.  If you decided that there were a problem, what

21      would that look like?  What would you do?

22      A.     Early on, I developed the pattern that was going on in

23      these particular accounts.  And if -- as an example, if this was

24      a remodeling company, I would look at the -- I'm familiar with

25      what would normally go on in some type of construction account
```

1    or remodeling account or something that was along the lines of

2    some type of a construction company.  I'm familiar with what

3    those accounts would look like, and I would look at that account

4    and just, basically, ask myself is this common for what would

5    actually be taking place in one of those accounts.  And those

6    irregularities is what I'm looking for on the fraud side of

7    these because, typically, construction and remodeling businesses

8    take place through a certain pattern, and it's fairly evident to

9    look at the accounts and see that there's remodeling activity

10   taking place in the account or some type of a construction

11   account.

12   **Q.**    Would the bank ever return funds to the original bank,

13   the originating bank?

14   **A.**    Yes.  That's common practice.  If we believe the

15   previous -- or the remitter of the funds is an innocent victim

16   in these instances right here, we would try to get the funds

17   back, if possible.

18   **Q.**    Did you see overlap in the addresses used on the

19   accounts?

20   **A.**    Yes, extensively.

21   **Q.**    Did you investigate those addresses further?

22   **A.**    I did.

23   **Q.**    What did you learn?

24   **A.**    The addresses overlap consistently.  They were in the

25   East L.A. area.  Typically, individuals would open up businesses

*Campbell - Direct - Bedell*

1  at a certain address, and then that address would be a

2  residence, and none of those individuals would be living at that

3  address, and none of them would be associated with each other.

4  And that's one of the patterns that I looked for as far as the

5  address.

6  **Q.**    Did you see any overlap in devices accessing the

7  accounts?

8  **A.**    In the what?

9  **Q.**    In devices accessing the accounts online.

10 **A.**    Across -- within the signer.  So one signer can't

11 technically log in to the account of another business, but we

12 look at more than just the signer.  We look at the actual device

13 that's logging in and make recommendations based on that.  And I

14 didn't -- I don't think I saw a whole lot of overlap within the

15 device itself amongst all of the candidates.  Whenever one

16 signer would log in to one account and the one signer would log

17 in to another account, that's fairly common.

18 **Q.**    Were you ever able to observe anyone involved with these

19 business accounts that you were tracking?

20 **A.**    I did.  Whenever -- as part of the investigation,

21 whenever I would look up -- whenever I would see one of the

22 accounts, I would look up the actual branch transactions.  We

23 record video at all of the branches, and I would look up the

24 individual actually conducting the transaction and the branch

25 activity that was going on there.

*Campbell - Direct - Bedell*

1  **Q.**    Did you notice any patterns there?

2  **A.**    I did.  The individuals were oftentimes accompanied by

3  someone else with them; and there were times when that person

4  who was accompanying the secondary person would show up on other

5  accounts.  So I would see the signer on one account with this

6  other person, and then the signer on another account come into

7  another branch with that same secondary person.

8  **Q.**    So for that secondary person, how many people did you

9  notice serving in that role or observe serving in that role?

10  **A.**    In the secondary role, there were, I want to say, four or

11  five individuals that I noticed kept appearing over and over.

12  **Q.**    And how many people did you see serving in the account

13  signer role?

14  **A.**    In total?

15  **Q.**    Yes.

16  **A.**    Early on, there were approximately 30; 30 signers, I want

17  to say.

18  **Q.**    Could I ask you to take a look at Exhibits 16-18 and

19  16-19?

20       THE INTERPRETER:  Your Honor, is it possible to arrange

21  a monitor for the interpreter so she can see what's on the

22  screen?

23       THE COURT:  I would be happy to look into that at a

24  break.  I'm afraid we can't do that right at this moment.  If you

25  want to move so that you can see this monitor, that might be

Campbell - Direct - Bedell

1      helpful.

2                    MR. KAMENS:  Your Honor, we actually have books we can

3      show them.

4                    THE WITNESS:  What was the number?

5      BY MS. BEDELL:

6      Q.      16-18 and 16-19.

7      A.      Yes.

8      Q.      Do you recognize this individual?

9      A.      I do.

10     Q.      How?

11     A.      He was one of the secondary individuals that I would

12     observe entering the branch with the signers in this group.

13     Q.      Are these pictures, 16-18 and 16-19, fair and accurate

14     depictions of the individual?

15     A.      Yes, they are.  I actually took the 16-19 picture.

16                   MS. BEDELL:  Your Honor, we would move to admit and

17     publish 16-18 and 16-19.

18                   MR. WENSTRUP:  No objection.

19                   THE COURT:  It will be admitted without objection.  You

20     may publish both of them.

21                   (Government's Exhibit Nos. 16-18 and 16-19 received in

22     evidence.)

23                   (Exhibit published.)

24     BY MS. BEDELL:

25     Q.      During the course of your investigation, did you come to

1    learn this individual's name?

2    **A.**    I did.

3    **Q.**    What was his name?

4    **A.**    His last name was Wong, and his first name escapes me

5    right now.  But at the time that I was taking these photos, I

6    did not know a name for this individual.

7    **Q.**    And you said that you took the picture in 16-19.

8    Could we pull that one up?

9    What was the context in which you took this picture?

10    **A.**    He was actually in the branch conducting activity on one

11    of the accounts.  He was actually at a kiosk.

12    **Q.**    How did you take this picture, then?

13    **A.**    That is the kiosk looking back at him.  Whenever he's --

14    whenever you're typing in to the kiosk and you're poking the

15    thing and you're hitting the buttons, there's a camera that

16    looks right back at you.

17    **Q.**    We saw the name Hailong Zhu appear on your list of

18    companies and individuals; how did you come across that name in

19    your investigation?

20    **A.**    How did I across what now?

21    **Q.**    The name Hailong Zhu in your investigation.

22    **A.**    Hailong Zhu was the signer on the Sea Dragon accounts.

23    There were a couple of the accounts that I noted had the victim

24    wires coming in, the disbursement wires going out to known

25    suspects, and that El Molino address was consistent across

1    several -- it overlapped with several of the other businesses.

2    **Q.**    Could you take a look at Exhibit 11-1?

3         MS. BEDELL:  And we would ask to publish that, Your

4    Honor.

5         THE WITNESS:  What was the number?

6    BY MS. BEDELL:

7    **Q.**    11-1.

8         THE COURT:  You may publish it.

9         (Exhibit published.)

10   BY MS. BEDELL:

11   **Q.**    So taking a look, again, now at some of the documents

12   that JPMorgan Chase has provided.  What is this document, 11-1?

13   **A.**    This is a signature card for --

14   **Q.**    What is -- sorry.  What is a signature card?

15   **A.**    This is a signature card for Sea Dragon Trading LLC.

16   **Q.**    Generally, what is a signature card?  How does the bank

17   use these?

18   **A.**    The signature card, whenever you're opening the account,

19   this is where the bank identifies the signers who are going to

20   be doing activity on that account, and they ask for their

21   driver's license, their Social Security number.  If it's a

22   business, they ask for identification for the business, and they

23   note all of it on this document right here.  There's also,

24   typically, a signature from the signer himself.

25   **Q.**    What is the last four on the account that the signature

*Campbell - Direct - Bedell*

```
 1    card is for, the last four of the account number?
 2    A.    Wow.
 3    Q.    I know.
 4    A.    That's super small.
 5    Q.    Zoom in on that a little bit.
 6    A.    3886.
 7    Q.    3886, okay.
 8          And what is the address on the account?
 9    A.    1140 South El Molino in Alhambra, California.
10    Q.    And going down to the bottom of this page, who is the
11    signer on the account?
12    A.    Hailong Zhu.
13    Q.    What is the telephone number provided here?
14    A.    (626) 949-1546.
15    Q.    What is Zhu's title?
16    A.    Manager.
17    Q.    What is the date of this signature?
18    A.    9/9 of '22.
19    Q.    And going back to the middle of this form, what does it
20    say under "primary ID type"?
21    A.    "Website documentation."
22    Q.    And what does "primary ID type" refer to?
23    A.    Whenever you create an LLC or a corporation at the state
24    level, those are typically recorded with the county clerk's
25    office or the state when they're creating the actual business.
```

1   The bank looks back at the identification of those documents

2   that were creating -- that they were creating at the state and

3   the county level to make sure the name on the business is the

4   same as the name on the incorporation documents.

5   **Q.**    So that's what it's referring to when it says "website

6   documentation"?

7   **A.**    Yes.

8   **Q.**    And so the primary ID type is just referring to the

9   method used to verify?

10  **A.**    Correct.

11  **Q.**    And why does the bank verify the identity of the entity?

12  **A.**    So that we can confirm who's actually doing transactions

13  on this business account, the individual.

14  **Q.**    And why is it important for the bank to confirm that

15  individual?

16  **A.**    Number 1, so nobody else does activity on that account,

17  but that person is responsible for the activity on that account.

18  That individual is the signer on that business account.

19  **Q.**    And what does it say under "issuance date" on this card?

20  **A.**    It looks like 9/7 of '22.

21  **Q.**    And is that a pattern you saw with these accounts?

22  **A.**    Yes.  These are called "new accounts."  Basically, the

23  incorporation date is 9/7 of '22 for the business, and the

24  creation of these business accounts is usually soon thereafter.

25  It's called a "new account."

*Campbell - Direct - Bedell*

1   **Q.**    And is there an acknowledgment in the middle of the page?

2   **A.**    Yes, there is.

3   **Q.**    Can you read the sentence starting "the depositor

4   certifies"?

5   **A.**    You want me to start at the beginning?

6   **Q.**    No.  I think starting with "the depositor certifies,"

7   which is about in the middle of this paragraph.

8   **A.**    "The depositor certifies that the information provided to

9   the bank is true to the best of its knowledge and authorizes the

10  bank, at its discretion, to obtain credit reports on the

11  depositor.  The depositor acknowledges receipt" --

12  **Q.**    That's great.  Thank you.

13         Could we look at 11-6?  What is this document?

14  **A.**    This is a similar signature card.  This one is for Sea

15  Dragon Remodel Inc.

16  **Q.**    And what is the last four of the account number on this

17  card?

18  **A.**    5581.

19  **Q.**    And the address on this account?

20  **A.**    It is 4661 District Boulevard, Vernon, California.

21  **Q.**    Going down to the bottom, who is the signer on the

22  account?

23  **A.**    Hailong Zhu.

24  **Q.**    The telephone number provided?

25  **A.**    (626) 949-1546.

*Campbell - Direct - Bedell*

1    **Q.**    And is that, perhaps, 625?  I don't know if we can -- no,

2    you're right, it is 626.  Thank you.

3         And what is Zhu's title?

4    **A.**    President.

5    **Q.**    And what is the date of the signature?

6    **A.**    The date of the signature is 10/21 of '22.

7    **Q.**    And now going back to the middle under "primary ID type,"

8    what is the primary ID provided here?

9    **A.**    This is the certified articles of incorporation.

10   **Q.**    What is the issuance date on the ID?

11   **A.**    10/14 of '22.

12   **Q.**    And does this document have the same language about the

13   depositor certification, that the information provided is true?

14   **A.**    Yes, it does.

15   **Q.**    Okay.  Could we take a look at Exhibit 16-6?

16        MS. BEDELL:  And at this point, Your Honor, I would

17   like to read Stipulation No. 10.

18        THE COURT:  I assume there's no objection.  These

19   stipulations have all been agreed to, correct?

20        MR. WENSTRUP:  Correct, Your Honor.

21        THE COURT:  You may proceed.

22        MS. BEDELL:  "The United States and the defendant,

23   Hailong Zhu, stipulate and agree that the exhibits set forth

24   below are authentic, accurate copies of business records of

25   California Secretary of State that meet the requirements of

*Campbell - Direct - Bedell*

1   Federal Rules of Evidence 902(4), 902(11), and 803(6).  The

2   defendant reserves his right to object to admissibility on other

3   grounds."

4           The exhibits here are Government's Exhibits 16-6 and

5   16-7.  At this time, we would move to admit and publish 16-6 and

6   16-7.

7           THE COURT:  Any objection?

8           MR. WENSTRUP:  No, Your Honor.

9           THE COURT:  Admitted without objection.  You may

10  publish.

11          (Government's Exhibit Nos. 16-6 and 16-7 received in

12  evidence.)

13          (Exhibit published.)

14  BY MS. BEDELL:

15  **Q.**    This is 16-6.  So what is this document?

16  **A.**    16-6 appears to be the State of California's

17  incorporation documents.

18  **Q.**    And what is the company being incorporated here?

19  **A.**    Sea Dragon Remodel Inc.

20  **Q.**    Who is the agent and incorporator who has signed this

21  document?

22  **A.**    The agent's name is Hailong Zhu, and the incorporator's

23  signature is Hailong Zhu.

24  **Q.**    And what is the address on the document?

25  **A.**    4661 District Boulevard, Vernon, California.

*Campbell - Direct - Bedell*

1  **Q.**   Can you read this purpose statement?

2  **A.**   "The purpose of the corporation is to engage in any

3  lawful act or activity for which a corporation may be organized

4  under the General Corporation Law of California other than the

5  banking business, the trust company business, or the practice of

6  a profession permitted to be incorporated by the California

7  Corporations Code."

8  **Q.**   What is the date on the signature?

9  **A.**   10/14 of '22.

10  **Q.**   And what is on the second page of this exhibit?

11  **A.**   This appears to be the detailing of the actual officers

12  of the incorporation.

13  **Q.**   Who is the listed officer?

14  **A.**   Hailong Zhu.

15  **Q.**   And what roles does he hold?

16  **A.**   Chief executive officer, chief financial officer, and

17  secretary.

18  **Q.**   What does it say is the type of business?

19  **A.**   What does it say for what?

20  **Q.**   Is the type of the business.

21  **A.**   Remodel and distribution of construction material.

22  **Q.**   And whose signature is on page 3?

23  **A.**   Hailong Zhu.

24  **Q.**   Is the information about the type of business that a

25  company is engaged in relevant to the bank?

*Campbell - Direct - Bedell*

1   **A.**      Yes, absolutely.  That's the -- yes, it is.

2   **Q.**      How do you use that information?

3   **A.**      That information would be used for me to determine what

4   type of activity I should see whenever I look into the account.

5   I would expect to see remodeling type of business activities

6   taking place and transactional activity on the account.

7   **Q.**      If an individual tells JPMorgan that the purpose of the

8   business is to receive fraud proceeds, would JPMorgan open the

9   account?

10  **A.**      Can you say that again?

11  **Q.**      If an individual tells JPMorgan that the purpose of his

12  business is receive fraud proceeds, would JPMorgan open the

13  accounts?

14  **A.**      Absolutely not.

15  **Q.**      Now, what sort of accounts did Mr. Zhu open with

16  JPMorgan?

17  **A.**      They were checking accounts.  I believe he had two

18  checking accounts and one individual personal account.

19  **Q.**      And for those checking accounts, were those business

20  accounts, then?

21  **A.**      Yes, they were.

22  **Q.**      And are there specific types of -- specific account types

23  for -- excuse me.

24          Are there specific account types for companies that are

25  in the money transmitter business?

Campbell - Direct - Bedell

1    A.     Yes, there are.

2    Q.     And what is the difference between those accounts and a

3    retail account?

4    A.     These accounts here are common retail accounts.  If we

5    are going to -- if Chase is going to bank another MSB, another

6    financial institution, those are corporate accounts, and they're

7    much more closely monitored.

8           Those are commercial accounts versus what these are,

9    retail accounts.  These are common everyday business accounts

10   that you would think of.

11   Q.     We talked about checking entity verification at account

12   opening.  What other sort of checks does JPMorgan perform when

13   they're opening an account?

14   A.     We identify the individual.  Typically, there's at least

15   two types of ID that are required there.  They're required to

16   show the identification for the individual.  They're required to

17   show the identification for the business when they're opening

18   the business accounts.

19   Q.     Would the bank be looking at other reports of fraud that

20   might be associated with a customer when they're opening an

21   account?

22   A.     Yes.  We have -- in addition to certain credit reports,

23   we have, in our own internal systems, and we monitor

24   fraud-related activities and can report on these suspects or

25   individuals because we don't want to keep banking them over and

Campbell - Direct - Bedell

1    over again.

2    Q.    If a customer had previously been associated with fraud

3    reports, would JPMorgan open an account for them?

4    A.    No.

5    Q.    Could we take a look at Exhibit 11-3.  What is this

6    document?

7    A.    This is the monthly statement for Sea Dragon Trading.

8    Q.    And what is the last four of this account number?

9    A.    This is the account number ending in 3886 for the time

10   period September 9th through September 30th.

11   Q.    If we take a look at page 2, what's on page 2?

12   A.    This is a summary of the activity that took place on this

13   account during that time period.

14   Q.    And what was that time period here?

15   A.    September 9th through September 30th.

16   Q.    How would you characterize the account activity during

17   this period?

18   A.    I would say this is minimal activity.

19   Q.    What was the balance at the end of September?

20   A.    $100.

21   Q.    Could we take a look at page 3, please?  What is this --

22   what is being depicted here?

23   A.    This is the same 3886 account number for the next month.

24   Q.    So October of 2022?

25   A.    Correct, October 1, 2022, through October 31st of 2022.

Campbell - Direct - Bedell

1   **Q.**    What were the total deposits into the account in this

2   period?

3   **A.**    Total deposits were $429,775.

4   **Q.**    And what were the total electronic withdrawals from the

5   account?

6   **A.**    Electronic withdrawals were $417,000 even.

7   **Q.**    And on page 4, what is depicted on page 4?

8   **A.**    This is a summary of the transactions that took place on

9   that account during that time period.

10  **Q.**    And what appears in that top section of the page?

11  **A.**    That is the deposits, or the additions, to the account.

12  **Q.**    What is the date of the first transaction listed there?

13  **A.**    10/12 of '22.

14  **Q.**    What kind of transaction is this?

15  **A.**    This is a Fedwire.

16  **Q.**    And what does that mean?

17  **A.**    Say it again.

18  **Q.**    What does that mean?

19  **A.**    This is a wire -- an incoming wire transfer that takes

20  place from Bank of America into this JPMorgan Chase account

21  3886.

22  **Q.**    Who is this transaction from and for how much?

23  **A.**    It's from Marisol Mejia Chavez from a Bank of America

24  account, and the amount is 31,000 even.

25  **Q.**    Where does it say that Ms. Chavez is located or sending

───── *Campbell - Direct - Bedell* ─────

1   the money from?

2   **A.**      Appears to be California.

3   **Q.**      And what is the rest of the information communicated in

4   this entry?

5   **A.**      Say that again.

6   **Q.**      What is the rest of the information communicated in this

7   entry, at a general level?

8   **A.**      Generally, they're somewhat hard to read because each

9   bank does them differently, but this particular one is from Bank

10  of America.  It lists the remitter of the wire, which is the

11  person sending the wire, and it lists, typically, an amount in

12  several transactional items to be able to track these funds.

13  **Q.**      So is it fair to say that's internal routing information?

14  **A.**      Yes.

15  **Q.**      And what is the next entry on this?

16  **A.**      On 10/12, there is another $15,000 deposit, but it's not

17  a wire.

18  **Q.**      And can you describe the next additions into the account?

19  **A.**      On 10/18, there is $150,000 wire from Steven J. Hoffman

20  at Parkway Bank and Trust.

21  **Q.**      Where is he located or sending the money from?

22  **A.**      They're from Norridge, Illinois.

23  **Q.**      And the second transfer on 10/18, where did that one come

24  in from?

25  **A.**      That's an $80,000 incoming wire from Tai Man B Leung from

Campbell - Direct - Bedell

1   a Citibank account.

2   Q.     And can you determine what the location that it's coming

3   in from is?

4   A.     It's not readily apparent right there, but it's Citibank,

5   New York City is the incoming.

6   Q.     And then the transfer on 10/21, where did that come from?

7   A.     That comes from --

8   Q.     Excuse me.  What kind of transfer is that?

9   A.     That is an ACH transfer.

10  Q.     So that's different than a wire transfer?

11  A.     Correct.

12  Q.     And the first transaction on 10/24, where did that come

13  from and for how much?

14  A.     That was a $100,000 wire from Frank Caseiras in Ballston

15  Lake, New York, through Trustco Bank.

16  Q.     And is this second transaction on 10/24 also from New

17  York?

18  A.     Yes, it is.

19  Q.     Moving on to the withdrawals here, I would actually like

20  to start with the last one on 10/25, if we could pull up the

21  bottom portion of that page for the jury to see.

22         Could you describe, for the jury, this transfer?

23  A.     This is an outgoing wire.  It's a $152,000 outgoing wire

24  from the 3886 account to China Construction Bank in Hong Kong

25  for the beneficiary of O Diamonds Trading Limited in Kowloon,

1    Hong Kong.

2    **Q.**    And is this labeled as an international or a domestic

3    wire?

4    **A.**    This is an international wire.

5    **Q.**    Now, you had mentioned that you had seen a number of

6    transfers from these companies -- in this scheme headed to the

7    same companies.  Is this one of the companies you had seen?

8    **A.**    Yes, it is.  This is one of the overseas companies that I

9    would consistently see our suspects sending -- disbursing funds

10   to.

11   **Q.**    Now, can you look at the first withdrawal on 10/17 and

12   describe that one, please?

13   **A.**    This is a $40,000 outgoing wire to Mitsubishi UFJ Trust,

14   and this is a JPMC customer, Mitsubishi UFJ.

15   **Q.**    And was this wire executed in person or online?

16   **A.**    This was a branch wire.

17   **Q.**    And so that means in person at the branch?

18   **A.**    Correct.  There's two different ways to send them:  The

19   branch or online.

20   **Q.**    And how do you know that it was an in-person transaction?

21   **A.**    Number 1, it will say on there, typically, the branch --

22   that it's a branch transaction; and if it's an online

23   transaction, it will typically say the word "online," wired

24   online transfer.

25   **Q.**    So after it directs the money to Mitsubishi UFJ Trust and

—Campbell - Direct - Bedell—

1   Banking, what further directions are provided?

2   **A.**     There are comments on this wire that contain uncommon

3   things that I would see.  So there's numbers, the letters DBT,

4   and then FFC, and then more numbers, and the name OO Axis

5   Digital Limited.

6   **Q.**     Breaking that down a little bit, after NY Branch, what

7   does it say?

8   **A.**     It says "further credit."

9   **Q.**     And then -- and you can just read the last four of that

10   account number.

11   **A.**     I would later find out this is an actual account number

12   here, but it ends in 0328.

13   **Q.**     And then it says "DBT"; did you determine what DBT stands

14   for?

15   **A.**     That stands for Deltec Bank.

16   **Q.**     And did you investigate that account?

17   **A.**     I did.  That's Deltec Bank & Trust in the Bahamas.

18   **Q.**     And after -- and so what does that further credit

19   direction doing?

20   **A.**     It's pushing the -- what it has the effect of doing is

21   it's pushing the wire on further to Deltec Bank, to a customer

22   of Deltec Bank's in the Bahamas.

23   **Q.**     So if I'm understanding correctly, the money goes from

24   the present bank account to Mitsubishi and then to this 0328

25   Deltec account so far?

1   **A.**     Correct, and that's a very odd way of doing it, but

2   that's the effect of what it has.

3   **Q.**     And then after that DBT, what does it say after that?

4   **A.**     FFC, and then a number ending in 2179, and the letter --

5   and the name on that business, OO Axis Digital Limited.

6   **Q.**     What is happening there?

7   **A.**     That OO Axis Digital Limited is a customer of Deltec

8   Bank & Trust in the Bahamas, and the 2179 number is the Deltec

9   Bank account number for OO Axis Digital Limited.

10  **Q.**     So where did the money in this transfer ultimately end

11  up, according to these instructions?

12  **A.**     In the Bahamas.

13  **Q.**     And what is the label on this account about whether this

14  is a ---- or on this transaction about whether this is domestic

15  or international?

16  **A.**     Say that part again.

17  **Q.**     How is this labeled in terms of it being domestic or

18  international, this transfer?

19  **A.**     As you can see right there, this shows to be a domestic

20  wire.  Both of these show to be domestic wires, and this is not

21  a domestic wire.  These funds are not going domestically;

22  they're going to the Bahamas.

23  **Q.**     And when you say "both of these," are you referring to

24  the transaction on 10/20?

25  **A.**     Correct, the one right below it.

Campbell - Direct - Bedell

1    **Q.**    And that one follows a similar path?

2    **A.**    Yes.  There's two of them:  One for 40,000 and one for

3    $225,000; one on 10/17 and one on 10/20.

4    **Q.**    Again, when you talked about seeing money ending up at

5    similar locations, was this one of the consistent locations you

6    were seeing?

7    **A.**    Yes, it is.

8    **Q.**    Could we look at page 6 of this exhibit, please?  What is

9    this?

10   **A.**    This is the last page of the monthly account statement

11   for 3886.

12   **Q.**    And which month is this for?

13   **A.**    October.

14   **Q.**    I'm sorry, are you looking at page 6?

15   **A.**    Mine aren't numbered.

16   **Q.**    Sorry.  It should be the November page is what I'm

17   looking for.

18   **A.**    Is it November 1st through the 30th?

19   **Q.**    Correct.

20   **A.**    Yes.  This is the 3886 account for November 1st through

21   the 30th, again, for Sea Dragon Trading LLC.

22   **Q.**    And what activity do you see on the account this month?

23   **A.**    This is, again, minimal activity on this account.  The

24   ending balance was zero in it, actually.

25   **Q.**    And can you tell how -- what level of transactions -- I'm

*Campbell - Direct - Bedell*

1  not sure if there's another page -- but what the transactions

2  were here?

3  **A.**    I don't have a page after that.  If you have the next

4  page after that, I could see --

5  **Q.**    Could you describe what's happening in the other

6  withdrawals?

7  **A.**    There is a debit DDA, or a check charge, for $3,680.

8  **Q.**    And what does that signal to you?

9  **A.**    That is a -- anytime you see the check charge like that

10  in our statements, that's an indication that the account is

11  being closed and those funds are being pulled by the bank; that

12  3680 is being taken by the bank to do something with.  That

13  check charge means it's an internal transfer out of this

14  account.

15  **Q.**    Now, is the account activity that we looked at for this

16  account consistent with the activity you were seeing in other

17  accounts?

18  **A.**    Yes.

19  **Q.**    What, if anything, about this sort of account activity

20  stands out or stood out to you?

21  **A.**    It's a pattern of a flow of movement of funds.  There's

22  not any actual business taking place in the account.  Whenever

23  you look at a trading business or a remodel business or a

24  construction business, you can usually see business actually

25  occurring in those accounts, and that's not what's happening

1   here.  These funds are just flying right through the account;

2   they're coming in and they're immediately being transferred out.

3   Q.     When you say you can see business occurring, what do you

4   mean by that?

5   A.     Businesses typically occur -- they have a cost of goods

6   that you can see in the accounts.  If someone is doing

7   remodeling or construction, you will see credit card payments

8   going towards construction fees; employee payroll; insurance;

9   electricity; the product, whatever it is that they're selling;

10   and then you can see the sale of that product actually occurring

11   and then them getting paid for that.  You actually see the flow

12   of business taking place in the account.

13   Q.     I would like you to take a closer look at the wires that

14   we looked at, so if you could look at Exhibit 11-10.

15   A.     11-10?

16   Q.     Do you recognize this document?

17   A.     I do.  This is my notes for Hailong Zhu.

18   Q.     And what is the information at the top of this page?

19   A.     The top of this is the actual customer information where

20   I'm trying to break down the accounts that he's associated with.

21   It's a picture of his onboarding passport.  In these business

22   transactions, as part of the identification, one of the things

23   they do is take a photo of that passport; and I'm copying a

24   picture of it here.  The other picture is one of the branch

25   surveillance photos that I viewed.

Campbell - Direct - Bedell

1    Q.     And turning -- pulling back up to the information on the

2    two columns at the bottom of the page, what information is in

3    those columns?

4    A.     These are two of the wires.  This is one of the things

5    that I was making note of in this account.  On the left, that

6    wire is from -- although they're from the same account, the one

7    on the left is a true international wire where you see the funds

8    going out of this bank through corresponding accounts going to

9    Hong Kong.

10   Q.     Okay; and we'll walk through that.  So we can definitely

11   talk about this, but I just want to understand where do these

12   forms come from; who generates them?

13   A.     These are generated in the branch.  Whenever the person

14   is doing an in-branch wire, this is the form that the teller or

15   the branch person actually has pulled up in front of them as

16   they fill in the information, trying to conduct a wire for the

17   customer.

18   Q.     And who provides the information that is contained on the

19   form?

20   A.     The customer does.

21   Q.     And so looking at this first column, which is the one we

22   have pulled up here, what does it say under "recipient location

23   details"?

24   A.     Are you on the left wire?

25   Q.     Yes.  You can see the one we've zoomed in on; but, yes,

*Campbell - Direct - Bedell*

1    the one on the left.

2    **A.**    The one on the left, under "location details," you see

3    the country sending to says "Hong Kong."

4    **Q.**    And does it say anything about the customer being

5    present?

6    **A.**    Yes, it does, towards the bottom.  One of the things they

7    do in branches is identify -- they actually pull ID on the

8    customer and identify them to make sure that they're authorized

9    to send transactions on that account, and that's what that is

10   down at the bottom.

11   **Q.**    We'll get down to the bottom in a second.

12          Sticking with the recipient details now in the middle,

13   what is the recipient name here?

14   **A.**    O Diamonds Trading Limited.

15   **Q.**    And under "monetary details," what is the transfer date

16   and amount?

17   **A.**    10/25/22.

18   **Q.**    And the amount, please.

19   **A.**    $152,000 even.

20   **Q.**    And now looking at the "sender details," who is the

21   sender?

22   **A.**    The sender is Hailong Zhu.

23   **Q.**    And what is the last four of the phone number he

24   provided?

25   **A.**    The phone number of 1546.

*Campbell - Direct - Bedell*

1    **Q.**     And you said that the banks do verify identity in person.

2    What was provided as identity documents here?

3    **A.**     The ID type used was a state-issued ID, U.S. ID with

4    photo from Illinois, and it lists the ID number there.

5    **Q.**     And was there a secondary form of identification as well?

6    **A.**     Yes.  The Chase -- as a secondary form of ID, he used his

7    Chase debit card.

8    **Q.**     So now looking at that second column on the right of the

9    page now, what does it say under the recipient location details

10   here?

11   **A.**     U.S., United States.

12   **Q.**     And does it also say that the customer is present for

13   this one?

14   **A.**     Yes, it does, at the bottom.

15   **Q.**     Who is the receiving bank?

16   **A.**     The receiving bank is Chase.

17   **Q.**     And then the recipient's name?

18   **A.**     The recipient's name is Mitsubishi UFJ Trust and Banking.

19   **Q.**     Are there additional instructions provided?

20   **A.**     Yes, there are.

21   **Q.**     And are those the same instructions that we've looked at

22   on the last form?

23   **A.**     Correct, noting OO Axis Digital Limited.

24   **Q.**     And so is this having the same effect as sending these

25   funds to the Bahamas?

*Campbell - Direct - Bedell*

A.      Yes.

Q.      And can you read the question that is asked under those additional instructions?

A.      "Will the additional instructions provided result in this wire transfer being sent to an international bank or location?"

Q.      What answer is provided?

A.      "No."

Q.      Under "monetary details," what is the date?

A.      10/17 of '22.

Q.      What is the amount?

A.      40,000 even.

Q.      Under "sender details," what is the sender's name and the last four of the phone number?

A.      Hailong Zhu is the sender, and the last four of the phone number are 1546.

Q.      And how did they verify identity here?

A.      Through an Illinois driver's license.  It doesn't give the number there, but it was an Illinois driver's license with photo.

Q.      Now, did you review other wire forms of this nature that were associated with Mr. Zhu's Sea Dragon account for other transactions?

A.      I did, yes.

Q.      Did these other wire forms use consistent routing that we saw on the form on the right?

1    **A.**     They did, yes.

2    **Q.**     Did those other forms indicate that those were also

3    domestic wire transfers?

4    **A.**     They did.

5    **Q.**     And did the other forms also indicate that the additional

6    instructions would not result in money going overseas?

7    **A.**     That's correct.

8    **Q.**     Now, why does the bank ask what country money is being

9    transferred to?

10   **A.**     It's two-part.  The first would be whether or not it's

11   international, to begin with.  Anything -- an international wire

12   would be a higher fee; we would collect a higher fee for

13   actually doing that; and one of the reasons there's a higher fee

14   is because there's a much higher risk involved with overseas

15   banking institutions, and so we track the risk level of those

16   other countries and other banks.

17   **Q.**     Is there a risk grading within overseas as well?

18   **A.**     Yes.  Overseas countries and overseas banks are graded,

19   typically, in a low, medium, and a high risk fashion.

20   **Q.**     Where does the Bahamas fall in the risk?

21   **A.**     It's high risk.

22   **Q.**     What would the bank have done if they knew all this money

23   was going to the Bahamas?

24   **A.**     They would have generated further scrutiny on that wire.

25   It wouldn't have necessarily stopped one wire.  It could have,

━Campbell - Direct - Bedell━

1    but there's much more scrutiny involved with us reviewing the

2    type of activity that's going on in this account and these

3    overseas Bahamas wires.  First of all, we'd question why would a

4    remodel company be sending funds to the Bahamas.

5    **Q.**    If the review had revealed multiple wires, numerous

6    wires, going overseas, what would the bank have done with that

7    information?

8    **A.**    They would have restricted that account and exited that

9    customer relationship.

10   **Q.**    Is Hong Kong a high-risk jurisdiction?

11   **A.**    I'm not sure.  I'm not sure.

12   **Q.**    Could we look at Exhibit 11-4?  Do you have that up?

13   What is this document?  And I think you might have to look at

14   the second page.

15   **A.**    This is a very small document.  This is our internal

16   system identifying -- this is our internal bank notes where we

17   identify what's going on with the account and where the funds

18   are to be held or disbursed related to that suspension.

19   **Q.**    So what is the account status here or purpose, perhaps?

20   **A.**    They're suspended; the funds are actually suspended.

21   **Q.**    And what does that mean?

22   **A.**    These are -- what's actually occurring right there when

23   it says "suspend funds" is it's moving the funds out of the 3886

24   account number and moving them into an internal account that we

25   control and the customer does not control.

*Campbell - Direct - Bedell*

1   **Q.**     And so what is the difference between restricting and

2   suspending funds?

3   **A.**     Suspending is much more permanent.  They both have the

4   same effect.  The customer can't access the funds, but putting

5   them into a suspense account like that allows us to actually

6   exit the customer and exit the relationship entirely.

7   **Q.**     So if an account is restricted, a customer could get the

8   account unrestricted and gain access to the money again?

9   **A.**     Correct.  They commonly -- suspects will enter a branch

10  and try to unrestrict -- try to talk the branch manager out of

11  removing the restriction, for example; and that's one of the

12  things this suspense does, is it moves it out of the purview of

13  anyone being able to undo that restriction.

14          THE COURT:  Ms. Bedell, let me stop you there just

15  because we're closing in on three o'clock and I told the jury we

16  would take a break right around there.  Is this a natural

17  place to break?

18          MS. BEDELL:  I have a few more questions on this

19  document, but after that would be a natural place to stop.

20          THE COURT:  All right.  Finish up this topic and then

21  we'll take our break.

22  BY MS. BEDELL:

23  **Q.**     So according to this document, why was this account

24  restricted?

25  **A.**     It says, "The customer is a wrongdoer."

Campbell - Direct - Bedell

1   **Q.**   And what was the date that the account was restricted?

2   **A.**   11/1 of '22.

3   **Q.**   Now, how much money had passed through the account

4   between when it was opened on September 9th and before it was

5   restricted on November 1st?

6   **A.**   How much money total?

7   **Q.**   Approximately.

8   **A.**   I would have to go back and look at the accounts, but I

9   think it was 400-and-something thousand.

10  **Q.**   And how do you account for the delay in shutting the

11  account down?

12  **A.**   Again, the account can be restricted prior to the funds

13  actually being suspended.  I know that's a play on -- it's a

14  semantic word right there, but whenever the account is

15  restricted, the customer can't access it.  Whenever the account

16  is suspended, we're actually pulling funds out, preparing for

17  something else to happen; usually, the closing of the account.

18  **Q.**   And a fair bit of money had passed through the account

19  before the bank was able to do that; and why did that happen?

20  Why did it take that long?

21  **A.**   Typically, we don't notice -- we don't know that

22  something's going to happen until it actually happens in the

23  banking world; and that's what happened right here, is once we

24  developed enough of the activity to view it as suspicious and

25  not something that we wanted to be a part of, then that's when

1   we backed out, but it typically takes time to see that pattern.

2          MS. BEDELL:  Your Honor, that concludes my questions on

3   this document, so this would be a good time for a break.

4          THE COURT:  Very good.

5          Ladies and gentlemen of the jury, we'll take a 10- to

6   15-minute break to stretch our legs and gear up for the final

7   part of the afternoon.  I'll ask you again to heed my admonition

8   not to discuss the case with each other or with anyone else, not

9   to engage in any independent research.  Just take the time to

10  relax, and we will resume somewhere between 3:15 and 3:20.

11         (Jury out at 3:04 p.m.)

12         THE COURT:  Mr. Campbell, you may step down from the

13  jury box.  You remain under oath and subject to the rule on

14  witnesses.  You may not discuss your testimony, and you'll be

15  back here so we can start promptly at 3:15 when we'll resume

16  direct examination.  You may step down at this time.

17         (Whereupon, the witness exits the stand.)

18         THE WITNESS:  Thank you.

19         THE COURT:  Is there anything we need to address before

20  we take our brief recess?  Ms. Bedell, can you give any forecast

21  as to how much longer you think for the direct examination?

22         MS. BEDELL:  I have six more pages, Your Honor.  I

23  would estimate, maybe, another 30 minutes.

24         THE COURT:  All right.  Well, let's try and start right

25  at 3:15, then, so we can promptly move forward.

*Campbell - Direct - Bedell*

1          (Whereupon, a recess in the proceedings occurred from

2   3:05 p.m. until 3:18 p.m.)

3          (Whereupon, the witness takes the stand.)

4          THE COURT:  You may bring in the jury.

5          Mr. Campbell, you remain under oath.

6          (Jury in at 3:18 p.m.)

7          THE COURT:  Let me confirm, ladies and gentlemen, that

8   you were able to follow my instructions and did not discuss the

9   case or engage in any independent research during the break.

10         I see you-all nodding your heads.

11         We will resume with the direct examination of

12  Mr. Campbell at this time.  You may proceed, Ms. Bedell.

13  BY MS. BEDELL:

14  **Q.**    Can we look at 11-2?

15  **A.**    11-2?

16  **Q.**    11-2.  What is this document?  And it may be helpful to

17  look at the second page.

18  **A.**    This is more of my notes.  Specifically, the first page

19  is Coat, the online admin printout of the activities for that

20  particular user.

21  **Q.**    Could we turn to the second page?  And what is the user

22  ID that you were looking at here?

23  **A.**    The user ID is hailong1983.

24  **Q.**    What was the email address for this user?

25  **A.**    Zhuhailong923@gmail.com.

1    **Q.**      The name of the user?

2    **A.**      Hailong Zhu.

3    **Q.**      The date of birth?

4    **A.**      9/23 of 1983.

5    **Q.**      And the last four of the phone number?

6    **A.**      Phone number 1546.

7    **Q.**      And then scrolling down, what is the date that appears

8    under the heading "combined events"?

9    **A.**      Say that again.

10   **Q.**      What data is being portrayed here in this sort of massive

11   data under "combined events"?

12   **A.**      This is the underlying activity.  Whenever the customer

13   logs in using their user ID and password, this is the

14   communications that take place between their device and JPMorgan

15   Chase servers.

16   **Q.**      So just a few details here.  What is the date on this top

17   entry?

18   **A.**      The top entry is 11/23 of '22.

19   **Q.**      What is the event that you recorded?

20   **A.**      This is a failed mobile device login from an iPhone.

21   **Q.**      Why was the login attempt denied?

22   **A.**      Say that again.

23   **Q.**      Why was the login attempt denied?

24   **A.**      "Fraud language" is the status.  Typically, whenever

25   there's "fraud language" on the profile, they restrict -- or

1   when the profile is restricted, there's language of fraud in

2   there.  They want to make a point of delineating that as that

3   being a fraud account versus being a victim account.

4   Q.    What is the name of the device that was used to try to

5   access the account?

6   A.    HailongiPhone.

7   Q.    And did you see that device being used to access the

8   account throughout the account's history?

9   A.    I did.

10  Q.    And did you look at this kind of data in the course of

11  your investigations of accounts?

12  A.    I did.  That's one of the things that I look for is the

13  device name.  There's several other instances that I look at to

14  see if this is the actual customer doing this activity online.

15  Q.    And so what about the device name is relevant to you, or

16  what are you looking for?

17  A.    That's his name.  HailongiPhone, that comes from -- on

18  your iPhone, whenever you change the name of it, that's what

19  actually shows up.  That's the way it presents itself to our

20  servers; and in that instance, it's Hailong's name.

21  Q.    And so to you, it suggested activity consistent with what

22  you would expect to see in this account?

23  A.    Yes.

24  Q.    And did you investigate whether this hailongiPhone had

25  been used to access other accounts?

1   **A.**     I did, yes.

2   **Q.**     What did you learn?

3   **A.**     There were the two business accounts and the personal

4   account, but there were no external other accounts that I found.

5   **Q.**     Could we look at Exhibit 11-7?  And what is this

6   document?

7   **A.**     This is a similar document.  This is the online activity

8   taking place between this device and Chase servers for the

9   username seadragon0923.

10  **Q.**     And had the -- did the -- did the hailongiPhone appear in

11  these records as well?

12  **A.**     Yes, it did.

13  **Q.**     And was this -- I'll leave it at that.  Sorry.

14          Exhibit 11-8, what is this document?

15          (Exhibit published.)

16          THE WITNESS:  This is the monthly statement for account

17  ending 5581 for October 21st through October 31st.

18  BY MS. BEDELL:

19  **Q.**     What is the date of the statement on this first page --

20  I'm sorry.

21          How many deposits were made into this account in this

22  time period?

23  **A.**     There were two additions to this account.

24  **Q.**     How much was the first deposit?

25  **A.**     The first deposit was $2,000.

*Campbell - Direct - Bedell*

1  **Q.**    And was that an account open deposit?

2  **A.**    Yes, it was.

3  **Q.**    What was the date of the second deposit?

4  **A.**    The second deposit was dated 10/26 for 45,000 even.

5  **Q.**    And where did that money come from?

6  **A.**    Shang Chen, Bank of America.  This is an incoming wire

7  for $45,000 from Shang D Chen in New York through Bank of

8  America -- their Bank of America account.

9  **Q.**    And is there a purpose provided for this transaction?

10 **A.**    Yes, there is.  It says "goods."

11 **Q.**    And how do you use the information provided in this

12 "purpose" field in your work?

13 **A.**    Typically, I would compare what's being noted in that

14 comments field there, that OBI field, to see if it's consistent

15 with what I would expect to see in that account.

16 **Q.**    And if the customer wrote down that they were sending

17 money to invest in crypto, would that be something you would

18 look for?

19 **A.**    Yes, absolutely.

20 **Q.**    And what would that signal to you?

21 **A.**    In this particular group, that was one of the

22 consistencies that I noticed on the incoming victim wires.  I

23 would see them reference some type of a cryptocurrency or an

24 investment or something like that.

25 **Q.**    And what would you do when you saw that information?

Campbell - Direct - Bedell

1    **A.**    That's a good indication to look at it further from

2    there.  That's -- typically, by the time I see that, I've

3    invested some amount of time actually looking into the account

4    and looking into the signers, but I would see the crypto account

5    and probably reach out to the other -- to the remitter; in this

6    instance, presumably, the victim.

7    **Q.**    Would you take a "purpose" information like that into

8    account when deciding whether to restrict or close the account?

9    **A.**    Yes, I would.

10   **Q.**    What information appears here under "withdrawals"?

11   **A.**    There's a 10/31, $15,000 outgoing wire.

12   **Q.**    And does this wire look similar to the other ones that we

13   had looked at that went to Deltec in the Bahamas?

14   **A.**    Yes.  This one actually spells out "for further credit

15   to."

16   **Q.**    And, then, what is the ending account for this

17   transaction?

18   **A.**    The ending -- I'm sorry, the ending date?

19   **Q.**    The last account that it ends up -- the money ends up in?

20   **A.**    It ends in 1924-GATL, looks like the abbreviation there.

21   **Q.**    And is that one of the accounts that you saw receiving

22   significant transfers?

23   **A.**    Yes, that and an iteration of it, GAT, and sometimes GAL;

24   but that same 1924 Deltec Bank account number, I would see it

25   consistently across the suspect accounts as one of the outgoing

1   disbursements.

2   **Q.**    Could you take a look at page 3?  What is this page?

3   **A.**    Looks like the first page of the November statement for

4   the 5581 account.

5   **Q.**    What were the total of deposits and additions into the

6   account?

7   **A.**    The deposits and additions were $472,700, and the

8   withdrawals were $450,000 even.

9   **Q.**    And if you could take a look at page 4, could you

10  identify some of the states that these transactions were coming

11  in from?

12  **A.**    Say that again.

13  **Q.**    Could you identify some of the states that these

14  transactions -- these income deposits and additions were coming

15  from?

16  **A.**    On 11/12, there's a $30,000 wire from New York.  On --

17  I'm sorry -- on 11/2.  On 11/2, there's an additional $20,000

18  wire from New Jersey.  On 11/3, there's a $20,000 wire from

19  California.  On 11/3, there's an $11,200 incoming wire from

20  Texas.  On 11/4, there's a $10,000 wire from Lafayette,

21  Louisiana.  On 11/7, there's a $100,000 wire from a Chase

22  customer in California.

23  **Q.**    That one says "book transfer"; what does that mean?

24  **A.**    That indicates that this is a Chase-to-Chase transfer

25  here, although the customer in that instance is attempting to

*Campbell - Direct - Bedell*

1    send a wire.  What ends up happening -- what the effect of it

2    happening is it comes Chase to Chase, so there's no sense in

3    sending an external wire just to bounce back, so we just send it

4    Chase to Chase.

5    **Q.**     And that's what book wire [*sic*] refers to there?

6    **A.**     That book transfer is on our books from Chase to Chase.

7    **Q.**     And what is the date of the last transaction reflected on

8    this page?

9    **A.**     11/15.

10   **Q.**     And why were there no further transactions in this

11   account?

12   **A.**     I don't know.

13   **Q.**     Could you take a look at page 5, please?

14   **A.**     Is that the withdrawals page?

15   **Q.**     The withdrawals page, yes.  Could you just summarize,

16   generally, what we're seeing here?

17   **A.**     These are the outgoing disbursement wires that I spoke

18   about.  There's a 50,000, a 50,000, a 160,000, a 90,000 a

19   50,000, and another 50,000 all between 11/3 and 11/14 going to

20   the GATL account at Deltec Bank.

21   **Q.**     Could we take a look at Exhibit 11-9?  Do you recognize

22   this type of document?

23   **A.**     I recognize this form, yes.

24   **Q.**     And what is it?

25   **A.**     This is the -- this is the notification that we've

1    restricted -- this is a notification to our customer that we've

2    restricted that particular account.

3    **Q.**    And do you see, in the center of the page, where the

4    letter directs the accountholder to call the bank?

5    **A.**    Mm-hmm.

6    **Q.**    What is the purpose of that?

7    **A.**    If they have questions about the activity that's taking

8    place, they typically will call that 1-800 number to get a

9    response from us as to why, typically.

10   **Q.**    Do the banks do identity verification when the

11   accountholder calls in?

12   **A.**    Yes, we do.

13   **Q.**    Why do you do that?

14   **A.**    To make sure that the person we're speaking to is

15   actually the account signer on the account.

16   **Q.**    And is the bank willing to speak to anyone who is not the

17   account signer?

18   **A.**    No.

19   **Q.**    What if there are English language issues?

20   **A.**    Typically, if there are language issues, if the customer

21   provides a person, I'll ask to speak to the customer directly

22   because we don't want there to be a third party involved without

23   the customer knowing about it.  Once I speak to the customer --

24   and most of the time even though there's a language barrier, we

25   can work through the verification of an identity of who that

*Campbell - Direct - Bedell*

1   person is -- they know their card number, they know their date

2   of birth, things like that -- so we can work through the

3   verifications even with a language barrier; but oftentimes in

4   the communications back and forth, if they need a translator,

5   we'll allow a translator to be on the line, but not without

6   verifying it through the customer first.

7   **Q.**   What would the bank do if it determined it was not

8   speaking to someone authorized on the account?

9   **A.**   We would not speak to someone -- we wouldn't give

10  information about the specifics of that account.  We would tell

11  them that this is a third party; we're not allowed to give

12  information to a third party in this instance.

13  **Q.**   And are accountholders ever told that they have to go to

14  the bank to verify transactions in person?

15  **A.**   That's common when we can't identify a person through

16  phone channels.  When you're speaking to someone, it's a lot

17  more difficult to identify who's on the other side, but it is if

18  someone is actually standing in the branch.  And a lot of times,

19  we can have a hard ID in the branch, whereas on the phone,

20  you're limited to the questions you can ask and get answers to.

21  **Q.**   Did you ever speak with Mr. Zhu?

22  **A.**   I believe I did.  He came into -- I believe he came into

23  one of the branches and was speaking to one of the branch

24  personnel, and the branch personnel reached out to me.  And I

25  think we attempted a conversation, but there was a language

1    barrier that I didn't feel comfortable with, and we weren't able

2    to actually carry on any conversation about the account.

3    **Q.**    Did the branch banker in that instance speak Chinese?

4    **A.**    No.

5    **Q.**    Do you have branch bankers who do speak Chinese?

6    **A.**    Yes.  We have many of them, actually.  There just wasn't

7    one at that branch at that time.

8    **Q.**    And why were you interested in speaking with Mr. Zhu?

9    **A.**    I wanted to get his side of the story of what was

10   actually going on on the accounts.  I wanted to ask him about

11   the transactional activity, the incoming wires, where he thought

12   those wires were coming from; and the outgoing wires, where he

13   intended to send those funds to because there was a question

14   about the format of those wires that was not normal, and I

15   needed to speak with him about the outgoing wires in that

16   account.

17   **Q.**    When you are having these sorts of calls -- you've

18   mentioned this a little bit -- what are you trying to learn in

19   these calls?

20   **A.**    I'm typically trying to find out what the purpose of the

21   transactions are.  I can see the transactional activity actually

22   in the account.  When I'm speaking to the person, I'm trying to

23   get them to explain what that transactional activity represents:

24   Are they actually doing remodeling work?  Are they doing

25   construction work?  If they're doing trade, what kind of trade

1    is actually taking place?  What is the purpose of the financial

2    transaction?

3    **Q.**    And are there instances where the information provided

4    checks out?

5    **A.**    Yes.

6    **Q.**    And what happens in that situation?

7    **A.**    If the account's restricted, I typically will unrestrict

8    the account.  That's one of the purposes of having the

9    restriction in place prior to just booting the account to begin

10   with.  You restrict it, and then ask the questions, make a

11   determination on what's actually taking place, and then act on

12   that determination.

13   **Q.**    Now, if an account ends up being closed, what happens to

14   the money in the account?

15   **A.**    Depends on what the reason for the closure was.  If

16   there's law enforcement involvement, typically, law enforcement

17   will issue a seizure warrant for those funds.  There can be

18   civil litigation involved.  The actual transactions that came

19   into that account could pull back at any given time; in other

20   words, the incoming wires could have a wire return or the

21   incoming ACHs could have an ACH return; and that's what we would

22   use those funds for, is to return them to the victims.

23   **Q.**    And why does JPMorgan investigate these frauds,

24   generally?

25   **A.**    Generally, what we're trying to do is -- there's actually

Campbell - Cross - Wenstrup

1   three things we're trying to actually do right there.  The first

2   is to protect the bank, to make sure that we're not at a loss in

3   any of the activity that's taking place right there, whether

4   that be a financial loss or a reputational loss.

5        The second one is to make sure that our customers aren't

6   taking any type of a loss scenario right there on these scams we

7   try to limit as much as we can on the scams.

8        And the third is to actually protect the U.S. financial

9   system.  We're a regulated financial entity, and what we're

10  trying to do is protect the U.S. financial system from being

11  used as a conduit for crimes.

12        MS. BEDELL:  Court's indulgence, Your Honor.

13        (Whereupon, there was a brief pause in the

14  proceedings.)

15        MS. BEDELL:  We have no further questions.

16        THE COURT:  Thank you very much.

17        Cross-examination, Mr. Wenstrup?

18                    CROSS-EXAMINATION

19  BY MR. WENSTRUP:

20  **Q.**    Good afternoon, sir.

21  **A.**    Good afternoon.

22  **Q.**    You are not aware of any loans made by Chase to victims

23  in this cryptocurrency conspiracy, correct?

24  **A.**    I don't believe in this instance.  I have run into them

25  before on the other victims, but I don't believe in this

1    particular set of victims -- I don't believe there were loans

2    involved.  It's common for them to take out a loan.

3    **Q.**    But in this instance, Chase didn't make any loans to any

4    of the victims?

5    **A.**    Correct.

6    **Q.**    And when you were talking about when Chase is trying to

7    detect fraud, that is to protect the financial system, correct?

8    **A.**    Yes.

9    **Q.**    And to protect Chase against any loss?

10   **A.**    Yes.

11   **Q.**    And also to protect its customers?

12   **A.**    Yes.

13   **Q.**    And when -- as a result, Chase tries to detect when fraud

14   conspiracies place criminal proceeds into a Chase account?

15   **A.**    Correct, yes.

16   **Q.**    And, again, that's because Chase wants to stop fraudulent

17   activity?

18   **A.**    Yes.

19   **Q.**    But when a fraud conspiracy places criminal proceeds into

20   a Chase account, at that point, Chase does not lose any money

21   when they place criminal proceeds into a Chase account, correct?

22   **A.**    That's correct, yes; financially, yes.

23   **Q.**    There's no financial loss?

24   **A.**    Correct.

25   **Q.**    You said -- I think you said that Hailong was a signer,

1  correct?

2  **A.**     Yes.

3  **Q.**     And that means that his name was the one on the account?

4  **A.**     Yes.

5  **Q.**     And I think you testified that there were at least 30

6  signers in this scheme?  You might have --

7  **A.**     Originally, it started off with about 20 to 30 signers.

8  **Q.**     And at some point, you identified more?

9  **A.**     Yes, far more.

10 **Q.**     And how many signers do you think you ended up counting

11 by the end of the conspiracy?

12 **A.**     Total?

13 **Q.**     Mm-hmm.

14 **A.**     Probably somewhere around 80 signers.

15 **Q.**     Hailong was one of about 80 people whose names were used

16 on these accounts?

17 **A.**     Correct, yes.

18 **Q.**     And you mentioned that you identified about four or five

19 organizers of those 80 signers, correct?

20 **A.**     It's a secondary person who's conducting activity with

21 them in the branch.

22 **Q.**     And I thought you mentioned that they were organizers,

23 but you are calling them "secondary persons"?

24 **A.**     Correct.  I don't believe I called them "organizers," but

25 they're a secondary person who's with them in the branch.

*Campbell - Cross - Wenstrup*

1    That's the four or the five people that I think that you're

2    talking about.

3    **Q.**    Okay.  And so there are four or five people; they would

4    accompany the signers to the branches?

5    **A.**    Yes.

6    **Q.**    And based on your investigation, those secondary people

7    are often giving the signers instructions, correct?

8    **A.**    Correct, yes.

9    **Q.**    They're instructing them what -- where they need to be

10   transferring money?

11   **A.**    I can't hear the conversation that's taking place.  I can

12   see it and I can observe it in the branch, but I can't hear the

13   conversation that's taking place.

14   **Q.**    Fair enough.  But based on your investigation, it appears

15   that the secondary person is giving instructions to the signers?

16   **A.**    They are speaking with the signers, yes.

17   **Q.**    And you reviewed -- in your review of video surveillance,

18   you've never seen Joseph Wong speak to a teller by himself,

19   correct?

20   **A.**    I've seen him speak to a teller with a signer in the

21   branch, but if Joseph Wong attempted to speak to a teller, I

22   don't think the teller would -- again, that's a third party --

23   so I don't believe the teller would conduct activity with that

24   third party.

25   **Q.**    And that's because Joseph Wong did not have a Chase

Campbell - Cross - Wenstrup

1  account in his name, correct?

2  **A.**     I believe Joseph Wong did have Chase accounts, yes.

3  **Q.**     He did have Chase accounts in his name?

4  **A.**     I believe he did.  There wasn't a whole lot of activity

5  in them, but he was a Chase customer, I believe, yes.

6  **Q.**     Okay.  So you described a lot of incoming activity to the

7  Sea Dragon accounts, correct?

8  **A.**     Mm-hmm, yes.

9  **Q.**     And there's several ways that a Chase customer could

10 become aware of the activity in their account, correct?

11 **A.**     Yes.

12 **Q.**     And one way that a customer can become aware of the

13 activity in their account is the traditional physical account

14 statement, correct?

15 **A.**     Yes.

16 **Q.**     And for physical account statements, those are mailed to

17 customers through the United States Postal Service?

18 **A.**     Yes, they are.

19 **Q.**     And those are mailed to the address on file?

20 **A.**     Yes.

21 **Q.**     And in these fraud schemes, multiple businesses are often

22 using the same address, correct?

23 **A.**     Correct.

24 **Q.**     And as you've testified, the address typically has

25 nothing to do with the accountholder, correct?

*Campbell - Cross - Wenstrup*

1    **A.**     In my experience, the address holder -- I'm sorry -- the

2    address has not been directly related to that account signer.

3    There was nothing externally that I could find associating

4    that address with the actual individual, the account signer.

5    **Q.**     So in your experience, the address typically has nothing

6    to do with the account signer?

7    **A.**     I'm not going to say it has nothing to do with it

8    because, again, these are new accounts.  Typically, this list of

9    suspects, these were new to the country also, and so they

10   wouldn't have a whole lot of addresses to historically look back

11   on.

12   **Q.**     In your experience, typically, the account addresses have

13   little to do with the account signer; not nothing, but not a lot

14   to do --

15   **A.**     Correct.

16   **Q.**     -- not a lot of connection with the account signer?

17   **A.**     Yes.

18   **Q.**     So it's certainly possible that the accountholder is not

19   receiving this paper statement at home, correct?

20   **A.**     That is possible, yes.

21   **Q.**     And if that was the case, then they wouldn't be seeing

22   these paper statements of the account activity?

23   **A.**     The paper accounts, yes, correct.

24   **Q.**     And another way customers could become aware of the

25   activity on their account is through accessing that account

1   online, correct?

2   **A.**     Yes.

3   **Q.**     And that can be done with either a phone or a computer?

4   **A.**     Correct, yes.

5   **Q.**     And you mentioned that the device used to access the Sea

6   Dragon accounts was called Hailong phone [*sic*]?

7   **A.**     Mm-hmm.

8   **Q.**     And you also alluded to the fact that just because it's

9   called Hailong phone, that doesn't necessarily mean that it is

10  Hailong Zhu's phone, correct?

11  **A.**     Correct.

12  **Q.**     It's possible for someone to add a name to a device

13  completely irrespective of the owner of that device, correct?

14  **A.**     Is that possible?

15  **Q.**     Yes.

16  **A.**     Yes, that's possible.

17  **Q.**     And if someone had the login information for an account,

18  that person would be able to access the account online, correct?

19  **A.**     The one that holds the iPhone?

20  **Q.**     On any account, if someone has the banking login

21  information, then that person would be able to access the

22  account statements online, correct?

23  **A.**     No.  There's far more than just the username and the

24  password that's used to identify the person logging on.

25  **Q.**     So what steps would need to be taken, then?

Campbell - Cross - Wenstrup

1    **A.**    An example would be the device name or something that's

2    historically showed up on that account.  There are -- there's

3    dozens of proprietor security measures that we take beyond just

4    the username and the password to confirm that that person is the

5    actual signer on that account when they log on online.

6    **Q.**    So if the person has the username and the password, but

7    they're on an unrecognized device, what's the next step of

8    security?

9    **A.**    That device will not be allowed on, and it will activate

10    what's called an "activation code," and we will send either an

11    SMS or an email to the known information on file saying, Is this

12    you trying to log in?  And they confirm either "yes" or "no" by

13    replying with the activation code that was sent.

14    **Q.**    And I imagine that's happened to all of us?

15    **A.**    Constantly.

16    **Q.**    And if the person trying to log in is in possession of

17    the phone and the phone number that is connected to the device,

18    then they would be the ones receiving the access code, correct?

19    **A.**    That is correct, yes.

20    **Q.**    And then they would be able to put in the correct access

21    code?

22    **A.**    That's correct, yes.

23    **Q.**    And then they would be able to access the account?

24    **A.**    That's correct, yes.

25    **Q.**    And so if the accountholder does not -- is not the one

*Campbell - Cross - Wenstrup*

1    who has online access to the account, if he doesn't have the

2    online login information, then that accountholder would not be

3    able to go online and see the banking activity in their account?

4    **A.**      Typically, that online account, or that online access, is

5    set up while they're in the branch opening the account to begin

6    with, so when they open up the account, usually, the first thing

7    people want to do is set up their online access, and that's one

8    of the first things they do is set up the online access right

9    there.  They do the username; the activation code gets sent; and

10   they create the user profile right there while they're in the

11   branch, immediately.

12   **Q.**      And if someone wrote down the login information and gave

13   it to another individual and no longer had it, that person, if

14   they didn't seek to access the account, wouldn't be able to

15   access the account online?

16   **A.**      Correct, yes.

17   **Q.**      So just to confirm, if the physical statements are not

18   going to someone's home address and that person also is not in

19   possession of the online login information, he might not have

20   any idea about the activity going on in his account?

21   **A.**      Are we speaking generally or about this --

22   **Q.**      We're speaking generally.

23   **A.**      Generally, I would say yes.  That's probably -- if not

24   seeking that information out, then yes.

25   **Q.**      That's possible?

*Campbell - Cross - Wenstrup*

1   **A.**      Yeah, that's possible, yes.

2   **Q.**      In your investigation, you identified that there was one

3   phone being used to access Hailong's Chase accounts, correct?

4   **A.**      Correct.

5   **Q.**      And the phone accessing his accounts was only accessing

6   accounts in his name, correct?

7   **A.**      Are you talking about the Hailong iPhone?

8   **Q.**      Yes.

9   **A.**      Correct, yes.

10  **Q.**      Now, based on your experience, that is a sign of a more

11  sophisticated fraud, using only one phone for accounts in one

12  name?

13  **A.**      That is -- yes, I would say that's a more sophisticated

14  fraud.  The frauds that I typically see that aren't that

15  sophisticated, they would log in using a device to user A, and

16  then they would log out of user A and log back into user B, and

17  then log out of that one and log back in to user C, but they

18  would do it with the same device.

19  **Q.**      That's easier for fraud investigators to see that this

20  person is accessing multiple devices?

21  **A.**      Correct.  That's a typical fraud that has account

22  compromises.  That's typically how they would actually do that.

23  **Q.**      And so if someone is using a one-name-per-one-phone

24  fraud, it's fair to say that suggests a more sophisticated

25  fraudster?

*Campbell - Cross - Wenstrup*

1    **A.**     I would say that's a very sophisticated fraudster, yes.

2    **Q.**     And so a person working a one-name-per-one-phone fraud,

3    as an investigator, you might look for that person to possess

4    multiple phones?

5    **A.**     Yes.

6    **Q.**     And as an investigator, you might look for, potentially,

7    one phone for every name the fraudster was using to open

8    accounts?

9    **A.**     Would I look for that?

10   **Q.**     Yes.

11   **A.**     Yes.  Absolutely, yes.

12   **Q.**     For example, if an individual is running accounts in

13   eight different names, he might have eight different phones?

14   **A.**     Not typically.  I would typically --

15   **Q.**     I'm sorry.  For this sophisticated fraudster, that

16   operation might mean that he is running eight different

17   people -- accounts in eight different people's names, he might

18   have eight separate corresponding phones?

19   **A.**     Correct, yes.

20   **Q.**     And a fraudster in this type of scam might have multiple

21   SIM cards to assist in running the scam?

22   **A.**     Yes.  We --

23          MS. BEDELL:  Objection, Your Honor.  I don't know that

24   Mr. Campbell would actually know what the fraudster's phone

25   situation is on the other end of the line.

1          THE COURT:  If he doesn't know the answer, he can say

2     so.  Objection overruled.

3          THE WITNESS:  From what Chase sees on our side,

4     typically, the swapping of SIMs in a phone changes a whole lot

5     more than just the actual phone.  Now you've got two things:

6     You've got the SIM and the phone that could show up differently

7     in the accounts.

8     BY MR. WENSTRUP:

9     Q.    So the SIM -- having different SIM cards would actually

10    provide a fraudster greater flexibility on how he's accessing

11    different accounts?

12    A.    I would think so, yes.

13    Q.    You had flagged certain transfers in the Sea Dragon

14    accounts, correct?

15    A.    Yes.

16    Q.    And part of the reason that you were flagging certain

17    transfers was because of the entities involved, correct?

18    A.    Correct.  The -- because of both entities involved.

19    Q.    On both ends?

20    A.    Incoming and outgoing.

21    Q.    And, in terms of outgoing, you testified about accounts

22    for an entity called, I think -- was it one called Diamonds

23    Trading?

24    A.    O Diamonds Trading.

25    Q.    And you also testified about an entity called Mitsubishi,

1    correct?

2    **A.**     Mitsubishi is actually a large bank that's -- Mitsubishi

3    UFJ, it's the largest bank in Japan.

4    **Q.**     Did anyone at -- and these were destinations for some of

5    the transfers from the Sea Dragon accounts?

6    **A.**     The ultimate destination, yes.

7    **Q.**     Did anyone at Chase ever ask Hailong if he knew what

8    Mitsubishi was?

9    **A.**     I don't believe I spoke to him about that.  I have spoken

10   to other suspects about that.

11   **Q.**     But I'm just talking about Hailong.

12   **A.**     No.

13   **Q.**     So, to your knowledge, no one at Chase has ever asked him

14   if he knew what Mitsubishi was, correct?

15   **A.**     Correct.

16   **Q.**     And, to your knowledge, no one has ever asked him if he

17   knew where Mitsubishi was, correct?

18   **A.**     Correct.

19   **Q.**     And, to your knowledge, no one at Chase ever asked him if

20   he knew what O Diamonds Trading company was, correct?

21   **A.**     Correct.  Yeah, presumably.

22   **Q.**     Just to your knowledge, are you aware that -- whether

23   anyone ever asked him if he knew what O Diamonds Trading company

24   was?

25   **A.**     I don't know of anyone, but he is sending wires there, so

*Campbell - Cross - Wenstrup*

1    I presume he has some knowledge of who he's sending wires to.

2    Q.    Right, but that's a presumption, and I'm just asking if

3    you know if anyone's asked him about that.

4    A.    No, not that I know of.

5    Q.    You were walking us through some of the wiring forms; and

6    on those forms, it was asking whether wires are domestic or

7    international, correct?

8    A.    Mm-hmm.

9    Q.    The form that we saw was in English, correct?

10   A.    Yes.

11   Q.    You, as part of your investigation, reviewed video

12   surveillance of Hailong in Chase branches, correct?

13   A.    I did, yes.

14   Q.    And you reviewed surveillance video from more than one

15   visit to Chase, correct?

16   A.    Yes.

17   Q.    And so on multiple instances, there was a second man with

18   Hailong, correct?

19   A.    I only recall one instance that he was actually alone in

20   the branch.  The rest of the time, he had someone with him.

21   Q.    So there was one time where he was alone, but every other

22   time, he was with someone else?

23   A.    Correct.

24   Q.    Do you know about how many other times you saw him?

25   A.    There weren't very many because there weren't very many

*Campbell - Cross - Wenstrup*

1    in-branch transactions to begin with.  He was never with anyone

2    other than Wong either in those branches.  I could go to the

3    branch video and find them if they were there; but, again, there

4    weren't that many in-branch transactions to begin with.

5    **Q.**    Okay.  And so on all but one occasion where you saw video

6    surveillance of Hailong in a Chase Bank, Wong was there with

7    him, correct?

8    **A.**    Correct.

9           MR. WENSTRUP:  I'm going to ask if the government could

10   publish Exhibit 10-10.

11          (Exhibit published.)

12   BY MR. WENSTRUP:

13   **Q.**    I just ask you to look at the image on the top right.

14   **A.**    Mm-hmm.

15   **Q.**    That's an image of Wong with Hailong at a Chase branch,

16   correct?

17   **A.**    Correct.

18   **Q.**    And is that at a kiosk, an ATM, a counter?  What are we

19   looking at?

20   **A.**    Where the camera is actually sitting is a kiosk -- it's a

21   large screen kiosk -- but directly behind them is a branch

22   teller at a desk there.

23   **Q.**    And so in terms of -- in terms of -- so when they're --

24   when Wong is coming with Hailong to a Chase branch, he's not

25   waiting in the car, correct?

1    **A.**     Wong?

2    **Q.**     Yes.

3    **A.**     No, he was not waiting in the car.

4    **Q.**     He didn't just drop Hailong outside, correct?

5    **A.**     Correct.

6    **Q.**     So this -- Mr. Wong would come into the branch with

7    Hailong, correct?

8    **A.**     They both came in together, yes.

9    **Q.**     And he would wait in line with Hailong, correct?

10   **A.**     Yes.  I don't think there was a large -- if there was one

11   person ahead of them -- there wasn't a line there, but they

12   were --

13   **Q.**     Chase moves through people quickly.

14   **A.**     Not that many people in that branch at that time.

15   **Q.**     So when we're looking at this image of the two of them at

16   the kiosk, Wong isn't waiting back behind Hailong, correct?

17   **A.**     Not in that picture, no.

18   **Q.**     He's right up there at the -- apparently, interacting

19   with the screen, correct?

20   **A.**     Correct.  He's interacting with Hailong.  Hailong is

21   actually touching the buttons on the screen.

22   **Q.**     But Hailong is doing that during the course of a

23   conversation with Wong, correct?

24   **A.**     Correct, yes.

25   **Q.**     And so in all of the video surveillance you have seen

Campbell - Cross - Wenstrup

1    with Wong and Hailong in Chase branches, you've never seen Wong

2    hand over his own identification documents to a teller, correct?

3    **A.**     That's correct.

4    **Q.**     And in all those times you've seen Wong with Hailong in a

5    Chase branch, you've never seen Wong hand over his own bank

6    cards to the teller, correct?

7    **A.**     Seen Wong do that?

8    **Q.**     Correct.

9    **A.**     Correct, yes.

10   **Q.**     It's always Hailong?

11   **A.**     Correct.  The bank would not accept a transfer from -- I

12   mean would not accept the identity from -- the identification

13   from Wong.  Wong is not a signer.

14   **Q.**     I'm just asking if you've ever seen Wong hand over his

15   own --

16   **A.**     Correct.  No, I did not.

17   **Q.**     And you're familiar with what a money mule is, correct?

18   **A.**     Yes, I am.

19   **Q.**     And what a mule herder is?

20   **A.**     Yes.

21   **Q.**     And a money mule is someone used by fraudsters to move

22   money closer to where they can access it or where they can get

23   access in their accounts, correct?

24   **A.**     Yes.

25   **Q.**     And often when a money mule goes to a bank, they're

1   accompanied by someone called a mule herder, correct?

2   **A.**      Typically, yes.  I have seen that before, yes.

3   **Q.**      And you can look for that relationship by watching -- or

4   you can look for an indicator of that money mule/mule herder

5   relationship by watching surveillance of a money mule in a bank?

6   **A.**      It usually takes more than one, but I typically can

7   discern that by watching the video over and over.

8   **Q.**      And, again, that's because the mule herder is someone who

9   accompanies them to the bank, correct?

10  **A.**      Yes.

11  **Q.**      And the mule herder typically doesn't approach the teller

12  themselves, correct?

13  **A.**      Correct.

14  **Q.**      They wait in the background, correct?

15  **A.**      Yes.

16  **Q.**      And then they both come and leave with the person who you

17  identify as a money mule?

18  **A.**      Yes.  They --

19  **Q.**      They enter and exit the bank with the money mule?

20  **A.**      Sometimes there's a delay, but they typically come in

21  with them, yes.

22  **Q.**      And money mules are not necessarily told what the scheme

23  is, correct?

24  **A.**      I don't know what they're told.

25  **Q.**      Okay.  Well, Chase has warnings explaining the danger of

1    becoming targeted to be a money mule, correct?

2    **A.**    I believe there's -- I believe Chase has that online, and

3    I believe several law enforcements actually put that information

4    out.

5    **Q.**    Right.  And Chase warns that, quote, Unfortunately,

6    criminals prey on those in need or who are too naive to

7    understand the seriousness of their choice.

8         That's the kind of warning Chase would put online,

9    correct?

10   **A.**    I don't know word for word if that's what it says.  I

11   don't know.

12   **Q.**    Does that sound like the kind of wording Chase would put

13   about being the money mule?

14   **A.**    I'm going to go say probably, but again, I don't know

15   specifically what we've put online in regard to that.

16   **Q.**    Are you familiar with a Chase warning that says, The most

17   insidious part of the scam is how it incriminates the victim?

18        Are you familiar with that Chase warning?

19   **A.**    Again, not -- the language is -- I'm not familiar with

20   that language specifically.

21   **Q.**    But Chase does give warnings to that effect?

22   **A.**    Yes, they do.

23   **Q.**    Okay.  And those warnings are basically that people will

24   prey on people who are naive to become money mules; that's the

25   kind of a warning Chase gives?

1  **A.**    Correct, yes.  That's a general warning that I believe we

2  have.  There are several of those out there.  I'm just not

3  familiar with the exact verbiage of it.

4  **Q.**    No problem at all.

5        MR. WENSTRUP:  Court's indulgence just for a sec.

6        (Whereupon, there was a brief pause in the

7  proceedings.)

8        MR. WENSTRUP:  Nothing further, Your Honor.

9        THE COURT:  Thank you very much.

10       Any redirect, Ms. Bedell?

11                    REDIRECT EXAMINATION

12  BY MS. BEDELL:

13  **Q.**    Mr. Wenstrup asked about loans.  Does Chase make loans

14  for cryptocurrency investments, to your knowledge?

15  **A.**    No.  Absolutely, they do not.

16  **Q.**    And why not?

17  **A.**    That's a very risky investment for them to be -- for us

18  to be loaning a customer funds -- to actually invest on that.

19  We do make personal loans for all kinds of things, but for

20  cryptocurrency investments specifically -- actually, investments

21  specifically would be not something that would take place in a

22  retail account.

23  **Q.**    If Chase was aware that someone wanted to take out a loan

24  for the purpose of investing in crypto, Chase would not complete

25  that transaction?

1          MR. WENSTRUP:  Objection, Your Honor, as to relevance.

2     Chase hasn't made any loans.

3          THE COURT:  Overruled.  It's within the scope of

4     redirect.

5          THE COURT REPORTER:  I'm sorry.  Was there an answer?

6          THE WITNESS:  Can you ask it again?

7     BY MS. BEDELL:

8     Q.    So if Chase -- if someone came to Chase and wanted to

9     take out a loan to invest in cryptocurrency, Chase would not

10    make that loan?

11    A.    Correct.  And we have done that in this instance right

12    here.  People have attempted to take out loans for something

13    they found online that was the latest and greatest

14    cryptocurrency that they were trying to invest in, and they

15    absolutely would stop them from doing that.

16    Q.    Mr. Wenstrup asked about being aware of account activity,

17    and we had looked at a couple of different transfers that were

18    made in person.  So, for example, we looked at a transfer on

19    10/25 for 152,000 to O Diamonds that was made in person.  So if

20    someone came in to make a transfer -- if Mr. Zhu had come in to

21    make that transfer, and the account didn't have that money in

22    it, would the teller notify Mr. Zhu?

23    A.    Yes.  They would not have the funds available to be able

24    to send the wire to begin with.

25    Q.    We also looked at a transfer on 10/17 for $40,000 -- that

*Campbell - Redirect - Bedell*

1    one went to Axis Digital, and it was also done in person -- if

2    the funds weren't in the account, would the teller notify

3    Mr. Zhu?

4    **A.**    Yes, they would.

5    **Q.**    Do tellers share the general account balances at that

6    time or just notify if there are insufficient funds?

7    **A.**    I'm not sure what they would tell them about the current

8    account balance, but they would notify that there was

9    insufficient funds to actually complete this wire form here.

10   **Q.**    And so the fact that he wasn't notified means that there

11   were sufficient funds in the account to complete the wire?

12   **A.**    There were, yes.

13   **Q.**    And, finally, you mentioned that you spoke with Mr. Zhu.

14   Do you recall -- were you able to observe him during that

15   conversation?

16   **A.**    I did.  One of the first things that happened when the

17   branch manager reached out to me is I pulled up the live video

18   feed to be able to see who was actually conducting the

19   transaction with her in the branch, and I pulled it up and

20   watched it live as I was speaking to him on the phone.

21   **Q.**    Do you recall if there was anyone with him on that

22   occasion?

23   **A.**    I did not see anyone with him.

24        MS. BEDELL:  No further questions, Your Honor.

25        THE COURT:  Thank you.

*Proceedings*

1          You may step down, Mr. Campbell.

2          Is Mr. Campbell released as a witness at this time?

3          MS. BEDELL:  Yes, Your Honor.

4          THE COURT:  So you're free to go.

5          (Whereupon, the witness takes the stand.)

6          THE COURT:  You may call your next witness.

7          MS. SCHWARTZ:  The government calls Ms. Chavez.

8          And, Your Honor, I will advise the Court that

9  Ms. Chavez will be testifying with the assistance of a Spanish

10  interpreter, if the Court will allow it.

11          THE COURT:  All right.  Of course.

12          Do we need to make room for a new set of interpreters

13  in addition to the interpreters we already have?

14          MS. BEDELL:  Your Honor, I believe that the Spanish

15  interpreter can just stand next to the witness stand.

16          THE COURT:  All right.  I just want to make sure that

17  the court reporter can hear and take down everything, so let's

18  make sure we have a mechanism for doing so.

19          First, let's have you sworn in as an interpreter.  Can

20  you please state your name?

21          THE INTERPRETER:  Ronnie Rodriguez.

22     (RONNIE RODRIGUEZ, INTERPRETER IN THE CASE, SWORN)

23          THE COURT:  Now let's swear in the witness.

24     (MARISOL MEJIA, ON BEHALF OF THE GOVERNMENT, SWORN)

25          (Whereupon, the witness takes the stand.)

*Mejia - Direct - Schwartz*

1          THE COURT:  And I just want to make sure that, Madam

2    Interpreter, you speak in a way to allow our other set of

3    interpreters to hear because we have multiple languages being

4    translated today.

5          THE INTERPRETER:  I'll try and speak loud.

6          MR. KAMENS:  Your Honor, we had also discussed a

7    limiting instruction for testimony distinguished from the bank

8    loan testimony if the Court wants to proceed with respect to this

9    witness.

10         THE COURT:  Well, let's take the testimony first, and

11   then we can address whether or not that's appropriate.

12         You may proceed.

13         MS. SCHWARTZ:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15   BY MS. SCHWARTZ:

16   **Q.**    Please state your name and spell it for the record.

17   **A.**    Marisol Mejia, M-A-R-I-S-O-L  M-E-J-I-A.

18   **Q.**    Where are you from?

19   **A.**    Mexico.

20   **Q.**    And where do you live now?

21   **A.**    In California.

22   **Q.**    How long have you lived there?

23   **A.**    A little over nine years.

24   **Q.**    What do you do for a living?

25   **A.**    I sell furniture on internet.

*Mejia - Direct - Schwartz*

1    **Q.**    I'd like to turn now to the events of this case.  Did at

2    some point last year you begin having discussions with someone

3    regarding cryptocurrency investments?

4    **A.**    Yes.

5    **Q.**    Approximately when did these conversations begin?

6    **A.**    Exactly August 25th of last year.

7    **Q.**    And how do you remember exactly when you started having

8    conversations?

9    **A.**    Because it's the day of my birthday.

10   **Q.**    Where did you meet this person?

11   **A.**    I met him through a dating app on Facebook.

12   **Q.**    What did this person tell you his name was?

13   **A.**    He said his name was Daniel.

14   **Q.**    How old did he say he was?

15   **A.**    Thirty-six.

16   **Q.**    How did you communicate with him?

17   **A.**    At the beginning, it was through the app, then we started

18   talking through WhatsApp and through Telegram.

19   **Q.**    Did you only text through those apps, or did you have

20   phone calls as well?

21   **A.**    Only through messages.

22   **Q.**    And what was the nature of your relationship with Daniel?

23   **A.**    It was a love-like relationship.

24   **Q.**    It was a romantic relationship?

25   **A.**    Yes.

*Mejia - Direct - Schwartz*

1   **Q.**   What sort of things did you talk about at the beginning?

2   **A.**   At the beginning, our projects, our lives, our interests.

3   **Q.**   How frequently were you chatting with him?

4   **A.**   Every day.

5   **Q.**   How many times per day would you say you were chatting?

6   **A.**   Almost all day.

7   **Q.**   And where did he say he lived?

8   **A.**   He said he lived in Long Beach, California.

9   **Q.**   What did he say he did for a living?

10  **A.**   He said he sold clothes through internet, and then he

11  also invested in Bitcoin.

12  **Q.**   And you mentioned that he said he invested in Bitcoin.

13  Is that how cryptocurrency came up originally?

14  **A.**   Yes.

15  **Q.**   Approximately when did he bring up cryptocurrency for the

16  first time?

17  **A.**   Talked about it since we began to talk.

18  **Q.**   Were you familiar with cryptocurrency before this?

19  **A.**   Yes.

20  **Q.**   And how were you familiar with it?

21  **A.**   I didn't know much about the crypto; just what I heard on

22  the news and what people talked about.

23  **Q.**   Had you invested in crypto before starting to speak with

24  Daniel?

25  **A.**   No.

*Mejia - Direct - Schwartz*

1   **Q.**    Originally, when he suggested investing, were you

2   comfortable with it?

3   **A.**    No.

4   **Q.**    And what guidance did he give you to make you more

5   comfortable?

6   **A.**    I was about to buy a house at the time, and so he told me

7   that this would help me get more money so that I could buy the

8   house.

9   **Q.**    So did you eventually make an investment?

10   **A.**    Yes.

11   **Q.**    And how did you make your first investment?

12   **A.**    The first investment I did through the crypto

13   application.

14   **Q.**    And do you remember the name of the crypto application,

15   the original one?

16   **A.**    I think the name is Cryptocurrency.

17   **Q.**    And how did you know to invest on that website?

18   **A.**    Daniel told me step by step what I was supposed to do.

19   He told me it was a safe investment, that I could check through

20   internet, and that's when I decided to invest.

21   **Q.**    How much did you invest, about, in your first investment?

22        THE INTERPRETER:  Can you repeat that?

23   BY MS. SCHWARTZ:

24   **Q.**    About how much did you invest in your first investment?

25   **A.**    I'm not exactly sure, but I think the first investment

1    was 1,500.

2    **Q.**    I would now like to show you what's been premarked as

3    Government's Exhibits 3-2 and 3-3, with the assistance of the

4    court security officer.  Do you recognize these exhibits?

5    **A.**    Yes.

6    **Q.**    Starting with 3-2, what is it?

7    **A.**    That's when Daniel was talking to me about the

8    investment, and he told me to begin with a little.

9    **Q.**    And so these are your chats with Daniel; is that fair to

10   say?

11   **A.**    Yes, those are my WhatsApp messages with Daniel.

12   **Q.**    And directing your attention to Exhibit 3-3, what are

13   these?

14   **A.**    These are the Telegram messages with Daniel.

15   **Q.**    And are these chats fair and accurate representations of

16   excerpts of the chats you had with Daniel on both WhatsApp and

17   Telegram?

18   **A.**    Yes.

19          MS. SCHWARTZ:  The government moves to admit 3-2

20   through 3-3.

21          MR. KAMENS:  No objection.

22          THE COURT:  It will be admitted without objection.

23          (Government's Exhibit Nos. 3-2 and 3-3 received in

24   evidence.)

25   BY MS. SCHWARTZ:

Mejia - Direct - Schwartz

1    **Q.**    Directing your attention to Exhibit 3-2, the first

2    page --

3              MS. SCHWARTZ:  If we could publish as well.

4              (Exhibit published.)

5    BY MS. SCHWARTZ:

6    **Q.**    -- do you remember about when these messages were sent?

7    **A.**    They must have been September, first days in September.

8    **Q.**    And what is happening in this first set of messages?

9    **A.**    Daniel told me that before any investment, he was going

10   to analyze it, he was going to check it, and that everything was

11   very safe.

12   **Q.**    And what is he saying in the last message on this page?

13   **A.**    He said that it was something very safe, that that's why

14   he was sharing with me, that he was not going to take the risk,

15   and that's why I could do the investment.

16   **Q.**    After you made your initial investment using the

17   cryptocurrency website, did you continue to make investments

18   into cryptocurrency?

19   **A.**    I made the first investment in crypto; and once I had

20   done that investment, Daniel suggested that I download another

21   application called Gamma, and then he made me follow step by

22   step, and then all my money was transferred to Gamma.

23   **Q.**    And turning to page 2 of this exhibit, was this him

24   sending you the Gamma website?

25   **A.**    Yes.

*Mejia - Direct - Schwartz*

1    **Q.**    What happened when you visited the Gamma website?

2    **A.**    I opened my profile, and he told me what steps to follow;

3    and then, without realizing, all my money had been transferred

4    to this application.

5    **Q.**    So step by step, he gave you instructions to transfer

6    what you had invested in crypto.com to Gamma; is that right?

7    **A.**    Yes.

8    **Q.**    And directing you to page 3 of this exhibit, what is

9    happening in the beginning portion of this conversation?

10   **A.**    He said that he had invested here, and the first time he

11   invested, he had asked for a loan from the bank.

12   **Q.**    And why was he suggesting getting a loan?

13          MR. KAMENS:  Objection.

14          MS. SCHWARTZ:  Sorry.  Let me rephrase, Your Honor.

15          THE COURT:  You may.

16   BY MS. SCHWARTZ:

17   **Q.**    Did he recommend you continue to invest money after you

18   made your first investment?

19   **A.**    Yes.  After my first investment, he wanted me to invest

20   more money into this platform, and I said no.

21   **Q.**    Why did you say no?

22   **A.**    Because I was in the process of buying my house, and I

23   needed the money quickly, and he said that there would be no

24   problem, that I would be able to get it within three months.

25   **Q.**    And so what did he suggest you do to meet that amount of

*Mejia - Direct - Schwartz*

1   money that you needed to invest?

2   **A.**     At this point when I tried to get my money out -- which,

3   by this time, it was about 5 or $6,000 -- I was no longer able

4   to do it; and what he wanted me to do was invest more so that I

5   could take my money out.

6   **Q.**     And how did he suggest you find the money to invest more?

7   **A.**     He wanted me to get a loan from the bank.

8   **Q.**     And is that what's happening in the last message -- or

9   the second to the last message of this exhibit -- I'm sorry --

10  the first message of this exhibit?

11  **A.**     In the first message?

12  **Q.**     Sorry.  In the first message of this page of the exhibit.

13  **A.**     That's where he was telling me that he had asked for a

14  loan from the bank, and that was the suggestion that he was

15  making to me so that I could continue investing.

16  **Q.**     You mentioned you had tried to withdraw money.  What

17  happened when you tried to withdraw?

18  **A.**     When I tried to withdraw the first 5 or $6,000 that I had

19  there, I wasn't able to do it.

20  **Q.**     Did you tell Daniel you weren't able to withdraw?

21  **A.**     Yes.

22  **Q.**     What did he say?

23  **A.**     That he didn't know what had happened; that had never

24  happened to him; and that it must have been some kind of rule

25  from the platform that he didn't know.

*Mejia - Direct - Schwartz*

1  **Q.**     So what did he suggest you do next?

2  **A.**     So the platform was requesting that I invest another

3  25,000.  The minimum I had to have in the account was 30,000 in

4  order to withdraw, and so he suggested that I invest that money.

5  **Q.**     And how did you know you had to invest an extra 25,000?

6  **A.**     Well, he said that -- since I wasn't being able to

7  withdraw, I should call customer service from the platform, and

8  they were the ones who told me the minimum amount I had to have

9  in the account was 30,000 in order to withdraw.

10  **Q.**     So in addition to communicating with Daniel, you were

11  also communicating directly with the platform; is that right?

12  **A.**     Yes.

13  **Q.**     Directing your attention to Government's 3-3, page 1, who

14  is Liv in these chats?

15  **A.**     That was Daniel's account in Telegram.

16  **Q.**     And who is the individual sending the message in the

17  white bubbles?

18  **A.**     That was Daniel.

19  **Q.**     And in the green?

20  **A.**     That's me.

21  **Q.**     What is happening in this first message here?

22  **A.**     That's when I told him that I wasn't being able to

23  withdraw my money, the first 5 or 6,000 that I invested.  He

24  told me he didn't know what was happening.

25  **Q.**     In this middle part of the message, is that a screenshot

*Mejia - Direct - Schwartz*

1    you sent to him from the platform?

2    **A.**    Yes.

3    **Q.**    And what did Daniel say in response to this?

4    **A.**    I told him I wasn't being able to withdraw my money.  He

5    said that these were rules of the platform; that because of the

6    money laundering issue, they had a whole bunch of rules, and

7    that I had to follow them.

8    **Q.**    Turning your attention to this same exhibit, next page,

9    did you ask him if he knew this would happen?

10   **A.**    Yes, and he said he didn't know.

11   **Q.**    I'm sorry, he said --

12           THE INTERPRETER:  He said he didn't know.

13   BY MS. SCHWARTZ:

14   **Q.**    And so what did he suggest that you do?

15   **A.**    He said I should pay the rest so that I could withdraw my

16   money.

17   **Q.**    And how did he suggest that you pay the rest of the

18   money?

19   **A.**    He said I should go to the bank and make a transfer

20   through my account.

21   **Q.**    And did you go to the bank and make a transfer through

22   your account?

23   **A.**    Yes.

24   **Q.**    And how much did you transfer?

25   **A.**    At this point?

*Mejia - Direct - Schwartz*

1    **Q.**      Yes.

2    **A.**      25.

3    **Q.**      At the bottom of this message, did he suggest that you

4    use your bank account to transfer the money?

5    **A.**      At the beginning, he said I should use my account and

6    that I should transfer the money through the E-account, and I

7    tried but I couldn't.

8    **Q.**      So what did you do after you couldn't do it online?

9    **A.**      So, initially, he wanted me to invest the money in crypto

10   and then transfer it from crypto to Gamma, and that was not

11   possible.  So I had to go to the bank and make the deposit from

12   my bank to Gamma, the transfer.

13   **Q.**      And did he say why he thought it was better to do it

14   through your bank account?

15   **A.**      My bank would not allow me to do that transfer.  So since

16   we weren't able to do the transfer, he suggested that I speak to

17   customer service and have customer service give me an account

18   number, and then be able to do that transfer through this

19   account number that customer service would give me.

20   **Q.**      And so Gamma customer service gave you an account number

21   to send the funds to?

22   **A.**      Yes.

23   **Q.**      And is that the number you provided your bank?

24   **A.**      Yes.

25   **Q.**      So did you end up being able to wire the money from your

*Mejia - Direct - Schwartz*

1    bank to that account?

2    **A.**    Yes.

3    **Q.**    Turning your attention to page 3 of this exhibit, what

4    happened after you made that transfer, that wire transfer in

5    your bank?

6    **A.**    After I made the transfer, presumably, once I had the

7    30,000, I would be able to make the withdrawal.  And I consulted

8    with customer service, but I was rejected.  They rejected the

9    withdrawal.

10   **Q.**    And what happened when they told you you could not make a

11   withdrawal?

12   **A.**    Customer service was now asking for $50,000 more in order

13   to make the withdrawal.

14   **Q.**    Did you tell Daniel?

15   **A.**    Yes.

16   **Q.**    And what did he say?

17   **A.**    He said that I should make the deposit; that those were

18   rules of the platform; and once I made that deposit, then I

19   would really be able to withdraw my money.

20   **Q.**    And in the middle of page 4 here, what is he

21   suggesting -- how is he suggesting you make that transfer?

22          THE INTERPRETER:  You said page 4?

23          MS. SCHWARTZ:  Yes.  The page we're on, middle of the

24   page -- I'm sorry, page 3.  My apologies.

25   /////

*Mejia - Direct - Schwartz*

1  BY MS. SCHWARTZ:

2  **Q.**     In the middle of the page on page 3, how is he suggesting

3  you make that transfer?

4  **A.**     At this point, I hadn't yet made that initial transfer.

5  **Q.**     Oh, this is before the 30,000?

6  **A.**     Yes.

7  **Q.**     So is this message him instructing you to go to the bank

8  and do the wire in person?  Is that right?

9  **A.**     Yeah.  At this point where he was telling me, still, to

10  make it through crypto and I wasn't able to, so later on is when

11  he told me to go and do it directly to Gamma.

12  **Q.**     Now turning to page 4, in the middle of this page, is

13  this where you were telling him that customer service had told

14  you to send an extra $50,000?

15  **A.**     Yes.

16  **Q.**     And did you send him your chat messages with customer

17  service?

18  **A.**     Yes.

19  **Q.**     Turning to page 5, did Daniel ever offer to loan you

20  money or help with the investments?

21  **A.**     Yes.

22  **Q.**     And in the top of this page, what are you talking about?

23  What's the conversation?

24  **A.**     He wanted me to pay the other 50,000, so he suggested

25  that he lend me 10,000 and I pay the other 40.

111

1    **Q.**    And, eventually, is that what you agreed to do?

2    **A.**    Obviously, I didn't want to, but I had already invested

3    30,000, and they had said that if I didn't complete this other

4    transaction in a question of two or three days, my account would

5    be frozen.

6    **Q.**    So how much did Daniel agree to invest?

7    **A.**    At this point here, he said he would lend me 14,000, and

8    he wanted me to pay 36.

9    **Q.**    And when he said he had lent you the money, how did he

10   lend you the money?

11   **A.**    I had suggested that he pay through my Zelle account

12   because I wanted to find out some information about him, but he

13   said no, he would send it directly to Gamma.

14   **Q.**    And why did he say he would send it directly to Gamma?

15   **A.**    So he said that it would be quicker.  Every time I spoke

16   to customer service, they would give me a number, and so Daniel

17   asked me for that so that he could send the money directly to

18   them.

19   **Q.**    Turning to the next page, page 6, what are you suggesting

20   at the top of this message?

21   **A.**    I told him that I was not going to make any more

22   deposits; that I was going to go to the bank and report that it

23   had been fraud and see if the bank would help me recover my

24   money.

25   **Q.**    What did he say in response to that?

112

*Mejia - Direct - Schwartz*

1   **A.**     He said he didn't recommend it; that the platform was

2   safe, but he didn't understand why this was happening, but that

3   once I paid the money that the platform was asking for, it is

4   100 percent safe, that I would be able to withdraw my money.

5   **Q.**     And in the middle of this message here, did he suggest

6   any other ways for you to make up your portion of the

7   investment?

8   **A.**     Yeah.  He told me to go to the bank and get a loan, and

9   that he was going to check to see if he could lend me a little

10  bit more.

11  **Q.**     And were you eventually able to come up with your portion

12  of the investment?

13  **A.**     Yes.  Daniel lent me the 20,000, according to him, and I

14  paid the other 30,000.

15  **Q.**     And did Daniel tell you anything else about -- at the

16  bottom of this message -- about the safety of the platform?

17  **A.**     Yes.  He said that he had an uncle that had invested a

18  lot, and that he had spoken to the uncle, and the uncle had told

19  him that these were things of the platform, that these were

20  rules, platforms that had a lot of rules.

21  **Q.**     Turning to page 7, you said Daniel eventually did

22  contribute to the investment that you made; is that right?

23  **A.**     According to him, yes.

24  **Q.**     And is that what's reflected in this chat?

25  **A.**     Yes.

*Mejia - Direct - Schwartz*

1   **Q.**    And in this screenshot, is this your conversation with

2   Gamma customer service?

3   **A.**    Yes.  When Daniel told me that he had invested the money

4   in my profile, I sent a message to Gamma to see if that was

5   true, and they said yes, that what I had to invest now was

6   30,125.

7   **Q.**    And did you end up making that investment?

8   **A.**    Yes.

9   **Q.**    How did you make that investment?

10  **A.**    So Daniel told me to call customer service and ask for an

11  account number so I could make the transfer directly into Gamma.

12  **Q.**    And now I'm going to ask you to flip to what has been

13  premarked for ID as Government's Exhibit 3-4.  Do you recognize

14  this?

15  **A.**    Yes.

16  **Q.**    What is it?

17  **A.**    That's the information that Gamma customer service sent

18  to make the transfer.

19  **Q.**    Is this a true and accurate picture of your conversation

20  with Gamma platform?

21  **A.**    Yes.

22       MS. SCHWARTZ:  The government now moves to admit

23  Exhibit 3-4 into evidence.

24       MR. KAMENS:  No objection.

25       THE COURT:  It will be admitted without objection.

*Mejia - Direct - Schwartz*

```
1              (Government's Exhibit No. 3-4 received in evidence.)

2              MS. SCHWARTZ:  And if we could publish.

3              THE COURT:  You may.

4              (Exhibit published.)

5   BY MS. SCHWARTZ:

6   Q.    What is the name of the bank account that Gamma told you

7   to send the money to?

8   A.    Sea Dragon Trading LLC.

9   Q.    And what is the last four digits of the account number

10  they gave you to send it to?

11  A.    3886.

12  Q.    And what is the date of this transfer -- I'm sorry.  I

13  apologize.

14             MS. SCHWARTZ:  Scrolling back out, if we could.

15  BY MS. SCHWARTZ:

16  Q.    Did the platform, in addition to an account number, give

17  you instructions for how to make the transfer?

18  A.    Yes.

19  Q.    And what are they telling you in bullet 3 of the

20  account -- of the instructions on how to make this transfer?

21  A.    They told me that when I sent the transfer, I'm not to

22  put the reason for the transfer.

23  Q.    And why did you understand they were giving you that

24  instruction?

25  A.    I didn't know.  Daniel told me the same thing, that when
```

*Mejia - Direct - Schwartz*

1    I made the transfer, make sure not to put the reason for the

2    transfer.

3    **Q.**    And did Daniel say why not to put the reason?

4    **A.**    He just said that if I put anything, the transfer would

5    be rejected.

6    **Q.**    And how did you make this transfer to this account

7    information?

8    **A.**    I went straight to the bank, and I did it through a

9    person.

10   **Q.**    Which bank did you go to?

11   **A.**    Bank of America.

12   **Q.**    Now showing you what has been premarked for ID as

13   Government's Exhibit 3-5.  Do you recognize this?

14   **A.**    Yes.

15   **Q.**    What is it?

16   **A.**    Copy of the transfer I made.

17   **Q.**    And is this a true and accurate version of your transfer

18   form from Bank of America?

19   **A.**    Yes.

20        MS. SCHWARTZ:  The government moves to admit

21   Exhibit 3-5 into evidence.

22        MR. KAMENS:  No objection.

23        THE COURT:  Admitted without objection.

24        (Government's Exhibit No. 3-5 received in evidence.)

25        MS. SCHWARTZ:  If we can publish.

*Mejia - Direct - Schwartz*

1          THE COURT:  You may.

2          (Exhibit published.)

3   BY MS. SCHWARTZ:

4   **Q.**    What is the date of this transfer?

5   **A.**    October 12, 2022.

6   **Q.**    And who is the recipient of this transfer?

7   **A.**    Sea Dragon Trading LLC.

8   **Q.**    And how much did you send?

9   **A.**    31,000.

10  **Q.**    What did you list under "purpose of payment"?

11  **A.**    I didn't put anything.

12  **Q.**    And is that because of the instructions they gave you?

13  **A.**    Yes.

14  **Q.**    Where did you get the money to make this transfer?

15  **A.**    From my savings account.

16  **Q.**    What happened after you sent this wire transfer?

17  **A.**    When I sent the 50,000 -- I'm sorry -- when I sent this

18  money, I had completed the 50,000 that they had asked for.  I

19  tried to make a withdrawal, and, again, it wasn't possible.

20  **Q.**    And did they ask you to send anything else to verify that

21  you had sent this wire?

22  **A.**    Yes.  When I did the transfer, they asked me to send a

23  copy of this transfer and also a copy of my ID.

24  **Q.**    And did you send that?

25  **A.**    Yes.

*Mejia - Direct - Schwartz*

1    **Q.**    And after you made this investment, you tried to withdraw

2    again?

3    **A.**    Yes.

4    **Q.**    And what happened?

5    **A.**    At this point, Daniel said to me that after all the

6    problems I had had, we should invest a little money so that I

7    should be able to withdraw something -- I should be able to get

8    something.  He said he would talk to his uncle so that we could

9    make the plan to see how I could invest some money and I would

10   be able to make some money.

11   **Q.**    And now directing your attention back to Exhibit 3-3 on

12   page 8 last answer.  It's a message that starts out with the

13   customer service screenshot.  What happened when you tried to

14   withdraw your money?

15   **A.**    When I tried to withdraw my money, again, I wasn't able

16   to because they were charging me taxes.

17   **Q.**    And did you tell Daniel of this problem?

18   **A.**    Yes.

19   **Q.**    And at the bottom of this message, how did he respond?

20   **A.**    Myself or Daniel?

21   **Q.**    How did Daniel respond when you told him?

22   **A.**    Daniel says it was something normal; that, obviously,

23   everybody had to pay taxes.

24   **Q.**    And so what did he tell you to do?

25   **A.**    That I have to pay them.

*Mejia - Direct - Schwartz*

1    **Q.**    Did you end up wiring additional funds to Gamma?

2    **A.**    Yes.  I sent the $28,460 that they were asking for

3    because, again, he said that after I paid this money, he was 100

4    percent sure that I was going to be able to withdraw my money.

5    **Q.**    Directing your attention to the next page, page 9, did

6    Daniel have any suggestions for how to get the money to be able

7    to make this investment?

8    **A.**    Yes.  He told me to go to the bank and ask for a loan.

9    **Q.**    And did he give you any other guidance regarding loans?

10   **A.**    Yes.  And he sent me a few platforms where I could

11   request a loan.

12   **Q.**    And did you end up getting a loan from these platforms?

13   **A.**    No.

14   **Q.**    Why not?

15   **A.**    I'd lost too much; and, besides, I didn't want to get a

16   loan I wasn't sure I was going to be able to pay back.

17   **Q.**    So after you made that additional investment, what

18   happened?

19   **A.**    After paying the taxes that they had asked me, I tried to

20   withdraw my money, and now they said that when Daniel lent me

21   the money, there had been a problem with the account and that I

22   had to send more money in order to withdraw.

23   **Q.**    And directing your attention to the last page of this

24   exhibit, Exhibit 10 -- page 10, rather, sorry -- is that what

25   you're discussing with Daniel in this series of text messages?

*Mejia - Cross - Kamens*

1    **A.**      Yes.

2    **Q.**      Did you make any additional investments after those

3    conversations?

4    **A.**      No.  After this, I had no more money.

5    **Q.**      How much, total, did you invest with Gamma?

6    **A.**      A little over $86,000.

7    **Q.**      Did you ever get any of your money back?

8    **A.**      Nothing.

9    **Q.**      Would you have invested if it had not been for Daniel?

10   **A.**      No, never.

11   **Q.**      And what impact has this had on your life?

12   **A.**      It obviously has affected me a lot.  I have depression; I

13   have anxiety; I lost a lot of weight; I stopped working for

14   about four months.

15            MS. SCHWARTZ:  Court's indulgence.

16            (Whereupon, there was a brief pause in the

17   proceedings.)

18            MS. SCHWARTZ:  Nothing further for this witness, Your

19   Honor.

20            THE COURT:  Thank you.

21            Cross-examination, Mr. Kamens?

22                      CROSS-EXAMINATION

23   BY MR. KAMENS:

24   **Q.**    Ms. Chavez, my name is Geremy Kamens.

25            THE INTERPRETER:  Speak a little louder, please.

*Mejia - Cross - Kamens*

1    BY MR. KAMENS:

2    **Q.**    Ms. Chavez, my name is Geremy Kamens.  I'm just going to

3    ask you a few questions, okay?

4         You mentioned that you first met Daniel in August of

5    2022?

6    **A.**    Yes.

7    **Q.**    Don't say the date because I think you said earlier

8    that's your birthday.  We'll have to redact that from the

9    transcript.  You began chatting on -- or you had been

10   communicating with Daniel on a Facebook dating site?

11   **A.**    Yes.

12   **Q.**    Is that right?

13   **A.**    Yes.

14   **Q.**    The language that you spoke to Daniel in, was that

15   English or Spanish or some other language?

16   **A.**    English.

17   **Q.**    The entire time that you were communicating with Daniel

18   was in English?

19   **A.**    Yes, it was in English.  Sometimes he made mistakes and

20   he would communicate with me in Mandarin, because he told me he

21   was from China.

22   **Q.**    Do you speak Mandarin?

23   **A.**    No.

24   **Q.**    So you were not able to communicate with Daniel in

25   Chinese?

*Mejia - Cross - Kamens*

1    **A.**    Of course not.

2    **Q.**    And then you moved to other communication apps; is that

3    right?

4    **A.**    Yes.  After we communicated through the dating app of

5    Facebook, he asked me to give him my phone number so he could

6    communicate through WhatsApp; and then after, we communicated

7    through Telegram.

8    **Q.**    And, again, all of your communications with Daniel were

9    in English on those communication apps?

10   **A.**    Yes.

11   **Q.**    Then you said he began to discuss investing in

12   cryptocurrency?

13   **A.**    Yes.

14   **Q.**    And you said you made an initial investment of, I think

15   it was, $1,500?

16   **A.**    1,500; and at the end, I think it was 6,000.

17   **Q.**    And were you able to, from your perspective, see gains in

18   that investment?

19   **A.**    Yes.  The first investment I made was 1,500, and then it

20   was complete with 6,000; and according to him, I had made 800.

21   **Q.**    I'm sorry.  According to him, you had made $800?

22   **A.**    (Nonverbal response.)

23   **Q.**    I see.  So this was convincing you that this was a real

24   investment?

25   **A.**    No, it's not that he convinced me, because from the

*Mejia - Cross - Kamens*

1    moment that I saw that I had made the 800, I wanted to withdraw

2    my money, but I wasn't able to --

3    **Q.**    I see.

4    **A.**    -- because my money was already in Gamma.

5    **Q.**    I see.  And then you tried to withdraw money, and you

6    were convinced to put in more money so you could make the

7    withdrawal?

8    **A.**    Yes.

9    **Q.**    And the first large investment you made was for $25,000?

10   **A.**    $25,000.

11   **Q.**    Do you remember who that $25,000 went to?

12   **A.**    I don't remember, but I did send all the proof, the

13   evidence.

14   **Q.**    I'm just going to show you what's been marked for

15   identification as Defendant's Exhibit 15.  Don't read anything

16   on this exhibit out loud.  I just want you to look at the second

17   page of this exhibit.  Can you see that?

18   **A.**    Yes.

19   **Q.**    Does this refresh your recollection about where the

20   $25,000 that you sent went to?

21   **A.**    Yes.

22   **Q.**    Don't read it.  I want you to tell me from --

23   **A.**    Yes.  I don't remember the name.

24   **Q.**    All right.  Well, does this look like the wire -- a fair

25   and accurate representation of the wire that you sent for the

*Mejia - Cross - Kamens*

1  $25,000?

2  **A.**    Yes.

3  **Q.**    Is this a representation of the document that you sent to

4  the prosecutors?

5  **A.**    Yes.

6  **Q.**    And take a look at the first page of this document.  Does

7  that also look to be a fair and accurate representation of a

8  wire that you sent?

9  **A.**    Yes, that's the photo that I sent.

10  **Q.**    And this is an accurate representation of what you gave

11  to the prosecutors?

12  **A.**    Yes.

13         MR. KAMENS:  I'll move to admit Defendant's Exhibit 15.

14         THE COURT:  Any objection?

15         MS. SCHWARTZ:  No objection, Your Honor.

16         THE COURT:  It will be admitted without objection.

17         (Defendant's Exhibit No. 15 received in evidence.)

18  BY MR. KAMENS:

19  **Q.**    Okay.  On the second page -- now, you can read it -- it

20  appears that you sent $25,000.  What's the date that you did

21  that?

22  **A.**    September 25, 2022.

23  **Q.**    And you sent it to who?

24  **A.**    UK ZVD Group Limited.

25  **Q.**    It doesn't say that you sent it to Sea Dragon Trading; is

1    that right?

2    **A.**      No.

3    **Q.**      Where did you get this recipient name from?

4    **A.**      This information was sent to me by Gamma's customer

5    service.

6    **Q.**      I see.  All right.  If you can, take a look at the first

7    page of this exhibit.  And this is that other wire that you

8    sent.  What's the date of this wire?

9    **A.**      October 24, 2022.

10   **Q.**      And how much was it?

11   **A.**      28,460.

12   **Q.**      And who did you send it to?

13   **A.**      QAG Trading LLC.

14   **Q.**      So that also doesn't say Sea Dragon?

15   **A.**      No.  Every time I made a transfer, they would send me a

16   different number and a different name.

17   **Q.**      And when you say "they," you're talking about the

18   platform that you were communicating with?

19   **A.**      Gamma customer service.

20   **Q.**      I see.  I think you've testified that you only did this

21   because of this person who called himself Daniel?

22   **A.**      Yes.

23   **Q.**      He convinced you to do this because it appeared he was a

24   romantic interest?

25   **A.**      No.  He convinced me to do that because I was trying to

Mejia - Cross - Kamens

1   buy a house, and he told me that this would help me to make

2   money faster.

3   **Q.**     I see.  So because you wanted to buy a house, he

4   convinced you that this was a way to make more money quickly?

5   **A.**     Yes.

6   **Q.**     Because of what he told you, you made the first

7   investment of 1,500 that turned into 6,000?

8   **A.**     Yes.

9   **Q.**     And because of what he told you, you made the second

10  investment of 31,000?

11  **A.**     Twenty-five.

12  **Q.**     And then you made -- because of what he told you, you

13  made the third investment of 31,000?

14  **A.**     After I was unable to withdraw the money and customer

15  service telling me I had to invest more and more.

16  **Q.**     It was because of what customer service and what Daniel

17  were telling you to do?

18  **A.**     Yes.  Obviously, Daniel and customer service was the same

19  person.

20  **Q.**     And that's why you made the transfers from your account?

21  **A.**     No.  Obviously, I didn't know that at that time.

22  **Q.**     I mean you made the transfers from your account based on

23  what Daniel and customer service were telling you?

24  **A.**     I trusted Daniel.  I thought he was saying the truth, and

25  that's why I made the transfers.

*Proceedings*

1        MR. KAMENS:  Thank you very much, Ms. Chavez.

2        THE COURT:  Any redirect?

3        MS. SCHWARTZ:  No, Your Honor.

4        THE COURT:  Thank you very much.

5        And is Ms. Chavez released as a witness at this time?

6        MS. SCHWARTZ:  Yes, Your Honor.

7        THE COURT:  Thank you.

8        Ms. Chavez, you may step down, and you're free to go.

9        (Whereupon, the witness exits the stand.)

10        THE COURT:  Madam Interpreter, I want to thank you for

11   your assistance.

12        And, ladies and gentlemen of the jury, I want you to

13   know what you have observed here is not easy.  We have two sets

14   of interpreters who have just done a remarkable and very

15   professional job of allowing you to hear this testimony.  And to

16   translate it accurately, it is not as easy as they make it seem.

17        Ladies and gentlemen of the jury, I said at the

18   beginning of the day that we would go until 5:30 today.  Let me

19   just see, with a nod of your head or a shake of your head, if you

20   are able to continue for another half an hour.  That will help us

21   as we go forward.

22        I see everyone nodding their head.

23        You may call your next witness.  I don't know if you

24   can complete it in a half an hour, but I will encourage you to

25   try.

*Liu - Direct - Schwartz*

1              MS. SCHWARTZ:  We'll do our best, Your Honor.

2              The United States calls Alex Liu.

3          (ALEX LIU, ON BEHALF OF THE GOVERNMENT, SWORN)

4          (Whereupon, the witness takes the stand.)

5                        DIRECT EXAMINATION

6    BY MS. SCHWARTZ:

7    **Q.**    Please state your name and spell it for the record.

8    **A.**    Alex Liu, A-L-E-X  L-I-U.

9    **Q.**    And what do you do for a living?

10   **A.**    I'm a full-time translator.

11   **Q.**    How long have you worked as a translator?

12   **A.**    Seven years.

13   **Q.**    And what is your native language?

14   **A.**    Chinese Mandarin.

15   **Q.**    How did you come to study English?

16   **A.**    I studied English both in my home country and in the U.S.

17   **Q.**    And what is your educational background?

18   **A.**    I have MA in translation and interpreting and an MBA.

19   **Q.**    And you have a bachelor's as well?

20   **A.**    Yes, Bachelor's in English Writing.

21   **Q.**    What did your master's program in interpreting entail?

22   **A.**    So I take a lot of language-specific courses and also

23   nonlanguage-specific courses.

24   **Q.**    Have you taken any other courses in translating?

25   **A.**    Yes.  I take a lot of legal translation and interpreting,

*Liu - Direct - Schwartz*

1    translation technology, translation Syria, principles of

2    interpreting.

3    **Q.**    And what kinds of materials have you translated?

4    **A.**    I translate both for the local school district and lot of

5    law firms and business, companies.

6    **Q.**    Do you have experience in both translation of audio

7    recordings and also written products?

8    **A.**    Yes.  I completed an audiovisual translation course at

9    NYU, and also demonstrated experience in audio translation.

10          MS. SCHWARTZ:  Your Honor, at this time, the government

11   moves to have Ms. Alex Liu certified as an expert witness in

12   Chinese language transcription and translation.

13          THE COURT:  Any objection?

14          MR. NI:  No.

15          THE COURT:  She will be so certified as an expert

16   in Chinese language and translation.

17   BY MS. SCHWARTZ:

18   **Q.**    What is typically your process for translating a

19   document?

20   **A.**    So I glance over both the source and target languages

21   before I even start my translation process, make sure I fully

22   understand both languages, and I will do the research.  If I

23   encounter any unfamiliar terms or knowledge, then I will start

24   translating.

25   **Q.**    Are you sometimes asked to review another person's

*Liu - Direct - Schwartz*

1    translations?

2    **A.**    Yes.  That's my full-time job.

3    **Q.**    And what does reviewing another person's translations

4    entail?

5    **A.**    It follows the same way.  I will glance over or have a

6    good preview of both source and target languages before I even

7    start translating, make sure I fully understand the content, the

8    specialization, and also all the characters involved in the full

9    process, and do the research work, if necessary.

10   **Q.**    Do you use any resources when you're working as a

11   translator?

12   **A.**    All the time.  I use both paper or online search

13   websites, dictionaries, and sometimes I talk to my peers about

14   revisions needed.

15   **Q.**    And what happens when you don't know a word or you're not

16   familiar with a word?

17   **A.**    So if I don't know a word, I would try to glance over the

18   materials and try and figure it out based on the context or

19   foreign linguistic perspective.  If it's not sufficient, I would

20   conduct detailed research either online or talk to my peers.

21   **Q.**    Turning to this case, in this particular case, what were

22   you asked to do?

23   **A.**    Oh, I was asked to revise another person's translation.

24   **Q.**    And can you describe the process for how you did that?

25   **A.**    So I reviewed the source language I was given before I

*Liu - Direct - Schwartz*

1   even started to do the translation.  And I encountered a lot of

2   errors in the translation in Chinese languages, and then I

3   started to do research and look them over and make necessary

4   corrections.

5   **Q.**     And you were able to correct the errors in the

6   translation?

7   **A.**     Yes.

8   **Q.**     With the assistance of the court security officer, I'm

9   now going to show you what has been marked as Government's

10  Exhibits 5-11 and 5-13.  They should be the CDs.  Do you

11  recognize these?

12  **A.**     Yes, I do.

13  **Q.**     And what are they?

14  **A.**     These are the CDs that contain the translation that I

15  revised.

16  **Q.**     Do these contain the translations you worked on?

17  **A.**     Yes.

18  **Q.**     How do you know these CDs contain the translations you

19  worked on?

20  **A.**     How do I know?  I know the translation was encrypted into

21  the CDs, and I recognize them.

22  **Q.**     And how do you know that the CDs that you're looking at

23  are what you reviewed?

24  **A.**     I remember lot of sentences that had serious errors that

25  I had to spend a lot of time doing research and reviewing.

*Liu - Direct - Schwartz*

1    **Q.**    In terms of these particular CDs, though, how do you know

2    that the CDs in front of you are the CDs that you reviewed?

3              THE COURT:  You can lead to identify.

4    BY MS. SCHWARTZ:

5    **Q.**    Did you sign the CDs?

6    **A.**    Yes, yes.  I put my initials.  I was shown the content

7    before I did my initials.

8    **Q.**    Are these translation fair and accurate translations of

9    the chats you reviewed?

10   **A.**    Yes.  After the revision, they are as accurate as

11   possible.

12   **Q.**    I am now showing you what has been marked for ID as

13   Government's Exhibit 5-12.  That would be in the book.  If you

14   could look at 5-12 and 5-14.  Feel free to look through and look

15   up when you're done reviewing.

16   **A.**    Okay.  I'm done reviewing.

17   **Q.**    Do you recognize these?

18   **A.**    Yes.

19   **Q.**    And what are they?

20   **A.**    They are a part of the translation I was provided and

21   asked to revise.

22   **Q.**    And are both Exhibits 512 and 514 fair and accurate

23   excerpts of portions of the chats that you did?

24   **A.**    Yes.

25   **Q.**    Did you translate anything else in this case?

*Liu - Cross - Ni*

1  **A.**     I did most of the revision for the translation I was

2  provided; but, in addition, I also did a little bit translation

3  myself for part of the chats.

4  **Q.**     And now showing you what has been premarked for ID as

5  Government's Exhibit 4-1, do you recognize this?

6  **A.**     Yes, I do.

7  **Q.**     And what is it?

8  **A.**     This is the part of the chats I translated myself.

9  **Q.**     And then flipping to 4-1A, do you recognize this?

10  **A.**     Yes.

11  **Q.**     And what is it?

12  **A.**     This is also part of the chats that I translated.

13  **Q.**     Are these translations a fair and accurate translation of

14  the chat excerpts you received?

15  **A.**     Yes, they are as accurate to my best of knowledge.

16          MS. SCHWARTZ:  No further questions for this witness,

17  Your Honor.

18          THE COURT:  Thank you.

19          Any cross-examination?

20          MR. NI:  Yes, Your Honor.

21          I am assuming I have 15 minutes?

22          THE COURT:  Yes, you have 15 minutes.

23                  CROSS-EXAMINATION

24  BY MR. NI:

25  **Q.**     Good afternoon, Ms. Liu.

1    A translator's duty is to be neutral, right, in the

2  translations that you render?

3  **A.**    Can you say it one more time?

4  **Q.**    As a translator, your duty when translating is to be

5  neutral in the translations you render --

6  **A.**    Yes.

7  **Q.**    -- to not interpret them?

8  **A.**    Sure.

9  **Q.**    And accurate?

10  **A.**    Yes, yes.

11  **Q.**    And not let your personal enthusiasm --

12  **A.**    Yes.  I have to comply by the code of conducts for our

13  industry.

14  **Q.**    And this proofing project that the government gave you,

15  it involved about 55,000 words, right?

16  **A.**    Yeah, around that.

17  **Q.**    Is that a lot?

18  **A.**    Yeah, it's a lot.

19  **Q.**    How long would it typically take you to translate?

20  **A.**    Took me about almost two weeks.

21  **Q.**    Two weeks?

22  **A.**    I was asked to revise, not to translate, so I could go a

23  lot faster.  A revision takes much faster than translation

24  myself.

25  **Q.**    How long would it typically take you to, say, revise

Liu - Cross - Ni

1    55,000 --

2    **A.**    I was working for almost six-hour -- eight hours per day,

3    so it took me almost two weeks to revise, just to revise.

4    **Q.**    And are you confident that there are no inaccuracies at

5    all in the 55,000 words that you revised?

6    **A.**    Am I confident?  I tried to cover as much as possible and

7    make them to the best quality I can possibly deliver.  I know

8    the timeline is pressing, but I was able to cover as much as

9    possible.

10   **Q.**    This was a very compressed timeline for proofing?

11   **A.**    Because I was working for the agency, and they didn't

12   tell me -- I can sense that this -- I was given are highly

13   important.

14             (Court reporter clarification.)

15   **A.**    This assignment I was given is very, very important, even

16   though I wasn't advised -- I wasn't told how important this

17   assignment is; but just based on my knowledge and judgment, so

18   that's why I was specially careful revising the translation.  I

19   did my best.

20   **Q.**    And when you completed the translation, you actually sent

21   out a tweet about the completion of this job; do you recall

22   that?

23   **A.**    Yes, yes.

24             Yes, yes, that's the tweet, because I thought it is

25   high-ranking government body that I feel proud of that I got an

*Liu - Cross - Ni*

1    opportunity to serve and contribute my expertise in solving

2    these matters even though I wasn't holding any personal opinions

3    regarding these content, but I feel honored that I got a chance

4    to be part of it, so that's why I tweeted.  It's not a first

5    time that I work with U.S. government.  I did before.

6    **Q.**    There's nothing wrong with that, tweeting.

7    **A.**    I just feel so proud of myself, you know.  And I also

8    work as a freelance translator and post editors, so I wanted to

9    showcase my skills.  That's pretty much it.

10   **Q.**    Absolutely.

11   **A.**    I want to have more opportunities to conduct jobs of this

12   matter in the future and work with these law firms or attorneys

13   or government agencies.

14   **Q.**    You were proud of what you did and you wanted to showcase

15   you did a good job.

16        And in the tweet, you said that, "Due to pressing

17   timeline, I basically had to treat it like an interpreting

18   project delivered at lightning speed, except this is in written

19   format.  It's an honor to assist a federal law enforcement

20   agency, exclamation mark," correct?

21   **A.**    Yes.  A lot of this content are very oral due to its

22   colloquial nature, and also the pressing deadline.  This was a

23   lot of work to deliver, revision due to such pressing deadline.

24   So I used to work as interpreter, so I make full use of my skill

25   in my past career experience.  Yeah, I had to be fast and

1    accurate.

2    **Q.**    And by treating it like an interpreting project delivered

3    at lightning speed, you're basically referring to what these

4    interpreters are doing right now --

5    **A.**    Yes.

6    **Q.**    -- simultaneously?

7    **A.**    Yeah.  Otherwise, I would have no chance of finishing it.

8    Yes.

9    **Q.**    Typically, when people are interpreting, can they

10   guaranty that no mistakes come through in their interpretation

11   given it's simultaneous?

12   **A.**    Yes.  Just because due to the special nature of this

13   assignment.  There are a lot of oral part of it, as probably the

14   majority of this content.  So that's why I thought about using

15   my interpreting techniques.  If it's other, like a more academic

16   or scientific or legal translation, I wouldn't be able to use my

17   interpreting skills, you know.  I would need a lot of time to

18   think about it to study the materials before I deliver

19   written deliverables.

20   **Q.**    Would you mind returning to Government's Exhibit 5-12,

21   please?  This is --

22         Are you there?

23   **A.**    Yes.

24   **Q.**    This is one of the two chats that you were asked to look

25   at earlier and that you proofread, right?

**A.**    Yes.

**Q.**    And do you recall how big this chat was, the original?
These are just excerpts.

**A.**    Yes.  They were very big.  They are like -- some of them
are 3,000 rows in Excel sheet, entries.

**Q.**    So it was much, much bigger than the --

**A.**    Yes, yes, yes.  Unfortunately, my agency who I got this
job from, they didn't tell me, like, how much time I was
given -- I was allowed to have and how important this assignment
is or who I work with due to confidential reasons, but I was
assuming I was translating for high-stake government bodies, so
that's why I put extra effort in it.

**Q.**    The portion that's been, I guess, put in front of you
excerpted, is between December 2nd and -- if you go to page -- I
think it's the last page -- December 12, 2022, right?

**A.**    Yes.  These conversations happened in -- throughout the
years, different months.

**Q.**    And the conversation that you proofread, this specific
chat is between three people; is that right?

**A.**    Yes.

**Q.**    You can see it right at the top.

**A.**    Actually, there are only two on the page.

**Q.**    There's only two on the first page, right?

**A.**    Yes.  On this cover page, there are only two persons
involved.

*Liu - Cross - Ni*

1   **Q.**     Yeah.  On the first couple of pages, there's only two

2   involved.  And then if you go to page 4, you'll see that --

3   well, let me ask you, who are the first two people that are

4   involved in this chat?

5   **A.**     Yes.

6   **Q.**     Who are they?

7   **A.**     One is Nikki, and the other is -- nickname is Xiao Qi.

8   **Q.**     And Xiao Qi isn't translated, but that means "Little 7,"

9   right?

10  **A.**     Xiao Qi is translated?

11  **Q.**     Is not translated; the name is not translated --

12  **A.**     No, no.

13  **Q.**     -- like, it means "Little 7"; is that right?

14  **A.**     Yes.

15  **Q.**     X-I-A-O Q-I, is that how you would spell it?

16  **A.**     Yes.

17  **Q.**     So those two people on the first page -- and they

18  keep talking about -- and Xiao Qi -- sorry -- Little 7 is the

19  one that has 5425 next to his name, right?

20  **A.**     Yes.

21  **Q.**     And Nikki is just in English, Nikki?

22  **A.**     (Nonverbal response.)

23  **Q.**     And they keep talking for the first couple of pages; and

24  by page 4, a third participant comes in, and his name is Joseph,

25  right?  It says "Joseph" right there in English?

 1    **A.**      Yes.

 2    **Q.**      And these are the three people that participate in this

 3    chat, right?

 4    **A.**      Yes.

 5    **Q.**      And Hailong is not participating in this chat, right?

 6    **A.**      You mean on this cover page?  No.

 7    **Q.**      You can take a look at every single page of this.

 8    **A.**      I wasn't sure if I was allowed to.

 9    **Q.**      Okay.  And do you see Hailong -- Mr. Hailong Zhu in there

10    anywhere participating in this chat?

11    **A.**      As based on my memory, I don't think Hailong directly

12    engaged in this kind of conversation.

13    **Q.**      That's right, he didn't -- you don't recall seeing him

14    participate?

15    **A.**      No.  He's only being referred.

16    **Q.**      Right.  And the three of them refer to him several times?

17    **A.**      Mm-hmm, mm-hmm.

18    **Q.**      Always in the third person?

19    **A.**      Yeah.

20    **Q.**      Do you recall what they referred to him -- how they

21    referred to him and what they say about him?

22    **A.**      I need to find the page.  I'm guessing, probably, Hailong

23    is, like, accountholder.  I'm guessing.  He or she owns one or

24    maybe several bank accounts.  That's my guessing.

25    **Q.**      And what else?

*Proceedings*

1   **A.**      What else?

2   **Q.**      Anything else?

3   **A.**      And he probably actively engages with other characters

4   for this case even though he does not fully show his appearance.

5   **Q.**      Right.  So he's involved in this --

6   **A.**      Right, he's definitely involved.  He's probably in charge

7   of a really big account.  That's my guessing.

8   **Q.**      I can stop with my questioning here because that's sort

9   of --

10           THE COURT:  So you have more cross-examination?

11           MR. NI:  Yeah.

12           THE COURT:  I'm going to keep my word and let you go at

13   5:30.  I think it's important that we keep to the schedule as

14   much as we can.

15           Ladies and gentlemen of the jury, I will release you

16   now.  I'm going to remind you again, especially when you go home

17   because questions will be asked; people will want to know, you

18   must take, very seriously, my instructions that you not discuss

19   this case; and you can blame it on me.  If a spouse or a loved

20   one really wants to know, you can tell them, of course, that

21   you're sitting on the jury, but do not discuss the matter with

22   them.  You can explain to them that the Court has instructed you

23   that until this matter ends and until you-all deliberate

24   together, you are not to discuss the matter with anyone, with

25   each other or with anyone at home.

*Proceedings*

1          Please do not conduct any research on your phone, on

2     your computer, in the newspaper.  Do not seek out any

3     information.  Forgot about this matter and relax for the evening

4     to return tomorrow.  We will start promptly at 9:30.  If you can

5     be here by 9:15, we will do our best to make sure we start early

6     and get through as much as we can tomorrow.  If, for any reason,

7     anyone approaches you to discuss this matter, of course, advise

8     the Court immediately.  When you come back tomorrow morning, I'll

9     ask you the same questions I've asked you to make sure that

10    you've been able to follow all those instructions.  In the

11    meantime, we thank you for your service and you are free to go.

12          (Jury out at 5:31 p.m.)

13          THE COURT:  Ms. Liu, you may step down at this time.

14    You can take the microphone off.  You remain under oath, and you

15    remain a witness subject to the rule on witnesses.  That means

16    that you may not discuss your testimony with anybody.  And when

17    you return tomorrow morning at 9:30, we'll put you back on the

18    stand to continue the cross-examination and then any redirect,

19    but you are released at this time.  So you may step down and exit

20    the courtroom.  Thank you very much.

21          (Whereupon, the witness takes the stand.)

22          THE COURT:  Mr. Kamens, you did not seek to have a

23    bench conference at the close of the last witness' testimony, and

24    I appreciate that we were moving quickly.  You had raised the

25    issue of a limiting instruction.  I will hear briefly from you on

*Proceedings*

1    that now, and I will hear from the government.  My inclination, I

2    will tell you, is to reserve on giving that instruction at this

3    time until, perhaps, we are closer to addressing jury

4    instructions.  I think I can anticipate why it might be better to

5    wait, from the government's perspective, but I will hear anything

6    that you briefly want to say right now on that issue.

7                MR. KAMENS:  So we've spent a lot of time

8    distinguishing between fraud committed against victims and fraud

9    that is designed to obtain bank property.  There's clearly, in

10   the testimony that the jury heard today, fraud that encouraged

11   Ms. Chavez to take her own money and provide it to fraudsters.

12   Without an instruction, the jury is naturally going to think that

13   that is bank fraud, when it is not, and they should be instructed

14   that it's not.

15               The government requested, when we had this dispute with

16   respect to the admission of this evidence, that the Court could

17   deal with any concerns about prejudice through a limiting

18   instruction, and we've asked for a limiting instruction, and we

19   think it's the only way to make sure that the jury understands

20   the difference between fraud against an accountholder and fraud

21   that is designed to obtain money or property from a bank.

22               THE COURT:  I understand.

23               MS. BEDELL:  Your Honor, I think this is appropriately

24   addressed with the complete jury instructions where the jury will

25   be getting a comprehensive overview of what constitutes bank

*Proceedings*

1    fraud and what doesn't.  Right now, they're taking in a lot of

2    information, and the limiting instruction would be extremely

3    confusing because it's just this one random thing that's clearly

4    not related to the facts of our case, it's not bank fraud, and I

5    don't think that's going to help the jury.  So we will have the

6    jury instructions, we will have our arguments, so there will be

7    plenty of time for them to say, okay, "Here's everything I've

8    heard; what does fall into -- whatever we end up deciding what is

9    or is not bank fraud -- but I think at this point, it would just

10   be an extremely confusing and prejudicial instruction to give.

11           THE COURT:  I understand your position.

12           MR. KAMENS:  Can I just say one point?  One thing the

13   Court could do is to tell the jury that, You're going to hear a

14   lot of evidence about a lot of things; some of it may not be

15   actually defined as bank fraud; we'll explain exactly what the

16   law is at a later time; but you need to understand that you are

17   going to hear a lot of evidence that may not specifically refer

18   to bank fraud.

19           THE COURT:  I understand your position.  I'm going to

20   take it under advisement.  I will give a limiting instruction.

21   It's clear that a limiting instruction will be appropriate.  The

22   contours of that instruction and the detail in which we define

23   what is at issue and what is not at issue and what evidence has

24   come in for a particular purpose versus for all purposes, I

25   think, need to be addressed comprehensively.  I'm not sure that

*Proceedings*

1    doing it with this witness is the appropriate time.  Depending on

2    what other evidence is presented, I will consider giving that

3    limiting instruction prior to the full jury instructions, but

4    right now, I think we just have to wait and see.  There are too

5    many moving parts.

6           I would also recommend that the government submit a

7    proposed limiting instruction, or that even the two of you talk

8    as the case goes on, to see whether there is some agreement about

9    the level of detail or how that should be defined.  There's no

10   doubt that the limiting instruction will have to be addressed in

11   connection with the ultimate definition of the essential elements

12   of the offense, which are already outstanding.

13          MR. KAMENS:  Can I raise one other minor issue?  I

14   think the government will be able to resolve, but one of the

15   witnesses that they intend to call is a woman named Yan Zhang,

16   and all of the money that Ms. Zhang provided, none of it went to

17   accounts opened by Mr. Zhu.  The MO is very similar to what we've

18   heard, but I'm not -- it's not entirely clear that it is the same

19   scam, even if it is one that is very similar.  So I would ask

20   before that witness be presented, that the government provide

21   some forecast why that witness and her fraud is the fraud that is

22   at issue in this case.

23          THE COURT:  That is not Victim 1, and --

24          MR. KAMENS:  It is not Victim 1.

25          THE COURT:  -- this was Victim 3.  Is this a different

*Proceedings*

1    person than the numbered victims?

2              MS. BEDELL:  Yes, Your Honor.

3              THE COURT:  Well, I will certainly allow you to address

4    that before that witness is called.  If you want to discuss,

5    beforehand, the order -- I don't know whether that person is on

6    the list for tomorrow or not, but before that witness is called,

7    we'll address that out of the presence of the jury.

8              MR. KAMENS:  Speaking of the witnesses, we'd ask the

9    government to provide the notice of who the witnesses --

10             THE COURT:  Yes.  Please do so so we can prepare for

11   tomorrow.  My hope is that we can move quickly.  I appreciate

12   counsel's efforts today.  Sometimes things do take a little bit

13   longer than we anticipate, but I would like to push everyone for

14   the benefit of the jury.

15             I will say that in the last trial we had, we gave the

16   jury the opportunity to stay a little bit later or even to start

17   a little bit earlier.  I know that places a burden on court

18   staff, on counsel, but I'm very mindful of the sacrifice that the

19   jurors are making; and to the extent they are willing to do that

20   as a group, I want to give them that opportunity.  So I want

21   you-all to plan accordingly.  And, again, I'm not insensitive to

22   the burden it places on all of us, but I think all of us would

23   like to keep to our initial estimate that this is a case that can

24   be tried within the week if we can do so.  So if that means they

25   want to stay till 6:00 or even 6:30, I'll certainly be guided by

1    their desire to do so.  But we'll start at 9:30 tomorrow, give

2    them the opportunity to consider that option, and let us know so

3    that we can then plan accordingly in the afternoon.

4          Let us be here at 9:15 tomorrow in case there are any

5    preliminary matters.  I don't think we need to be here with me

6    taking the bench at 9:00, but it gives us a few minutes to make

7    sure that we can start promptly at 9:30.

8          Court will be in recess.

9          (Whereupon, the proceedings concluded at 5:39 p.m.)

10

11                    *     *     *     *     *

12

13                    CERTIFICATE OF REPORTER

14          I, Diane Salters, hereby certify that the foregoing

15    transcript is a true and accurate record of the stenographic

16    proceedings in this matter.

17

18                              /s/ Diane Salters

19                              _____

20                              Diane Salters, CSR, RCR, RPR
                                Official Court Reporter

21

22

23

24

25