```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3      UNITED STATES OF AMERICA,        :
                                         :
 4                   Plaintiff,          :   Criminal Action
                                         :   No. 1:23-cr-00081
 5             v.                        :
                                         :
 6      HAILONG ZHU,                     :   September 6, 2023
                                         :   9:17 a.m.
 7                                       :
                     Defendant.          :   Volume 2
 8                                       :
        ............................. :
 9

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
11          UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13    For the United States:      UNITED STATES ATTORNEY'S OFFICE
                                  Alexandra Zoe Bedell, AUSA
14                                Stefanie Schwartz, AUSA
                                  2100 Jamieson Avenue
15                                Alexandria, VA 22314

16    For the Defendant:          OFFICE OF THE FEDERAL PUBLIC
                                  DEFENDER
17                                Geremy Kamens, Federal Defender
                                  Nathaniel Wenstrup, AFPD
18                                1650 King Street, Suite 500
                                  Alexandria, VA 22314
19
                                  AFN LAW PLLC
20                                Angus Fei Ni, Esquire
                                  504 2nd Ave
21                                14th Floor
                                  Seattle, WA 98104
22
      Also Present:               Mandarin Interpreters:
23
                                  Wing-Chi Chan
24                                Renee Wang

25
      (Continued)
```

1    (Continued)

2    Court Reporter:           Diane Salters, B.S., CSR, RPR, RCR
                               Official Court Reporter
3                              United States District Court
                               401 Courthouse Square
4                              Alexandria, VA 22314
                               Email: Dianesalters.edva@gmail.com
5                              Telephone: (301) 338-8033

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     Proceedings reported by machine shorthand.  Transcript produced by
25   computer-aided transcription.

3

**TABLE OF CONTENTS**

**EXAMINATION**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ALEX LIU | | | | |
|     BY MR. NI | | 13 | | |
|     BY MS. SCHWARTZ | | | 39 | |
| SCOTT HOLT | | | | |
|     BY MS. BEDELL | 40 | | | |
|     BY MR. WENSTRUP | | 71 | | |
| ANDREA POZOS | | | | |
|     BY MS. SCHWARTZ | 84 | | | |
|     BY MR. WENSTRUP | | 93 | | |
| CHUNHUA DONG | | | | |
|     BY MS. SCHWARTZ | 101 | | | |
|     BY MR. WENSTRUP | | 112 | | |
| YANG WEN | | | | |
|     BY MS. BEDELL | 119 | | 161 | |
|     BY MR. NI | | 140 | | |
| SCOTT GOLLADAY | | | | |
|     BY MS. SCHWARTZ | 163 | | | |
|     BY MR. WENSTRUP | | 181 | | |
| KWADWO DANSO-FORDJOUR | | | | |
|     BY MS. BEDELL | 185 | | | |
|     BY MR. KAMENS | | 217 | | |
| GEORGE JASEK | | | | |
|     BY MS. SCHWARTZ | 227 | | | |
|     BY MR. KAMENS | | 243 | | |
| JEFFREY SHI | | | | |
|     BY MS. SCHWARTZ | 264 | | | |

1                        **GOVERNMENT'S EXHIBITS**

2      <u>NUMBER</u>                                                    <u>PAGE</u>

3      10-1, 10-3 through 10-12, and 10-15 through 10-18     43
       12-1, 12-2, 12-4, 12-5, 12-6, 12-7, and 12-8         52
4      13-1 and 13-2                                        55
       14-1, 14-2, and 14-3                                 58
5      16-1                                                 61
       10-17A                                               76
6      15-2                                                 125
       1-1                                                  190
7      1-1A through 1-1E                                    191
       1-2                                                  196
8      1-3                                                  206
       1-4 and 1-4B                                         208
9      5-12, Line 1,801                                     227
       15-4 through 15-7                                    231
10     5-1, 6-1, 7-1, and 8-1                               243
       15-3                                                 268
11     9-1 and 9-5                                          272
       15-1                                                 274

12                        **DEFENDANT'S EXHIBITS**

13     <u>NUMBER</u>                                                    <u>PAGE</u>

14
       1A                                                   39
15     10A through 10L                                      249
       6                                                    260

16

17

18

19

20

21

22

23

24

25

*Proceedings*

1          THE COURTROOM DEPUTY:  *United States v. Hailong Zhu*,

2     Case No. 23-cr-81.  This case comes on for jury trial.  Will the

3     parties please note their appearances for the record.

4          MS. BEDELL:  Good morning, Your Honor.  Zoe Bedell and

5     Stefanie Schwartz for the United States.

6          THE COURT:  Good morning.

7          MR. KAMENS:  Good morning, Your Honor.  Geremy Kamens,

8     Nate Wenstrup, and Angus Ni on behalf of Mr. Zhu, who is present.

9          Your Honor, we have just a few minor issues to raise

10    before the jury comes in.  One was I handed up a proposed limited

11    instruction yesterday.  I just wanted to make sure that's made

12    part of the record.  I don't know the best way to do that.

13         THE COURT:  Yes, it will be made a part of the record.

14    It was filed, stamped.  I don't know if it has shown up on the

15    docket, but we'll make sure it's part of the record, and I will

16    take it under consideration.

17         As we discussed yesterday, I have encouraged you both

18    to talk with each other and the government to submit their

19    proposed instruction.  I'm also looking at other limiting

20    instructions from other sources, and we'll address all those in

21    due course.

22         MS. BEDELL:  And, Your Honor, just to clarify, are you

23    contemplating doing a limiting instruction before the general

24    jury instruction so that we should be proposing something for

25    that, or is it a part of the rest of the jury instructions? which

1    would be our recommendation and preference.

2         THE COURT:  If I wasn't clear yesterday, let me be

3    clear now.  I have not decided when to give that limiting

4    instruction.  There's no doubt that a limiting instruction will

5    be appropriate.  Right now, I've concluded that doing it after

6    each witness is not appropriate or necessary given the scope of

7    the issues that we're still discussing, but to the extent the

8    defense asked me to -- and I think it's appropriate -- I may do

9    it during the trial, and, therefore, the sooner you submit your

10   proposal, the sooner I can consider it, but it's up to you when

11   you want to do that.

12        MS. BEDELL:  Thank you, Your Honor.

13        And the one issue we wanted to raise is, Mr. Kamens,

14   yesterday, suggested that I didn't understand how the victim

15   Yan Zhang, who is one of our witnesses for today, is connected to

16   the scheme, so I wanted to proffer that testimony there.

17        First of all, the M.O., the sort of experience she went

18   through, as her experience is part of the scam, is virtually

19   identical to the other victims.  But then, additionally, the

20   website she used to invest has the same domain registrar as the

21   website that Special Agent Saunders used, which he received a Sea

22   Dragon account for him to send his money to.  It was the same

23   website, and he had learned of that website from a victim.  It is

24   also the same domain registrar that was for -- the other victim

25   who's testifying today, and it's also the same domain website

*Proceedings*

1   registration information as for our fourth victim, who is not

2   allowed to testify, and who also sent money to Mr. Zhu's account

3   and received his contact information through customer service.

4   So we would ask, if Mr. Kamens intends to attack the scheme, that

5   we would be allowed to bring our fourth victim in and to testify,

6   because I won't be able, I don't think, to get that information

7   necessarily in that he was scammed on this website that also has

8   the same registrar and they're all connected at that domain level

9   without him.

10          THE COURT:  Let me just have you back up to make sure I

11   understand.  You made reference to the case agent communicating

12   with the domain name and sending something to Sea Dragon --

13          MS. BEDELL:  Yes.  I apologize.

14          THE COURT:  -- that is not information that I think the

15   Court is aware of.  What is the --

16          MS. BEDELL:  So Special Agent Saunders, very early on

17   in the investigation after initially learning about the scam from

18   the victim, learned about a specific website from that victim.

19   And so he went online to that website and did an undercover

20   operation where he chatted with customer service -- as we heard

21   and will hear that our victims have done -- and he said, I'd like

22   to send some money; where should I send it?  They sent him back

23   to the Sea Dragon account -- one of the Sea Dragon accounts, and

24   that website was called Simex LUA, and it has -- when he went to

25   look at who the registrar was, who had registered that domain

*Proceedings*

1  name, he also looked at the other domain names that had been

2  registered under the same information.  And the website that

3  Ms. Zhang had used, that Mr. Danso-Fordjour had used, and then

4  our fourth victim, they also are all under the same registration

5  information.

6         Sorry.  Does that help clarify the facts?

7         THE COURT:  Yes, I think so.  I guess I am still

8  unclear on how it relates to the overarching theory of the

9  conspiracy to commit bank fraud as opposed to the cryptocurrency

10  standing alone.

11         MS. BEDELL:  So the argument, I believe, that

12  Mr. Kamens was making was that maybe this victim was just a

13  victim of a totally different scheme that involved cryptocurrency

14  and it wasn't a part of this scheme; and so that domain

15  registration information ties it all in to the same scheme, even

16  though she did not send money to Mr. Zhu's accounts herself.

17         THE COURT:  All right.  Thank you.

18         MR. KAMENS:  So this is -- well, there are two parts of

19  new information, at least to me.  The first is that this witness,

20  Yan Zhang, went to a website that has the same domain

21  registration information as the domains that were used by victims

22  who actually did send money to accounts opened by Mr. Zhu.  I

23  would ask the Court to reserve ruling on that.  I just want to

24  educate myself on whether that's a sufficient connection, because

25  we're talking about a witness who will talk about being scammed

*Proceedings*

1    for a large amount of money but didn't send anything to Mr. Zhu

2    or to an account opened by Mr. Zhu.  And the M.O. is very

3    similar, but it is not exactly the same.

4           The victim that we heard from yesterday and one that

5    we'll hear from today, the recipients of the wires are all

6    different.  They go on a website and they get a new one.  The

7    third victim out of a large series, maybe 10 to 15 transfers, all

8    but one are to the same recipient.  So money is not sent to

9    Mr. Zhu or an account opened by him; the M.O. is similar but not

10   identical; and the link the government has just said is that it's

11   the same domain registration, and I just don't know if that's

12   enough to make it tied to the scheme that they have charged or

13   not.  I would just like to look into that.

14          THE COURT:  That's fine.  I'm not going to rule on that

15   now.  When were you planning on calling that particular witness,

16   Ms. Bedell, today?

17          MS. BEDELL:  After your ruling.  We don't have the

18   witness here, Your Honor, so we would need to get him here.  He's

19   in New Jersey, and so we would need to let him know, but -- I'm

20   sorry, which witness?  The witness that we weren't planning on

21   calling?

22          THE COURT:  No, Ms. Zhang.

23          MS. BEDELL:  I believe -- I suspect at this point that

24   they will probably go in the afternoon today, so if there is time

25   before that, Your Honor.

*Proceedings*

1          THE COURT:  We can address it at the lunch break

2     beforehand, and maybe we can all think a little bit about what

3     the purpose of that witness is and how it relates, but I

4     appreciate that clarification.

5          MR. KAMENS:  The other question I have, and perhaps

6     this is something I missed in the discovery, but I had not seen a

7     memo discussing the proactive work by the agent to interact with

8     a platform and get a payment site.  I would think that would be

9     in, sort of, testing.  That would have to be disclosed to the

10    defense under Rule 16.  Maybe it has been.  I didn't know that;

11    didn't see it.

12         THE COURT:  You can confer with the government; and,

13    certainly, to the extent there's something that you didn't get,

14    you can let the Court know, but --

15         MR. KAMENS:  Thank you, Your Honor.

16         THE COURT:  -- it may be in there.

17         Is there anything else we need to address this morning

18    before we bring in the jury?

19         Are we still waiting for some jurors?

20         THE COURT SECURITY OFFICER:  Yes.

21         THE COURT:  I will take a brief recess; and, hopefully,

22    we can start promptly at 9:30.  The interpreters were placed

23    under oath yesterday.  I don't think we need to place them under

24    oath each day -- oh, we have a new one that we're waiting for, so

25    we'll place that interpreter under oath.  And, likewise, with the

*Proceedings*

1  witnesses who were placed under oath, they've remained under

2  oath, so we don't need to do that.  So we'll take a brief recess

3  now and convene at 9:30.

4        (Whereupon, a recess in the proceedings occurred from

5  9:26 a.m. until 9:33 a.m.)

6        THE COURT:  Well, before we begin, we've had unexpected

7  news from one juror who says that he's feeling unwell, may have

8  been exposed, and is ill.  He came in today; he's wearing a mask;

9  he's out in the hallway; the other jurors have not been exposed.

10  I'm not sure that it is worth trying to inquire into the level of

11  his exposure or the genuineness of what is going on.  I'm not

12  casting any aspersions, but it strikes me that the most efficient

13  way to proceed is to release him and continue with the 13 jurors

14  who are left, but I will hear from both parties with regard to

15  the best way to proceed.

16        I can't remember the juror number.  It is the youngest

17  member of the jury, if you will recall, a male member of the

18  jury.

19        THE COURTROOM DEPUTY:  Juror No. 3.

20        MS. BEDELL:  Your Honor, I think that probably makes

21  sense, especially if he risks contaminating the whole rest of the

22  jury.

23        MR. KAMENS:  Agreed.

24        THE COURT:  I agree as well, with some reluctance, but,

25  of course, the safety of everyone -- the jurors and everyone --

*Proceedings*

1    is most important.  So, with that, we will bring in the 13 jurors

2    and proceed with our trial this morning.  I will briefly address

3    the matter with them.

4            Good morning.

5            THE INTERPRETER:  Good morning, Your Honor.

6            THE COURT:  We will swear you in shortly.

7            THE INTERPRETER:  I came from Gaithersburg.

8            THE COURT:  I'm sorry it was a little bit trafficky.

9            We can swear the interpreter now at this time.

10                    (Interpreter Sworn.)

11           THE INTERPRETER:  Good morning.  This is Wing Chan;

12   last name C-H-A-N; first name Wing, W-I-N-G.

13           THE COURT:  Thank you very much.

14           MS. BEDELL:  Your Honor, would it make sense to have

15   the witness on the stand?

16           THE COURT:  Yes, you may bring the witness in.  Thank

17   you.

18           (Jury in at 9:37 a.m.)

19           THE COURT:  Good morning, ladies and gentlemen of the

20   jury.  I hope that you were able to have a little bit of a

21   relaxing evening last night.  As we discussed yesterday, I want

22   to make sure that you were able to follow all of the Court's

23   instructions overnight and that you did not discuss the matter

24   with anyone, that you did not conduct any research on the

25   internet or otherwise, and have followed the Court's instructions

*Liu - Cross - Ni*

1    in all regards.

2            I see you're nodding your heads.  I appreciate that.

3    Again, we know that this is a burden and a responsibility.  We

4    ask you to follow all of the rules so that we can get through

5    this as quickly as possible and let you get to the point where

6    you can deliberate with each other.

7            You may have noticed that you are missing one person.

8    We have decided to allow that juror to be released, out of an

9    abundance of caution.  We don't want anyone to get sick.  He was

10   not feeling well.  Fortunately, we do have the ability to move

11   forward with 13 rather than 14; and so, hopefully, everyone will

12   be fine and feel better and move on.  And so that was the cause

13   of the delay this morning.

14           As I told you last night, we will resume in one moment

15   with the cross-examination of the witness.  The witnesses remain

16   under oath, and we will pick up where we left off.

17           And so, Mr. Ni, you may come to the podium, and we can

18   put the witness back on the stand.

19           (Whereupon, the witness takes the stand.)

20           THE COURT:  Good morning, ma'am.  You remain under oath

21   from yesterday.

22     (ALEX LIU, ON BEHALF OF THE GOVERNMENT, PREVIOUSLY SWORN)

23                   CONTINUED CROSS-EXAMINATION

24   BY MR. NI:

25   Q.    Good morning, Ms. Liu.

Liu - Cross - Ni

1    **A.**    Good morning.

2    **Q.**    So, yesterday, we talked about one of the text message

3    chains that you proofread, Government's Exhibit 5-12, and that's

4    in front of you right now.

5    **A.**    Huh?

6    **Q.**    That exhibit is in front of you right now.

7    **A.**    Yeah, yeah.  Okay.

8    **Q.**    I would like to go back to that.  And I'll tell you what

9    I'm going to do is go through that exhibit, the text chain, in

10   some detail so we're sure that we get the translation of these

11   text messages down right.  And I'll just say, before we start,

12   that I'm not doing this to criticize you or to embarrass you at

13   all.  As a fluent Chinese speaker, I work with interpreters like

14   you all the time, and I know it's extremely difficult to get

15   this stuff right, and even with ample time --

16   **A.**    Especially due to pressing --

17   **Q.**    Exactly, the pressing --

18   **A.**    -- without knowing how much time I was given.  So I did

19   as fast as I could.

20   **Q.**    I totally understand.  My goal here is just to work with

21   you to get this right.

22   **A.**    Yeah, sure.

23   **Q.**    And you'll be patient with me?  And please don't be

24   offended.

25   **A.**    Sure, sure.

1   **Q.**    Let's start with the chat's first line, line 333, and

2   this is where Nikki says something to Little 7, who has the

3   number 5425 next to his screen name.  And the translation says,

4   "Should I call Bank of America?" is that right?

5   **A.**    (Nonverbal response.)

6   **Q.**    Can you please respond "yes" or "no" for the

7   stenographer?

8   **A.**    Yes.

9   **Q.**    And the Chinese, though, it literally says, Does Bank of

10  America need to be called?

11          MS. SCHWARTZ:  Objection, Your Honor.  This is improper

12  impeachment.  May we sidebar?

13          THE COURT:  You may come forward if you wish, yes.

14          (Whereupon, a conference was held at the bench.)

15          MS. SCHWARTZ:  Your Honor, we object to this

16  impeachment on several grounds.  First, there was no alternative

17  translations provided that defense counsel has brought to use to

18  cross our translator on the accuracy of her translations.  They

19  were provided these exhibits in advance, with the translations in

20  advance, and raised no objection prior to trial on the accuracy

21  of the translations.

22          They also haven't put forward an expert to come forward

23  to use to cross our expert on the accuracy of these translations

24  and made no objection to her being sworn as an expert yesterday.

25  We think that this is not a proper line of questioning, unless

1    they're going to put forward some treatise or something that they

2    could use to say that certain parts of the translations are not

3    accurate.

4          The only reason they know --

5          MR. NI:  I mean, Ms. Liu is the expert.  She made these

6    translations.  She did them herself.  She admits there could be

7    errors in them.  She admits that she had no time to do it.  I can

8    ask her if she thinks a translation is correct or what the proper

9    translation is.  She can mark it up herself.  She agrees it's her

10   translation, it's her proofreading, and we won't have an

11   opportunity to do this with anyone else.

12         What's going to happen is -- they've introduced this

13   expert, put the exhibit in front of her; and what's going to

14   happen is, this exhibit with wrong translations, it's going to be

15   put in front of an agent who doesn't speak Chinese, who can't be

16   cross-examined on it, and he's going to be, like, Yeah, this is

17   what it says.

18         THE COURT:  If you thought the translator's was wrong,

19   why didn't you designate an expert and provide alternative

20   translations so that the government could see where the areas of

21   disagreement were?

22         MR. NI:  Frankly, it's just, like she said, impossible

23   with 55,000 lines of text.  You know, we didn't know what the

24   government was going to exactly put up, and we didn't know what

25   we would have to do on impeachment.  55,000 lines --

*Liu - Cross - Ni*

1          THE COURT:  The document you have now is eight pages

2     long.

3          MR. NI:  And we had a lot of other stuff picked out

4     that we wanted to use as well.  It was just too compressed to --

5          THE COURT:  I'm not going to allow you to pick apart

6     these translations.  You didn't object to the qualifications of

7     the expert.  You didn't object to the accuracy of them when they

8     were introduced.  If you want to ask her, you know, Does this

9     sentence say this?  She would say "yes" or "no."  It's her

10    translation.  Presumably, she would say "yes."  If she got it

11    wrong, it's a fair question to ask if she said the word -- you

12    know, "light" was the word, you know, whatever, "chair."  They

13    have the right to point out that she was wrong.

14          Frankly, she's already admitted there could be mistakes

15    in there.  She's already admitted she had an enormous amount to

16    do in a short amount of time.  Pointing out the specifics of her

17    mistakes is -- you know, if that's what you want to do on cross,

18    I will let you do it, but you don't get to testify as the lawyer,

19    and you don't get to testify as an expert; but if you want to ask

20    a specific question about an exhibit that they introduced to say,

21    Well, this is right, or, This is wrong, I'm going to give you the

22    chance to ask that question.  But if this turns into an academic

23    exercise on translating, we're not -- we can't do that.  First of

24    all, it's not the proper way to run a trial; and, secondly, you

25    don't have an expert in this case.

1          So I'm going to overrule the objection on the line of

2     questioning, but I'm cautioning you that it is not proper

3     impeachment to say something, testify as to its accuracy, you

4     know, get her to agree with it.  But you can ask her what

5     something means, and she can agree with you or not.  If she

6     doesn't, well, then, we'll see what your remedies are.

7          MR. NI:  Because this is kind of a fine line.  Your

8     Honor, just to be sure -- I'm not going to tell her to -- I'm not

9     going to say, like -- well, I'll try to keep it tight.

10          THE COURT:  Remember, this is cross-examination.  You

11     can lead the witness to either agree with what you say or they

12     don't agree with what you say.

13          Objection overruled, but with the caution that we're

14     not going to keep doing these bench conferences, and I'm only

15     going to give you so much latitude.

16          MR. NI:  Thank you, Your Honor.

17          (Whereupon, the following occurred in open court.)

18          THE COURT:  You may proceed.

19     BY MR. NI:

20     Q.     The first sentence, line 333, says, Does Bank of America

21     need to be called?  Correct?

22          MS. SCHWARTZ:  Objection, Your Honor.  We restate our

23     previous objections.  He's providing an alternate translation,

24     and there's no basis for that translation, and they have not

25     provided one.

1          THE COURT:  What is the exhibit number, Mr. Ni?

2          MR. NI:  5-12.

3          THE COURT:  And what is the line that you just

4    referenced?

5          MR. NI:  The first line is 333, Your Honor.

6          THE COURT:  All right.  Go ahead and ask your question.

7    BY MR. NI:

8    **Q.**    Ms. Liu, does that line state, Does Bank of America need

9    to be called?  The word "I" is not in there.

10          MS. SCHWARTZ:  Objection, Your Honor.  That's not what

11    the translation says.  He's not asking about her --

12          THE COURT:  I'm going to sustain the objection.  You

13    need to be specific.  The exhibit is here.  Unless you're going

14    to put it up for the jury to see, they don't understand what's

15    happening.  You need to explain either, This is what's in the

16    translation, or, This is what's not in the translation;

17    otherwise, it will confuse the jury, who thinks that what you've

18    just said is what's written down here.

19          MR. NI:  I see; so I'll read the words, and I'll say

20    what's not in there.

21    BY MR. NI:

22    **Q.**    Ms. Liu, your translation says -- shows Nikki saying,

23    "Should I call Bank of America?"  The word "I" is not in there,

24    right?

25    **A.**    Yeah; it's not literally in the source, but it's implied.

─Liu - Cross - Ni─

1   If you base on the context, it's implied.  That's how we use in

2   the conversation.

3   **Q.**     Understood.  Just to be --

4   **A.**     Due to the nature of Chinese language; like, sometimes

5   the subject, which is different from English, of course --

6   sometimes the subject of a sentence can be omitted.

7   **Q.**     Understood.  But the sentence can also be ambiguous; it

8   could also be, Should Bank of America be called?

9            MS. SCHWARTZ:  Objection, Your Honor.

10           THE WITNESS:  It's possible --

11           THE COURT:  We can't all talk at once.  It's impossible

12   for the interpreter and the court reporter.  I'm going to

13   overrule the objection.  If you want to ask a specific question

14   about what it says, ask the specific question.

15   BY MR. NI:

16   **Q.**     But, Ms. Liu, there can be ambiguity; it could also mean,

17   "Should" --

18   **A.**     Technically, yes, you are right, but based on this

19   context or what come before and after, which is -- should be,

20   Should I call Bank of America?  Translation is not just based

21   on, like, linguistically only; but, also, we have to consider

22   the specific context.

23   **Q.**     Absolutely, Ms. Liu, and we'll get to the context as we

24   get to the next sentences.

25   **A.**     Sure.

*Liu - Cross - Ni*

1  Q.    And next, on 334, Little 7 says, "Yes," as in, We should

2  call Bank of America?

3  A.    Yes.

4  Q.    And if you go to 337, which is about an hour and a half

5  later, your translation says, "Hailong's business BoA bank

6  account will basically be closed after confirmation.  It's not

7  closed now because there are three batches of remittances to be

8  confirmed"; is that right?

9  A.    Yes.

10  Q.    So you talked about the context earlier --

11  A.    Mm-hmm.

12  Q.    -- does this context imply that Little 7 has called Bank

13  of America and found this out?

14  A.    I think it matches; it matches the context.

15  Q.    It is the context, right?

16  A.    It matches.

17  Q.    So he's called Bank of America --

18  A.    There's no conflict there.

19  Q.    -- correct?  And it wasn't Nikki who called; it was

20  Little 7 who called?

21  A.    What's the question again?  You said who should be

22  calling, right?

23  Q.    Yeah.  It was Little 7 who called Bank of America and

24  found this out, that Hailong's bank account would be closed?

25  A.    Yes.

Liu - Cross - Ni

1    **Q.**    Thank you.

2         If you turn the page and go to line -- go through these

3    lines and go to line 347, Little 7 has explained that the Bank

4    of America is verifying these three transfers in the account,

5    and on line 347, Nikki responds -- the translation is, "So we're

6    just gonna have to wait.  Do you have time?"  But that is not

7    correct, is it, the "do you have time" part?

8    **A.**    Yeah.  I think there's -- yeah, it's not quite

9    appropriate.

10   **Q.**    Yeah, exactly.  In Chinese, it actually says, Do you

11   have --

12              MS. SCHWARTZ:  Objection, Your Honor.

13              MR. NI:  Sorry.

14              THE COURT:  Sustained.

15   BY MR. NI:

16   **Q.**    What does it actually say in Chinese?

17   **A.**    In Chinese means, What is appropriate timeline?

18   **Q.**    Can you say that again?  And feel free to use the

19   context, and take your time.

20   **A.**    What is the approximate timeline for the wait?

21   **Q.**    Approximate time frame?

22   **A.**    Yeah.

23   **Q.**    And so in context, this says, So we're just going to have

24   to wait?

25   **A.**    Mm-hmm.

1    **Q.**    And, What is the approximate time frame that Bank of

2    America will take to verify these transactions?

3    **A.**    Then you have to go back to the -- yeah, I think so, yes.

4    Yes.  How long basically means how long the bank take to verify

5    the three transfers.

6    **Q.**    So 349, then -- I'm sorry, 348, the next sentence, it

7    says -- your translation says, "I don't have time," but that's

8    not accurate, is it?

9    **A.**    Yeah.  There is no -- it says -- it is ambiguity in

10   there.  I wouldn't say it's quite wrong.

11   **Q.**    Yeah.  And it implies --

12   **A.**    It can be better.

13   **Q.**    Implies there's no time frame?

14   **A.**    Chinese is kind of very -- there is ambiguity in Chinese

15   source.

16   **Q.**    That's understandable.

17          And in 349, she actually commands him to say something;

18   is that correct?  She commands Little 7 to say something to the

19   bank while he's on the phone with them?

20          MS. SCHWARTZ:  Objection, Your Honor; that's not what

21   the translation says either.

22          THE COURT:  Overruled.  You can ask your question.

23          MR. NI:  Thank you.

24          THE WITNESS:  349, the translation is fine.

25   /////

Liu - Cross - Ni

BY MR. NI:

**Q.**    And in 351 --

**A.**    Yeah, it's fine.

**Q.**    So in 349, is your translation accurate, the first part?

**A.**    Yes, yes.  The word is fine.  There's always room for improvement, but it's accurate.

**Q.**    But is it ambiguous whether or not she's giving him a command to say something to the bank?  In the context, right -- let's go back to the context.

347 says [as read]:  Is there an approximate time frame?

348 says [as read]:  There's no approximate time frame. I'll call every week to check the status.

349 says --

**A.**    Yes.  Already evaluated context, and so my decision is 349's translation is accurate.

**Q.**    And is it a command to him?

**A.**    Is it a command?

**Q.**    Is it a direction to him to say something?

**A.**    Say one more time.

**Q.**    Would you describe 349 as --

**A.**    Command?

**Q.**    -- a direction or order from Nikki to Little 7?

**A.**    No, no, I don't think it's a direction for anyone.  It's just like a reiteration of what Little 7 has said before --

**Q.**    And what Little 7 --

*Liu - Cross - Ni*

1    **A.**     -- remind him of a context:  Oh, you said this before.

2    **Q.**     Got it.  So it's what Little 7 said to the bank?

3    **A.**     Yeah, before --

4    **Q.**     Got it.

5    **A.**     -- so it's not a direction.

6    **Q.**     And if you go back to -- and this whole time, they're

7    talking about how long it would take for Bank of America to

8    verify these transactions into Hailong's account, right?

9    **A.**     Mm-hmm.

10   **Q.**     And if you go all the way down to 354, is that -- it

11   says, "Give them," as in the Bank of America, "some time."  Is

12   that an accurate translation?  And you can follow up on the next

13   page, which is her next sentence, if you want some context.

14   **A.**     It's the same as the last line you mentioned.  It should

15   be -- there will be ambiguity, but it should be, like, Can they

16   provide a time frame?

17   **Q.**     Perfect, yes.  She's asking Little 7 whether or not Bank

18   of America provided --

19              MS. SCHWARTZ:  Objection, Your Honor.  Again, he's --

20              THE COURT:  Sustained.  Just ask your question.

21   BY MR. NI:

22   **Q.**     And you just said that, Let them provide a time frame,

23   right?

24   **A.**     Mm-hmm.

25   **Q.**     So this whole time -- so let's just summarize this line

1    of text messages.  They're talking about Hailong's Bank of

2    America account, right?

3    **A.**      Mm-hmm.

4    **Q.**      And they're -- is that right, Ms. Liu?

5    **A.**      They're talking about what?

6    **Q.**      Hailong's Bank of America account.

7    **A.**      Yes, yes.

8    **Q.**      And if you can just follow my question and answer "yes"

9    or "no."

10        And they're discussing what Bank of America is telling

11   Little 7 about this bank account on the phone; is that right?

12   **A.**      Yes.

13   **Q.**      But Hailong is not participating in this conversation, is

14   he?

15   **A.**      No.

16   **Q.**      And he's not calling the bank; Little 7 is?

17   **A.**      No; I don't think Hailong is participating.

18   **Q.**      Understood.  Hailong is not participating?

19   **A.**      No.

20   **Q.**      And so if you just turn a couple of pages to line 1,635,

21   please -- page 4, actually, bottom of page 4, line 1,635, -36,

22   and -37.  Are you there, Ms. Liu?

23   **A.**      Yes.

24   **Q.**      And so does Nikki say here -- and I'm quoting from the

25   transcript -- "Hailong just asked, don't we go to Wynn this

*Liu - Cross - Ni*

1    time?"  And there's a bracket, "laughing," and that is, I guess,

2    an emoji she sent; is that what it is?

**A.**    It should be.

**Q.**    And can you tell me what the -- I guess "laughing" is an

interpretation of yours of the emoji?  It's your interpretation

of the emoji?

**A.**    There can be better way of describing an emoji.

**Q.**    There's a better way to describe that emoji?

**A.**    Mm-hmm, yes.

**Q.**    Can you tell me how you describe it?

**A.**    It should be like a breaking into laughter.

**Q.**    Breaking --

**A.**    Breaking into laughter.

**Q.**    Breaking into laughter?

**A.**    Means whoever the person is wasn't laughing before, but

is breaking into laughter.

**Q.**    And can you tell me the literal words of that emoji in

Chinese?

**A.**    (Foreign language spoken.)

**Q.**    P-O-T-I W-E-I X-I-A-O?  And can you tell me literally

what that means, word by word?

**A.**    Means somebody was -- earlier was weeping, but breaking

into laughter.

**Q.**    So laughing with tears coming out?

**A.**    Mm-hmm, laughing with tears.

Liu - Cross - Ni

1   **Q.**    So, hilarious?

2   **A.**    Yes.  It's just an emoji.  If you are familiar with the

3   WeChat, there's -- this emoji is popularly used by the WeChat.

4   **Q.**    So Nikki is saying, "Hailong just asked, don't we go to

5   Wynn this time, laughing in tears"?

6   **A.**    Means he's happy, he's happy.

7   **Q.**    And then the next sentence, 1,636, Joseph says, "Ha ha!

8   He's got an idea."  Is that the literal translation of what he

9   said, "He's got an idea"?

10  **A.**    I think it's right.  The Chinese is very ambiguous, but

11  the English translation is not causing any conflicts with the

12  source, so I think it's acceptable, it's right.

13  **Q.**    And he's referring to Hailong, right, "Ha ha!  He's got

14  an idea"?  Is he referring to Hailong?

15  **A.**    Yes.  I think -- maybe Hailong, maybe both, but whoever's

16  idea going to the W-y-n-n is.

17  **Q.**    And the idea was Hailong's, right?  Nikki says, "Hailong

18  just asked," and Joseph says, "Ha ha!  He's got an idea"?

19  **A.**    Yes.

20  **Q.**    And then, finally -- that's Joseph.  And, finally,

21  Little 7, the third member of this group, responds in three

22  emojis, and you've got, "Chuckling, chuckling, chuckling" as the

23  translation.  Is that literally what the emojis show?

24  **A.**    Not quite.

25  **Q.**    Can you give sort of a more --

*Liu - Cross - Ni*

**A.**     More like, if you are used to the emojis used in WeChat,
ashamed, like (indicating), ashamed of yourself of something you
did.

**Q.**     So is he being respectful to the person with the idea or
disrespectful?

**A.**     I think there's nothing to do with respect.  It's just
like when you -- for example, if you praise me, right, if you
give me a praise but I feel like I did not earn it, or I feel
like I do not deserve that, or maybe you are overly praising me,
then I will do that (indicating).  You understand?

**Q.**     And so he's covering his mouth and chuckling?

**A.**     Yeah.  He's ashamed or maybe embarrassed; you're overly
praising me.

**Q.**     It's kind of a mouth-covering chuckle --

**A.**     Mm-hmm.

**Q.**     -- here in context?

**A.**     Yes.

**Q.**     So would it be accurate to describe this three-line
exchange as Nikki saying, Hailong's idea, laughing very hard
about it; and Joseph saying, Ha-ha, what an idea; and Little 7
covering his mouth and chuckling at the idea?

**A.**     Yeah, you got it.

**Q.**     Last line on this exhibit -- it's the last set of text on
this exhibit, 1,797, which is page --

**A.**     Seven.

*Liu - Cross - Ni*

Q.      Yeah, page 7.  Thank you.

        And it says, in English, "Did Hailong set up Cathay
Pacific online banking? @Joseph."  This sort of implies that
Hailong is doing the setup, but is that accurate?

A.      What's your question again?

Q.      Is your translation of 1,797 accurate insofar as it
suggests that Hailong is setting up the Cathay Pacific online
banking account?

A.      Yes.

Q.      Is there ambiguity in that it could be someone else
setting it up for Hailong?

A.      Yeah, it can mean.

Q.      Understood.  So it can mean that?

A.      Yeah.  It can mean either Hailong or somebody else set up
Hailong's account for him.

Q.      So let's give you some context.  If you move on to
1,800 -- she's talking @Joseph in 1,797; and two lines later,
she says -- so the first line, it's ambiguous [as read]:  Has
Hailong's Cathay Pacific online banking account been set up?
And then 1,800 says [as read]:  I'll give you the template.

        MS. SCHWARTZ:  Objection, Your Honor; that's not
what --

        THE COURT:  Sustained.

        MR. NI:  Sorry, Your Honor.  It's automatic.  I take it
back.

Liu - Cross - Ni

1   BY MR. NI:

2   **Q.**    What does 1,800 say, in context?

3   **A.**    [As read]:  I'll give you a template.

4   **Q.**    And so 1,797 says, Has Hailong -- is ambiguous what it

5   says about who's setting up Hailong's online bank account, and

6   1,800 says [as read]:  Let me give you the template.

7        And the template follows, right?  She sends Joseph a

8   template.  And the template in 1,801 --

9   **A.**    Based on the following chat, we can deduct that Hailong's

10  online banking account probably is not set up yet.

11  **Q.**    Not set up yet?

12  **A.**    Yeah.  Because if it's already set up, then they wouldn't

13  need all this information for the address or template.

14  **Q.**    So, in context, is Nikki telling Joseph to set up

15  Hailong's online banking account with this template --

16  **A.**    Yes.

17  **Q.**    -- with the address?

18  **A.**    So it can mean --

19  **Q.**    And in 1,802, it says, "This is the address for all"?

20  **A.**    Yes.

21  **Q.**    Is that a direction to Joseph to use this address for all

22  of Hailong's bank accounts?

23  **A.**    Yes.

24        MR. NI:  Can I ask the bailiff to please put in front

25  of Ms. Liu Defense Exhibit 1A?  But don't take that away; just

1    put it on top, because there's going to be some overlap.

2    BY MR. NI:

3    **Q.**     If you just glance through this chat.

4           Ms. Liu, do you recall yesterday how we talked about how

5    the chat that Government's Exhibit 5-12 came from is thousands

6    of lines?

7    **A.**     Mm-hmm, I remember.

8    **Q.**     And it's so big that we can't possibly go through it in

9    one day, right?  It's thousands of thousands of lines?

10   **A.**     Mm-hmm.

11   **Q.**     Do you recognize -- if you glance through Defendant's

12   Exhibit 1A, can you tell me if this is other portions of

13   Government's Exhibit 5-12?

14   **A.**     Yes, it's part of the chat.

15   **Q.**     Yeah, it's the same chat.

16   **A.**     Mm-hmm.

17   **Q.**     So would you mind going to line 159, please?  I just want

18   to take you through some of these lines that the government

19   didn't put into its exhibits and we put into ours.

20          If you look at 159, the translation says, right in the

21   middle, [as read]:  Tomorrow, I will take Hailong to Cathay

22   Pacific.

23          And I want you to look at the line "to Cathay Pacific"

24   specifically and tell me if that is an accurate translation or

25   if it's missing any words.

*Liu - Cross - Ni*

1      Maybe I will be more specific.  What is he taking Hailong

2  to Cathay Pacific to do?  What does it say in Chinese?

3  **A.**    Open account.

4  **Q.**    That's right.  So it should say, I will take Hailong to

5  Cathay Pacific to open account, right?

6  **A.**    Mm-hmm.

7  **Q.**    And so this is about 1,600 lines before Nikki tells

8  Joseph to do Hailong's Cathay Pacific online banking that we

9  talked about earlier.  So, here, you have him -- we have Joseph

10 saying to, I guess, both Nikki and Little 7, Tomorrow, I'm

11 taking Hailong to Cathay Pacific to open his bank account?

12 **A.**    Yeah.

13 **Q.**    Okay.  Let's go to lines 462 to 495.

14 **A.**    I missed what you say.

15 **Q.**    462 through 495 -- 490.  And just tell me when you have

16 reviewed those lines of texts.

17 **A.**    Yes.

18 **Q.**    And so the first line, 462, is Little 7 asking Nikki,

19 "Are Hailong's cards from Chase and the two companies with you?"

20 Is this a fully accurate translation?

21 **A.**    It should be -- it should be add another preposition.

22 **Q.**    I'm sorry?

23 **A.**    Add one more preposition.

24 **Q.**    What should it be?

25 **A.**    Are Hailong's cards from Chase and from the two

1   companies?  If in English, put this way, it can cause ambiguity.

2   In Chinese, there is no ambiguity in the source, but there's

3   ambiguity in the target language.

4   **Q.**     And so in Chinese, it's clear to you that --

5   **A.**     Yes, in Chinese, it's clear.

6   **Q.**     He's asking whether Hailong's bank cards are with Nikki,

7   right?

8   **A.**     Yes.

9   **Q.**     Nikki says they're not with her?

10  **A.**     Hailong has cards from Chase, and also he has cards of

11  these two companies.

12  **Q.**     So he's got, like, his bank cards; is that right?

13  **A.**     Yes.

14  **Q.**     And they're asking if his bank cards are with Nikki?

15  **A.**     Mm-hmm.

16  **Q.**     And what does Nikki say?

17  **A.**     "I don't have any."

18  **Q.**     Yeah, that's right.

19       And if you go all the way through this line of texts, can

20  you describe what happens?  Where are they?  I guess I'll lead

21  you through it.

22       Next, she says, "I don't have it.  Ask Menggu."  What

23  does Menggu mean?  It's a transliteration, but what does it mean

24  literally?

25  **A.**     It's a place in China, but I think, in this context,

— Liu - Cross - Ni —

1   means somebody's name.

2   **Q.**    It's his name, right?

3   **A.**    Uh-huh.

4   **Q.**    And Joseph says, (foreign language spoken), [as read]:

5   Do you have these cards?

6              (Court reporter clarification.)

7   BY MR. NI:

8   **Q.**    Little 7 -- I'm sorry.  I get confused between --

9         Little 7 says, Do you have these cards?  Nikki says,

10  They're not with me.  And Joseph says, You have them -- "You

11  have it."

12        Is he, in essence, insisting that Nikki does have the

13  cards?

14  **A.**    Yes, right.

15  **Q.**    And he's insisting because he says, You took pictures of

16  them and sent them to me before, right?

17  **A.**    Mm-hmm.

18  **Q.**    And that's why he knows she's got them.

19        And then in line 473, Nikki says again [as read]:  No, I

20  don't have them.  So she's responding to him saying, "No"; is

21  that right?

22  **A.**    Yeah, you're right.

23  **Q.**    And 475, she says, "I don't have the company's card

24  either"; is that right?

25  **A.**    Yes, you're right.

1    **Q.**    And she's saying that, I don't have them, because in

2    line 476, she says, "I gave that to you"?

3    **A.**    Mm-hmm, you are right.

4    **Q.**    So she's saying, I gave Hailong's Chase Bank cards and

5    company bank cards to you guys?

6    **A.**    Mm-hmm.

7    **Q.**    So she had them at one point, and she gave them to either

8    Joseph or Little 7?

9    **A.**    Right.

10   **Q.**    Not Hailong?

11   **A.**    Right.

12   **Q.**    And then Little 7 comes back in and says, [as read]:  No,

13   wait; what I'm actually looking for is a credit card?  Line 477.

14   **A.**    Yes.

15   **Q.**    So in the beginning when he said, Hey Nikki, are

16   Hailong's Chase Bank card and company bank cards with you, he

17   meant credit cards, and they were just talking about bank cards.

18   So now he comes and clarifies, No, I'm looking for his credit

19   cards?

20   **A.**    Right.

21   **Q.**    And Nikki says, Well, you didn't ask for a credit card;

22   is that right?

23   **A.**    Right.

24           MS. SCHWARTZ:  Objection, Your Honor.  If counsel has

25   issues with any of these translations, I'm not sure why he's

*Liu - Cross - Ni*

 1    asking the witness about it.

 2            THE COURT:  Mr. Ni, why don't we move on to keep

 3    this --

 4    BY MR. NI:

 5    Q.    So I'll just conclude this line.

 6          Does it seem like Nikki and these other two -- Little 7

 7    and Joseph -- have both Hailong's bank cards and his credit

 8    cards?

 9    A.    Say it one more time.

10    Q.    Does it seem like, from this line of exchanges, that

11    these three have Hailong's credit cards and bank cards?

12    A.    No.  I think Joseph -- Joseph have -- should have credit

13    card, but not bank card in general.

14    Q.    And Nikki has the bank cards?

15    A.    Huh?

16    Q.    Nikki has the bank cards?

17    A.    Yes, Nikki has it.

18    Q.    Now, one last bit on this exhibit.  2,089 and 2,090 and

19    2,091, and my question is going to be about 2,091.  Is that

20    accurate?  But take a look at the context and let me know if

21    2,091 is accurate.

22    A.    Yes, it's accurate, but it can be more clear.

23    Q.    Yeah, and --

24    A.    It's a little bit unclear.  I mean, Chinese is unclear,

25    but the translation should make it better.

1   **Q.**    Yeah.  And so 2,091, how would you make that more

2   clearly, because 2,089 --

3   **A.**    If I have another time to revise it or more time to

4   revise it, I probably would put, Menggu should have Hailong's

5   public account information.

6   **Q.**    That's right, perfect.  So 2,089, Nikki says, "Put in" --

7   well, can you just tell me how you would translate 2,089, what

8   Nikki says to Joseph and Little 7?

9   **A.**    I did not translate this.

10  **Q.**    How would you say it?

11  **A.**    Can you sort out the public account information for

12  Mingxing and Hailong and send to me?

13  **Q.**    So she's telling the two of them to send her Mingxing and

14  Hailong's East West Bank accounts?

15  **A.**    Can you send me the public accounts of Hua Mei?

16  **Q.**    Yeah, and --

17  **A.**    -- and Mingxing and Hailong, and send to me?

18  **Q.**    Yeah.  And next, Little 7 sends his -- what he knows, and

19  he says, in 2,091 [as read]:  Menggu should have Hailong's bank

20  account information.

21  **A.**    Mm-hmm, yeah.

22  **Q.**    And Hailong is not a part of this conversation, right?

23  **A.**    No.

24          MR. NI:  Defense moves to admit Defendant's Exhibit 1A.

25          THE COURT:  Any objection?

*Liu - Redirect - Schwartz*

1         MS. SCHWARTZ:  No objection, Your Honor.

2         THE COURT:  It will be admitted without objection.

3         (Defendant's Exhibit No. 1A received in evidence.)

4         MR. NI:  That's all I have.

5         THE COURT:  Thank you.

6         Any redirect?

7         MS. SCHWARTZ:  Very briefly, Your Honor, just one brief

8  question.

9                  REDIRECT EXAMINATION

10  BY MS. SCHWARTZ:

11  **Q.**    There may be some small inaccuracies in the translations

12  you did, but would you say that the translations accurately

13  captured the substance of the conversation?

14  **A.**    Sure.

15         MS. SCHWARTZ:  Nothing further, Your Honor.

16         THE COURT:  Thank you.

17         Is Ms. Liu released from further testimony, or will she

18  be needed at a later time by either side?

19         MS. BEDELL:  She's released.

20         MR. KAMENS:  No objection.

21         THE COURT:  You may step down, Ms. Liu.  You are

22  released at this time.

23         Call your next witness.

24         (Whereupon, the witness exits the stand.)

25         MS. BEDELL:  The government calls Scott Holt.

*Holt - Direct - Bedell*

```
 1              (SCOTT HOLT, ON BEHALF OF THE GOVERNMENT, SWORN)

 2                  (Whereupon, the witness takes the stand.)

 3                           DIRECT EXAMINATION

 4   BY MS. BEDELL:

 5   Q.    Good morning.

 6   A.    Good morning.

 7   Q.    Would you please state your name and spell it for the

 8   record?

 9   A.    Scott Holt, H-O-L-T.

10   Q.    Where do you work?

11   A.    I work for Deloitte.

12   Q.    What is your title there?

13   A.    I'm a specialist leader.

14   Q.    What does that role consist of?

15   A.    I lead investigative teams that support federal law

16   enforcement on financial investigations.

17   Q.    Have you received any training for your role?

18   A.    Yes.

19   Q.    What training is that?

20   A.    I'm a CPA, so I have accounting training and specific

21   training through online courses and developed courses.

22   Q.    How long have you worked for Deloitte?

23   A.    Fifteen years.

24   Q.    And how long have you been in this specific role?

25   A.    Eight years.
```

*Holt - Direct - Bedell*

**Q.**    What is your educational background?

**A.**    I have an undergrad in finance and a master's in accounting.

**Q.**    I would like to turn to this case.  At some point, did you become involved in this particular case?

**A.**    Yes.

**Q.**    And how is that?

**A.**    We are -- we support Secret Service and their financial investigations, and there was a request that came from headquarters for accounting support.

**Q.**    What role have you played in this case?

**A.**    I've been a supervisor on it and in the weeds, like, doing the work, preparing the exhibits, checking the work, and providing examples.

**Q.**    When you say "doing the work," what does that involve?

**A.**    Well, we'll often be provided financials, bank statements.  We'll have to kind of convert the statements, stage the data, get it into an Excel format that's usable to more easily kind of sum and extract information from; and so I get those extracts, check the work, check the information, verify it against the hard documents, and go from there.

**Q.**    So as part of your involvement in this case, have you reviewed bank accounts -- bank records for accounts in the name of Hailong Zhu?

**A.**    Yes.

*Holt - Direct - Bedell*

1   **Q.**     And in the name of Sea Dragon Trading and Sea Dragon

2   Remodel?

3   **A.**     Yes.

4   **Q.**     What were you looking for as you reviewed those records?

5   **A.**     We summarize sources that use the funds.

6   **Q.**     And how did you determine that an account was associated

7   with Zhu or his companies?

8   **A.**     Based on either the name on the account and/or the

9   signature documents that are provided.

10  **Q.**     Did you review records from Bank of America?

11  **A.**     Yes.

12          MS. BEDELL:  At this time, Your Honor, I would like to

13  read Stipulation No. 1.

14          THE COURT:  You may do so.

15          MS. BEDELL:  "The United States and the defendant,

16  Hailong Zhu, stipulate and agree that the exhibits set forth

17  below are authentic, accurate copies of business records of Bank

18  of America, N.A., that meet the requirements of Federal Rule of

19  Evidence 902(11) and 803(6).  The defendant reserves his right to

20  object to admissibility on other grounds."

21          And the exhibits here -- and I will move to admit them

22  afterwards so that everyone is tracking since it's a long list --

23  are Exhibits 10-1, 10-3, 10-4, 10-5, 10-6, 10-7, 10-8, 10-9,

24  10-10, 10-11, 10-12, 10-15, 10-16, 10-17, and 10-18.  And we

25  would move to admit them at this time.

*Holt - Direct - Bedell*

1              THE COURT:  Is there any objection?

2              MR. WENSTRUP:  No objection.

3              THE COURT:  They will be admitted without objection.

4              (Government's Exhibit Nos. 10-1, 10-3 through 10-12,

5      and 10-15 through 10-18 received in evidence.)

6              MS. BEDELL:  Can we take a look at and publish 10-1 and

7      10-3?  And if you could publish 10-1, please?

8              (Exhibit published.)

9      BY MS. BEDELL:

10     **Q.**    And what is this document?

11     **A.**    This is the account opening documents for Sea Dragon

12     Trading LLC, account ending in 3881.

13     **Q.**    And who is the sole person listed on this exhibit?

14     **A.**    Hailong Zhu.

15     **Q.**    And on page 2, what is the signature and date on this

16     document?

17     **A.**    Hailong Zhu, September 9, 2022.

18     **Q.**    Is this one of the documents you reviewed to determine

19     Zhu's association with this account?

20     **A.**    Yes.

21     **Q.**    Could we look at Exhibit 10-4, please?

22             (Exhibit published.)

23     BY MS. BEDELL:

24     **Q.**    What is this document?

25     **A.**    This is a bank statement for Sea Dragon Trading LLC,

*Holt - Direct - Bedell*

1    account ending 3881.

2              MS. BEDELL:  And if we could look at page 7, please.

3    BY MS. BEDELL:

4    **Q.**    What is depicted on page 7?

5    **A.**    This is the listed deposit and credit activity for

6    account 3881.

7    **Q.**    And at the bottom -- I don't think it's visible on the

8    screen -- but the withdrawals --

9    **A.**    It has the withdrawal activity for this account.

10   **Q.**    And does the rest of the document similarly contain such

11   transaction data?

12   **A.**    Yes.

13   **Q.**    And is this one of the documents that you reviewed to

14   understand the transactions associated with the account?

15   **A.**    Yes.

16             MS. BEDELL:  Could we look at Exhibit 10-5, please?

17             (Exhibit published.)

18   BY MS. BEDELL:

19   **Q.**    And what is this document?

20   **A.**    This is account opening documents for Sea Dragon Remodel

21   Inc., account ending 9529.

22   **Q.**    What is the signature and date on the account?

23   **A.**    Hailong Zhu, October 20, 2022.

24             MS. BEDELL:  And if we could look at 10-6.

25             (Exhibit published.)

*Holt - Direct - Bedell*

1    BY MS. BEDELL:

2    **Q.**    What is this document?

3    **A.**    This is the bank statement for Sea Dragon Remodeling

4    [*sic*] Inc., account ending 9529.

5           MS. BEDELL:  If we could look at page 9 of this

6    document.  Maybe one additional page.  Is that page 9?  Can we go

7    back to the last page, then?

8    BY MS. BEDELL:

9    **Q.**    What is this page showing?

10   **A.**    This is the cover page, the summary of activity within

11   the account ending in 9529.

12          MS. BEDELL:  Could we look at page 11, please?

13   BY MS. BEDELL:

14   **Q.**    And what is shown on this page?

15   **A.**    This is the deposit and credit activity for this account.

16          MS. BEDELL:  And could we see the whole page, please?

17          (Exhibit published.)

18   BY MS. BEDELL:

19   **Q.**    And which month is this for?

20   **A.**    This is for November of 2022.

21   **Q.**    What information is being shown in these deposit lines?

22   **A.**    We can see the wires going into the accounts.  There's an

23   ACH, like any account at Colorado, CU.  That appears to be all.

24   **Q.**    You're referring to those transactions on November 2nd?

25   **A.**    Yes.

*Holt - Direct - Bedell*

1   **Q.**    Those are ACH transactions?

2   **A.**    Yes.

3   **Q.**    And what are the rest of the transactions, then?

4   **A.**    Wire transactions.

5   **Q.**    And then on November 1st, what is the type of transaction

6   that day?

7   **A.**    It is a wire in to this account.

8   **Q.**    I'm sorry.  The transaction -- they are all for the same

9   amount -- the fourth transaction for November 4th.

10  **A.**    This is a wire transaction within the account.  It's

11  listed as a "book in" from Saul Reyes for $10,000.

12  **Q.**    Does that mean it came from an account at Bank of

13  America?

14  **A.**    Yes.

15  **Q.**    What does "TLR transfer" mean at the bottom of this page?

16  **A.**    It's when someone goes to the bank and, like, moves money

17  using -- like, at the bank with the teller.

18  **Q.**    Now, from these particular forms, can you typically see

19  where the transactions are coming in from, like, what state?

20  **A.**    No.

21         MS. BEDELL:  Could we look at page 12?

22  BY MS. BEDELL:

23  **Q.**    And what is shown here?

24  **A.**    This is a continuation of the activity with wires,

25  transfers, and that's it.

*Holt - Direct - Bedell*

1   **Q.**     And the first transfer shown here on 11/7 --

2          MS. BEDELL:  If you could zoom in on the top portion of

3   the page.

4   BY MS. BEDELL:

5   **Q.**     -- what is the purpose given for that payment?

6   **A.**     It says "family support."

7   **Q.**     And the first transfer executed on 11/15, what does the

8   purpose get written in there for the payment?

9   **A.**     It says "payments and goods services."

10  **Q.**     What bank did that transfer come in from?

11  **A.**     Wells Fargo Bank.

12  **Q.**     The transfer on 11/17, what is the purpose of this

13  transfer?

14  **A.**     This one says "home renovation customer to renovation

15  company."

16  **Q.**     What bank did that transfer come in from?

17  **A.**     U.S. Bank.

18         MS. BEDELL:  Could we look at page 13, please?

19  BY MS. BEDELL:

20  **Q.**     What is shown here?

21  **A.**     It's a continuation of the deposit activity and has the

22  withdrawals and debits at the bottom.

23  **Q.**     Can you read the details of the second transaction shown

24  in the deposits, please?

25  **A.**     It says "POP Services."

*Holt - Direct - Bedell*

1   **Q.**     Oh, excuse me.  Who is that transfer in from?

2   **A.**     I'm sorry.  This is a wire from Kwadwo Danso-Fordjour.

3   **Q.**     What is the date on that transfer?

4   **A.**     November 25, 2022.

5   **Q.**     And could you look at the last transaction that came into

6   the account on 11/30?  What is the purpose supplied for that

7   transaction?

8   **A.**     It says "pay off a loan."

9   **Q.**     And then what is the total amount of deposits into this

10  account for the month of November?

11  **A.**     $566,316.22.

12  **Q.**     And then looking at the bottom of the page within the

13  withdrawals and other debit section, what is the date and

14  general description of that second wire listed?

15  **A.**     It is November 3, 2022.  It is a wire to O Diamonds

16  Trading Limited for goods, $94,000.

17  **Q.**     And is that labeled as an international transaction?

18  **A.**     Yes.

19  **Q.**     And what is the date and general description of the third

20  wire listed?

21  **A.**     It is a wire to -- it says "Mitsubishi UFJ TR and Banking

22  for further credit to," and there's an account number listed

23  ending in 0328 DB for $80,000.

24  **Q.**     And then looking at the last transaction on this page,

25  what is the date and general description of that one?

1    **A.**     This is November 17, 2022.  It is a wire to the benefit

2    of Mitsubishi UFJ TR and Banking for further credit to account

3    ending 0328 DBT FF for $38,000.

4    **Q.**     And with that -- the first one that says "DB" and the

5    second one that says "DBT FF," what do you understand to be

6    happening there?

7    **A.**     The full description is cut off.

8           MS. BEDELL:  Could we look at page 14, please?

9    BY MS. BEDELL:

10   **Q.**     What are the total withdrawals for November of 2022?

11   **A.**     $539,200.37.

12   **Q.**     And does this document contain similar records for

13   October and December of 2022 as well as January and

14   February 2023?

15   **A.**     Yes.

16          MS. BEDELL:  Can we look at Exhibit 10-7?  And this one

17   is actually a CD, please.

18          (Exhibit published.)

19   BY MS. BEDELL:

20   **Q.**     Have you reviewed the contents of this CD?

21   **A.**     Yes.

22   **Q.**     What does it contain?

23   **A.**     It contains the wire details for the Bank of America

24   accounts.

25   **Q.**     And when you say "the Bank of America accounts," are you

*Holt - Direct - Bedell*

1   referring to the 9529 and 3381 accounts we just looked at?

2   **A.**     Yes.

3   **Q.**     And does this document detail where the transfers came in

4   from?

5   **A.**     Yes.

6   **Q.**     And does this document have the full version of the

7   transfer details that were cut off in the versions we were just

8   looking at?

9   **A.**     Yes.

10          MS. BEDELL:  Can we look at Exhibit 10-8, please?

11          (Exhibit published.)

12   BY MS. BEDELL:

13   **Q.**     What is this document?

14   **A.**     This is the account opening for an account in the name of

15   Hailong Zhu ending 6689.

16   **Q.**     And what kind of an account is this?

17   **A.**     This is an individual checking account.

18   **Q.**     And what is the signature and date on this account?

19   **A.**     This is Zhu, Hailong; looks like September 28, 2021.

20          MS. BEDELL:  Could we look at Exhibit 10-9, please?

21          (Exhibit published.)

22   BY MS. BEDELL:

23   **Q.**     And what is this document?

24   **A.**     This is the bank statement in the name of Hailong Zhu,

25   account ending 6689.

*Holt - Direct - Bedell*

1   **Q.**    And does this document have statements from

2   September 21st -- September 2021 until December 2022?

3   **A.**    Yes.

4   **Q.**    All right.  Turning to JPMorgan, did you also review

5   records from JPMorgan Chase?

6   **A.**    Yes.

7   **Q.**    Did you review JPMorgan Chase signature cards and

8   statements for accounts ending 3886 and 5581?

9   **A.**    Yes.

10  **Q.**    And are those documents reflected in Exhibits 11-1, 11-3,

11  11-6, and 11-8, which have already been admitted?  And I can

12  read those again once you're in the right location.

13  **A.**    Yes.

14  **Q.**    Did you also review records from U.S. Bank?

15  **A.**    Yes.

16            MS. BEDELL:  At this time, I will read the stipulation

17  for U.S. Bank:

18            "The United States and the defendant, Hailong Zhu,

19  stipulate and agree that the exhibits set forth below are

20  authentic, accurate copies of business records of U.S. Bank that

21  meet the requirements of Federal Rule of Evidence 902(11) and

22  803(6).  The defendant reserves his right to object to

23  admissibility on other grounds."

24            These are Exhibits 12-1, 12-2, 12-4, 12-5, 12-6, 12-7,

25  and 12-8.  At this time, we would move to admit.

*Holt - Direct - Bedell*

1           THE COURT:  Any objection?

2           MR. WENSTRUP:  No, Your Honor.

3           THE COURT:  Admitted without objection.

4           (Government's Exhibit Nos. 12-1, 12-2, 12-4, 12-5,

5  12-6, 12-7, and 12-8 received in evidence.)

6           MS. BEDELL:  Could we take a look at Exhibit 12-1,

7  please?

8           (Exhibit published.)

9  BY MS. BEDELL:

10  Q.    And what is this document?

11  A.    This is the account opening documents for U.S. Bank

12  account in the name of Hailong Zhu.

13  Q.    And what is the name and signature on this account?

14  A.    Hailong Zhu, signed July 2, 2021.

15           MS. BEDELL:  Is it possible to see the very top of this

16  document?

17  BY MS. BEDELL:

18  Q.    You might need to look at the hard copy.

19        Is this an opening document or an addendum document?

20  A.    This is an addendum document.

21           MS. BEDELL:  Could we look at 12-2, please?

22           (Exhibit published.)

23  BY MS. BEDELL:

24  Q.    And what is this document?

25  A.    This is a bank statement for the Hailong Zhu, account

*Holt - Direct - Bedell*

1    ending in 4148.

2    **Q.**    And is this a personal or business account?

3    **A.**    A personal account.

4         MS. BEDELL:  Could we look at page 155 of this

5    document?

6    BY MS. BEDELL:

7    **Q.**    And what is -- what is on page 155?

8    **A.**    This is the statement for the account.  It says,

9    "Information You Should Know."  It lists out your deposit

10   agreement, customer information.

11        MS. BEDELL:  If we could zoom in on the top portion.

12   BY MS. BEDELL:

13   **Q.**    What is the date that's covered in this statement?

14   **A.**    September 20, 2019, through September 23, 2019.

15   **Q.**    And what is the address on the account?

16   **A.**    3573 Mulligan Drive, Woodridge, Illinois 60517.

17   **Q.**    If we could take -- was this the first statement for this

18   account?

19   **A.**    Yes.

20        MS. BEDELL:  Could we take a look at page 61 of this

21   document, please?

22   BY MS. BEDELL:

23   **Q.**    And what is the time frame that's reflected here?

24   **A.**    This is October 23, 2021, through November 22, 2021.

25   **Q.**    What is the address on the account at this time?

*Holt - Direct - Bedell*

1   **A.**    It is 239 West 18th Street, Apartment 4D, Chicago,

2   Illinois 60616.

3          MS. BEDELL:  Could we look at page 7 of this document?

4   BY MS. BEDELL:

5   **Q.**    What is the time frame on this statement?

6   **A.**    This is October 25, 2022, through November 22, 2022.

7   **Q.**    And what is the address on this account?

8   **A.**    It says 1140 South El Molino Street, Alhambra,

9   California 91801.

10         MS. BEDELL:  Could we look at Exhibit 12-5, please?

11         (Exhibit published.)

12  BY MS. BEDELL:

13  **Q.**    And what is this document?

14  **A.**    This is an image provided with the statements of one of

15  the transactions that occurred.

16  **Q.**    And does this exhibit contain other surveillance stills

17  as well?

18  **A.**    Yes.

19  **Q.**    And did you review these materials?

20  **A.**    Yes.

21  **Q.**    Why did you review them?

22  **A.**    It was part of the documents provided.

23  **Q.**    And did they have any useful information specifically

24  beyond the bank account information?

25  **A.**    Yes.

*Holt - Direct - Bedell*

1    **Q.**    And what is that?

2    **A.**    It gives an image of who conducted specific transactions.

3    **Q.**    Did you also review records from Wells Fargo?

4    **A.**    Yes.

5          MS. BEDELL:  At this point, I'll read Stipulation

6    No. 4:

7          "The United States and the defendant, Hailong Zhu,

8    stipulate and agree that the exhibits set forth below

9    are authentic, accurate copies of business records of Wells

10   Fargo, N.A., that meet the requirements of Federal Rule of

11   Evidence 902(11) and 803(6).  The defendant reserves his right to

12   object to admissibility on other grounds."

13         The exhibits here are 13-1 and 13-2.  At this point, we

14   would move to admit them.

15         THE COURT:  Any objection?

16         MR. WENSTRUP:  No objection.

17         THE COURT:  Admitted without objection.

18         (Government's Exhibit Nos. 13-1 and 13-2 received in

19   evidence.)

20         MS. BEDELL:  Could we look at Exhibit 13-1, please?

21         (Exhibit published.)

22   BY MS. BEDELL:

23   **Q.**    What is this account -- document?

24   **A.**    This is a bank opening -- a business account application

25   for Wells Fargo in the name of Sea Dragon Remodel Inc., account

*Holt - Direct - Bedell*

1   ending -- with the customer Hailong Zhu.

2   **Q.**    And what was the last four of the account?  I think

3   that's in the middle of this page here.

4   **A.**    It is 6778.

5         MS. BEDELL:  Could we look at page 3, please?

6   BY MS. BEDELL:

7   **Q.**    And what does it say is the number of employees of Sea

8   Dragon Remodel?

9   **A.**    Seven.

10   **Q.**    What is the annual gross sales?

11   **A.**    800,000.

12   **Q.**    What is the industry?

13   **A.**    Construction.

14   **Q.**    And what is the description of the business?

15   **A.**    Commercial remodeling construction.

16   **Q.**    Under "bank use only," what is listed as the entity

17   verification?

18   **A.**    Articles of incorporation.

19         MS. BEDELL:  Could we look at page 4, please?

20   BY MS. BEDELL:

21   **Q.**    Who is listed as the owner and authorized signer?

22   **A.**    Hailong Zhu.

23   **Q.**    At the bottom, what ID was provided?

24   **A.**    NDLC.

25   **Q.**    Do you know what that stands for?

1    **A.**     No.

2    **Q.**     Could you look at page 5, please?  What is the name and

3    date on the card?

4    **A.**     Hailong Zhu, November 1, 2022.

5         MS. BEDELL:  Can we look at 13-2, please?

6    BY MS. BEDELL:

7    **Q.**     What is this document?

8    **A.**     This is the bank statement for Sea Dragon Remodel Inc.,

9    account ending 6778.

10   **Q.**     And this document has multiple pages?

11   **A.**     Yes.

12   **Q.**     And this is one of the documents you reviewed?

13   **A.**     Yes.

14   **Q.**     Did you also review records from East West Bank?

15   **A.**     Yes.

16        MS. BEDELL:  Stipulation No. 5:

17        "The United States and the defendant, Hailong Zhu,

18   stipulate and agree that the exhibits set forth below are

19   authentic, accurate copies of business records of East West Bank,

20   N.A., that meet the requirements of Federal Rule of Evidence

21   902(11) and 803(6).  The defendant reserves his rights to object

22   to admissibility on other grounds."

23        Exhibits 14-1, 14-2, and 14-3, at this point, we would

24   move to admit.

25        MR. WENSTRUP:  No objection, Your Honor.

1          THE COURT:  Admitted without objection.

2          (Government's Exhibit Nos. 14-1, 14-2, and 14-3

3    received in evidence.)

4          MS. BEDELL:  Could we look at Exhibit 14-1, please?

5          (Exhibit published.)

6    BY MS. BEDELL:

7    **Q.**    What is this document?

8    **A.**    It's an account opening document for East West Bank.

9    **Q.**    And what is the account number?

10   **A.**    (No response.)

11   **Q.**    I'm not sure if it's listed --

12   **A.**    I don't think it's on this page.

13   **Q.**    Do you recall the account number from your other

14   investigation or other review of records?

15   **A.**    I do not.

16   **Q.**    Who was the only authorized signer listed on the account?

17   **A.**    Hailong Zhu.

18   **Q.**    And what is the date of the account opening?

19   **A.**    The date is --

20   **Q.**    I believe --

21   **A.**    -- October 31, 2022.

22   **Q.**    And whose signature, on page 3, is listed on the account?

23   **A.**    Hailong Zhu.

24          MS. BEDELL:  Could we look at Exhibit 14-2?

25          (Exhibit published.)

*Holt - Direct - Bedell*

BY MS. BEDELL:

**Q.**   What is this document?

**A.**   This is the bank statement for East West Bank.

**Q.**   And what is the account number provided here?

**A.**   It's account ending in 9274.

MS. BEDELL:  I'm sorry, could we zoom in on that just to make sure we have the right account number?

**A.**   I'm sorry, 9074.

**Q.**   This is Hailong Zhu's account, correct?

**A.**   Yes.

**Q.**   And is this one of the documents that you reviewed in preparing your analysis?

**A.**   Yes.

MS. BEDELL:  Could we look at Exhibit 14-3, please?

(Exhibit published.)

BY MS. BEDELL:

**Q.**   And what is this document?

**A.**   These are the supporting documents for the bank statements.

**Q.**   And what do you mean by "supporting documents"?

**A.**   So if there's something accompanying a deposit or a withdrawal, like, if you write a check, it will provide the check separately; if you deposit a check, it will provide that as a supporting document for the statement.

**Q.**   Is this one of the documents you reviewed?

*Holt - Direct - Bedell*

1    **A.**      Yes.

2    **Q.**      Did you review other documents -- review documents for

3    any other bank accounts with either Zhu's name or the Sea Dragon

4    names on them?

5    **A.**      Yes.

6    **Q.**      Approximately how many?

7    **A.**      Four.

8    **Q.**      And what accounts -- what banks were those accounts at?

9    **A.**      They were with East West Bank and Bank of America.

10   **Q.**      And what names were those accounts in?

11   **A.**      Hailong Zhu, Sea Dragon Remodeling [*sic*], and Sea Dragon

12   Trading.

13   **Q.**      When were those accounts opened?

14   **A.**      2022 or a similar time frame.

15   **Q.**      What sort of activity did you see in those accounts?

16   **A.**      The activity was pretty limited.  There was less than

17   $10,000 in total activity with a couple of cash deposits and

18   transfers.

19          MS. BEDELL:  Okay.  We're finished with the bank

20   documents.  Could we look at Exhibit 16-1, please?

21          (Exhibit published.)

22   BY MS. BEDELL:

23   **Q.**      Do you recognize -- actually, you'll have to pull this

24   out of the binder, that small binder.  When you have a chance to

25   pull it up, you can let me know if you recognize this exhibit.

*Holt - Direct - Bedell*

1   Do you recognize this exhibit?

2   **A.**   Yes.

3   **Q.**   What is it?

4   **A.**   This is the summary of banking activity that I created.

5   **Q.**   You said you did create it?

6   **A.**   Yes.

7   **Q.**   How did you create it?

8   **A.**   When we receive the bank statements, if it comes in

9   Excel, we will incorporate that into it.  If it comes in PDF,

10   we'll convert them into Excel and use that to summarize the

11   activity within the accounts.

12         MS. BEDELL:  At this time, we would move to admit and

13   publish Exhibit 16-1.

14         THE COURT:  Any objection?

15         MR. WENSTRUP:  No objection, Your Honor.

16         THE COURT:  It will be admitted without objection.  You

17   may publish it.

18         (Exhibit published.)

19         (Government's Exhibit No. 16-1 received in evidence.)

20   BY MS. BEDELL:

21   **Q.**   Taking at look at Slide 1, what is depicted on this page?

22   **A.**   This is an account summary for all of the accounts that

23   were part of this investigation, to include the bank name, the

24   account name, the last four of the account number, the

25   transaction range, total deposits, and withdrawals.

*Holt - Direct - Bedell*

1   **Q.**     When you say all of the accounts that were reviewed, is

2   it just the ones that we walked through all the bank statements

3   for just now?

4   **A.**     Yes.

5   **Q.**     And not necessarily those other four accounts?

6   **A.**     The other four accounts are excluded.

7   **Q.**     And what is Group A?

8   **A.**     Group A are the accounts where there were identified

9   victims had sent wires to these accounts.

10  **Q.**     And what is Group B?

11  **A.**     Group B are other accounts that were owned or controlled

12  by Hailong Zhu during -- that were asked to be analyzed as part

13  of the investigation.

14  **Q.**     And what does first and "Last TRX" refer to on these

15  charts?

16  **A.**     These are the first transactions that occurred within the

17  account and the last transactions that occurred within the

18  account based on the information that we have.

19  **Q.**     So is that different, potentially, than the account open

20  and closed date?

21  **A.**     It could be.

22  **Q.**     What is the total deposits into the Group A account?

23  **A.**     $2,423,069.

24  **Q.**     And what is the total withdrawals in that group?

25  **A.**     $1,935,158.

*Holt - Direct - Bedell*

1          MS. BEDELL:  Could we look at Slide 2, please, page 2?

2   BY MS. BEDELL:

3   **Q.**     What is depicted here?

4   **A.**     So it's the same transactions.  It's just kind of grouped

5   into what type of transaction occurred within the account.

6   **Q.**     What was the predominant form of money moving in and out

7   of these accounts?

8   **A.**     Wires.

9          MS. BEDELL:  Could we look at Slide 3, please?

10  BY MS. BEDELL:

11  **Q.**     What does this slide depict?

12  **A.**     This is a detail of who wired money into the account.  On

13  the left, it lists the names and the amounts; and on the right

14  is kind of the activity for the listed time period.

15  **Q.**     And what is listed in red here?

16  **A.**     The red are those who have been identified as victims.

17  **Q.**     How would you deposit -- how would you characterize the

18  deposit activity into the Group A accounts?

19  **A.**     It was quick, occurred over a relatively short time

20  period, came from a lot of locations, and, largely, from

21  individuals.

22  **Q.**     What was the last thing you said?  I'm sorry.

23  **A.**     Largely from individuals.

24          MS. BEDELL:  Could we look at page 4, please?

25  /////

BY MS. BEDELL:

**Q.**    And what does this slide depict?

**A.**    So this is the location of the wires.  So each -- within each wire, it will have the sender's address; and from that, we extracted the state that the wires originated from and used that to display the location of the senders.

**Q.**    Is there anything excluded from this?

**A.**    Yeah.  There is one wire that was listed from Canada.

         MS. BEDELL:  And could we look at Slide 5, please?

BY MS. BEDELL:

**Q.**    What does this slide depict?

**A.**    This is, like, where the wires went to and the wires coming out of the account.  It's by how much went to the -- I mean, really, four recipients.

**Q.**    I'm sorry, what was the last thing you said?

**A.**    It went to four recipients.

**Q.**    And what do the charts on the left show?

**A.**    It details each of the recipients with the sum of the amount, and below is kind of a pie chart representation of how much went to each of the recipients, and the bar chart on the right is a representation of how it happened over time.

**Q.**    And could you read the four recipients of the wires, please?

**A.**    Yes.  It was -- Axis Digital Limited received $664,600; GATL received $465,000; O Diamonds Trading Limited received

1    $354,000; GHK Enterprises LLC received $125,000.

2    **Q.**    What is the final category listed there?

3    **A.**    It was a reversal, so a wire that was like sent in and

4    then reversed.

5    **Q.**    What is the time frame shown in that graph on the right?

6    **A.**    The activity occurred between October and December of

7    2022.

8          MS. BEDELL:  Could we look at Slide 6, please?

9    BY MS. BEDELL:

10   **Q.**    What does this slide show?

11   **A.**    So within the wires, there are sometimes instructions

12   that accompany the wire; so where that was included, we

13   summarized and extracted the instructions or the memos and

14   included them here with the amount.

15   **Q.**    And what does red indicate?

16   **A.**    Identified victims.

17         MS. BEDELL:  Could we look at Slide 7, please?

18   BY MS. BEDELL:

19   **Q.**    What does this slide show?

20   **A.**    There are certain transactions that occur in person, and

21   you can do others online on mobile devices.  So whenever there

22   was a transaction where someone went to a bank to make those

23   transactions and interacted with a teller, that's what is

24   depicted here.

25   **Q.**    So you said they interacted with a teller, so this is

*Holt - Direct - Bedell*

1   only activities that required interaction with bank personnel?

2   **A.**    Yes.

3   **Q.**    So not, for example, an ATM withdrawal?

4   **A.**    Correct.

5   **Q.**    To confirm, this is only Group A, correct?

6   **A.**    Yes.

7   **Q.**    Which of these would have been most likely to have

8   executed by Zhu or with Zhu present?

9          MR. WENSTRUP:  Objection --

10          THE WITNESS:  Any withdrawal --

11          MR. WENSTRUP:  -- speculation.

12          THE COURT:  I'll sustain.  If you can lay a foundation,

13   you may ask the question.

14   BY MS. BEDELL:

15   **Q.**    How do you identify which transactions are conducted in

16   person?

17   **A.**    I mean, if there was a withdrawal, only the authorized

18   personnel can withdraw money from the account, so that would be

19   someone who's listed as a signer to go into the bank and

20   withdraw funds from those accounts.  And others would be -- I

21   mean, if it's a deposit going into the account, you

22   won't necessarily -- unless it's greater than $10,000, where

23   they would have to collect identifying information, you wouldn't

24   necessarily know who deposited money into the account, but that

25   someone did go in and deposit money into those accounts.

1          MS. BEDELL:  Could we look at Slide 8, please?

2     BY MS. BEDELL:

3     **Q.**     What does this slide show?

4     **A.**     I mean, this is an extract of, kind of, transactions over

5     a short period of time within the Sea Dragon Trading account

6     ending in 3386, and the date range is October 12th through

7     October 17, 2022.

8     **Q.**     What was the starting balance in the account during this

9     time frame?

10    **A.**     The opening balance is $100.

11    **Q.**     And what was the -- what were the incoming wires during

12    this period?

13    **A.**     There was a $31,000 wire from Marisol Mejia Chavez, and

14    there was also a cash deposit.  Both of those occurred on the

15    12th, for a total of, I mean, $46,000 and change.

16    **Q.**     And what was the outgoing transaction at the end of this

17    time period?

18    **A.**     So there was a wire out on the 17th to -- it says,

19    "Reference Mitsubishi UFJ Trust and Banking," for further

20    credit, "FFC Axis Digital Limited" for $40,000.

21    **Q.**     Were these all the -- was this all the activity in the

22    account during this period?

23    **A.**     There were two other transactions that were wire fees

24    charged on wires in and wires out.

25    **Q.**     And approximately how much were the wire fees?

*Holt - Direct - Bedell*

1  **A.**     $50.

2          MS. BEDELL:  Could we look at Slide 9, please?

3  BY MS. BEDELL:

4  **Q.**     What does this slide show?

5  **A.**     So this is the summary of activity of the U.S. Bank

6  account ending in 4148 where it shows the activity and, kind of,

7  from the start of the account all the way through the end of

8  2022 in amounts -- this is the credit activity and the amounts,

9  and then over time, and an image of one of the transactions.

10 **Q.**     So looking -- just to confirm, actually, is this a

11 Group A or Group B account?

12 **A.**     This is a Group B account.

13 **Q.**     When was the first recorded activity that you saw in this

14 account?

15 **A.**     It was the third quarter of 2019.

16 **Q.**     And then how would you characteristic the activity in the

17 account from then on?

18 **A.**     I mean, the activity between the third quarter of 2019

19 and the third quarter of 2022 was relatively steady, and then in

20 the fourth quarter of 2022, there was a large spike in activity.

21 **Q.**     And what time period does Q4, Quarter 4, cover?

22 **A.**     This is September -- October, November, December of 2022.

23 **Q.**     And what is depicted on the right of the page?

24 **A.**     So this is an extract from the statement to show that

25 there was a deposit for $75,000 that occurred on November 15th

*Holt - Direct - Bedell*

1   and accompanying, like, the documents where the image -- it was

2   an image from that deposit activity.

3   **Q.**    Okay.  So it shows the three deposits into the account

4   and the images associated with that middle deposit?

5   **A.**    Yes.

6   **Q.**    And what was the amount of the middle deposit?

7   **A.**    $75,000.

8   **Q.**    And this is a personal account, correct?

9   **A.**    Yes.

10         MS. BEDELL:  Could we look at Slide 10, please?

11   BY MS. BEDELL:

12   **Q.**    What does this page depict?

13   **A.**    So this is the withdrawal activity associated with the

14   same account, U.S. Bank account ending 4148, with the activity

15   over time from Q3 2019 all the way through the end of 2022.

16   **Q.**    What sort of activity do we see?

17   **A.**    I mean, similarly, steady activity from the account

18   opening until the third quarter of 2022, and then there's a

19   large spike in the fourth quarter of 2022.

20   **Q.**    And what is depicted on the right of this page?

21   **A.**    So this is the withdrawal that occurred on the account

22   with -- like, the withdrawal slip with the amount and the image

23   associated with that withdrawal.

24   **Q.**    What was the amount withdrawn?

25   **A.**    $100,010.

*Holt - Direct - Bedell*

1   **Q.**    As you said, that surveillance footage was from the

2   withdrawal occasion; is that correct?

3   **A.**    Correct.

4           THE COURT:  Ms. Bedell, let me interrupt you just

5   because we've gone past our eleven o'clock because we started a

6   little bit late, but --

7           MS. BEDELL:  Your timing is impeccable.  I am done,

8   Your Honor.

9           THE COURT:  Very good.  Are you finished with your

10  questions?

11          MS. BEDELL:  I am, yes.  I have no further questions at

12  this time.

13          THE COURT:  Let's take our break before we resume for

14  cross-examination.  Ladies and gentlemen of the jury, we'll take

15  our mid-morning break and resume at 11:30.  Please remember my

16  instructions not to discuss the case with each other or anyone

17  else or conduct any research.  Go and stretch your legs, and

18  we'll resume promptly in 15 minutes.  You may go now.

19          (Jury out at 11:13 a.m.)

20          THE COURT:  Mr. Holt, you may step down.  Just take

21  your microphone off.  You remain under oath and subject to the

22  rule on witnesses.  Don't discuss your testimony.  You may step

23  outside of the courtroom now.

24          (Whereupon, the witness exits the stand.)

25          THE COURT:  Are there any matters we need to raise

*Holt - Cross - Wenstrup*

1    before we take our brief break this morning?

2            MS. BEDELL:  No, Your Honor.

3            MR. KAMENS:  No, Your Honor.

4            THE COURT:  Court will be in recess until 11:30.

5            (Whereupon, a recess in the proceedings occurred from

6    11:14 a.m. until 11:30 a.m.)

7            THE COURT:  You may bring in the jury.

8            (Jury in at 11:31 a.m.)

9            THE COURT:  We'll resume now with the cross-examination

10   of the witness.  Let me confirm, before we start, that you were

11   able to follow my instructions and not discuss the case or

12   otherwise engage in any independent research.

13           I see you are nodding your heads.  I appreciate your

14   attention to the rules.

15           Mr. Wenstrup, cross-examination?

16           MR. WENSTRUP:  Yes, thank you.

17           THE COURT:  Mr. Holt, you remain under oath.

18                        CROSS-EXAMINATION

19   BY MR. WENSTRUP:

20   **Q.**    Good morning, Mr. Holt.

21   **A.**    Good morning.

22   **Q.**    Mr. Holt, you're joining us from New Orleans, correct?

23   **A.**    Yes.

24   **Q.**    You brought the weather with you?

25   **A.**    I did.

*Holt - Cross - Wenstrup*

1  **Q.**     So in your experience working on these cases, the

2  business addresses for accounts involved in scams like this are

3  not necessarily connected to where the named accountholder

4  lives, correct?

5  **A.**     It's possible.

6  **Q.**     Okay.  So it is possible that the account statements are

7  sent to an address where the accountholder doesn't live?

8  **A.**     It's possible.

9  **Q.**     And so it's also possible that a person other than the

10 named accountholder might control the phone or the online login

11 information for an account?

12 **A.**     That is possible.

13 **Q.**     And so if a named accountholder wasn't getting the paper

14 account statements and didn't have the online login information

15 for an account, it's possible that a named accountholder would

16 not know the number of wires coming into an account?

17 **A.**     Yes.

18 **Q.**     And it's also possible that the named accountholder

19 wouldn't know the sources of the wires coming into the account?

20 **A.**     That's possible, yes.

21 **Q.**     And, now, if the accountholder successfully transferred

22 money out of the account, obviously, they would know that there

23 had been money in the account before the transfer?

24 **A.**     Correct.

25 **Q.**     But they would not necessarily know where that money had

1    come from?

2    **A.**    If they didn't receive the statements or any of the

3    verifications, it's possible, yes.

4    **Q.**    And so looking at page 3 of Government's Exhibit 16-1 --

5             MR. WENSTRUP:  I would ask if the government could

6    publish that.

7             (Exhibit published.)

8    BY MR. WENSTRUP:

9    **Q.**    And so, again, this is Group A wires in?

10   **A.**    Yes.

11   **Q.**    So looking at page 3, based on the conversation we just

12   had, we can't be certain that Hailong knew about any of these

13   transfers, correct?

14   **A.**    If he wasn't receiving the account statements or, like,

15   wire verifications, it's possible, yes.

16            MR. WENSTRUP:  Now I'd ask that we publish page 6,

17   please.

18   BY MR. WENSTRUP:

19   **Q.**    And so, here, we're looking at wire transfers -- the

20   majority of these are transfers in, correct?

21   **A.**    Yes.

22   **Q.**    And based off the conversation we just had, it's possible

23   that Hailong didn't know about any of these incoming transfers,

24   correct?

25   **A.**    Again, if he didn't have -- receive the statements or any

*Holt - Cross - Wenstrup*

1    confirmations, yes.

2              MR. WENSTRUP:  I'll ask that we go back to page 4,

3    please.  Is that page 4?  One second.  Give me a second to sort

4    out the hard copy.

5              I'm sorry.  Can you publish page 5?

6    BY MR. WENSTRUP:

7    **Q.**    Looking at page 5, the wires out of the Sea Dragon

8    accounts go to four entities, correct -- many of them go to

9    these four entities, correct?

10   **A.**    Yes.

11   **Q.**    In your review of the documents, you've not seen any

12   evidence that Hailong has access to any of those entities'

13   accounts?

14   **A.**    I haven't reviewed these accounts, the --

15   **Q.**    You haven't reviewed --

16   **A.**    -- destinations --

17   **Q.**    -- accounts for the four entities?

18   **A.**    Correct.

19   **Q.**    And you have not interviewed Hailong, correct?

20   **A.**    No.

21   **Q.**    So you don't know if Hailong knows what these entities

22   are?

23   **A.**    I know that, for example, on the wires that were

24   conducted in person, those entities were listed as the

25   beneficiary of those wires; but, beyond that, I don't.

*Holt - Cross - Wenstrup*

1   **Q.**    So beyond that, you don't know if he knew what kind of

2   entities they purported to be, correct?

3   **A.**    I don't know.

4   **Q.**    Okay.  And you don't know if he has any idea where those

5   entities purport to be, correct?

6   **A.**    I would have to look at the wire detail to confirm,

7   because sometimes there are addresses listed with who you're

8   wiring money to.  So if the addresses were listed, then I would

9   presume that he knew where those entities were located.

10  **Q.**    But off the top of your head, you can't recall if they

11  are listed for the --

12  **A.**    I don't recall the specifics of that.

13          MR. WENSTRUP:  So I'd ask if the government could

14  publish page 7.  I'm looking for the in-person transactions.

15  Thank you.

16  BY MR. WENSTRUP:

17  **Q.**    So, here, you've listed all of the in-person transactions

18  for, I believe, the Bank of America and the Chase accounts,

19  correct?

20  **A.**    Yes.

21  **Q.**    And during your review, did you review surveillance

22  footage from all of these in-person transactions?

23  **A.**    No.

24  **Q.**    Did you review surveillance footage from some of them?

25  **A.**    I don't recall.  I know there were some issues with one

1    of them.  Whether or not it was these specific ones -- I have

2    seen surveillance, but I don't recall on these specific ones.

3              MR. WENSTRUP:  I would ask if the government could

4    publish page 1 of Exhibit 10-17A.

5    BY MR. WENSTRUP:

6    **Q.**    Were you ever given this picture to review?

7    **A.**    I don't recall reviewing this one specifically.

8              MR. WENSTRUP:  I would ask if the government could

9    publish, now, page 4 of the same exhibit.

10             Your Honor, it appears that the government moved to

11   admit almost all of Exhibit 10, but -- all of the exhibits in

12   Group 10, but not 10-17A.  I think -- without objection from the

13   government, I would ask to go ahead and we'll move that in now.

14             MS. BEDELL:  No objection, Your Honor.

15             THE COURT:  Very good.  It will be admitted without

16   objection.  10-17A is now admitted.  You may publish it.

17             (Government's Exhibit No. 10-17A received in evidence.)

18             (Exhibit published.)

19             MR. WENSTRUP:  Could we move to page 4?

20   BY MR. WENSTRUP:

21   **Q.**    And in your review, were you given this surveillance

22   footage to review?

23   **A.**    If it was in the documents.  I don't recall reviewing

24   this one specifically, but --

25             MR. WENSTRUP:  I would ask that the government publish

*Holt - Cross - Wenstrup*

1      Exhibit 11-10.

2                (Exhibit published.)

3      BY MR. WENSTRUP:

4      **Q.**    You see there's an image on the upper right?

5      **A.**    Yes.

6      **Q.**    Were you given this image to review?

7      **A.**    Again, if it was provided.  I don't recall this one

8      specifically.

9                MR. WENSTRUP:  And then the last one, I would just ask

10     if the government could publish Exhibit 12-5, page 4.

11               (Exhibit published.)

12     BY MR. WENSTRUP:

13     **Q.**    Do you recall reviewing this image?

14     **A.**    Yes.

15     **Q.**    And in your -- during your review, are you familiar with

16     someone named Joseph Wong?

17     **A.**    I've heard the name Wong, yes.

18     **Q.**    Okay.  Has anyone ever shown you a picture of Mr. Wong?

19     **A.**    No, not that --

20     **Q.**    In the exhibit you're looking at, do you recognize the

21     defendant?

22     **A.**    Yes.

23     **Q.**    Okay.  Is he the one in front of the teller window?

24     **A.**    No.

25     **Q.**    He's standing --

*Holt - Cross - Wenstrup*

1    **A.**    -- to the side.

2    **Q.**    -- next to -- to the side?

3    **A.**    Yes.

4    **Q.**    So you've heard Mr. Wong's name.

5          Are you familiar with someone named Nikki?

6    **A.**    No.

7    **Q.**    Okay.  So you've never been shown a picture of a woman

8    named Nikki?

9    **A.**    No.

10          MR. WENSTRUP:  So now, you're -- if we could go back to

11    16-1, the in-person transactions page, page 7.

12    BY MR. WENSTRUP:

13    **Q.**    The four transactions at the top, those are before

14    Mr. Zhu got to California, correct?

15    **A.**    I don't know where he lived when --

16    **Q.**    So you're not familiar with where he lived at what time?

17    **A.**    Right.

18    **Q.**    So the four transactions at the top occurred before the

19    Sea Dragon accounts opened, correct?

20    **A.**    Yes.

21    **Q.**    Okay.  And so subtracting those four, there are 27

22    in-person transactions listed on this table, correct?

23    **A.**    Yes.

24    **Q.**    And you are not certain in how many of those 27 that

25    surveillance photos show another individual with Hailong at the

*Holt - Cross - Wenstrup*

1  bank, correct?

2  **A.**      Correct.

3  **Q.**      And -- okay.

4          So I want to turn to U.S. Bank.  So for years, Mr. Zhu

5  had had a personal bank account with U.S. Bank, correct?

6  **A.**      Correct.

7  **Q.**      I'm sorry?

8  **A.**      Correct.

9  **Q.**      Thank you.  Sorry about that.

10  **A.**      No worries.

11  **Q.**      And for several years, that account had normal activity?

12  **A.**      Consistent activity, yes.

13  **Q.**      And that activity was consistent through September 2022,

14  correct?

15  **A.**      Correct.

16  **Q.**      And that activity was consistent through the first three

17  weeks, at least, of October 2022, correct?

18  **A.**      I believe so, yes.

19  **Q.**      Now, starting in late October of 2022, some of the other

20  Sea Dragon accounts started becoming restricted, correct?

21  **A.**      What was the date?

22  **Q.**      Starting in late October 2022.

23  **A.**      Yes.

24  **Q.**      Okay.  And after some of those other Sea Dragon accounts

25  had been restricted, that's when the U.S. Bank account saw a

1    handful of larger deposits?

2    **A.**    It was during the time of the activity.

3    **Q.**    About that time.

4          And around this time, someone changed the address

5    associated with Hailong's account, correct, his U.S. Bank

6    account?

7    **A.**    I'd have to look.  I believe so.  We went over the dates.

8    **Q.**    And in direct examination, you reviewed that at some

9    point, that --

10   **A.**    The date -- to California, yes.

11   **Q.**    And there's no evidence that Hailong was the one that

12   changed that address, correct?

13   **A.**    You need to -- it depends on what documentation was

14   presented, and you oftentimes need to go into a bank to do that,

15   so it's possible.  I don't --

16   **Q.**    So it's possible that it wasn't Hailong who changed the

17   address?

18   **A.**    I mean, it depends on what U.S. Bank's requirements are

19   for address change.  If it's online --

20   **Q.**    You're not familiar --

21   **A.**    I'm not familiar with U.S. Bank's change of address.

22   **Q.**    But you've seen no evidence in your review that Hailong

23   filed paperwork to change his account?

24   **A.**    No.

25   **Q.**    And you have not seen any document in your review that

1    Hailong came and spoke to someone and changed the address on

2    that account?

3    **A.**    No.

4    **Q.**    So that was -- the account address was changed to an

5    address in California, correct?

6    **A.**    Yes.

7    **Q.**    And, earlier, you said that it's possible that an account

8    address would not necessarily be the place where the

9    accountholder resided, correct?

10   **A.**    It's possible, yes.

11   **Q.**    And, in fact, the account address, the new California

12   account address, was the same account address as some of the Sea

13   Dragon accounts, correct?

14   **A.**    I would need to confirm.  I think so.

15   **Q.**    Now, after U.S. Bank closed Hailong's personal account,

16   they mailed a check to Hailong with a balance at the account

17   address in California?

18   **A.**    Okay.  I would need to -- I don't know the specific

19   transactions.

20   **Q.**    You reviewed the --

21   **A.**    Yeah, I --

22   **Q.**    -- U.S. Bank records, correct?

23   **A.**    Yes.

24   **Q.**    And are you aware that a check with a balance of the

25   U.S. Bank account was deposited in an East West Bank account in

*Holt - Cross - Wenstrup*

1    California in February?

2    **A.**     No.

3    **Q.**     And so you weren't aware that that check was deposited in

4    February in California after Hailong had returned to Illinois?

5    **A.**     No.

6    **Q.**     So, earlier, we talked about four destination accounts,

7    correct?

8    **A.**     Yes.

9    **Q.**     And you said you didn't review -- you didn't review the

10   accounts for those entities, correct?

11   **A.**     Correct.

12   **Q.**     Okay.  But there were other accounts sending money to

13   those four entities, correct?

14   **A.**     Like, other -- from other entities not related to this?

15   **Q.**     From entities other than Sea Dragon; other entities were

16   sending money to these four entities?

17   **A.**     To at least two of them, I'm aware of.

18   **Q.**     And do you know what other entities were sending money to

19   those two entities overseas?

20   **A.**     Not offhand.

21   **Q.**     So, obviously, the government asked you to review all of

22   Mr. Zhu's -- all of Mr. Zhu's accounts, correct, all the

23   accounts in his name?

24   **A.**     Yeah, all the accounts that were provided, yes.

25   **Q.**     And so for -- of all the other accounts sending money to

*Holt - Cross - Wenstrup*

1   these two entities overseas, how many of those accountholders'

2   names did you review?

3   **A.**     I haven't reviewed any of them at this point.

4   **Q.**     I'm sorry?

5   **A.**     I haven't reviewed any of them at this point.

6   **Q.**     So if there were, let's say, dozens of other

7   accountholders, and money was being sent to these two entities

8   overseas, you haven't reviewed any of those dozens of other

9   accountholders; you've only reviewed Hailong's accounts?

10  **A.**     I have seen the wires that were sent.  I was able to --

11  we can see who the accountholders were.  I don't recall.  I

12  mean, the sender account name and the number, I mean, I don't

13  recall them specifically.

14  **Q.**     So you could see who some of the senders were to these

15  overseas banks?

16  **A.**     Yes.

17  **Q.**     But even though you could see who the senders were, no

18  one ever asked you to review the accounts of those senders?

19  **A.**     They were -- some of them were subpoenaed.  I think many

20  of them were subpoenaed.  That hasn't been part of my review at

21  this point.

22  **Q.**     So no one asked you to review those?

23  **A.**     Not for this trial, no.

24          MR. WENSTRUP:  No further questions, Your Honor.

25          THE COURT:  Thank you.

*Pozos - Direct - Schwartz*

1          Any redirect?

2          MS. BEDELL:  No, Your Honor.

3          THE COURT:  Thank you.

4          Is Mr. Holt released as a witness in this matter?

5          MS. BEDELL:  Yes, Your Honor.

6          THE COURT:  Thank you, Mr. Holt.  You may step down.

7   You're free to go.

8          You may call your next witness.

9          (Whereupon, the witness exits the stand.)

10          MS. SCHWARTZ:  The government calls Andrea Pozos.

11        (ANDREA POZOS, ON BEHALF OF THE GOVERNMENT, SWORN)

12          (Whereupon, the witness takes the stand.)

13                    DIRECT EXAMINATION

14   BY MS. SCHWARTZ:

15   **Q.**     Good morning, Ms. Pozos.  Please state your name and

16   spell it for the record.

17   **A.**     Andrea Pozos, A-N-D-R-E-A; last name P-O-Z-O-S.

18   **Q.**     Where do you work?

19   **A.**     I work at U.S. Bank.

20   **Q.**     How long have you worked with U.S. Bank?

21   **A.**     In October, it will be five years.

22   **Q.**     And what is your role at U.S. Bank?

23   **A.**     I'm currently a client relationship consultant 3.

24   **Q.**     How long have you been in that role?

25   **A.**     Right under a month.

*Pozos - Direct - Schwartz*

1    **Q.**    And what did you do before that role?

2    **A.**    I was a client relationship consultant 2.

3    **Q.**    And what do you do as a client relationship consultant?

4    **A.**    I handle transactions, account openings, and account

5    maintenance.

6    **Q.**    And so you work in the branch?

7    **A.**    Yes.

8    **Q.**    Which branch do you work in?

9    **A.**    I currently work at the Alhambra Albertsons office.

10   **Q.**    And did you work at a different branch before that?

11   **A.**    Yes.

12   **Q.**    Which branch?

13   **A.**    Rosemead Walmart office.

14   **Q.**    Do you receive training for your role?

15   **A.**    Yes.

16   **Q.**    What kind of training?

17   **A.**    I receive transaction training, regulation training.

18   **Q.**    Do you receive training on identifying fraud?

19   **A.**    Yes.

20   **Q.**    What kind of training?

21   **A.**    AML and BSE training.

22   **Q.**    What does AML stand for?

23   **A.**    Anti-money laundering training, and then BSA is Bank

24   Secrecy Act training.

25   **Q.**    Turning to the events of this case, were you working on

*Pozos - Direct - Schwartz*

1    December 1, 2022?

2    **A.**     Yes.

3    **Q.**     Do you remember any interactions from that day?

4    **A.**     Yes.

5    **Q.**     Did you interact with somebody that day named Hailong

6    Zhu?

7    **A.**     Yes.

8    **Q.**     Can you briefly describe that interaction?

9    **A.**     Mr. Hailong Zhu came in to do a deposit.

10   **Q.**     Before doing any transactions, did you ask him for ID?

11   **A.**     Yes.

12   **Q.**     Do you remember what he provided?

13   **A.**     He provided a state ID.

14   **Q.**     Do you always ask your customers for ID before doing a

15   transaction?

16   **A.**     For the most part, yes.

17   **Q.**     Would you do transactions in the account if the

18   accountholder couldn't provide ID?

19   **A.**     I would not.

20   **Q.**     And do you remember if the ID you reviewed matched the

21   account information that Mr. Zhu had provided?

22   **A.**     On the account, I remember, it had a different form of ID

23   when the account was opened.

24   **Q.**     So the ID you reviewed was a different form of ID, but

25   did all the information match?

*Pozos - Direct - Schwartz*

1   **A.**      From what I could tell, yes.

2   **Q.**      What language did you and Mr. Zhu use when you were

3   communicating?

4   **A.**      English and his, I believe, native language.

5   **Q.**      Did he seem to understand you when you were speaking?

6   **A.**      Somewhat, mm-hmm.

7   **Q.**      And were you able to understand him?

8   **A.**      Yes.

9   **Q.**      Was anyone with Mr. Zhu or was he alone?

10  **A.**      I can't recall.

11  **Q.**      You mentioned a deposit; do you remember what the deposit

12  was that he was trying to make?

13  **A.**      It was a check and cash deposit.

14  **Q.**      Do you remember how much cash?

15  **A.**      It was, I want to say, 87,000.

16  **Q.**      And do you remember how much the check was for?

17  **A.**      19,000.

18  **Q.**      Do you remember where the check was from?

19  **A.**      It was written from the Wynn.

20  **Q.**      Did you process the deposit for Mr. Zhu?

21  **A.**      Yes.

22  **Q.**      Did he ask you to do anything else?

23  **A.**      Yes.

24  **Q.**      What did he ask you to do?

25  **A.**      To conduct an international wire.

88

*Pozos - Direct - Schwartz*

1   **Q.**    What was your impression of that request?

2   **A.**    It was odd.

3   **Q.**    Why was it odd?

4   **A.**    Typically, in the beginning of the transaction, a

5   customer would disclose a full transaction they would like to

6   do, such as, I would like to make a deposit and a wire.

7   Separating the transactions was odd.

8   **Q.**    So he didn't ask about wiring the money until after you

9   had deposited the check and the cash?

10  **A.**    Correct.

11  **Q.**    What did you do when he asked about the wire?

12  **A.**    I looked into his account.

13  **Q.**    What did you see in the history of his account?

14  **A.**    A large sum of cash deposits and a cashier's check made

15  out to the Wynn.

16  **Q.**    So you noted that his account had purchased a cashier's

17  check to the Wynn?

18  **A.**    Correct.

19  **Q.**    And did anything stand out to you about those

20  transactions?

21  **A.**    It was odd to have cash deposited and then made out to

22  the Wynn, and then being brought back again for roughly the same

23  amount.

24  **Q.**    Did you process the international wire for Mr. Zhu?

25  **A.**    No.

1   **Q.**    Why not?

2   **A.**    Other than the fact that the bank would not allow it on

3   the same day as such a large deposit, I did not feel comfortable

4   making that wire.

5   **Q.**    And did you tell him that?

6   **A.**    Yes.

7   **Q.**    And how did he react to that information?

8   **A.**    Mildly frustrated.

9   **Q.**    I'm sorry?

10  **A.**    Mildly frustrated.

11  **Q.**    What did he say when you told him that you weren't going

12  to process that transaction?

13  **A.**    He asked the reasons as to why, which I explained to him,

14  and then he had the option to reverse.

15  **Q.**    And is that what he decided to do?

16  **A.**    Yes.

17  **Q.**    When you reversed the transaction, what did you give him

18  back?

19  **A.**    The check and the cash.

20  **Q.**    Would a reversal like that show up in bank statements?

21  **A.**    No.

22  **Q.**    And why is that?

23  **A.**    A reversal won't show in the bank statement because it's

24  not conducted as a deposit than a similar withdrawal.  It's a

25  reversal, so it wouldn't track it on the statement, as it didn't

*Pozos - Direct - Schwartz*

1    happen.

2    **Q.**    Is there anywhere in the bank's system where a reversal

3    would show up?

4    **A.**    Yes.

5    **Q.**    And where is that?

6    **A.**    It's on other Hogan screen that the bank has.

7    **Q.**    I'd now like to show you what's already been admitted as

8    Government's Exhibit 12-6.

9              (Exhibit published.)

10   BY MS. SCHWARTZ:

11   **Q.**    Do you recognize this?

12   **A.**    Yes.

13   **Q.**    What is it?

14   **A.**    It's our Hogan screen.

15   **Q.**    And is this the screen that you would have seen in your

16   internal system if you were looking up the transactions?

17   **A.**    Yes.

18   **Q.**    Directing you to -- I know it's a little hard to read --

19   the first line of this screen, what is the date on the deposit?

20   **A.**    December 1, 2022.

21   **Q.**    What is the total amount?

22   **A.**    It's for 102,000.

23   **Q.**    And what is that first line there showing?

24   **A.**    The first line shows the date, time, the number of

25   transactions, the type of transaction, account number, total

Pozos - Direct - Schwartz

1    amount, cash amount, and then my cashbox number.

2    **Q.**    And what is the last four of the account number?

3    **A.**    4148.

4    **Q.**    And so this reflects the deposit that was done into the

5    account?

6    **A.**    Yes.

7    **Q.**    So then directing you to the second line there, what

8    would this line show?

9    **A.**    This is identifying information.

10   **Q.**    And what -- under the amount, it has a minus sign; does

11   that mean that this is the withdrawal that was done when you

12   returned --

13   **A.**    It's not a withdrawal; it's a reversal.

14   **Q.**    A reversal, sorry.

15          Is that what that's indicating?

16   **A.**    Yes.

17   **Q.**    And is this a summary of the transaction you reversed for

18   Mr. Zhu on December 1st?

19   **A.**    Yes.

20   **Q.**    Did he ask you to do anything else?

21   **A.**    No, not that I can recall.

22   **Q.**    What did you do once Mr. Zhu left?

23   **A.**    I went ahead and filed the investigative referral form.

24   **Q.**    What's on that investigative referral form, generally?

25   **A.**    It just my findings of what I saw when I reviewed the

92

Pozos - Direct - Schwartz

1     account and the transaction he attempted to do.

2     **Q.**     And why did you fill out an investigative referral form?

3     **A.**     Because of the nature of the account; the request that

4     was made that day as well.

5     **Q.**     Do you always fill out referral forms after each

6     interaction with your clients?

7     **A.**     Not each; only when I feel the need to.

8     **Q.**     And what do you do with that form when it's completed?

9     **A.**     I submit it.

10    **Q.**     Who do you submit it to?

11    **A.**     To our investigations team.

12    **Q.**     Just directing you back to this exhibit very briefly, can

13    you read the -- there's a total amount on this form, and then

14    there's an amount next to it.  Can you read the number of that

15    amount?

16    **A.**     It's 83,000.

17    **Q.**     And what would that be capturing?

18    **A.**     That would be the cash amount.

19    **Q.**     I'd now like to show you what has been admitted as

20    Government's Exhibit 12-5.

21             (Exhibit published.)

22    BY MS. SCHWARTZ:

23    **Q.**     Do you recognize the scene in this photo?

24    **A.**     Yes.

25    **Q.**     And what is it?

*Pozos - Cross - Wenstrup*

1   **A.**     It is the office where I used to work at and two people.

2   **Q.**     And to be clear, this isn't -- this isn't a photo that

3   you took --

4   **A.**     No.

5   **Q.**     -- that you recognize, but this is the branch that you

6   worked at?

7   **A.**     Yes.

8   **Q.**     And this is the branch you were working at in December

9   when the transaction --

10  **A.**     The Rosemead office.

11          MS. SCHWARTZ:  No further questions, Your Honor.

12          THE COURT:  Thank you.

13          Any cross-examination?

14          MR. WENSTRUP:  Yes, please.

15                    CROSS-EXAMINATION

16  BY MR. WENSTRUP:

17  **Q.**     Hi, Ms. Pozos.  How are you?

18  **A.**     I'm doing good.  Thank you.

19  **Q.**     On direct examination, you testified that on

20  December 1st, you were more or less able to understand what

21  Hailong was saying?

22  **A.**     Yes.

23  **Q.**     So -- now, on August 9th, you had a telephone call with

24  the prosecutor, correct?

25  **A.**     Yes.

*Pozos - Cross - Wenstrup*

**Q.**     And Ms. Bedell was on that call?

**A.**     Yes.

**Q.**     And Ms. Schwartz was on the call?

**A.**     I believe so.

**Q.**     Special Agent Saunders was on that call?

**A.**     Yes.

**Q.**     There was also someone from U.S. Bank's general counsel's office on that call, correct?

**A.**     Yes.

**Q.**     And that call was preparing your testimony for trial, correct?

**A.**     Mm-hmm.

**Q.**     And, obviously, when you were speaking to the U.S. Attorneys and the special agent, you told the truth, correct?

**A.**     Yes.

**Q.**     And on that phone call, you told them that Mr. Zhu's English was very broken and you had a very hard time understanding him, is that correct, that's what you told them on that phone call?

**A.**     I think so, yeah.

**Q.**     Okay.  And so -- okay.

       So you told them on the phone call that his English was very broken and you had a hard time understanding him?

**A.**     Yes.

*Pozos - Cross - Wenstrup*

1   **Q.**     Now, also, when you were testifying earlier, you

2   testified that you reviewed Hailong's identification, correct?

3   **A.**     Yes.

4   **Q.**     And he provided you with a state identification, you

5   said, correct?

6   **A.**     Yes.

7   **Q.**     And that identification was from Illinois?

8   **A.**     Yes.

9   **Q.**     Okay.  And, now, you testified that the information on

10  the ID matched the information on the account, correct?

11  **A.**     No.

12  **Q.**     Okay.  How not?

13  **A.**     The account had a different form of ID than what was

14  presented to me.

15  **Q.**     Okay.  So --

16  **A.**     I would have verified the information on the ID based on

17  the information that's on the account.

18  **Q.**     And so would you verify, for example, the address?

19  **A.**     Right.  That's one of those things I did verify.

20  **Q.**     So you can verify the address on the account, correct?

21  **A.**     And other things as well.

22  **Q.**     So you would have matched the address on the account with

23  Hailong's state ID, correct?

24  **A.**     Or name and birth date and other identifying factors.

25  **Q.**     Okay.

*Pozos - Cross - Wenstrup*

1    MR. WENSTRUP:  I would ask the government to publish

2  page 4 of Exhibit 12-2, please.

3    (Exhibit published.)

4  BY MR. WENSTRUP:

5  **Q.**    Ms. Pozos, are you familiar with this document -- this

6  kind of document?

7  **A.**    It looks like a bank statement.

8    MR. WENSTRUP:  I'm sorry, I want to make sure I'm

9  looking at page 4 of 12-2.  I apologize, Your Honor.  Hopefully,

10  we'll sort this out in a sec.

11    THE COURT:  It's all right.

12  BY MR. WENSTRUP:

13  **Q.**    Sorry about that, Ms. Pozos.

14    So we're looking at -- I don't know -- can you see, at

15  the top of this document, the --

16    Now, first of all, let me back up.  This document is an

17  account statement for the account that we're talking about,

18  correct?

19  **A.**    I believe so, yes.

20  **Q.**    Okay.  And this account statement is a statement as of

21  November 22, 2022, correct?

22  **A.**    Yes.

23  **Q.**    And he came in to your branch on December 1st, correct?

24  **A.**    Yes.

25  **Q.**    About eight days later.

*Pozos - Cross - Wenstrup*

1          And so the address on this document is a California

2     address, correct?

3     **A.**     That's correct.

4     **Q.**     Okay.  And so that couldn't have matched his Illinois

5     state ID address, correct?

6     **A.**     I can't recall what address was on there.

7     **Q.**     Okay.  But an Illinois state ID, just based on your

8     experience in the world, probably doesn't have a California

9     address on it, correct?

10    **A.**     It can, though.

11    **Q.**     Fair enough.

12          So when you saw Mr. Zhu that day, do you recall if he was

13    wearing anything in his ear?

14    **A.**     I can't recall.

15          MR. WENSTRUP:  I would just ask that the government

16    could pull up 12-5.

17          (Exhibit published.)

18    BY MR. WENSTRUP:

19    **Q.**     Ms. Pozos, looking at this picture, do you see

20    anything -- a white object in Mr. Zhu -- in Hailong's right ear?

21    **A.**     Yes.

22    **Q.**     So it looks like he was wearing some kind of earpiece or

23    headphone in his right ear?

24    **A.**     Yes; however, that's not me in the bottom.

25    **Q.**     I understand that.  I'm just saying --

*Pozos - Cross - Wenstrup*

1  **A.**     In this picture, there is something --

2  **Q.**     -- he's wearing something in his ear?

3  **A.**     Correct.

4  **Q.**     Now, when Hailong came in on December 1st, right, his

5  first transaction was to deposit money, correct?

6  **A.**     Yes.

7  **Q.**     And then he asked you if he could do an international

8  wire transfer?

9  **A.**     Yes.

10  **Q.**     And he was clear that it was international?

11  **A.**     Yes.

12  **Q.**     And you told him it was not possible?

13  **A.**     Correct.

14  **Q.**     And at that point, he asked you what else could be done,

15  correct?

16  **A.**     I believe so, yes.

17  **Q.**     And so he did not ask to transfer the funds to a

18  different account?

19  **A.**     Different account?  Well, wire transfer is a --

20  **Q.**     I'm sorry.  After you told him that you couldn't do this

21  international wire transfer, he then asked you what else could

22  be done, correct?

23  **A.**     Yes.

24  **Q.**     He asked you a question?

25  **A.**     Okay.

*Pozos - Cross - Wenstrup*

1    **Q.**    Yes or no?

2    **A.**    Yes.

3    **Q.**    So then he asked you the question of what else could be

4    done; and at that point, he didn't ask you to make a different

5    kind of wire transfer, correct?

6    **A.**    No.

7    **Q.**    And at that point, he didn't ask for a cashier's check?

8    **A.**    No.

9    **Q.**    Okay.  And he actually did not independently ask for the

10   money back, correct?

11   **A.**    No.

12   **Q.**    Because what happened was, you told him that you could

13   give the money back to him, correct?

14   **A.**    That's what a reversal is; I would give it back to him.

15   **Q.**    You told him you could do a reversal, correct?

16   **A.**    Yes.

17   **Q.**    He didn't know to ask for a reversal, correct?

18   **A.**    I don't know if he knew or not he could do that.

19   **Q.**    Fair enough.

20          He didn't ask you for a reversal before you offered,

21   correct?

22   **A.**    I can't recall.

23          MR. WENSTRUP:  Court's indulgence just for a moment.

24          (Whereupon, there was a brief pause in the

25   proceedings.)

*Pozos - Cross - Wenstrup*

BY MR. WENSTRUP:

**Q.**    So, Ms. Pozos, I'm going to direct you back to that August 9th phone conversation with the prosecutors and the special agent --

**A.**    Okay.

**Q.**    -- and the U.S. Bank attorney, okay?

          Again, on that phone call, you spoke the truth, right?

**A.**    Yes.

**Q.**    You guys were talking about trial preparation?

**A.**    Yes.

**Q.**    And you were talking about your testimony?

**A.**    Yes.

**Q.**    Okay.  And on that phone call, you said that you informed the customer that it's not possible right now due to timing. You stated that the customer told her he was pressed for time, and is there anything else that could be done.  You informed the customer there was not, but that you informed him that you could give him his deposit back, then you informed him that -- then he told you he did want his money back?

**A.**    Yes.

**Q.**    So you told him that you could do a reversal?

**A.**    Yes.

**Q.**    And then he took you up on that offer, correct?

**A.**    Yes.

**Q.**    And at that point, he just took the deposit and left?

*Dong - Direct - Schwartz*

1  **A.**      Yes.

2  **Q.**      But when he had -- when you initially told him you

3  couldn't do the wire transfer, he asked you what else he could

4  do, correct?

5  **A.**      Yes.

6           MR. WENSTRUP:  No further questions, Your Honor.

7           THE COURT:  Any redirect?

8           MS. SCHWARTZ:  No, Your Honor.

9           THE COURT:  Thank you.

10           Is this witness released?

11           MS. SCHWARTZ:  Yes, Your Honor.

12           THE COURT:  Thank you, Ms. Pozos.  You may step down.

13  You're free to go.

14           THE WITNESS:  Thank you.

15           THE COURT:  You may call your next witness.

16           (Whereupon, the witness exits the stand.)

17           MS. SCHWARTZ:  The government calls Nikki Dong.

18      (CHUNHUA DONG, ON BEHALF OF THE GOVERNMENT, SWORN)

19                       DIRECT EXAMINATION

20  BY MS. SCHWARTZ:

21  **Q.**      Good afternoon, Ms. Dong.  Please state your name and

22  spell it for the record.

23  **A.**      My name is --

24           THE COURT:  I'm going to ask you to just try and speak

25  up as much as you can so we can all hear you.

*Dong - Direct - Schwartz*

1          THE WITNESS:  Can you hear me now?  Hello.

2    BY MS. SCHWARTZ:

3    **Q.**    A little bit better, yeah.  Go ahead.

4          Can you state your name and spell it for the record?

5    **A.**    My name is Chunhua Dong.

6    **Q.**    Can you spell that?

7    **A.**    C-H-U-N-H-U-A; last name is D-O-N-G.

8    **Q.**    And do you also go by Nikki?

9    **A.**    Yeah.

10   **Q.**    Where do you work?

11   **A.**    I work with U.S. Bank.

12   **Q.**    How long have you worked for U.S. Bank?

13   **A.**    A bit more than a year, since May 22nd.

14   **Q.**    What is your role at U.S. Bank?

15   **A.**    Like, the CRC; like, a bank card teller.

16   **Q.**    I'm sorry, can you say that one more time?  Maybe we can

17   move your mic just a little closer.

18          THE COURT:  Try and speak up so we can all hear you.

19          THE WITNESS:  I'm a CRC, like, a banker and teller.

20   BY MS. SCHWARTZ:

21   **Q.**    And how long have you been in that role?

22   **A.**    Since I work with U.S. Bank.

23   **Q.**    What are some of your duties in that role?

24   **A.**    I help with clients with their requests.  When I work as

25   a teller, I do, like, transactions, like deposits and

*Dong - Direct - Schwartz*

1  withdrawals, and I help them with their account issues.

2  **Q.**    Did you receive any training to perform these duties?

3  **A.**    Yeah.  In the first month with U.S. Bank, we do, like, a

4  training for the whole month.

5  **Q.**    And does part of your job involve completing customer due

6  diligence forms, CTA forms?

7  **A.**    Yes.

8  **Q.**    And what are those forms, just generally?

9  **A.**    Like, we receive -- my manager assigned it to me, and she

10  received the forms from another department.

11  **Q.**    So your manager receives it from another department and

12  then passes them to you to fill out?

13  **A.**    Yeah.

14  **Q.**    After you receive the form, what do you typically do?

15  **A.**    I read the form, and I review the customer profile before

16  contacting them.

17  **Q.**    And so after you review the customer profile, you contact

18  the customer; is that right?

19  **A.**    Yeah.

20  **Q.**    And what is the purpose of these calls, typically?

21  **A.**    Like, to ask customer the questions on the form and get

22  answers.

23         THE COURT:  Ma'am, I'm just going to ask you to put the

24  microphone even a little bit closer so that the interpreters and

25  all of us can hear.  Thank you.

*Dong - Direct - Schwartz*

1    BY MS. SCHWARTZ:

2    **Q.**    Did you fill out a CTA form in reference to U.S. Bank

3    account number ending in 4148?

4    **A.**    4148?

5    **Q.**    Mm-hmm, an account -- a U.S. Bank account ending in 4148.

6    **A.**    I think so.

7    **Q.**    Okay.  I'm now showing you what has been marked -- what

8    has been admitted as Government's Exhibit 12-4.

9            (Exhibit published.)

10            THE INTERPRETER:  May the interpreter humbly ask the

11    witness to speak up and slow down the speech?

12            THE COURT:  Okay.  Thank you.

13            THE INTERPRETER:  Acoustic problem.

14            THE COURT:  I understand.

15            If you can just hold the microphone very close and slow

16    down; hopefully, that will allow us to get the information out.

17            THE WITNESS:  Okay.

18    BY MS. SCHWARTZ:

19    **Q.**    Do you recognize this?  Maybe we can scroll through a

20    couple of pages of it.

21    **A.**    Yeah.

22    **Q.**    And is this a form you received and then filled out?

23    **A.**    Yeah -- yes.

24    **Q.**    What was the date of the call on this form?

25    **A.**    It says on January the 5th, 2023.

Dong - Direct - Schwartz

1   **Q.**     And how do you know what number to call when you're

2   making one of these customer calls?

3   **A.**     So there is contact number on the profile.  We call the

4   number on the profile.

5   **Q.**     And is it normally on here, the number you call?

6   **A.**     Do I remember the number?

7   **Q.**     Is it on this form?

8   **A.**     I don't think so.

9          MS. SCHWARTZ:  If we could scroll up to the first page.

10   Sorry, scroll down.

11   BY MS. SCHWARTZ:

12   **Q.**     But you know the number that you would have called would

13   have been the number on the account that's referenced in this

14   form; is that right?

15   **A.**     No.  The number is in the profile in our system.

16   **Q.**     In your system?

17   **A.**     Yeah.

18   **Q.**     For this specific call, do you remember which language

19   you spoke during the call?

20   **A.**     Chinese Mandarin.

21   **Q.**     And why was that?

22   **A.**     Because the person who answered the phone spoke Mandarin.

23   **Q.**     So when he answered the phone, he answered in Mandarin?

24   **A.**     Yeah.

25   **Q.**     And do you speak Mandarin?

*Dong - Direct - Schwartz*

1   **A.**     Yeah, I speak Mandarin.

2   **Q.**     Did you have any trouble understanding each other on the

3   call?

4   **A.**     No.

5   **Q.**     Do you typically verify the identity of the accountholder

6   when you make one of these calls?

7   **A.**     Yes.

8   **Q.**     And how do you do that?

9   **A.**     In general, for incoming calls, we ask more security

10  questions.  For outgoing calls, we will confirm whether that's

11  the one we are trying to reach out, and ask some questions,

12  maybe, about the address or other transactions.

13  **Q.**     And did you do that in this case when you made the call?

14  **A.**     Yes.

15  **Q.**     Do you remember which questions you asked to verify

16  Mr. Zhu's identity?

17  **A.**     Yes, I think so, because I remember something about the

18  address, and it was not in Illinois, which is our branch.

19  **Q.**     So you made the call because the account was opened in

20  Illinois; is that right?

21  **A.**     Yes.  I think the case was assigned to us because it was

22  opened in Illinois.

23  **Q.**     What happens on one of these calls if you can't verify

24  the ID of the customer?

25  **A.**     We'll stop asking questions.

*Dong - Direct - Schwartz*

1    **Q.**    So directing your attention back to this form, is the

2    customer name on this form who you would call?

3    **A.**    Yes.

4    **Q.**    And the customer name and some of the information on this

5    form, was it filled in already when you received the form?

6    **A.**    For this page, it was filled.

7    **Q.**    Okay.  So you received this form, and it already had the

8    information under "request summary"; is that right?

9    **A.**    Yes.

10    **Q.**    How do you know what questions to ask the customer when

11    you receive one of these forms?

12    **A.**    So I read the form, and it's in the summary, what

13    questions to ask.  And also, I believe, down there, there are,

14    like, a number of questions.

15            MS. SCHWARTZ:  If we can go to page 3 of this form.

16    BY MS. SCHWARTZ:

17    **Q.**    Are these the questions that you asked Mr. Zhu on the

18    call?

19    **A.**    Yes.

20    **Q.**    And do these answers reflect the answers that Mr. Zhu

21    provided?

22    **A.**    Yes.

23    **Q.**    I want to walk through the answers on this form.  Can you

24    read the first question that you asked?

25    **A.**    "What is our customer's current or most recent

*Dong - Direct - Schwartz*

1   occupations and employer?"

2   **Q.**    And what was the answer you recorded?

3   **A.**    Construction, self-employed.

4   **Q.**    And what was the second question you asked?

5   **A.**    "What is the source and the purpose of the customer's

6   account credit activity -- cash deposits, check deposits, and

7   self-wire addressed -- as described in the summary?  What funded

8   the wires from East West Bank?"

9   **Q.**    So for this question, did you refer to the transactions

10  listed on page 2 of this form?

11  **A.**    Yes, I did.

12  **Q.**    And you asked him specifically about those different

13  transactions listed on page 2?

14  **A.**    Yes, I did.

15  **Q.**    And what was his answer to No. 2?

16  **A.**    "Credit transactions to account were the payments to

17  Mr. Zhu's construction business.  His customers paid him in cash

18  most of the time."

19  **Q.**    And he answered similarly for all the different

20  transactions that you referred to.

21  **A.**    Similarly?

22  **Q.**    You mentioned that you went transaction by transaction.

23  No. 2 was his answer to respond to all of those transactions

24  listed on page 2; is that right?

25  **A.**    I think so.

*Dong - Direct - Schwartz*

1  **Q.**   What was question 3 that you asked him?

2  **A.**   "Does the customer expect to have similar transactions --

3  cash deposits, check deposits, and self-transfers -- in the

4  future?  If yes, what is the anticipated frequency, amounts, and

5  purpose of the activity?"

6  **Q.**   And what did Mr. Zhu answer in response to this?

7  **A.**   "Yes, Mr. Zhu expects to have the similar transactions in

8  the future, but not as often as in the past few months.  Mr. Zhu

9  bases in Chicago.  He worked his projects in California for the

10 past few months, and will be back to Chicago this year."

11 **Q.**   What was question No. 4 on this form?

12 **A.**   "Do you gamble?  If yes, how often?"

13 **Q.**   And what was the answer to that question?

14 **A.**   "Yes, Mr. Zhu gambles.  He goes to the casinos about

15 twice a month."

16 **Q.**   And what is the fifth question you asked on this form?

17 **A.**   "What was the purpose of attempted international wire

18 transfers on December 1, 2022?  Who was to receive the wire?

19 What was your relation?"

20 **Q.**   And what did you record as Mr. Zhu's response?

21 **A.**   "The attempted wire on December 1, 2022, was the payment

22 for the construction/renovation materials to the supplier

23 overseas."

24 **Q.**   Other than verifying his identity at the beginning of the

25 call and asking him the questions on these forms, did you ask

1  him anything else during that call?

2  **A.**     No, I don't think so.

3  **Q.**     And when he gave an answer, did you ask him follow-up

4  questions?

5  **A.**     If I need to, like, clarify the answer, I will ask

6  follow-up questions.

7  **Q.**     So these responses reflect his answers to the questions

8  and any follow-up questions you asked?

9  **A.**     Yes.

10 **Q.**     What did you do with this form when you were done?

11 **A.**     So I filled out this answer part and send it back to the

12 other department.

13         MS. SCHWARTZ:  If we could turn to page 2 of this

14 exhibit and scroll down to the middle under "request summary."

15 BY MS. SCHWARTZ:

16 **Q.**     I just want to briefly walk through some of these

17 transactions that you asked him about in question 2.

18 **A.**     Okay.

19 **Q.**     Can you read the second paragraph of "request summary"?

20 **A.**     "During the review of the account, unusual activity

21 totaling $200,000 consists of three unusual cash deposits

22 totaling $168,000, one unusual self-addressed wire credit of

23 $13,000 from account 2037059074 held at East West Bank Pasadena,

24 CA, and one unusual check deposit from Wynn for $19,000 on

25 December 1, 2022.  The ultimate source for these transactions is

1    unknown.  Unusual activity occurred between from October 28,

2    2022 through December 1, 2022."

3    **Q.**    And then right underneath that --

4         MS. SCHWARTZ:  If we could scroll down a little bit to

5    the bottom of this form.

6    BY MS. SCHWARTZ:

7    **Q.**    -- can you read those two lines underneath?

8    **A.**    "On December 1, 2022, a cash deposit totaling $83,000 was

9    conducted at branch No. 6644 in Rosemead, CA.  On December 1,

10    2022, a check deposit from Wynn totaling $19,000 was conducted

11    at branch No. 6644 in Rosemead, CA."

12         MS. SCHWARTZ:  Court's indulgence.

13         (Whereupon, there was a brief pause in the

14    proceedings.)

15    BY MS. SCHWARTZ:

16    **Q.**    Scrolling up to the very top of this form, can you read

17    what it says in this top box as well, please?

18    **A.**    On October 28, 2022, a cash deposit totaling 10,000 was

19    conducted at branch No. 7215 in Arcadia, CA.  On

20    November 15, 2022, a cash deposit totaling 75,000 was conducted

21    at branch No. 6644 in Rosemead, CA.  On November 16, 2022, a

22    wire totaling $13,000 was remitted by Hailong Zhu located at

23    1140 South El Molino Street, Alhambra, CA 91801-4908 via account

24    2037059074 held at East West Bank, Pasadena, CA."

25         MS. SCHWARTZ:  No further questions, Your Honor.

*Dong - Cross - Wenstrup*

1        THE COURT:  Thank you.

2        Any cross-examination?

3        MR. WENSTRUP:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. WENSTRUP:

6   **Q.**    Good afternoon, Ms. Dong.

7   **A.**    Good afternoon.

8   **Q.**    Before you placed this call to -- before you placed this

9   call on January 5th, you had never spoken to Hailong Zhu before,

10  correct?

11  **A.**    Correct.

12  **Q.**    And when you placed this call on January 5th, you were

13  not familiar with Hailong Zhu's voice?

14  **A.**    No.

15  **Q.**    And this was not a video call, correct?

16  **A.**    No.

17  **Q.**    And it was not -- this call was not recorded, correct?

18  **A.**    Correct.

19  **Q.**    And you testified that the identity verification is not

20  as intensive when you're making an outgoing call, correct?

21  **A.**    Not as intensive as what?

22  **Q.**    It's not as intensive as if you're receiving an incoming

23  call about the account, correct?

24  **A.**    Correct.

25  **Q.**    The outgoing calls have less intensive verification?

*Dong - Cross - Wenstrup*

1   **A.**     Yes.

2   **Q.**     And so in this case, after you placed the call, somebody

3   picked up on the other end, correct?

4   **A.**     Correct.

5   **Q.**     And that person spoke Mandarin?

6   **A.**     Yes.

7   **Q.**     And you asked that person for the address associated with

8   the account?

9   **A.**     Yes.

10  **Q.**     To verify the identity, correct?

11  **A.**     Correct.

12  **Q.**     And the person on the other end of the call provided the

13  address on the account?

14  **A.**     I don't remember clearly this part, but I remember I

15  verified the address, and the one answered the phone, he

16  explained what happened to the different addresses.

17  **Q.**     So the person -- I just want to make sure I'm clear.

18  When you asked the person about the address, they provided the

19  address to you in a satisfactory way?

20  **A.**     Yes.

21  **Q.**     And we're talking about the street address associated

22  with the account?

23  **A.**     What street address?

24  **Q.**     A street, like, a physical address, as opposed to an

25  email address?

1   **A.**      Yes.

2   **Q.**      So we're talking about a physical address?

3   **A.**      Yes.

4   **Q.**      So if someone other than Hailong had the phone connected

5   to the account and they knew the street address associated with

6   the account, that person could pass the verification question,

7   correct?

8   **A.**      But the one answered the phone said he's Hailong Zhu.

9   **Q.**      So the person who answered the phone said, This is

10  Hailong Zhu?

11  **A.**      Yeah, because I asked, May I speak to -- like, May I

12  speak to Hailong Zhu?  Are you Hailong Zhu?  And then I verified

13  the identity.

14  **Q.**      Got it.  So the order of the phone call was, the person

15  picked up the phone, correct?

16  **A.**      Yeah.

17  **Q.**      And they said hello in Mandarin?

18  **A.**      Yeah.

19  **Q.**      And then you asked to speak to Hailong Zhu, correct?

20  **A.**      Correct.

21  **Q.**      And then the voice on the phone said, This is Hailong

22  Zhu?

23  **A.**      Yes.

24  **Q.**      Okay.  And so -- and then that person provided you with

25  the physical address associated with the account, correct?

*Dong - Cross - Wenstrup*

1   **A.**     I don't remember clearly of the address part, but I'm

2   pretty sure I verified the address because something was

3   different.

4   **Q.**     Okay.  So if someone had the phone associated with the

5   account, they told you that their name was Hailong Zhu, and they

6   knew the street address associated with the account, that person

7   could pass the verification questions?

8   **A.**     No.  We also verify with the transactions.

9   **Q.**     You also review the transactions?

10  **A.**     Yes.

11  **Q.**     So if someone -- so you reviewed the transactions with

12  the person on the phone, correct?

13  **A.**     Correct.

14  **Q.**     Now, it's possible that someone other than Hailong Zhu

15  could be familiar with the transactions in that account?

16  **A.**     I don't know.  I don't know this part of it.

17  **Q.**     I'm just asking, is it possible that someone other than

18  Hailong would know the account activity in Hailong's bank

19  account?

20  **A.**     (No response.)

21  **Q.**     For example, if someone else had access to Hailong's

22  physical account statements or had his online login information,

23  that person could be familiar with the transactions, correct?

24  **A.**     But I believe I asked for something about the address,

25  about the difference of the address, and that person answered

*Dong - Cross - Wenstrup*

1   the phone, he explained to me what exactly happened and why that

2   happened.

3   **Q.**     So you're saying that the person explained the shift in

4   the address from Illinois to California, correct?

5   **A.**     Yeah.

6   **Q.**     Okay.  So it's possible that someone other than Hailong

7   knew that his account address had changed from Illinois to

8   California, correct?

9   **A.**     Maybe.

10  **Q.**     It's possible that someone else would have known about

11  that change, correct?

12  **A.**     Maybe.

13  **Q.**     So if someone else had Hailong's phone, had the account

14  information and transactions, knew the address associated with

15  the account, both the new and the old address associated with

16  the account, it's possible that you did not actually speak to

17  this Hailong Zhu?

18  **A.**     We challenge the accountholder.

19  **Q.**     It's possible that if someone else had all that

20  information, it's possible you did not speak to the

21  accountholder; that, instead, you spoke to someone identifying

22  themselves as the accountholder; that's possible, right?

23  **A.**     Yes.

24  **Q.**     Now, after you completed the verification, you believed

25  you were speaking to the accountholder?

*Dong - Cross - Wenstrup*

1   **A.**      Yes.

2   **Q.**      And you mentioned the four questions that you asked,

3   correct?

4   **A.**      Yes.

5   **Q.**      You didn't ask this person if anyone else was using the

6   bank account, correct?

7   **A.**      I don't remember.

8   **Q.**      You don't remember asking that?

9   **A.**      I don't remember whether I asked.

10  **Q.**      Okay.  You didn't ask the person you were speaking with

11  if they knew their online login information, correct?

12  **A.**      Could you repeat?

13  **Q.**      Sure.  So when you were speaking to this person on the

14  phone, you didn't ask them if they knew their online username

15  and password, correct?

16  **A.**      I don't remember.

17  **Q.**      And --

18  **A.**      I mean, I don't remember whether I asked, because that's

19  one of our verifying questions.

20  **Q.**      That is a verifying question, but that's not a verifying

21  question that you asked in this case, correct?

22  **A.**      I don't remember.  I don't remember whether I asked.

23  **Q.**      Okay.  And you didn't ask this person if they were in

24  possession of their own bank cards, correct?

25  **A.**      Bank cards, like, specific bank cards?

*Dong - Cross - Wenstrup*

1    **Q.**    Right.  You didn't ask the person on the phone if they

2    were in possession of their bank cards, correct?

3    **A.**    I don't remember.

4    **Q.**    You don't remember asking that question?

5    **A.**    I don't remember if I asked about the cards because it's

6    an account number.

7    **Q.**    I'm sorry, because --

8    **A.**    It's an account number; it's not a card number.

9    **Q.**    But I'm asking about the card itself.  You didn't ask

10   this person if they were in physical possession of their own

11   bank cards?

12   **A.**    Because the form didn't mention cards.

13   **Q.**    So you didn't ask it because the form didn't mention it?

14   **A.**    Yeah.

15            MR. WENSTRUP:  No further questions.

16            THE COURT:  Any redirect?

17            MS. SCHWARTZ:  No, Your Honor.

18            THE COURT:  Thank you.  And are you in need of this

19   witness at a later time?

20            MS. SCHWARTZ:  No, Your Honor.

21            THE COURT:  Ms. Dong, thank you very much.  You may

22   step down, and you're free to go.

23            THE WITNESS:  Thank you.

24            (Whereupon, the witness exits the stand.)

25            THE COURT:  Do you have a very short witness that we

1    could try and call before we break at 1:00?

2          MS. BEDELL:  Your Honor, I suspect Yang Wen will be a

3    shorter witness.  It's a little bit out of order, but it is one

4    we flagged and wanted to try to get done today, so I think -- I

5    don't know what you have in mind for cross there, but I think,

6    from our perspective, that would be a shorter witness.

7          MR. NI:  Your Honor, we're planning to cross him for a

8    little bit, but I guess it depends on --

9          THE COURT:  But why don't we try.  I think we should

10   break at 1:00 and try and stick to our schedule, for everyone's

11   sake.  So call your next witness, and we'll see how far we get.

12         MS. BEDELL:  The government calls Yang Wen.

13         (YANG WEN, ON BEHALF OF THE GOVERNMENT, SWORN)

14         (Whereupon, the witness takes the stand.)

15                        DIRECT EXAMINATION

16   BY MS. BEDELL:

17   **Q.**    Good afternoon, Mr. Wen.  Could you please state your

18   name and spell it for the record?

19   **A.**    My name is Yang Wen.

20   **Q.**    And could you spell that for the record?

21   **A.**    The first name is spelled Y-A-N-G, and the last name is

22   spelled W-E-N.

23   **Q.**    Where are you employed?

24   **A.**    I am employed with Manpower Group.

25   **Q.**    What do you do at Manpower Group?

*Wen - Bedell - Direct*

1   **A.**   I'm a research linguist with Manpower Group.

2   **Q.**   Can you describe what a research linguist does?

3   **A.**   It's a new concept.  As a linguist, part of the job is to

4   do research before we actually translate articles.

5   **Q.**   And do you also just do transcription and translation

6   work?

7   **A.**   We do both transcription and translation.

8   **Q.**   What language is your specialty?

9   **A.**   Translation from Chinese into English or the other way

10  around.

11  **Q.**   How long have you been a Chinese linguist for?

12  **A.**   A good 25-some years.

13  **Q.**   Can you describe your educational background?

14  **A.**   I received my bachelor's degree from Georgetown

15  University and my M.A. from Georgetown University too.

16  **Q.**   Can you describe your knowledge of Chinese?

17  **A.**   I'm a native, growing up in China.  I left China when I

18  was freshman in college, so I am pretty much native.

19  **Q.**   In your time as a Chinese linguist, have you published

20  books on the topics of translation?

21  **A.**   Yes.  I wrote two books and published two books on the

22  subject of translation; one in English, one in Chinese; and the

23  English one is available in most university libraries in the

24  U.S.

25  **Q.**   Have you also edited language textbooks?

*Wen - Bedell - Direct*

1   **A.**    Yes.  I edit one, *Chinese for Dummies*.  I'm a technical

2   editor of the book.

3         MS. BEDELL:  At this point, we would move to qualify

4   Mr. Wen as an expert in Chinese language transcription and

5   translation.

6         THE COURT:  Is there any objection?

7         MR. NI:  No objection.

8         THE COURT:  He will be so qualified.

9   BY MS. BEDELL:

10  **Q.**    In this case, were you asked to transcribe and translate

11  an audio recording?

12  **A.**    Yes, I was asked to transcribe and translate.

13  **Q.**    Could you first describe what the transcription process

14  is?  What does that mean?

15  **A.**    Well, when we do transcription, we are asked to render

16  every word, every pause, every repetition moved into the

17  transcription column.

18  **Q.**    So you are listening to Chinese, and then you write it

19  down in Chinese --

20  **A.**    Yes; I listen to the Chinese audio file and put that into

21  English.

22  **Q.**    And then what is the translation part?

23  **A.**    Translation would be -- when we're done with the

24  transcription part, we translate the transcription portion.

25  **Q.**    What process do you use when you are undertaking a

*Wen - Bedell - Direct*

1  transcription and translation task?

2  **A.**    Process?  We do the transcription first from beginning to

3  finish, trying to get the picture of the subject matter, the

4  content.

5  **Q.**    And is that the process that you used in this case?

6  **A.**    Yes.

7  **Q.**    Now, I understand that Chinese is a tonal language.  Can

8  you explain briefly what that means?

9  **A.**    Yeah.  When we say Chinese is tonal language, we are

10  talking about spoken Chinese, and there are specific tones to

11  each word, and different tones will give a word a different

12  meaning.  It's very abstract.  We don't have it in English, but

13  in Chinese, you can say "want," it means one thing; if you say

14  "want," it means a different thing.  That's when the tone is

15  working.

16  **Q.**    Is the syntax of Chinese sentences different from English

17  syntax?

18  **A.**    It is, it is, it is.  It's quite different.  If we say in

19  English, if we say, We had lunch at home yesterday, but in

20  Chinese, it will be, We yesterday at home had lunch.

21  **Q.**    When you are translating, what do you do when one of the

22  speakers makes a mistake?

23  **A.**    If makes a linguistic mistake, we'll put the [*sic*], the

24  Latin word, indicating this is the mistake made by the original

25  speaker or person.

*Wen - Bedell - Direct*

1   Q.    Would you also potentially put a translator's note in the

2   text?

3   A.    We do.  If it helps the reader to better understand the

4   intention, the message, we'll put that as an English note.

5   Q.    What do you do if you cannot hear or understand one of

6   the speakers?

7   A.    In this transcription portion, if we really, really had

8   difficulties understanding the word or the meaning, we just

9   put a un --

10  Q.    Is it UI?

11  A.    UI, that's our linguist term.

12  Q.    Does that stand for unintelligible?

13  A.    Unintelligible, yeah, because we're not supposed to make

14  up anything to improve, to modify.

15  Q.    What was the audio recording that you were asked to

16  transcribe and translate in this case?

17  A.    It's an interview between two agents and Mr. Zhu.

18  Q.    What languages did the agents speak?

19  A.    The agent speaks -- Agent Shi speaks both Chinese and

20  English when asking questions.

21  Q.    And what language did the other agent speak?

22  A.    The other agent speaks English.

23  Q.    Could you take a look at Exhibit 15-2, which is a CD?

24  A.    15-2, mm-hmm.

25  Q.    Have you reviewed this item?

*Wen - Bedell - Direct*

1    **A.**      Oh, yes.  I see my signature.  Yes.

2    **Q.**      What is on that CD?

3    **A.**      It's the interview -- it's an interview.

4    **Q.**      And was that the audio recording that --

5    **A.**      The audio recording to do the transcription.

6    **Q.**      And could you look at 15-2A, which I believe is in the

7    binder -- actually, it's a paper exhibit.  I'm sorry, that audio

8    recording, that's the one you translated?

9    **A.**      Yes.

10   **Q.**      Have you reviewed this item?

11   **A.**      Yes.

12   **Q.**      And what is it?

13   **A.**      This is the transcription and translation I did.

14   **Q.**      And is this translation a fair and accurate translation

15   of the recorded conversation between Agent Shi and the

16   defendant?

17   **A.**      Yes, it is.

18   **Q.**      And could you look at 15-2B?  Have you reviewed this

19   item?

20   **A.**      Yes, I did.

21   **Q.**      And is this excerpts of your full translation?

22   **A.**      Yes, it is.

23   **Q.**      And are these translations and excerpts fair and accurate

24   translations of the portions of the interview?

25   **A.**      It is from the transcription and translation.

*Wen - Bedell - Direct*

1    MS. BEDELL:  Your Honor, at this time, we would move to

2 admit Exhibit 15-2.

3    MR. NI:  No objection.

4    THE COURT:  It will be admitted without objection.

5    (Government's Exhibit No. 15-2 received in evidence.)

6 BY MS. BEDELL:

7 **Q.** Mr. Wen, having listened to the full conversation between

8 agent -- excuse me -- Mr. Zhu and Special Agent Shi, does

9 Special Agent Shi have an accent?

10 **A.** Really, I would say no, really.  His Chinese, it sounds

11 educated, learning from school, standard.

12 **Q.** Did he ever struggle to translate into Chinese or --

13 **A.** Yes.  When it comes to the colloquialism, local

14 expression, he will have difficulty understanding the

15 expressions.

16 **Q.** Did he ever struggle to understand Mr. Zhu?

17 **A.** At some point, yes.

18 **Q.** Overall, how would you characterize Special Agent Shi's

19 ability in Chinese?

20 **A.** He handled this type of conversation very proficient,

21 very good.

22 **Q.** In the instances where there were difficulties

23 understanding, is that noted in the transcript?

24 **A.** It's noted in the translation -- in the transcription of

25 the translation.

*Wen - Bedell - Direct*

1    **Q.**      Regarding Mr. Zhu, does he have an accent?

2    **A.**      No.  No, I wouldn't say -- no.  His -- if accent, it

3    would be Northern China accent, something like that.

4    **Q.**      Was he generally able to understand Mr. Shi -- Special

5    Agent Shi?

6    **A.**      Yes.

7    **Q.**      On any occasions when they were not fully understanding

8    each other, is that clearly reflected in the transcript?

9    **A.**      It is, it is, yeah.

10   **Q.**      How did you reflect that?

11   **A.**      I will reflect that either cupping the original response

12   or message from the tone in the transcription, in translation.

13   **Q.**      So were there times when Mr. Zhu would ask

14   Special Agent Shi to repeat himself?

15   **A.**      Yes.

16   **Q.**      And that's reflected --

17   **A.**      Yes.

18   **Q.**      And what is the general nature of the conversation in

19   terms of the tone?

20   **A.**      It's -- wouldn't call it S and T, science and technology.

21   It's everyday subject matter, and it's rarely technical.  It's

22   everyday normal conversation.

23   **Q.**      And how was the dynamic between Special Agent Shi and

24   Mr. Zhu?

25   **A.**      Dynamics, you mean?

*Wen - Bedell - Direct*

 1   **Q.**    Were they hostile; were they friendly, that sort of --

 2   **A.**    They're conversational.  I think they're friendly.

 3   **Q.**    Could you look at Exhibit 15-1, which should be,

 4   hopefully, right around where you are in the binder?  Have you

 5   reviewed this document?

 6   **A.**    Yes, I did, I did.

 7   **Q.**    What is it?

 8   **A.**    It's the Chinese translation of the *Miranda* right.

 9   **Q.**    Is it signed at the bottom?

10   **A.**    It's signed at the bottom.

11        MS. BEDELL:  Your Honor, at this time, we would move to

12   conditionally admit and publish Exhibit 15-1.

13        THE COURT:  Any objection?

14        MR. NI:  No objection.

15        THE COURT:  It will be admitted without objection.

16        MS. BEDELL:  Could we publish this document, please?

17        THE COURT:  You may.

18        (Exhibit published.)

19   BY MS. BEDELL:

20   **Q.**    And, Mr. Wen, what is this document communicating?

21   **A.**    (No response.)

22   **Q.**    What is this document communicating?  What is the

23   information?

24   **A.**    That is the Chinese translation of the *Miranda* rights.

25   **Q.**    The *Miranda* rights?

*Proceedings*

1    **A.**      Yes.

2    **Q.**      And are all of the *Miranda* rights here communicated

3    properly?

4    **A.**      Yes; they're all translated correctly and accurately.

5    **Q.**      Is this a complicated or sophisticated document?

6    **A.**      It is not.  It is everyday -- easy to understand.

7    **Q.**      What education level would you need to understand this

8    document?

9    **A.**      I would say elementary school, fourth, fifth grade.  That

10   should be it.

11   **Q.**      And final question:  Does the name Hailong have a meaning

12   in English?

13   **A.**      It does.  Hailong is two characters, two Chinese

14   characters:  Hai means sea, ocean; long meaning dragon.

15            MS. BEDELL:  Your Honor, we have no further questions.

16            THE COURT:  Thank you.  Perhaps we should take our

17   lunch break now rather than just have five minutes of

18   cross-examination.

19            Ladies and gentlemen of the jury, we'll take a little

20   bit more than an hour, and we'll resume at two o'clock.  I

21   encourage you to go and stretch your legs.  I know it's a little

22   bit hot outside, but maybe it will be good to get out of the air

23   conditioning for a short period of time.

24            Let me remind you that you must not discuss the case

25   with each other, with anyone else, conduct any research.  If

*Proceedings*

1    anyone approaches you, be sure to let the court security officer

2    know right away; and, otherwise, follow all of the instructions

3    I've given you, and we'll try and resume promptly at 2:00 p.m.

4    You may go at this time.

5              (Jury out at 12:59 p.m.)

6              THE COURT:  Mr. Wen, you may take off your microphone.

7    You may step down.  You'll remain under oath.  You are subject to

8    the rule on witnesses, so you must not discuss your testimony

9    with anyone.  Thank you.

10             (Whereupon, the witness exits the stand.)

11             THE COURT:  You may step out of the courtroom at this

12   time.

13             Are there any issues that we need to address before we

14   recess court?

15             MS. BEDELL:  Not from the government.

16             MR. KAMENS:  No, Your Honor.

17             THE COURT:  Maybe we should resume at ten of 2:00 to

18   address whether or not the government seeks to put on -- is it

19   Ms. Yang?  We addressed that briefly this morning, but maybe we

20   should resolve that so that we know what the afternoon's schedule

21   looks like; otherwise, we will begin cross-examination of Mr. Wen

22   at two o'clock promptly.

23             Court will be in recess.

24             (Whereupon, a recess in the proceedings occurred from

25   1:01 p.m. until 1:54 p.m.)

1          THE COURT:  Good afternoon, I hope you were able to get

2     some lunch.  As you may have heard, the jury has offered to stay

3     late tonight and to come in early tomorrow.  I think it's always

4     a reflection of the seriousness with which they're taking the

5     process that they are willing to do that.  I'm sure they also

6     want to get it done as quickly as possible, but it really is a

7     sacrifice, and I want to try and accommodate them as much as we

8     can.  I realize that that has an impact on us as well.  And I

9     will confirm with them when they come in -- you know, if they

10    want to go to 6:30, I'm willing to do that, and I hope the

11    government will be able to --

12          MS. BEDELL:  Yes.

13          MR. KAMENS:  So, Your Honor, we, of course, want to

14    accommodate the jury.  We would like to know what other witnesses

15    the government would call.  It does impact our preparation since,

16    if they call additional witnesses, that may require some work

17    that we haven't --

18          THE COURT:  I understand, and I'll ask that they do

19    that promptly.  And if you think there's really some challenge in

20    being able to be prepared, we can address that in turn.  That

21    would be a good problem to have since we don't know how long

22    these next witnesses will take.  It looked to me like they were

23    mostly law enforcement witnesses left, and I'm not sure whether

24    or not some of that could be expedited.  I don't know if it's

25    chain of custody or identifying things that were found in

*Proceedings*

1   searches, but --

2          MS. BEDELL:  Your Honor, on the list for this

3   afternoon, Your Honor, we have one representative from U.S. Bank

4   and then two victims, and then everyone after that, I think, is

5   all law enforcement.  Two of them will be pretty fast, and the

6   last, Agent Saunders, but at least two will be really quick.

7          MR. KAMENS:  So in terms of the law enforcement

8   witnesses, we'd ask that -- well, we don't object to direct, so,

9   perhaps, we could do the direct of Saunders once we are able to

10  complete the witnesses that are listed for today, and then

11  reserve the rest for tomorrow.

12         MS. BEDELL:  Your Honor, we're not --

13         THE COURT:  I'm not inclined to -- if the government

14  wants to end with their case agent, I'm going to let them do

15  that.  Let's see where we go.

16         MR. KAMENS:  Understood.

17         THE COURT:  Let's see if we can accomplish all goals,

18  which is to maximize getting in as much evidence as we can and

19  doing it efficiently.  I don't want anyone to feel like they

20  haven't had sufficient time.  We know who these witnesses are,

21  and, hopefully, we can get it done.

22         MR. KAMENS:  Understood.

23         THE COURT:  Is there any other matter we need to

24  address?

25         MR. KAMENS:  Yes.  I think Your Honor had suggested

*Proceedings*

1    that we discuss the issue of the one witness, Yan Zhang, and the

2    admissibility of this witness.  So this is a witness who was a

3    victim of a fraud, provided a substantial amount of money to

4    fraudsters.  None of the money that she sent went to any accounts

5    opened by Mr. Zhu.  They were sent largely during a time period

6    after Mr. Zhu had left California, so I can proffer to the

7    Court -- I think it's in the government's exhibits -- Mr. Zhu

8    left California January 27th of 2023.  Ms. Zhang has a

9    substantial number of wires that occur -- so five wires:

10   February 2nd, February 6th, February 15th, 22nd, 23rd of 2023.

11   She does have wires that date back to November, a number of

12   wires, through January.  All of the recipients, except for one,

13   are an entity called MCB Foris.  Their other recipient of the

14   wires is an entity called Dongdong Trading Company Limited.  None

15   of those are the recipients that are identified as receiving the

16   bulk of the money from the money that was funneled through

17   Mr. Zhu's accounts.  So that would be the entities that are

18   identified in Government's Exhibit 16-1:  Axis Digital Limited,

19   GATL, O Diamonds Trading Limited, and GHK Enterprises LLC.  And

20   so when I asked, Well, what is the relationship between Ms. Zhang

21   and this charged conspiracy if the money didn't go through

22   Mr. Zhu's accounts; is there some other way to link it to the

23   conspiracy that we're talking about, what the government has said

24   this morning is that that domain registration information is the

25   same company that used the cryptocurrency spoofed website that

*Proceedings*

1    was used to lure Ms. Zhang to contribute money; used the same

2    domain registrar company as the companies used in this

3    conspiracy.  I didn't honestly know what a domain registrar

4    company was.  When I looked it up, it's an internet company that

5    manages domain names, such as godaddy.com or Squarespace.

6              MS. BEDELL:  Your Honor, I think there's a

7    misunderstanding.  I apologize.  Let me clarify.

8              THE COURT:  That's all right, and I'd like you to

9    clarify because I'm also not an expert in this area, but, in

10   fact, this court handles anti-cybersquatting cases all the time,

11   especially as magistrate judges, so I'm very familiar

12   with Verisign and top-level domains, registries, and registrars;

13   and it is totally unclear to me how that could relate to this

14   case.

15             MS. BEDELL:  And that is fair.  If that was my

16   argument, I would be on thinner ground.  And I apologize for my

17   lack of clarity this morning.

18             The registration name, as in the person and the entity

19   that was given as the entity or person that registered each of

20   the domains, was the same.  So I'm actually not even sure what

21   godaddy or Verisign they used, but if I go and create a website

22   zoebedell.com and my name is, you know -- I am the person who did

23   the registration --

24             THE COURT:  So you're saying the common link between

25   those entities is that there was one person registering them when

*Proceedings*

1    they signed up for their domain names?

2              MS. BEDELL:  And I will clarify that a little bit in

3    that it is a common set of registration information, so it is --

4    it's not a specific person listed, but the information is

5    identical for all of the -- all of the -- for all -- for every --

6    I'm sorry.

7              The registration information -- the name of the entity

8    or person who did the registration -- is identical across these,

9    and you see some consistent patterns.  Frankly, it's probably

10   fake information; it's just the identical fake information, and

11   that's why I'm being a little bit weird and I can't just say

12   "person" or "entity."

13             THE COURT:  Well, I think I understand what you're

14   saying.  So that goes to show that these various fake

15   cryptocurrency platforms -- we heard about Gamma; we'll hear

16   about ASX, I assume -- that's what you're talking about --

17             MS. BEDELL:  Yes.  They were all registered --

18             THE COURT:  -- these companies that purported to be

19   actual cryptocurrency exchanges and were a front for the scam;

20   and so this witness would testify about her experience being

21   scammed and going to websites that are not the ones that have

22   been identified by the other witnesses?

23             MS. BEDELL:  Correct.

24             THE COURT:  But how does that help with regard to the

25   government's case?  First, why is it not cumulative; and,

*Proceedings*

1    secondly, how is it relevant to proving the conspiracy to commit

2    bank fraud?  I'm not seeing it.

3         MS. BEDELL:  Your Honor, so -- maybe I'll start at the

4    beginning here.  Yan Zhang is another victim -- our argument is

5    she is another victim of this conspiracy.  She took out a loan.

6    She made misrepresentations, at the inducement of the

7    conspirators, to the bank, both in taking out the loan and also

8    in making her transfers.  So, that, we believe is bank fraud,

9    and -- so that's why we are offering her as another example of

10   what the scheme is and how it's operating.  And, also, it began

11   because she did take out that loan and she lives in EDVA.

12        So then Mr. Kamens objected that he didn't think it's

13   part of the same scheme because the wires go to a different

14   level, or he raised that concern.  And so our response is that in

15   addition to the M.O. and her experience at being scammed being

16   identical to these other victims who were scammed, which we

17   believe is absolutely evidence that this is part of the same

18   scheme, there is also evidence that the site that she was using

19   is registered using the same information that all -- not all --

20   but a number of the other victims -- the sites that a number of

21   the other victims have used.  So that helps tie this all

22   together, including victims -- or Special Agent Saunders, who

23   received the defendant's account information.  So that ties -- it

24   helps as additional information tying it to the overall scheme,

25   in response to that particular comment.

*Proceedings*

1           THE COURT:  I think I understand, but there's nothing

2      about this evidence or witness that ties anything either to

3      Mr. Zhu or to Mr. Wong or to any of the other named victims in

4      the superseding indictment; is that correct?

5           MS. BEDELL:  I think that would be correct in, like, a

6      direct sense; like, she does not transfer to Zhu or have a

7      contact that we're aware of with Wong, but I think our broader

8      argument is that this is all part of the same scheme, and so it

9      is all connected, Your Honor.

10           THE COURT:  I think I understand the argument.  I am

11      going to exclude this witness.  I think, having heard the full

12      explanation, I don't find either that it's integral to the

13      charged conduct or that it would fall within an exception under

14      404(b).  I also find that it would potentially, to the extent it

15      had any relevance to the scheme, be cumulative of the evidence

16      that's already in the record or that will be presented.

17           MS. BEDELL:  Your Honor, I will say, I mean, we have

18      one witness who was testifying about a loan, and that is critical

19      information and a critical aspect of this scheme.  The other

20      thing is that Ms. Yan was directed to make misrepresentations,

21      and so that is also very critical to the scheme.  So I think that

22      this really is absolutely intrinsic evidence to the bank fraud

23      conspiracy, and she adds additional evidence that other victims

24      have not been able to testify to or will not testify to.  Or, you

25      know, we have one victim who did take out a loan, for example.

*Proceedings*

1    But, again, it's a conspiracy, and, frankly, an incidence of one,

2    I think that's a much weaker case than if you see a pattern,

3    especially given the scale of this conspiracy.  I really do think

4    that this is, not even 404(b), but 100 percent intrinsic

5    evidence.

6            And to the extent that Mr. Kames wants to argue she was

7    scammed by some completely other set of people, that's an

8    appropriate argument to the jury, but I think at this point, this

9    is absolutely intrinsic evidence that should be allowed to be

10   considered by the jury.

11           THE COURT:  I understand, but my ruling stands.  Thank

12   you.

13           MR. KAMENS:  Your Honor, there is one other issue I

14   wanted to raise, and that was the introduction of chats.  So we

15   have introduced a defense exhibit of chats.  I don't believe the

16   government has introduced the chats that they had the linguist

17   talk about.  And there is also another set of chats that are

18   drawn from devices that the government has obtained.  We would

19   like to move for their introduction, but we don't know exactly

20   the proper time.  It could be when the devices from which the

21   chats were obtained were introduced, which I think would be

22   through the agent, or we now have a linguist who could review the

23   chats -- and they've been translated either by us or by the

24   government -- to confirm that they are translations of those

25   chats.  But I'm looking for guidance of when we should seek to

*Proceedings*

1    introduce those things.

2          THE COURT:  I'm not sure that it's up to the Court to

3    direct your strategy on this, and I don't know whether this

4    witness is the appropriate vehicle.  It's one thing -- I believe

5    the things you sought to introduce before had been reviewed and

6    confirmed at the government's direction, but if Mr. Wen is seeing

7    this stuff for the first time and simply happens to be a Mandarin

8    speaker, I don't think that's appropriate --

9          MR. KAMENS:  Understood -- -

10         THE COURT:  And I don't think it's fair to subject the

11   jury to that, but whether you have some other mechanism for

12   seeking to enter that --

13         MR. KAMENS:  Understood.  So, perhaps, we should just

14   seek to introduce them at the time the device from which the

15   chats came are introduced at the trial.

16         THE COURT:  I'm not going to give an advisory opinion

17   on that.

18         MS. BEDELL:  We will object at that time.

19         THE COURT:  And you will have the right to do so.

20   We'll take it up at the appropriate time.  Let's bring the jury

21   in.

22         (Jury in at 2:09 p.m.)

23         THE COURT:  Welcome back, ladies and gentlemen of the

24   jury.  I hope you were able to get some lunch and not melt in the

25   sun.  Let me confirm that you've been able to follow the Court's

139

*Proceedings*

1   instructions not to discuss the case, conduct any research, or

2   otherwise violate the Court's instructions.  I see that you're

3   all nodding your head, and I appreciate that.

4          We will resume in just a moment.  We can bring in

5   Mr. Wen, who will be subject to cross-examination.  I understand

6   that you've consulted and agreed that you would be willing to

7   stay late this evening.  We very much appreciate that.  I know

8   counsel appreciate your willingness to have a longer day.  Let's

9   see how things go in terms of the witnesses, but we will go -- I

10  think you said your final cutoff was 6:30, which is very

11  generous.  I think we could revisit whether or not 6:00 or 6:15

12  or 6:30 is appropriate depending on where things stand, but the

13  goal will be to get as much of the case in today as possible.

14         Further, I understand that you are willing to begin at

15  9:00 a.m. tomorrow, which, again, we appreciate, and we can

16  revisit that at the end of the evening, but I think everyone is

17  willing to accommodate your desire to do so, and that I know

18  you-all have a hard stop at 5:30, I think, tomorrow evening, and

19  that's fine.  So I want you-all to be reassured that we'll, no

20  matter what's going on, certainly accommodate you in that regard.

21         So with that, you can bring Mr. Wen in.  Thank you.

22         (Whereupon, the witness takes the stand.)

23         THE COURT:  Mr. Wen, you remain under oath, and we will

24  now proceed with cross-examination.

25         THE WITNESS:  Thank you, Your Honor.

                          CROSS-EXAMINATION

BY MR. NI:

**Q.**     Good afternoon, Mr. Wen.

**A.**     Thank you.

**Q.**     You have a bachelor's degree from Georgetown?

**A.**     Correct.

**Q.**     And a master's degree from Georgetown?

**A.**     From Georgetown, too.

**Q.**     And you're currently a Ph.D. candidate?

**A.**     Candidate, yes.

**Q.**     Your day job is a research linguist?

**A.**     Right, with Manpower.

**Q.**     With --

**A.**     Manpower Group.

**Q.**     Manpower Group.

           And you consult and provide research on defense and

military related science and technology?

**A.**     Translations, yes.

**Q.**     Including on satellites?

**A.**     Satellites and defense systems.

**Q.**     Sorry.  Can you speak --

**A.**     Defense systems, satellites, and weapons systems.

**Q.**     Electronic information?

**A.**     Electronic, yes.

**Q.**     Current political issues?

*Wen - Cross - Ni*

1    **A.**      Mm-hmm, yes.

2    **Q.**      Current economic issues?

3    **A.**      Yes.

4    **Q.**      That's all about China?

5    **A.**      All about China.

6    **Q.**      Cultural issues?

7    **A.**      Rarely; sometimes cultural issues.

8    **Q.**      And that's kind of -- all the advice you give and the

9    analyses you give is in the context of Chinese history and

10   culture?

11   **A.**      Yes.

12   **Q.**      With which you are familiar?

13   **A.**      Mm-hmm, yes.

14   **Q.**      You testified earlier that you wrote a book called *Lost*

15   *in Translation*?

16   **A.**      Correct.

17   **Q.**      I guess you'd be familiar with passages from your own

18   book?

19   **A.**      Yes.

20   **Q.**      And that book is about how to translate Chinese into

21   English?

22   **A.**      Correctly, yes, how to translate Chinese into English

23   correctly.

24   **Q.**      And do you recognize this passage that I've put in front

25   of you?

1   **A.**      Yes.  This is from my book.

2   **Q.**      And it's from the introduction of the book *Lost in*

3   *Translation*?

4   **A.**      Mm-hmm.

5   **Q.**      The first -- this book is here to pick up where

6   dictionaries left off by showing you the right word for the

7   right context; is that right?

8   **A.**      That's correct.

9   **Q.**      Can you elaborate a little on what you mean by context?

10  **A.**      Well, by "context," when people mention a word in

11  Chinese, for example, meaning -- I have to say the Chinese word,

12  (foreign language spoken); in the context -- in the right

13  context, the two words will give you different -- in different

14  context, the two words will give you different translation.  So

15  that's why the context is crucial in translation.

16  **Q.**      So the word you just used is pinyin is M-A-O-D-U-N,

17  right?

18  **A.**      D-U-N, yes.

19  **Q.**      Contradiction?

20  **A.**      Contradiction.

21  **Q.**      And you're saying these two words, for example, used in

22  one context means one thing; another context, another thing?

23  **A.**      That's correct, especially in philosophical context, in

24  academic context, "contradiction" is the correct translation,

25  but in everyday conversation, in different context, these two

*Wen - Cross - Ni*

1   words, (foreign language spoken), will mean "problems," will

2   mean "conflicts," will mean "differences," so it doesn't mean

3   "contradiction" in the philosophical context.

4   **Q.**    Understood.  And in this introduction, you give numerous

5   examples of similar, kind of, contextually distinguishable

6   words --

7   **A.**    That's correct.

8   **Q.**    -- they mean completely different things in different

9   context?

10   **A.**    That's correct.

11   **Q.**    And you say improper choice of words can cause many

12   golden opportunities to slip away -- many opportunities for

13   promotion to be put on hold and many otherwise excellent papers

14   to be denied all because of not knowing how to put that critical

15   Chinese expression into English properly.

16       And so when you were translating, you're looking for

17   context?

18   **A.**    Yes, yes.  Context is very important in translation, like

19   in real estate industry, buying houses, they say "location,

20   location, location," but in our field, in translation, we

21   emphasize "context, context, context."

22   **Q.**    And so to understand why you translated the interrogation

23   transcript the way you did, we would have to look at the context

24   of the statements translated; is that correct?

25   **A.**    Yes, that's correct.

*Wen - Cross - Ni*

1    **Q.**     And the context depends on the entire exchange; is that

2    correct?

3    **A.**     To change the tone of the speakers, their dialect, their

4    language, expression skills.

5    **Q.**     So let's break that down a little bit.  Tone?

6    **A.**     Yes, the tone.

7    **Q.**     Dialect?

8    **A.**     Dialect and their colloquial expressions.

9    **Q.**     And so you listen to their respective dialect?

10   **A.**     Yes.

11   **Q.**     What do you mean by "dialect"?

12   **A.**     Like (foreign language spoken), accent in (foreign

13   language spoken) expressions.  Like, Mr. Zhu will say (foreign

14   language spoken), meaning the place where I am from, my

15   hometown, that place; but it's never in the extent of Chinese,

16   so that's the colloquial expression.

17   **Q.**     You just said W-O-N-A-G-E?

18   **A.**     (Foreign language spoken), N-A G-A.

19   **Q.**     And that's a specific expression of that region --

20   **A.**     Mm-hmm.

21   **Q.**     -- where he's from?

22   **A.**     Yes.

23   **Q.**     And you can tell his dialect --

24   **A.**     Yes.  I am from Northern China too.

25   **Q.**     Where are you from?

*Wen - Cross - Ni*

1   **A.**      Heilongjiang.

2   **Q.**      You said Heilongjiang, H-E-I-L-O-N-G-J-I-A-N-G?

3   **A.**      Yes.

4   **Q.**      That's where my grandpa is from.

5   **A.**      My grandma too.

6            THE COURT:  Let's stick with questions.

7   BY MR. NI:

8   **Q.**      And so you said you take into account the dialect?

9   **A.**      And the dialect, making sure when I translate that,

10  (foreign language spoken) I have to put that into standard

11  Chinese, meaning where I'm from, my hometown, that place.

12  **Q.**      And what about the next thing you said you took into

13  account was accent; what's the difference between accent and

14  dialect?

15  **A.**      "Accent" meaning, for extended Chinese, Mr. Zhu will say

16  (foreign language spoken), (foreign language spoken).  It's a

17  standard -- Mandarin Chinese would be (foreign language spoken),

18  slightly different, but if you're not familiar with that local

19  accent, (foreign language spoken), (foreign language spoken),

20  (foreign language spoken), then you won't be able to pick up the

21  term (foreign language spoken), meaning "my country folks, my

22  folks at home."

23  **Q.**      "My fellow villagers"?

24  **A.**      "My fellow villagers."

25  **Q.**      That's L-A-O-X-I-A-N-G?

1    **A.**    X-I-N-G -- L-A-O-X-I-A-N-G.

2    **Q.**    And you also -- and you can tell their accents?

3    **A.**    I can tell -- luckily, he's from the region where I'm

4    familiar with the accent.

5    **Q.**    And Mr. Shi as well -- Agent Shi?

6    **A.**    Agent Shi's Chinese is standard.  You can tell he picked

7    up Chinese from school.  Every word is fully pronounced; very

8    bookish, school-like pronunciation; too standard to pick up any

9    colloquial accent, so it's standard.

10   **Q.**    You don't know Mr. Shi personally, do you?

11   **A.**    Oh, no.

12   **Q.**    But you can tell from just listening to his --

13   **A.**    By listening, you can tell it's as if he's reading from a

14   textbook, pronouncing every word correctly.

15   **Q.**    But you don't know if he ever went to school in China?

16   **A.**    No, I don't.

17   **Q.**    But you can tell he --

18   **A.**    I can tell.

19   **Q.**    -- he must have learned --

20   **A.**    Yeah.  Because in speaking, you swallow some tones.  If

21   you're a native, you will swallow some words, but you don't

22   pronounce every word to the full extent.

23   **Q.**    So I want to talk to you about the context in these

24   translations a little bit.

25             MR. NI:  Bailiff, would you mind putting in front of

*Wen - Cross - Ni*

1    Mr. Wen Government's Exhibit 15-2A, which might already be in

2    front of you?

3    BY MR. NI:

4    **Q.**    Do you have it in front of you?

5    **A.**    Yes.

6    **Q.**    So, earlier, you were told to look at 15-2B, which is a

7    subset of the complete transcript, but you translated personally

8    the complete transcript?

9    **A.**    Yes.

10   **Q.**    And you have 15-2B in front of you as well?

11   **A.**    Yes.

12   **Q.**    And 15-2B ends at line 791, right?

13   **A.**    Yes, 7-9-1.

14   **Q.**    And 15-2A ends at 958?

15   **A.**    1,058.

16   **Q.**    And 15-2B starts at 58, correct?

17   **A.**    58, yes.

18   **Q.**    But 15-2A, the complete transcript, starts with one?

19   **A.**    Starts from one.

20   **Q.**    And so the beginning and end of this transcript are

21   not --

22   **A.**    It's incomplete.

23          (Court reporter interruption.)

24   BY MR. NI:

25   **Q.**    The beginning and end of the full transcript that you

*Wen - Cross - Ni*

1  translated has not been admitted?

2  **A.**    That's the full transcript of the --

3  **Q.**    From --

4  **A.**    From last page, from first page to the last page.

5  **Q.**    So --

6  **A.**    It starts from No. 1, ends with 1,058.

7  **Q.**    Yeah, that's the full transcript?

8  **A.**    The full transcript.

9  **Q.**    But 15-2B, the transcript that the government just

10  admitted, moved into evidence earlier, 15-2B does not include

11  the beginning and end?

12  **A.**    That's true.  It's the middle.

13  **Q.**    Thank you.  Sorry for the confusion.

14       So I want to talk about a part that's not been admitted,

15  and, specifically, a part where you talk about you can tell

16  where he's from.

17  **A.**    Mm-hmm.

18  **Q.**    So if you were to go to line 56 --

19  **A.**    56.

20  **Q.**    -- which is --

21  **A.**    It's not --

22  **Q.**    It's only in -2A, not in -2B.

23  **A.**    Yeah, 56.

24  **Q.**    So it's two lines before -2B begins?

25  **A.**    Yes, there it is.

1   **Q.**     Where does he say he's from?

2   **A.**     Yep.

3         MS. BEDELL:  Your Honor, we would object to this; it's

4   hearsay.

5         THE COURT:  Well, go ahead and cross-examine the

6   witness.  You can ask questions about work that he did --

7         MR. NI:  His translation.

8         THE COURT:  -- but having him simply repeating what's

9   in here --

10         MR. NI:  I understand.  I'm not going to say --

11   BY MR. NI:

12   **Q.**     Your translation states that he says that he's from

13   X-I-N-G-'-A-N League in Y-O-N-G-F-E-N-G Village, Inner Mongolia.

14   And I wanted to ask you, where is Inner Mongolia?

15   **A.**     Inner Mongolia is the northern part of China, somewhere

16   in the middle part of northern part of China.

17   **Q.**     And Xing'an League, do you know where that is?

18   **A.**     I don't know where that is, but it's in Inner Mongolia.

19   It's the equivalent of a state in the U.S.  It's equivalent of a

20   province.

21   **Q.**     Inner Mongolia?

22   **A.**     It's a subunit of Inner Mongolia.  It is a league.  We

23   call it a "league."  We call it "province" or "state" or

24   "perfecter."

25   **Q.**     You said you understood his accent because it's from

*Wen - Cross - Ni*

```
1    northeastern China --

2    A.      Right.

3    Q.      -- where you're from?

4    A.      Mm-hmm.

5    Q.      Yes?

6    A.      Yes.

7    Q.      And that's at the very top northeastern --

8    A.      Right, yes.

9    Q.      -- part of --

10   A.      Yes.

11   Q.      -- China, right next to Siberia?

12   A.      Right next to Siberia, yeah.

13   Q.      And so is his accent from the same region?  Like, is

14   his -- sorry, I take it back.

15          Is the part of Inner Mongolia where he's from right next

16   to where you're from, the same region?

17   A.      No, no.  It's far away from where I'm from, but the

18   accent covers the whole northern region.

19          Mandarin Chinese almost -- back in history, almost took

20   his accent as the standard Chinese.

21   Q.      You said you were from Kenjing?

22   A.      Kenjing.

23   Q.      Sorry, so I made a mistake.  I didn't mean where you were

24   from, but is that accent sort of -- is Inner Mongolia touching

25   Heilongjiang province?
```

1   **A.**    Mm-hmm.

2   **Q.**    It is?

3   **A.**    Yeah.  I have a few provinces before I reach Inner

4   Mongolia.

5   **Q.**    And so is where he's from further north --

6   **A.**    Further north from where I am.

7   **Q.**    Again, right next to Siberia?

8   **A.**    Next to, yes.

9   **Q.**    I want to ask you about the "league."

10  **A.**    The league, yeah.

11  **Q.**    Do you know the historical origins of that word?

12        MS. BEDELL:  Objection, Your Honor.

13        THE COURT:  I'm going to sustain the objection unless

14  you can bring it to something that's relevant to this trial.

15  BY MR. NI:

16  **Q.**    Why did you translate it as "league"?

17  **A.**    It's the standard Chinese translation within China.  It's

18  called "league" (foreign language spoken), like province, like

19  perfecter, like county.  It has to be league.  It's not baseball

20  or football league, but it's just league.

21  **Q.**    It's a region --

22  **A.**    Region, yes.  A province of state, but it's officially

23  translated as "league."

24  **Q.**    And that sort of means --

25  **A.**    It means "level."

Wen - Cross - Ni

1   **Q.**    And it's like a -- sort of like a Mongolian tribal

2   reservation area?

3   **A.**    I wouldn't say that.  It's kind of like a province.  We

4   just call it "league" in English, but in Chinese, we call it

5   (foreign language spoken).  In Tibet, they will call it

6   something else.

7   **Q.**    And I'm only --

8   **A.**    Inner Mongolia, they call it (foreign language spoken).

9   I guess it has its own history.  It has nothing to do with

10  football league, that sort of thing.

11  **Q.**    It comes from --

12  **A.**    It's from --

13  **Q.**    From Mongolia?

14  **A.**    From Mongolia.  They call it (foreign language spoken),

15  yeah.

16  **Q.**    So it's like a Mongolian area?

17  **A.**    Like Mongolian term, concept.

18  **Q.**    You said earlier -- you testified earlier that every

19  instance of a lack of understanding, a mutual misunderstanding

20  or non-understanding between Agent Shi and Hailong, you

21  identified in the transcript?

22  **A.**    Yes.  It's reflected in their asking, What do you mean?

23  Reflected in Agent Shi saying, I'm sorry, my Chinese is not good

24  enough to capture that particular expression.  It's reflected in

25  Mr. Zhu asking, like, No, what do you mean?

*Wen - Cross - Ni*

1   **Q.**    And that's -- those are sort of literal

2 misunderstandings, right, where they just literally don't get

3 what each other is saying?

4   **A.**    Especially the term (foreign language spoken).

5   **Q.**    Did you mark out any substantive misunderstandings

6 between the agent and Hailong?

7   **A.**    What do you mean by substance [*sic*]?

8   **Q.**    Like, they're misinterpreting what each other is saying,

9 the meaning?

10   **A.**    I don't mark it.  My job is to mirror-image what they're

11 saying.

12   **Q.**    So, literally, when they couldn't understand what word is

13 being said, you marked it out, but if they didn't understand the

14 content or the substance of what each other was saying, you

15 didn't mark that out?

16   **A.**    I didn't -- I just mark out if there's an overlap noise,

17 if the voices overlapped, if there's something I really couldn't

18 pick up, the technical problems.  If their voice is too low or

19 noises in the background, then I will mark it; otherwise, if

20 it's the problem -- they're understanding each other, then it's

21 reflected in the transcription or translation.

22   **Q.**    But you did identify a fundamental substantive

23 misunderstanding between the agent and Hailong to the

24 government; is that correct?

25   **A.**    Mm-hmm, yes.

*Wen - Cross - Ni*

1    **Q.**    And you sent the government an email about this

2    fundamental misunderstanding?

3    **A.**    Yes.  It's not reflected in the translation, but it's in

4    the email.

5    **Q.**    So in an email you sent August 13, 2023, which is in

6    front of you, you said, There is one case, I think it is crucial

7    where Mr. Zhu is saying -- Hailong is saying, I realize what I

8    was doing was not right; but the Chinese for "was not right"

9    meant the thing, slash, event didn't go the way it should, but

10   Agent Shi heard -- is hearing "not right" to mean morally and

11   legally not right as in illegal?

12   **A.**    That's correct.

13   **Q.**    He fails to catch the fact that Hailong was saying this

14   is not right, like things are not going right --

15   **A.**    That's correct.

16   **Q.**    -- not admitting that he knew what he was doing was

17   illegal?

18   **A.**    That's correct.

19   **Q.**    In fact, you summarized that and you said, Agent Shi is

20   believing all along that Mr. Zhu realized that it was illegal,

21   but he continued to do it, but Mr. Zhu is not saying he realized

22   it was illegal; instead, he only realized they didn't give him

23   the money as promised?

24   **A.**    That's correct.

25   **Q.**    And you concluded, So the two are talking past each

1    other; Agent Shi keeps pounding on Mr. Zhu why he continued to

2    do it when realizing it was illegal, but Mr. Zhu keeps saying, I

3    didn't realize it was illegal, and quickly repeating his anger

4    for not getting the money?

5    **A.**    Correct.

6    **Q.**    How did you catch this substantive misunderstanding?

7    **A.**    It's the very last word "crucial" (foreign language

8    spoken) and (foreign language spoken), and the (foreign language

9    spoken), the very last word.  Three words.  It ended with

10   (foreign language spoken).  In most cases, it will mean, "It

11   didn't go the way I expected."  It doesn't carry that moral,

12   legal understanding that something went wrong.

13   **Q.**    And is the phonetic B-U-D-E-L-E versus B-U-D-E-D-E,

14   B-U-D-E-L-E, which is "something wrong" --

15   **A.**    Something wrong.

16   **Q.**    -- and B-U-D-E-D-E, which is illegal, immoral?

17   **A.**    Not definitely, but in the context, it's in that police

18   officer -- if it's grandma and grandchildren, it will mean the

19   same thing, but in that particular context, it will mean that.

20   **Q.**    And that phonetic difference is not reflected in the

21   transcript?

22   **A.**    No.

23   **Q.**    Because you didn't transliterate the words you

24   translated?

25   **A.**    Our job is to mirror-image, not to modify, not to do any

1   change.

2   **Q.**    That's why the substantive misunderstanding doesn't come

3   across in the transcript, but you knew it?

4   **A.**    It still uses the word "correct, correct, correct," but

5   in English, it's always "not correct, not correct, not correct."

6   **Q.**    So the transcript is actually reflecting, at times, the

7   opposite of what Mr. Hailong is trying to say?

8   **A.**    The transcript is correct (foreign language spoken),

9   (foreign language spoken), (foreign language spoken), but the

10  English is -- (foreign language spoken), so I have no way to

11  invent a new word in English, so it has to be right --

12  **Q.**    So the English is --

13  **A.**    Not right.

14  **Q.**    The English is saying the opposite of what he's actually

15  trying to mean, convey?

16  **A.**    The English is -- the English is still not right.  What

17  he's trying to say, Something goes wrong, something doesn't go

18  the way -- something is not right, English is "not right, not

19  right, not right."  But implied nuance in Chinese cannot be

20  reflected in English, but we don't -- we don't need that word to

21  catch that Chinese nuance in English language --

22  **Q.**    Understood.

23  **A.**    -- unless I have a parenthesis going lengthy explanation,

24  but that's not translation; that's not even transcription.

25  **Q.**    And as he's saying all of these things, Hailong is not

1   being combative, correct?

2   **A.**     I don't know.

3   **Q.**     Well, during the -- as you listened to the recording, was

4   he being cooperative?

5   **A.**     You mean combative or cooperative?

6   **Q.**     Sorry.  The word I used was "combative," like --

7   **A.**     No, he's not combative.

8   **Q.**     He's cooperative?

9   **A.**     He's cooperative.

10  **Q.**     And you said just now that you caught the

11  misunderstanding through context?

12  **A.**     (Nonverbal response.)

13  **Q.**     So not only was the words -- not only were the words

14  themselves, the context was also telling you that there was this

15  misunderstanding?

16  **A.**     Mm-hmm, like in this case, yes.

17  **Q.**     And can you, by chance, identify any instances of that

18  such context where this came through to you?

19  **A.**     For example, Agent Shi would say "open bank" to mean open

20  bank account, but "open bank" will be -- is reflected in

21  transcription and translation; but, actually, the implied

22  message is open bank accounts.  We don't open bank business; we

23  don't open banking business, but Agent Shi's Chinese, he will

24  say "open bank."

25  **Q.**     Can I point you to -2A, line 793?

*Wen - Cross - Ni*

1    **A.**      719?

2    **Q.**      790.

3    **A.**      90, 9-0?

4    **Q.**      9-0, yeah.  Actually, if you look at that page, that

5    whole page, is this one instance where this misunderstanding

6    sort of --

7    **A.**      Well, this is correct.  There's account in there.  This

8    is correct.  This is correct.

9    **Q.**      Right, the transaction is correct?

10   **A.**      Translation is correct and transcription is correct.

11   **Q.**      Would this be one of the instances of the context where

12   kind of, like, what they're talking about, this conversation,

13   showcases that they're not understanding each other, if you look

14   at the whole five or six sentences that's exchanged?

15   **A.**      You mean the "open bank" versus "open bank account"?

16   **Q.**      No, not the words themselves, not that specific word.

17   This conversation they're having, this entire conversation

18   across six or seven sentences.

19   **A.**      Oh, six or seven sentences.

20   **Q.**      Is this an instance of the two not understanding each

21   other where Mr. Shi is saying, Well, you knew it was illegal,

22   why did you keep doing it?  And he says --

23                MS. BEDELL:  Objection, Your Honor.

24                THE COURT:  Just ask the question.

25   BY MR. NI:

Wen - Cross - Ni

1    **Q.**    Is this --

2            THE COURT:  Let him answer, but you can't testify,

3    Mr. Ni.

4            MR. NI:  Understood.  Sorry.

5    BY MR. NI:

6    **Q.**    And is this one of the instances where Agent Shi and

7    Hailong were not understanding each other?

8    **A.**    I believe so.

9    **Q.**    And how can you tell that from this -- these sentences?

10   **A.**    Again, from what we've just talked about.  Mr. Zhu

11   confessed -- not confessed, but acknowledged that he realized

12   something went wrong --

13   **Q.**    And did you --

14   **A.**    -- but that he was understood as something went wrong

15   legally --

16   **Q.**    Mm-hmm.

17   **A.**    -- but not wrong as I would expect -- meaning, He should

18   have given me money, but I didn't receive money.  Wrong in that

19   aspect.

20           But in this case here, Special Agent Shi might have

21   understood as, You knew already that it was illegal or legally

22   wrong, but you continued to do it.

23   **Q.**    Is what -- is how Hailong feels about what happened to

24   him evident from the transcript in any way?

25   **A.**    I couldn't tell what he was thinking, but the two were

1    talking past each other.

2            MR. NI:  Court's indulgence.

3            (Whereupon, there was a brief pause in the

4    proceedings.)

5    BY MR. NI:

6    **Q.**    Let me just -- last few questions.

7            So, earlier, you testified that your research work

8    involved political, economic, and defense-related issues

9    involving China.  China experienced huge economic growth over

10   the past 20 years?

11   **A.**    Yes.

12   **Q.**    And over a billion people got lifted out of poverty and a

13   lot of wealth created?

14   **A.**    Yes.

15           MS. BEDELL:  Objection, Your Honor.

16           THE COURT:  I will sustain objection unless you can

17   find a way to make this relevant to the case.

18           MR. NI:  It's to -- should I just say it?

19           THE COURT:  Well, ask your next question, and I'll

20   either permit him to answer it or not.

21   BY MR. NI:

22   **Q.**    Would a Chinese person like Hailong understand that the

23   Chinese government has capital controls that prevent people from

24   taking money out of China and exchanging it into dollars?

25           MS. BEDELL:  Objection.

 1           THE COURT:  Sustained.

 2           MR. NI:  No further questions.

 3           THE COURT:  Thank you.

 4           Any redirect?

 5           MS. BEDELL:  Briefly, Your Honor.

 6                          REDIRECT EXAMINATION

 7   BY MS. BEDELL:

 8   **Q.**    Mr. Wen, could you look at 15-2A, page 78?  And this

 9   is --

10   **A.**    78, yes.

11   **Q.**    And then line 850.  Are you in 15-2A?

12   **A.**    Yes, 2A.

13   **Q.**    Do you see the location?

14   **A.**    I see 78.

15   **Q.**    I'm sorry?

16   **A.**    78?

17   **Q.**    Line 850 on page 78.

18   **A.**    Oh, page 78.

19   **Q.**    Sorry, page 78.

20   **A.**    Yeah, I'm on that page.

21   **Q.**    You see line 850 there?

22   **A.**    850, yes, 8-5-0.

23   **Q.**    Agent Shi, you have translated this as, At first, you

24   knew it was not right, correct?

25   **A.**    Mm-hmm, that's correct.

*Wen - Redirect - Bedell*

1    **Q.**    And then what happens next -- what do you write next?

2    Excuse me.

3    **A.**    I wrote in Chinese (foreign language spoken) as

4    B-U-D-U-I-D-I.

5    **Q.**    And that's referring to the Chinese word that Agent Shi

6    had used there?

7    **A.**    Yes.

8    **Q.**    And then -- and so you put this in a bracket, right?

9    **A.**    Right.

10   **Q.**    And so this is a translator's note here?

11   **A.**    It's the translator note, meaning trying to explain

12   there's only one English word "right" for that implied nuances

13   of two concepts.

14   **Q.**    So you put a translator's note indicating the ambiguity

15   in the Chinese language so that someone reading this would

16   understand that ambiguity?

17   **A.**    Exactly, yes.

18           MS. BEDELL:  No further questions, Your Honor.

19           THE COURT:  Thank you.

20           Does the government seek to call Mr. Wen at a later

21   time?

22           MS. BEDELL:  No, Your Honor.

23           THE COURT:  Mr. Wen, you may step down.  Thank you very

24   much.  You are free to leave.

25           The government can call its next witness.

*Golladay - Direct - Schwartz*

1              (Whereupon, the witness exits the stand.)

2              MS. SCHWARTZ:  The government calls Scott Golladay.

3         (SCOTT GOLLADAY, ON BEHALF OF THE GOVERNMENT, SWORN)

4              (Whereupon, the witness takes the stand.)

5                        DIRECT EXAMINATION

6    BY MS. SCHWARTZ:

7    **Q.**    Good afternoon.  Please state your name and spell it for

8    the record.

9    **A.**    Scott Golladay, S-C-O-T-T  G-O-L-L-A-D-A-Y.

10   **Q.**    Where do you work?

11   **A.**    U.S. Bank.

12   **Q.**    How long have you worked for U.S. Bank?

13   **A.**    Twenty-nine years.

14   **Q.**    And over those 29 years, what kinds of positions have you

15   held at U.S. Bank?

16   **A.**    Everything from teller to branch manager, auditor, and

17   various levels of fraud operations and research.

18   **Q.**    And what do you do now for U.S. Bank?

19   **A.**    I'm the manager for fraud research and process support.

20   **Q.**    How long have you been in that role?

21   **A.**    Different titles and different bosses, but 25 years,

22   essentially.

23   **Q.**    And you said you're a manager; what does your team do?

24   **A.**    My team provides guidance and support for branches for

25   things that are happening in the moment.  We also do loss

1    analysis, fraud investigations.  We create solutions for fraud

2    that's happening in the moment, and we spin up mitigation

3    routines; things that if we can't do from an automation

4    standpoint, my team will build something out to stop the fraud.

5    **Q.**    Is it fair to say your team does both prevention of fraud

6    and identification of fraud?

7    **A.**    Yes.

8    **Q.**    What does your job on that team entail?

9    **A.**    My job -- basically, I'm the leader of the team, so I'm

10   engaged with everything from escalations where my team needs

11   assistance, whether it's counterfeit checks, counterfeit IDs, if

12   they have a loan fraud ring going on, elder fraud.  I'm brought

13   in for pretty much all the fire drills or anything high-dollar

14   amount.

15   **Q.**    Have you received training for this role?

16   **A.**    On-the-job training.  I actually create most of the

17   training for the fraud that we do, so I'm the one that creates

18   it.

19   **Q.**    And do you come into contact or work with different

20   sections of the bank in this role?

21   **A.**    Yes.

22   **Q.**    What are some of those sections?

23   **A.**    I work with card strategy, which would be credit card;

24   electronic fraud, eFraud, which would be, like Zelle, ACH

25   transactions; OSS wires, which would be, like, incoming and

*Golladay - Direct - Schwartz*

1    outgoing wires.  I work on the checking account side, DBA.  I'm

2    engage with all of them.

3    **Q.**    About how many people on your team?

4    **A.**    Right now, I have 31.

5    **Q.**    Are you familiar with general banking practices in the

6    industry?

7    **A.**    Yes.

8    **Q.**    Would you say U.S. Bank practices are similar to other

9    banks' practices?

10   **A.**    Yes.

11   **Q.**    Can you explain some of the general mechanisms U.S. Bank

12   has in place for fraud detection?

13   **A.**    We have rules that will alert us to certain deposits that

14   will then get a second-level review.  We have CTR reports.  We

15   have MICLs, Monetary Instrument Check Logs, for when people are

16   buying things 3 to $10,000 in cash.  We review wires.  We

17   review -- we have a number of things that we have in place.

18   **Q.**    And does U.S. Bank have mechanisms in place for

19   authentication for identifying their clients?

20   **A.**    Yes.

21   **Q.**    When an accountholder has an account with U.S. Bank and

22   wants to make a transaction in or out of the account, does

23   U.S. Bank typically verify ID?

24   **A.**    Yes.

25   **Q.**    How does the bank do that, at a high level?

*Golladay - Direct - Schwartz*

1    **A.**    Driver's license, state ID, possibly a passport.

2    **Q.**    If a customer wants to open an account or withdraw from

3    an account, is U.S. Bank going to ask them for ID to do so?

4    **A.**    Yes.

5    **Q.**    And if the customer cannot provide ID, what typically

6    happens?

7    **A.**    To open an account without an ID?  The account's not

8    going to be opened.

9    **Q.**    What about to withdraw from an account?

10   **A.**    Yes, you would need an ID.

11   **Q.**    When somebody opens an account at U.S. Bank, does the

12   bank inquire as to the purpose of the account?

13   **A.**    Yes.  That's a requirement for all banks to inquire about

14   what's going to be going on with the account, the purpose.

15   **Q.**    And why is the bank doing this?

16   **A.**    It's part of the KYC, know your customer, so we have to

17   know the identity.  So we'll ask for the driver's license.

18   We'll want to understand what is going to be the purpose of the

19   account, what you're going to be doing, you know, writing

20   checks, incoming wires, things like that.  And then, you know,

21   anything else related to the account, we're going to ask about.

22   **Q.**    If the client is opening a business account, does the

23   bank inquire as to the purpose of that business?

24   **A.**    Yes.

25   **Q.**    What is the bank trying to understand when they ask about

*Golladay - Direct - Schwartz*

1    the purpose?

2    **A.**    We want to understand what's going on with the account to

3    make sure that they're not engaged in any type of prohibited

4    business that we're not allowed to have an account for.  We also

5    want to make sure that we understand the type of activity that's

6    going to be going on so that we prevent possible money

7    laundering, terrorism financing, fraud to the bank, corruption,

8    things like that.

9    **Q.**    In addition to the person whose name is on the account,

10   if an account does not have the name of a second or third

11   signatory, and the client wants to make a withdrawal or change

12   account information, would a second person be allowed to do

13   that?

14   **A.**    No.  You have to be on the account.

15   **Q.**    Does U.S. Bank do any monitoring of transactions in and

16   out of personal accounts?

17   **A.**    Yes, we monitor all transactions.

18   **Q.**    What are some of the ways that U.S. Bank monitors

19   transactions in and out of personal accounts?

20   **A.**    We monitor transactions through various ways.  We have

21   automated systems, rules that will look at deposits and

22   withdrawals.  We have CTR reports that we fill out when people

23   are doing transactions greater than $10,000.  We monitor wire

24   activity through different rules, and then just escalations from

25   branch personnel.

*Golladay - Direct - Schwartz*

1  Q.    For some of those flags you talked about, will your team

2  sometimes get involved if something comes up in an account,

3  something triggers one of those rules?

4  A.    Yes.

5  Q.    What types of transaction make a flag for additional

6  review that would warrant your team coming in?

7  A.    Deposits that are outside normal activity; perhaps it's a

8  deposit that's much larger than what the customer has typically

9  done, and the branch feels uncomfortable.  Perhaps they have

10 questions about the check itself; maybe they have a concern that

11 it's counterfeit, stolen, altered.  Perhaps they have a concern

12 with the incoming wires going into an account.  You could have a

13 wire that goes into somebody's account that has a name mismatch,

14 because banks only look at the account number, so a lot of the

15 times, if you have fraud activity going on, you'll see an

16 incoming wire that's intended for a title company but goes into

17 a consumer account, something like that.

18 Q.    So is it fair to say the bank looks at the context of the

19 account and compares that with whatever is happening?

20 A.    Yes.

21 Q.    And why does the bank do this review?

22 A.    Because they want to ensure that they are not helping the

23 customer -- facilitating the movement of fraud funds.  They want

24 to make sure that the customer is not engaged in money

25 laundering or, like I said, terrorism financing or scamming

*Golladay - Direct - Schwartz*

1   other individuals and moving funds from point A to B to C.

2   **Q.**     You mentioned some of the common banks documents that you

3   look at in your role, and you mentioned CTRs; what is a CTR?

4   **A.**     A CTR stands for currency transaction report, and it's a

5   standard form that all banks are required to fill out for any

6   transaction involving cash $10,000 or greater, whether it's a

7   withdrawal, a transfer, buying a cashier check, anything along

8   those lines, a bank is required to fill that out.

9   **Q.**     I would like you to take a look at what has been admitted

10  as Government's Exhibit 12-8.  Taking a look at this form, what

11  kind of form is this?

12  **A.**     This is a CTR, currency transaction report.

13  **Q.**     And can you identify which account this report -- which

14  U.S. Bank account this report was filled out about?

15  **A.**     Let's see.  What's the account number?  I see the TIN

16  number, so you've got the customer's TIN right there.  You've

17  got, right up there on the top, his social.  Did you want me to

18  call it out?

19  **Q.**     If you could -- no, you don't have to read out that

20  number.

21          If you could go to the second page of this document.

22  **A.**     There's an account number right there on the second page.

23  **Q.**     What are the last four digits of the account number?

24  **A.**     4148.

25  **Q.**     And is there a contact information listed on this form?

*Golladay - Direct - Schwartz*

1   **A.**     Yes.  There would always be contact information:  Name,

2   date of birth, address, driver's license number information.  I

3   think it's on another page, but it would be collected.

4          MS. SCHWARTZ:  If we could go back to that first page,

5   I believe -- the top of the second page.

6          THE WITNESS:  There you go.

7   BY MS. SCHWARTZ:

8   **Q.**     How would U.S. Bank -- where would this information come

9   from when one of these reports is being filled out?

10  **A.**     This information would come from the person making the

11  deposit in this case.

12  **Q.**     And can you read the information on the individual who

13  made this particular deposit?

14  **A.**     Yes.  The name is Hailong Zhu.

15  **Q.**     Is there a phone number on this form?

16  **A.**     Should be.  Email --

17  **Q.**     On the right-hand side there.

18  **A.**     Oh, yes, phone number there.

19  **Q.**     Can you read that phone number?

20  **A.**     Yes, it's (773) 828-1816.

21  **Q.**     And is there an email address on this form?

22  **A.**     Yes, there's an email on the bottom,

23  hailongzhu666@icloud.com.

24  **Q.**     What is done after one of these reports are filed?

25  **A.**     They are collected by the bank and then submitted.

1  **Q.**    What was the amount that was deposited on this form?

2  **A.**    Cash in is $75,000.

3  **Q.**    Does your team also review wire transfers?

4  **A.**    We do, yes.

5  **Q.**    What kinds of circumstances would your team be reviewing

6  wire transfers?

7  **A.**    Unusual large deposit amount for the customer.  It could

8  be they've deposited a check, and the branch or ESS wire

9  investigations is concerned it's a counterfeit check, so they

10  would reach out to my team to make sure that it's a legitimate

11  check before they release the funds.

12  **Q.**    What are you looking for when you're reviewing a wire

13  transfer?

14  **A.**    What I'm looking for when I'm reviewing a wire transfer

15  is I'm looking for a couple of things.  I'm looking for -- if

16  it's a check, is it a valid check, is it stolen, altered, or is

17  it counterfeit.  If it's cash, then I'm worried about either

18  possibly money laundering activity or the customer is being

19  scammed themselves and they're draining their life savings.  If

20  it's an incoming wire that's being quickly flipped back out,

21  then I'm looking for a name mismatch.

22  **Q.**    Do you ever do additional inquiry into the purpose of a

23  wire?

24  **A.**    Yes.  We'll do customer outreach.

25  **Q.**    What does that typically look like when you're

1    doing customer outreach?

2    **A.**    Typically, we just want to make sure that we understand

3    where the money came from.  If it's a check and we suspect it's

4    counterfeit, then we're probably looking for potential for a

5    scam victim.  If it's cash, then we're wanting to talk to the

6    customer to find out where did they obtain the money, before we

7    release the funds, to make sure that it's -- like I said,

8    they're not involved in, like, a romance scam or investment scam

9    or a popup box on their computer or something like that, and

10   they're draining their life savings, or are they just getting

11   money from multiple people around the country and they're

12   grouping it together and they're sending the wire on, acting as

13   what we call a "money mule."

14   **Q.**    If you're investigating a transaction like this, and you

15   contact the customer, and they told you they were sending money

16   to invest in crypto, what would the bank do?

17   **A.**    We would do a follow-up conversation to find out what

18   their understanding of crypto was.  So in a situation like that,

19   we're probably leaning towards potential money mule activity;

20   you have somebody that's investing in crypto, but they don't

21   know who's sending them the money.  Those people are giving us a

22   different story as to why they're sending our customer the

23   money, and the story falls apart as soon as you start to ask

24   further questions about, you know, what's their experience in

25   investing in crypto and who are the people involved; they can't

*Golladay - Direct - Schwartz*

1    give you any of those details.

2    **Q.**    If the customer tells you that they were investing

3    cryptocurrency but they've never invested before, and don't seem

4    to have a background in it, what would the bank do?

5    **A.**    We wouldn't send the wire.

6    **Q.**    If a customer wanted to use a personal loan to invest in

7    cryptocurrency, is that the type of loan that U.S. Bank would

8    give to a customer?

9    **A.**    You could do it.  It's not technically illegal.  You

10   could apply for an unsecured loan, check off the box "other";

11   and if you have good credit, it would probably be automated,

12   given an approval up to probably about $20,000, but if you did

13   cite that it was for investing in crypto, it would be heavily

14   scrutinized.  Not everybody tells you exactly what they're doing

15   with the money.

16   **Q.**    And if you do know that it was for crypto, is that a loan

17   that the bank would typically make?

18   **A.**    That would be outside of my department.  You would have

19   to talk to underwriting, but I know it would be scrutinized.

20   **Q.**    And why would it be scrutinized?

21   **A.**    It's very risky.

22   **Q.**    If someone is making a wire transfer, ACH transfer, and

23   they lie about the purpose of that transfer, does that put the

24   bank at risk?

25   **A.**    Yes.

*Golladay - Direct - Schwartz*

**Q.**      Why?

**A.**      It could be money laundering; it could be funding for terrorism --

**Q.**      And how -- sorry.  Go ahead.

**A.**      It could be a number of things that the bank does not want to help facilitate.

**Q.**      I want to talk a little bit about account restriction. Are there ever circumstances where your group will recommend that an account gets restricted?

**A.**      Yes.  My team has the ability to put an account under review.

**Q.**      What kind of circumstances would you recommend that an account be restricted?

**A.**      Identity.  Maybe it's a synthetic identity, meaning it's a newly created Social Security number.  You could have counterfeit checks being deposited into the account.  We could have stolen checks that have been altered.  Could be -- maybe there's device connections between that customer and other accounts that we've seen fraud at in the past.

**Q.**      What happens when an account is restricted, generally?

**A.**      We place an alert on the account so that you cannot debit or credit into the account until we finish our review.

**Q.**      What does the review entail?

**A.**      It depends on the situation.  If it's identity concerns, then we're looking at driver's license, social, address, phone

*Golladay - Direct - Schwartz*

1   numbers, emails, do they match up?  Is there some explanation as

2   to why we think it might be synthetic?  If it's checks, we're

3   going to know fairly quickly if they're depositing counterfeits.

4   **Q.**   Does part of this process involve looking into specific

5   transactions?

6   **A.**   Yes.

7   **Q.**   And does part of the process also involve calling

8   customers directly?

9   **A.**   It can.

10  **Q.**   What kind of questions would you or your team be asking

11  on a call with a customer if that was the case?

12  **A.**   If it's checks, we're wanting to understand where they're

13  getting the checks from.  If we think they're depositing

14  counterfeit checks, then we want to understand where they got

15  the checks from and what their intent was to do with the money

16  once it became available.

17  **Q.**   What if you see large wires in and out of an account or

18  large withdrawals and deposits that don't match the context,

19  like you were talking about before?

20  **A.**   We just want to understand where are they getting the

21  funds and what's the purpose of the account.  Does it match up

22  with what they told us when they opened up the account?  Maybe

23  they're running a business now; maybe they've opened up a new

24  business and they're running it through their consumer and they

25  just never took the time to open up a business account.

1   **Q.**    Could those answers to those questions lead your team to

2   recommend the account be closed?

3   **A.**    It could.

4   **Q.**    What happens if you ask those questions and your team

5   comes to a determination that the activity in and out of the

6   account was fraudulent activity?

7   **A.**    Then we would talk to the branch and the market, and

8   recommend move to closure.

9   **Q.**    Who's the market?

10   **A.**    Market would be if it's a -- a market would be like the

11   city, like the City of Cincinnati or Ohio or the City of Los

12   Angeles, the market manager.

13   **Q.**    So you're typically talking to the local branch where the

14   account was opened?

15   **A.**    Yes.  It could be a local branch manager or it could be

16   his boss, which would be like a market manager.

17   **Q.**    In that case, if you've discovered that funds in and out

18   of the account are fraudulent and you recommend closure, do the

19   funds get returned to the customer?

20   **A.**    It depends on what they were depositing.  So if it was

21   cash and we cannot determine where the cash came from, then,

22   yes, they would be cutting them a cashier check and sending it

23   back.  If it's checks and the person who is sending the customer

24   the checks -- let's say they were involved in a romance scam and

25   that it's an elderly person and another bank, we might be

1    working with that other bank for them to submit the proper

2    paperwork to reclaim the funds; or if it's an incoming wire

3    that's a name mismatch, we might be going, you know, a little

4    bit different route.  But, essentially, the same thing:  That

5    bank would submit the proper paperwork to pull back the funds if

6    the customer doesn't sign off.

7    **Q.**    So you can essentially freeze the funds in the account in

8    anticipation that another bank may come and make a claim to --

9    **A.**    Or law enforcement.

10    **Q.**    -- those funds?

11    **A.**    Yes, like a seizure, yes.

12    **Q.**    And if a bank is looking -- if U.S. Bank is looking into

13    closing an account, would the bank ever require verification of

14    some of the funds that are moving in and out of the account from

15    the customer before they would cut them a check to issue them

16    the remaining funds in the account?

17    **A.**    I'm sorry, verify with the customer?

18    **Q.**    So if U.S. Bank is going to recommend account closure,

19    are they ever reaching out -- they're going to let the customer

20    know, presumably, that that's happening?

21    **A.**    Yes, that can happen.

22    **Q.**    And in that circumstance when they are letting the

23    customer know their account is being recommended for closure,

24    what sort of information gets passed to the customer about why

25    that occurred?

178

1    **A.**     Depends on the situation.  If it's a customer that's

2    involved -- say, they're in a romance scam and their boyfriend

3    is on an oil rig overseas and they've never met him and they're

4    receiving money from other individuals around the country, and

5    if we can't -- you know, we'll try to communicate with the

6    customer and explain to them what exactly is going on, but if

7    they're completely bought into the story that their boyfriend is

8    on an oil rig, then we'll explain to them, Hey, the funds are

9    going to be returned back to the people that sent you the cash,

10   but we're going to be moving your account to close.  And if

11   there's any, like, Social Security deposits mixed in, payroll

12   checks, we'll return the funds to the customer.

13   **Q.**     So you'll return funds to the customer if they were sort

14   of consistent with the previous account activity?

15   **A.**     Yes, those funds would go back.

16   **Q.**     I would like you to take a look at what's been admitted

17   as Government's Exhibit 12-7.  Do you generally recognize what

18   kind of document this is?

19   **A.**     Yes.  This is a standard closure letter by U.S. Bank to a

20   customer.

21   **Q.**     What is the last four of the account number on this

22   closure letter?

23   **A.**     4148.

24   **Q.**     And on the top left-hand corner, who is the customer and

25   what is the address that is provided?

*Golladay - Direct - Schwartz*

1  **A.**    Customer's name is Hailong Zhu, and the address is 1140

2  South El Molino Street, Alhambra, California 91801-4908.

3  **Q.**    On the top right corner, what is the date of this letter?

4  **A.**    January 24, 2023.

5  **Q.**    And the second to the last bullet on this letter, can you

6  read what that says?

7  **A.**    Yes.  It says, "If the account has a positive balance, a

8  cashier's check will be mailed to you within 15 business days

9  once all previously deposited items have been verified."

10 **Q.**    Do you know why it would say, Once previous items have

11 been verified?

12 **A.**    They're concerned about I was returning counterfeit,

13 altered stock payments, maybe a check returns as closed account,

14 so they're essentially waiting for those items to get past a

15 certain number of days to ensure they're not going to return and

16 cause additional loss.

17          MS. SCHWARTZ:  Court's indulgence.

18          (Whereupon, there was a brief pause in the

19 proceedings.)

20 BY MS. SCHWARTZ:

21 **Q.**    Why does the bank engage in fraud detection and

22 prevention?

23 **A.**    Because the bank does not want to take a loss.  It

24 doesn't want to see their customers take a loss.  A lot of the

25 times, the customer could be a victim or they could be a

*Golladay - Direct - Schwartz*

1    perpetrator.  So we don't want to help take the fraudulent funds

2    and causing other people's losses.  At the same time, we don't

3    want to incur losses.

4    **Q.**    And can fraud cause the bank loss?

5    **A.**    How can fraud cause --

6          MR. WENSTRUP:  Objection.

7    BY MS. SCHWARTZ:

8    **Q.**    How can fraud activity cause the bank loss?

9          MR. WENSTRUP:  Withdrawn.

10   **A.**    Fraud activity -- a counterfeit check they deposited into

11   the account.  The customer has been with us two years, and the

12   funds are available next day, they withdraw it out.  Check

13   returns three days later because it's counterfeit.  It's

14   $100,000, and the customer can't pay it back, so the bank writes

15   it off as a loss.  That's the typical one.

16   **Q.**    And other than the risk of actual loss, are there other

17   reasons U.S. Bank doesn't want to engage in this type -- would

18   close down accounts that exhibited fraudulent activity in them?

19   **A.**    Yes.  They would get fined.  The bank could be at risk of

20   a fine from the government for allowing that kind of activity to

21   occur when they're supposed to have tools in place to monitor

22   for that kind of activity.

23         MS. SCHWARTZ:  No further questions, Your Honor.

24         THE COURT:  Thank you.

25         Cross-examination?

                        CROSS-EXAMINATION

BY MR. WENSTRUP:

**Q.**     Good afternoon.

         Sorry, is it Mr. Golladay?

**A.**     Yes.

**Q.**     Mr. Golladay, I just want to pick up on one of the last

examples you gave.  You talked about loss to the bank where

there's a counterfeit check, correct?

**A.**     Yes.

**Q.**     And that is a situation where you described a counterfeit

check being returned, and then the bank would have to write that

hundred thousand dollars off as a loss, correct?

**A.**     Yes.

**Q.**     That's kind of the textbook example of --

**A.**     Textbook.

**Q.**     -- bank fraud?

**A.**     Yes.

**Q.**     I just want to return briefly to -- you were talking a

little bit about verification procedures.  And so verification

procedures are designed to prevent fraud by people who -- by

people without permission to the account information, who don't

have permission to have the account information?

**A.**     Okay.  Yes, that would be one example.

**Q.**     Okay.  Now, in a circumstance where an accountholder

provided his identification documents, the phone connected to

*Golladay - Cross - Wenstrup*

1    the account, and account documents to a third party, that third

2    party could access the account remotely, correct, if the

3    accountholder provided them all of that information?

4    **A.**      Oh, yeah.  If they provided -- you're talking about

5    logging in from, like, a mobile app or something like that,

6    yeah, they could have given up their credentials.

7    **Q.**      So if they've given up all that information, a third

8    party could access the account online?

9    **A.**      Yeah.

10   **Q.**      Now, the verification process exists in person as well,

11   correct?

12   **A.**      The verification in person?  Yes.

13   **Q.**      I'm sorry.  When someone comes in to a teller and wants

14   to make a transaction, there's also a verification process

15   there, correct?

16   **A.**      Yes.

17   **Q.**      But the verification process for an in-person

18   transaction, those processes don't prevent a third party from

19   accompanying someone to a bank, correct?

20   **A.**      So you mean if somebody walked in and they had somebody

21   standing next to them?  No, it doesn't prevent it.

22   **Q.**      And the verification process doesn't prevent someone from

23   accompanying someone up to the teller, correct?

24   **A.**      You mean like a husband and wife?

25   **Q.**      I mean like any third party.

*Golladay - Cross - Wenstrup*

**A.**      No, it does not.

          MR. WENSTRUP:  I would ask if the government could publish Exhibit 12-5, page 4.

          (Exhibit published.)

BY MR. WENSTRUP:

**Q.**      What we're looking at -- you recognize this as a U.S. Bank location?

**A.**      Do I recognize it as a U.S. Bank location?  It could be any bank location, but -- oh, yes.  Says right down here at the bottom, 5341 West Tropicana Smith's.  We're in Smith's; that's us.

**Q.**      Just for the jury, Smith's is a grocery store?

**A.**      Yes.

**Q.**      So this is a location in a grocery store?

**A.**      We have 4,000 banks, so I don't know all the numbers.

**Q.**      You did pretty well off the top of your head there.

          And so here in this surveillance footage, we have two people up at the teller window, correct?

**A.**      Yes.

**Q.**      So the verification procedures don't prevent that from happening?

**A.**      No.

**Q.**      And the verification procedures don't prevent someone from following the instructions of a third party when they're conducting a transaction with a teller?

1    **A.**    (No response.)

2    **Q.**    So maybe I can be more clear.  If, before someone goes up

3    to a teller, they receive instructions from a third party as to

4    how to conduct a transaction --

5    **A.**    Okay.

6    **Q.**    -- they're going to be following someone else's

7    instructions when they get to the teller --

8    **A.**    Okay.

9    **Q.**    -- the verification process doesn't stop that, correct?

10   **A.**    No.  We wouldn't know.

11   **Q.**    And you mentioned money mules earlier, correct?

12   **A.**    Yes.

13   **Q.**    What I just described sounds a little bit like a money

14   mule scenario?

15   **A.**    Yes.

16          MR. WENSTRUP:  No further questions, Your Honor.

17          THE COURT:  Thank you.

18          Any redirect?

19          MS. SCHWARTZ:  No, Your Honor.

20          THE COURT:  And will you need Mr. Golladay again?

21          MS. SCHWARTZ:  No, Your Honor.

22          THE COURT:  Mr. Golladay, you may step down, and you're

23   free to go.  Thank you.

24          THE WITNESS:  Thank you.

25          MS. BEDELL:  Your Honor, the United States calls Kwadwo

*Danso-Fordjour - Direct - Bedell*

1    Danso-Fordjour.

2              (Whereupon, the witness exits the stand.)

3              THE COURT:  And we may take a break at some point

4    during the direct examination just to stretch our legs, maybe at

5    3:45.  Do you think we can make it to 3:45?

6              (Jurors nod.)

7              THE COURT:  All right.  Then let's try and do that.

8     (KWADWO DANSO-FORDJOUR, ON BEHALF OF THE GOVERNMENT, SWORN)

9              (Whereupon, the witness takes the stand.)

10                      DIRECT EXAMINATION

11   BY MS. BEDELL:

12   **Q.**    Good afternoon, Mr. Danso-Fordjour.  Could you please

13   state your name and spell it for the record?

14   **A.**    Do I stand up?

15   **Q.**    No, no, you can stay seated.  Thank you.

16   **A.**    My name is Kwadwo Danso-Fordjour.

17   **Q.**    Could you spell that for the record, please?

18   **A.**    Could I spell it?

19   **Q.**    I'm sorry?

20   **A.**    Spell it?

21   **Q.**    Could you spell it, please?

22   **A.**    Spell it, okay.  The first name is Kwadwo, K-W-A-D-W-O,

23   and the last name is D-A-N-S-O, hyphen, F-O-R-D-J-O-U-R.

24   **Q.**    Where are you from?

25   **A.**    Originally, I'm from Ghana.

*Danso-Fordjour - Direct - Bedell*

1  **Q.**    And how long have you lived in the United States?

2  **A.**    I am here for about 21 years.

3  **Q.**    Where do you live now?

4  **A.**    I live at Falls Church in Virginia.

5  **Q.**    What do you do for a living?

6  **A.**    I'm just retired.  To stay active, I'm trying to get

7  something to do.

8  **Q.**    What did you do for work before you retired?

9  **A.**    Retail merchandise.

10  **Q.**    And how old are you?

11  **A.**    I am 70 years.

12  **Q.**    Are you married?

13  **A.**    Yes, please.

14  **Q.**    Do you have kids?

15  **A.**    I have three.

16  **Q.**    I'd like to turn now to the events of this case.  Did you

17  at some point last year begin having discussions with someone

18  regarding cryptocurrency investments?

19  **A.**    Yes, please.

20  **Q.**    Approximately, when did this happen?

21  **A.**    May 2022.

22  **Q.**    How did you meet this person?

23  **A.**    By phone.  I received a call one day, and then it was,

24  for my understanding, she was calling a different person.

25  **Q.**    I see.

*Danso-Fordjour - Direct - Bedell*

1    **A.**      But, rather, it was my phone.  We got to know each other;

2    and from there, we started conversing.

3    **Q.**      What did this person tell you her name was?

4    **A.**      Sorry, I didn't get the last part.

5    **Q.**      What did she tell you that her name was?

6    **A.**      Her name?

7    **Q.**      Yes.

8    **A.**      Rachel.

9    **Q.**      How old did you think Rachel was?

10   **A.**      She told me that as of last year, she was 35.

11   **Q.**      How did you communicate with her?

12   **A.**      First of all, we're communicating through phone, and then

13   later on, she said that it would be proper to shift to Telegram,

14   so we were communicating by Telegram.

15   **Q.**      So you said you did sometimes speak through phone call?

16   **A.**      Yes.

17   **Q.**      What did you believe was the nature of your relationship?

18   **A.**      Friends.  I would say we were friends.

19   **Q.**      What sort of things did you talk about?

20   **A.**      Practically, we talked about everything.

21   **Q.**      How frequently were you in contact and chatting?

22   **A.**      More or less, practically every day, practically every

23   day.

24   **Q.**      Where did she say that she lived?

25   **A.**      In Miami, Florida.

*Danso-Fordjour - Direct - Bedell*

1    **Q.**    What did she say that she did for a living?

2    **A.**    She told me that she was working for a company on a

3    part-time basis, and then she does cryptocurrency.  That is what

4    she told me she did.

5    **Q.**    And did all your conversations with Rachel happen when

6    you were in or around Falls Church, Virginia?

7    **A.**    Yes.  Yes, please.

8    **Q.**    So it sounded like at some point, you did start talking

9    about cryptocurrency investments; is that correct?

10   **A.**    Yes, please.

11   **Q.**    Approximately, when did that happen?

12   **A.**    If I remember correctly, it's around July, July last

13   year.

14   **Q.**    How did crypto come up in your conversations?

15   **A.**    During our conversations, we were talking about business,

16   you know.  She told me that as far as a business investment is

17   concerned, she is not into that, but she was into

18   cryptocurrency, and that she will teach me how to do it.

19   **Q.**    Was there something you were trying to make money for at

20   the time?

21   **A.**    That is what she said -- no, no.  Did I get the -- your

22   question were?  Did I get it right?

23   **Q.**    Was there something -- when you decided to invest, were

24   you trying to make money for some particular goal?

25   **A.**    Oh, yeah, yes.  Sorry.  I didn't get the last part.

*Danso-Fordjour - Direct - Bedell*

1    Trying to get some funds to set up a foundation for the widow

2    and the orphans in my community back in Ghana.

3    **Q.**     Were you familiar with cryptocurrency before these

4    conversations?

5    **A.**     I had heard about it on the phone -- sorry, sorry -- on

6    the news, yes; and at times, I read about it in the newspapers

7    and in magazines, but I was not into it.

8    **Q.**     Were you comfortable investing before your conversations

9    with Rachel?

10   **A.**     She told me she was going to teach me because I didn't

11   know anything about that.  She was going to teach me so that

12   I'll be able to make some money out of that.

13   **Q.**     Could you take a look at Exhibit 1-1, which is a CD,

14   please?

15   **A.**     Yes.

16   **Q.**     Do you recognize this exhibit?

17   **A.**     Yes, please.

18   **Q.**     And what is it?

19   **A.**     It's the conversations I had with Rachel, which have been

20   exported and made into this disk.  So I recognize -- I have my

21   signature, everything on it.

22   **Q.**     Were these your conversations from Telegram?

23   **A.**     Yes.

24   **Q.**     Did you ever delete any chats you had with Rachel?

25   **A.**     Yes.  I deleted some of them because, from time to time,

*Danso-Fordjour - Direct - Bedell*

1    it popped up on my phone that it's full, it's full, there's no

2    space, so I deleted some of them, the ones I think were not very

3    important.  For example, emojis and the settings, I removed them

4    so I can make room.

5    **Q.**    Does this document contain a fair and accurate

6    representation of the remaining chats you had with Rachel?

7    **A.**    Can you come back again?

8    **Q.**    Yes, yes.

9          So when you reviewed this CD, are the chats there an

10   accurate representation of your chats with Rachel?

11   **A.**    Yes.

12             MS. BEDELL:  At this time, we would move to admit

13   Exhibit 1-1.

14             MR. KAMENS:  No objection.

15             THE COURT:  It will be admitted without objection.

16             (Government's Exhibit No. 1-1 received in evidence.)

17   BY MS. BEDELL:

18   **Q.**    If you could look in the binder at Exhibits 1-1A through

19   1-1E, have you had a chance to look at these exhibits before?

20   **A.**    Yes.

21   **Q.**    Do you recognize them?

22   **A.**    Yes, I do.

23   **Q.**    What are they?

24   **A.**    The page in front of me is an image that Rachel sent to

25   me.

*Danso-Fordjour - Direct - Bedell*

1    **Q.**    So, more generally, are those exhibits excerpts from your

2    chats with Rachel?

3    **A.**    Yes, they are excerpts from my phone.

4            MS. BEDELL:  At this point, we move to admit

5    Exhibits 1-1A through 1-1E.

6            THE COURT:  Any objection?

7            MR. KAMENS:  No objection.

8            THE COURT:  They will be admitted.

9            (Government's Exhibit Nos. 1-1A through 1-1E received

10   in evidence.)

11           MS. BEDELL:  Could we publish 1-1A, please?

12           (Exhibit published.)

13   BY MS. BEDELL:

14   **Q.**    At the top of this page, what is the date at the top

15   here?

16   **A.**    It's August 11, 2022.

17   **Q.**    And who are the two people chatting here?

18   **A.**    Rachel and Alex.

19   **Q.**    Who is Alex?

20   **A.**    That is my internet name, the name I use on the internet.

21   **Q.**    Could you summarize this -- could you review this top

22   message and summarize what was going on here?

23   **A.**    Yeah.  Rachel is saying that I have invested in gold,

24   foreign exchange, bonds, funds, technology, stocks, and many

25   industries before.  Although I also made money, I ended up

1    losing 1 to 2 million USD, and investing in traditional stocks

2    requires a lot of principal, and the period of profit is very

3    long.  Profit is also very low.  There will be the risk of

4    market closure, market suspension, and bankruptcy, and

5    cryptocurrencies have no requirements for funds.  A small amount

6    of funds can be purchased.  No market closures, flexible funds.

7    It can be done 24 hours a day, seven days a week.

8    **Q.**    Is Rachel here explaining the benefits of investing in

9    crypto?

10   **A.**    Yes, exactly.

11   **Q.**    And below that, if we could zoom back out, what sort of

12   conversations are transpiring here?

13   **A.**    We were talking about exercises.  Proper exercise is good

14   for you.  I just had --

15   **Q.**    We won't have you read all of them.  We'll try to move

16   this along.  So just general conversation?

17   **A.**    Yes.  We spoke about anything.

18   **Q.**    And was this typical of your interactions with Rachel?

19   **A.**    Yes.

20   **Q.**    If we could look at page 3 of this document.  And what is

21   happening here, and specifically -- yes.  Could you just explain

22   what is happening in those first two shots?

23   **A.**    Yeah.  Can you -- can it be enlarged?

24   **Q.**    Can you zoom in any more?

25   **A.**    Here, she is teaching me how to invest in this

193

1    cryptocurrency, so it is one of the screenshots that was sent to

2    me.

3    **Q.**    And then could we look at the text in the middle of this

4    page, please?  Could you read what Rachel says here?

5    **A.**    Okay, yeah.  She says crypto.com currently does not

6    support M&T Bank withdrawals of U.S. dollars, so you can choose

7    BofA.  She's telling me that I can't transfer money from my

8    accounts at M&T Bank, but, rather, I should choose Bank of

9    America because that one is --

10   **Q.**    So when you first started considering investing, did you

11   invest by sending money to crypto.com or tried to?

12   **A.**    Yes, I tried to do that.

13   **Q.**    And what happened?

14   **A.**    Transfer the money, yes, through cryptocurrency.  She

15   introduced me to certain accounts -- certain crypto -- I can't

16   describe it.  For example, Coinbase --

17   **Q.**    Was crypto -- is one of them crypto.com, as shown here?

18   **A.**    So she introduced me to all those systems.  I didn't know

19   anything about it.  So that is why I don't have it in my head.

20   **Q.**    At some point, did you switch to another website or app?

21   **A.**    Yes.

22   **Q.**    And what website or app was that?

23   **A.**    It is ASX.

24   **Q.**    Did you say coin ASX?

25   **A.**    ASX; A like apple; S like Sam; and X.

*Danso-Fordjour - Direct - Bedell*

**Q.**     Why did you switch to that site?

**A.**     Because all the other sites did not support what she was trying to teach me.  So, eventually, she said that if you try the ASX, so that is where -- and we went with that.

**Q.**     And did you -- how did you know how to find ASX?  Did she send you a link?

**A.**     Yes; she sent me a screenshot.  It was through that that I was introduced to that one.

**Q.**     So she introduced you to the site?

**A.**     Yes, she introduced me to that.

**Q.**     When you visited the website, did it lead you to download an app?

**A.**     Yes, I downloaded an app.  She showed me everything.

**Q.**     And did you speak with anyone through that app?

**A.**     Yes.  It was -- I spoke with somebody at customer service.

**Q.**     Okay.

**A.**     I was communicating with that person from time to time, especially when I sent money -- when I sent money.

**Q.**     Did you send any identification documents to the app?

**A.**     Yes.  My driver's license, my Social Security card, I sent them there, because anytime I sent money to them, they want me to take a picture of my ID and then the Social Security number.  According to them, they are going to identify me with what I've sent them, so the name I have on these things with the

*Danso-Fordjour - Direct - Bedell*

1   documents that I have sent.

2   Q.    So you were sending a picture of your ID and then the

3   transfer form, the wire transfer form?

4   A.    Yes.

5   Q.    Okay.  Could we look at Exhibit 1-2, please?  Could you

6   look at Exhibit 1-2 in the binder, please?  Do you recognize

7   this exhibit?

8   A.    Yes.

9   Q.    What is it?

10  A.    It's a transaction I made at M&T Bank.

11  Q.    Are there multiple pages in this exhibit with other

12  transactions you've made?

13  A.    Yes.

14  Q.    Are these pictures of the transaction forms?

15  A.    Yes.

16  Q.    And they're fair and accurate pictures of the forms?

17  A.    Yes.

18        MS. BEDELL:  At this point, we move to admit

19  and publish 1-2.

20        MR. KAMENS:  Your Honor, I have no objection except

21  there's some handwriting on page 2, and I would just like to

22  confirm that it's his handwriting.

23  BY MS. BEDELL:

24  Q.    Could you look at page 2 of the exhibit?  Do you see the

25  handwriting at the top?

*Danso-Fordjour - Direct - Bedell*

1    **A.**      I see -- this is from M&T Bank, and then I see SoFi loan.

2    **Q.**      And is that your handwriting?

3    **A.**      It doesn't look like my handwriting.

4               MR. KAMENS:  We would just ask that that be redacted.

5    I would think it's from an agent, which, of course, would be

6    hearsay; but the rest, of course, is admissible.

7               THE COURT:  I will admit the exhibit.  We will redact

8    the handwriting on the second page.  I'll instruct the jury, if

9    that comes up, to ignore it and disregard it, but when that

10   exhibit goes back, we will make sure it's appropriately redacted.

11              MS. BEDELL:  And I can confirm that is agent

12   handwriting --

13              THE COURT:  That's fine.

14              MS. BEDELL:  -- so the jury is aware that is not

15   Mr. Danso-Fordjour's notation.

16              (Government's Exhibit No. 1-2 received in evidence.)

17   BY MS. BEDELL:

18   **Q.**      Could you look at page 1 of that exhibit?  We can publish

19   that.

20              (Exhibit published.)

21   **A.**      Page 1, okay.

22   **Q.**      Page 1, and it's on the screen as well.  Is this a wire

23   transfer form you filled out for a wire dated August 12, 2022?

24   **A.**      Yes, but it looks a little blurred.  Can it be expanded

25   so that -- from this angle, I can barely see and read it.

1  Q.     We can blow it up.  I think part of it is that the image

2  is a little blurry itself.  Can you see at the top what bank you

3  transferred money to -- from?

4  A.     Yes, it is better.

5  Q.     What is the bank you transferred money from?

6  A.     M&T Bank; transferred it from M&T.

7  Q.     And is the wire amount here for $1,100?

8  A.     Yes.

9  Q.     And what was the $100 for?

10 A.     It's for tax purposes, because when you send money, the

11 bank takes tax.

12 Q.     And so why did you send this money?

13 A.     It was one of the transactions that I was making with

14 Rachel.  I had to transfer a thousand dollars, but I added a

15 hundred dollars so that that would take up for any taxes that

16 may come.

17 Q.     Who did you send this money to?

18 A.     Can it move up a bit?  It's Haights -- I think it's

19 Haights --

20 Q.     Is that maybe Haights Kim Trading Inc.?

21 A.     Yes, trading company.  Normally, what happens is that

22 when I am about to -- when Rachel wants me to send money, she

23 asked me to contact customer service, and then the customer

24 service will send me the address, the bank where I had to send

25 the money.  So this is the address that was provided to me from

*Danso-Fordjour - Direct - Bedell*

1    ASX customer service.

2    **Q.**    And did you make this transfer from -- excuse me.  Where

3    did you make this transfer?  Physically, where were you?

4    **A.**    I was at the bank.  I went to the bank premises.  Anytime

5    I'm sending money, I do it at the premises of M&T or Bank of

6    America.

7    **Q.**    Were these branches that you went to all within Falls

8    Church?

9    **A.**    Yes.

10   **Q.**    Could we look at page 2, please?

11         THE COURT:  Well done on the redaction.

12   BY MS. BEDELL:

13   **Q.**    Is this a wire transfer form you filled out for a wire

14   dated September 15, 2022?

15   **A.**    Yes, please.

16   **Q.**    Actually, I think this is not the right page.  We'll hold

17   off on this one.

18         Let's go back to -- I'm sorry.  Could we look at page 3

19   of this exhibit?  Is this a wire transfer form you filled out

20   for a wire dated September 15, 2022?

21   **A.**    Can it be enlarged?

22   **Q.**    So is this a wire transfer for a wire transfer dated

23   September 15, 2022?

24   **A.**    Can it be enlarged?

25   **Q.**    Is this a wire transfer form?

*Danso-Fordjour - Direct - Bedell*

1  **A.**      Yes.

2  **Q.**      And is it dated September 15, 2022?  You can see that

3  sort of in the middle under "wire information"?

4  **A.**      Please, can it be enlarged?

5  **Q.**      Oh, yes.

6  **A.**      It looks blurred.

7  **Q.**      Does that help?

8  **A.**      Yes.

9  **Q.**      Do you see the date of September 15th?

10  **A.**      Yes, September 15, 2022.

11  **Q.**      And what was the wire amount that you sent?

12  **A.**      It was 3,100.

13  **Q.**      And why did you make this transfer?

14  **A.**      It was one of the -- one of our transactions for the

15  cryptocurrency that we were dealing with.

16  **Q.**      So you were investing through the platform again here?

17  **A.**      Yes.

18  **Q.**      What did you write as the purpose of this payment?

19  **A.**      I wrote "other" because Rachel told me that I don't have

20  to disclose the exact purpose that this money is meant for

21  because the U.S. government doesn't want people to engage in

22  cryptocurrency.  For that reason, that is why -- so anytime I go

23  there, I don't reveal the purpose by which I'm making that

24  transfer.

25  **Q.**      Was there a concern that the transfer wouldn't go through

1    if you put the real purpose?

2    **A.**    That is what she was trying to tell me, that the U.S.

3    government doesn't want -- but because I didn't know anything

4    about it, I didn't doubt it.  I didn't know anything about that.

5    **Q.**    Could you look at Exhibit 1-1B?

6         THE COURT:  Ms. Bedell, let me ask you just to -- if

7    you think it makes sense, you can ask another couple of

8    questions, then we'll take our break, or we could take our break

9    now and come --

10        MS. BEDELL:  This is a good spot, Your Honor.

11        THE COURT:  Very good.  Well, we hit 3:45.  Why don't

12   we take our afternoon break.  Ladies and gentlemen, we'll take a

13   15-minute break.  I will ask you to heed my admonitions about

14   discussing the case or undertaking any research, but go ahead and

15   stretch your legs and we'll resume at three o'clock with the

16   direct examination.

17        (Jury out at 3:47 p.m.)

18        THE COURT:  Sir, you may step down.  You remain under

19   oath.  You must not discuss your testimony, and we will resume in

20   15 minutes with your direct examination.  We'll take a recess

21   now.

22        I would like counsel to discuss the plan for the next

23   witnesses to see whether or not there's a way to accommodate both

24   trying to get as much evidence in while being fair to both sides

25   for adequate preparation.  We may also be able to address jury

*Danso-Fordjour - Direct - Bedell*

1   instructions later on this evening, if that's another way that we

2   can use our time productively, although I would like to use the

3   time with the jury as best we can.

4          Is there anything we need to address before we take a

5   brief recess?

6          MS. BEDELL:  No, Your Honor.

7          MR. KAMENS:  No, Your Honor.

8          THE COURT:  Court will be in recess.

9          (Whereupon, a recess in the proceedings occurred from

10  3:48 p.m. until 4:07 p.m.)

11         THE COURT:  You may bring the jury in.

12         (Jury in at 4:08 p.m.)

13         THE COURT:  I will assume everyone followed my

14  instructions during this brief break.  You're nodding your heads.

15  We will continue with the direct examination.

16         You remain under oath.

17  BY MS. BEDELL:

18  **Q.**    Could we take a look at Exhibit 1-1B, which has been

19  admitted?  And at the very bottom here, if we could zoom in down

20  there.  What is the date, when you can see it?

21  **A.**    The date is 19th September 2022.

22  **Q.**    And are we able to display the text on the bottom?

23         What are you asking about here?

24  **A.**    She sent a statement to me, which I didn't understand, so

25  I was asking her to explain to me what that QCB mean.

*Danso-Fordjour - Direct - Bedell*

**Q.**     And what was it?

**A.**     I said, "First of all, what is QGB?  And, secondly, I have to have 10,000 to take part, which means I am out."  She wanted me to transfer $10,000 so that I could participate in an upcoming transaction.  So I was telling her that, first of all, I didn't understand the QGB; and then, secondly, I didn't have that $10,000 in my account.

**Q.**     Continuing on to the next page of the exhibit.  Do you repeatedly tell her that you don't have the money for that investment?

**A.**     Yeah.

**Q.**     Could you read the text that was sent at 23:07?

**A.**     23:07?  Rachel sent me this.  It says that, "I've bought $300,000 in new coins.  What is your credit score?  If it's not very low, I think I have a way for you to get funding."

**Q.**     What did Rachel end up suggesting as the way for you to get funding?

**A.**     She was going to recommend a bank, a financial institution for me through which I would be able to secure that amount or even more.

**Q.**     So taking out a loan?

**A.**     Yes, I was to take out the loan from that financial institution.

**Q.**     What bank did she ultimately suggest to you?

**A.**     Ultimately, it was SoFi.

*Danso-Fordjour - Direct - Bedell*

1   **Q.**    And had you ever banked with SoFi before?

2   **A.**    No.  That was my first time.  I have not --

3   **Q.**    You had --

4   **A.**    -- before, because normally I deal with a traditional

5   bank, like the M&T, Bank of America.

6   **Q.**    Did you know how to get a bank loan from SoFi?

7   **A.**    No.  It was Rachel who, you know, led me to it.

8   **Q.**    Did you go in person for this loan?

9   **A.**    Yes, I went in for that.  And through her help, I was

10  able to secure that amount of $15,000.

11  **Q.**    Did you do the loan online or in person at a branch?

12  **A.**    Online.

13  **Q.**    If we could look at the next page of this exhibit.  What

14  is the date of this next chat about halfway down?  What is the

15  date there?

16  **A.**    25th September 2022.

17  **Q.**    Moving on to the next page, the top of the next page.

18  Can you read the first question that you ask Rachel?

19  **A.**    First question?  The one at 22:44?

20  **Q.**    Yes.

21  **A.**    "What happens when I do not get the approval from SoFi

22  before the deadline tomorrow?"

23  **Q.**    And what was the context of this question?

24  **A.**    She told me that the next day, the next day was the

25  deadline for the transaction to be done.  So I was asking her in

1    case I don't get the loan, what shall I do?  Which means that if

2    I don't get the loan, I cannot participate in the transaction.

3    **Q.**    What did Rachel say in response?

4    **A.**    She says, "If you haven't received their approval email

5    after get off work tomorrow" -- that is when I get off work --

6    "you can call them; and if there are no problems with the

7    application, you can also get funds in advance on the ASX first

8    to buy new coins."

9    **Q.**    And did ASX give you a loan?

10   **A.**    Yes.

11   **Q.**    And could you look at page -- the next page of this

12   document?  And could you read what happens at 21:31, or could

13   you describe what happened there?

14   **A.**    21:31, I got this text from Rachel.  It says, "Are you

15   still busy?  I now teach you to get funds on the ASX and buy new

16   coins."

17   **Q.**    And on the next page of this document?

18   **A.**    That is the beginning of transaction on ASX.

19   **Q.**    So is she sending you screenshots here?

20   **A.**    Yes.  If she wanted me to do something, she will take a

21   screenshot, send it to me, and then tell me what I had to do,

22   and then I will follow the instructions that had been sent to

23   me, then I will do that.

24   **Q.**    Okay.  And then on the next page of this document -- and

25   can we zoom in on the screenshot in the middle -- the bottom

*Danso-Fordjour - Direct - Bedell*

1    screenshot?  Can you describe what's happening in this

2    screenshot?

3    **A.**     Well, the 22:07?

4    **Q.**     At 22:07, yes.

5    **A.**     Can it be enlarged?  Can it be enlarged, because it is

6    very -- it looks blurred.

7    **Q.**     Yes.  This one is definitely hard to read.  Let's see if

8    we can zoom in any more.  Are we able to?

9    **A.**     It's a statement that was sent to me that I should fill

10   in order to get the loan.  So "I, full name, borrowing" an

11   amount -- I can't seem to figure out --

12   **Q.**     They're sending you the text that you have to say --

13   **A.**     Yes, the instruction which I had to follow in order to

14   get the loan.

15   **Q.**     Okay.  Let's look at Exhibit 1-3 next.  This one might be

16   a little easier to read.  You'll have to look at it in your book

17   first, please.  Do you recognize this document?

18   **A.**     Yes.

19   **Q.**     And how?

20   **A.**     I wrote it.  It is exactly the instructions I followed,

21   what I was reading before, and I did it -- can I read it?

22   **Q.**     Not yet.  Is it a fair and accurate representation of the

23   document?

24   **A.**     Yes.

25               MS. BEDELL:  We would move to admit and publish

*Danso-Fordjour - Direct - Bedell*

1    Exhibit 1-3.

2              MR. KAMENS:  No objection.

3              THE COURT:  It will be admitted without objection.

4              (Government's Exhibit No. 1-3 received in evidence.)

5              MS. BEDELL:  Can we publish that?

6              (Exhibit published.)

7    BY MS. BEDELL:

8    **Q.**    Is this the text from the screenshot that we were looking

9    at?

10   **A.**    Yes.

11   **Q.**    And who wrote this?

12   **A.**    I wrote it.  I followed the instructions, and then I

13   wrote this out.

14   **Q.**    And then after you wrote this out, what did you do with

15   it?

16   **A.**    After writing this, then I was instructed to -- can I

17   demonstrate it?

18   **Q.**    Oh, yes.  You can pop it out of the binder if that's --

19   **A.**    I wrote it, and then they instructed me to handle it this

20   way (indicating), and they used my cell phone to take a picture

21   so that this would be closer to my head like this (indicating)

22   with my cell phone, and I did that and sent it.

23   **Q.**    So you held the note by your head in the picture?

24   **A.**    Yes.

25   **Q.**    When you took that picture, what did you do with that

*Danso-Fordjour - Direct - Bedell*

1   picture?

2   **A.**    I sent it to -- I sent it to them as the instructions

3   that they tell me.

4   **Q.**    And what happened next?

5   **A.**    The money was approved.

6   **Q.**    Taking a look at 1-1C; so is this after you got the loan

7   from ASX?

8   **A.**    Yes.

9   **Q.**    And then what is happening here?

10  **A.**    She said that, "If you have photographed the IOU and sent

11  them, wait a moment and check to see if the ASX shows funds."

12  **Q.**    And then did ASX show that you had funds?

13  **A.**    Yes, it showed funds.

14  **Q.**    And then did Rachel walk you through investing those

15  funds?

16  **A.**    Yes.

17  **Q.**    Did you ultimately get the loan from SoFi?

18  **A.**    Yes.

19  **Q.**    Could you look at Exhibit 1-4B?

20  **A.**    1-4A?

21  **Q.**    B.

22  **A.**    B.

23  **Q.**    Got it?

24  **A.**    Yes.

25  **Q.**    Do you recognize this document?

*Danso-Fordjour - Direct - Bedell*

1   **A.**      Yes.

2   **Q.**      What is it?

3   **A.**      The loan I received from SoFi.

4          MS. BEDELL:  At this time, I'm going to read in a

5   stipulation to the record.  It's Stipulation No. 6, Your Honor.

6          "The United States and the defendant, Hailong Zhu,

7   stipulate and agree that the exhibits set forth below are

8   authentic, accurate copies of business records of SoFi Bank that

9   meet the requirements of Federal Rule of Evidence 902(11) and

10  803(6).  The defendant reserves his right to object to

11  admissibility on other grounds."

12         And that's 1-4 and 1-4B.  And at this time, we would

13  move those two exhibits into the record.

14         MR. KAMENS:  No objection.

15         THE COURT:  They will be admitted without objection.

16         (Government's Exhibit Nos. 1-4 and 1-4B received in

17  evidence.)

18  BY MS. BEDELL:

19  **Q.**   If we could publish the first page of that, please, that

20  agreement.

21         (Exhibit published.)

22  BY MS. BEDELL:

23  **Q.**   What is the date of the agreement at the top there, in

24  the top right corner?

25  **A.**   September 27, 2022.

*Danso-Fordjour - Direct - Bedell*

1   **Q.**    And are you listed as the borrower here?

2   **A.**    Yeah.

3   **Q.**    And SoFi is the creditor?

4   **A.**    Yes, please.

5   **Q.**    And could we turn to page 10 of the document?  And it

6   will be on the screen as well.  Is that your signature?

7   **A.**    Yes, please.

8   **Q.**    And what did you do with the money that SoFi loaned you?

9   **A.**    I used the money to repay the money I took from ASX,

10  because the interest that they were charging was too high.

11  **Q.**    The interest that ASX was charging?

12  **A.**    Yes.  It was too high, so I decided to -- I discussed

13  with Rachel, and she directed me to SoFi, and I got this loan to

14  pay back, because the loan from ASX was carrying a high

15  interest.

16  **Q.**    Could we look at Exhibit 1-1D, as in Delta?  And could

17  you read what Rachel says to you at 20:31 at the middle top of

18  the page?  Could you read the next four chats?

19  **A.**    What's the time?

20  **Q.**    Starting at 20:31 from Rachel.

21  **A.**    "How your SoFi loans going?"  And I replied, "Got it.  It

22  has been credited to my account when I checked it today."

23  **Q.**    And then what did Rachel say next?

24  **A.**    "Okay.  Has your 15K got to your M&T Bank account yet?"

25  And I said, "Yes."

*Danso-Fordjour - Direct - Bedell*

1   **Q.**      And then could you read what Rachel says at 21:22?

2   **A.**      21:22, it says, "You can head to the bank after hours

3   tomorrow afternoon and contact ASX customers for wire transfer

4   information to repay their loans.  This will allow your funds to

5   reach the ASX to repay the loan by next Tuesday at the latest."

6   **Q.**      And if we could turn to the next page, please.  What is

7   the date near the top of that page?

8   **A.**      At what time?

9   **Q.**      The date right at the top there.

10  **A.**      The top one?  That is -- the date is 30th September 2022.

11  **Q.**      And can you read what it says at 12:51 down at the bottom

12  of the page?

13  **A.**      12:51, okay.  "I have just wire transferred the 15,100 to

14  ASX as you directed yesterday.  I added $100 in case it arrives

15  late and it is going to attract interest.  I am very grateful to

16  you."  That is, I was, you know, trying to explain what has

17  happened to Rachel.

18  **Q.**      Thank you.  Could we look at -- go back to 1-2, and I

19  think it's page 2, our newly redacted --

20          THE COURT:  I've instructed the jury to ignore the

21  handwriting at the top.  I'm sure we can deal with that.

22  BY MS. BEDELL:

23  **Q.**      Let's take a look at this.  And what is this document?

24  **A.**      Can it be enlarged, please?  I know it's from M&T Bank,

25  but I want to know the details.

*Danso-Fordjour - Direct - Bedell*

1    **Q.**    There we go.  Is that better?

2    **A.**    It's a document showing that wire transfer that I did.

3    **Q.**    And what is the date that you did this wire transfer?

4    **A.**    9 -- sorry.  September 30, 2022.

5    **Q.**    And is this the transfer where you sent the loan

6    repayment, the SoFi loan repayment?

7    **A.**    Yeah.  Yes, please.

8    **Q.**    Who did you send the transfer to?

9    **A.**    The information was given to me from ASX customer

10   service.  That is P -- I don't see very clearly.  It looks --

11   **Q.**    If I say that it's PBB International Consulting --

12   **A.**    International Consulting Corporation, yes.

13   **Q.**    After you sent this money, did you have to send any

14   confirmation of this transfer to ASX?

15   **A.**    All the time, all the time.  I have to send it to the

16   customer service.

17   **Q.**    Did you pay back your loan to SoFi?

18   **A.**    Yes.

19   **Q.**    And how did you do that?

20   **A.**    What I saw here was that, still, the interest from SoFi

21   was very high.  It was about 17-point-something percent.  So I

22   discussed it with my bankers, and then they loaned me an amount,

23   which I tried to get very low interest so that will help reduce

24   the amount I had to pay for interest.  So they gave me a loan to

25   repay it, and it was sent to SoFi to repay the loan.

*Danso-Fordjour - Direct - Bedell*

1   **Q.**    I'm sorry, to what?

2   **A.**    I am saying that when I discussed with my bankers, they

3   gave me the loan.

4   **Q.**    So you took out a different loan?

5   **A.**    Yeah.

6   **Q.**    To pay back the SoFi loan?

7   **A.**    Yes.

8   **Q.**    Have you paid back that different loan yet?

9   **A.**    I am still paying.

10  **Q.**    And what bank was that second loan from?

11  **A.**    Huh?

12  **Q.**    The second loan you took out, what bank did that come

13  from?

14  **A.**    It was M&T.

15  **Q.**    Did you at some point attempt to withdraw money from ASX?

16  **A.**    Yes, on many occasions.

17  **Q.**    What happened?

18  **A.**    I was not allowed.

19  **Q.**    Could we look at Exhibit 1-1E?  At some point, did ASX

20  tell you that you needed to send money for a management fee?

21  **A.**    Yes, yes.

22  **Q.**    Is that what's depicted in this very tiny screenshot?

23  **A.**    Yes.

24  **Q.**    Can you see -- do you recall or can you read the amount

25  that you had to send for a management fee?

*Danso-Fordjour - Direct - Bedell*

1    **A.**    I can't -- but if I remember, I think it was 7,000 --

2    **Q.**    I think it's on the screen now.

3    **A.**    Okay.  The management fee was 5,000.  Sorry.

4    **Q.**    $5,000?

5    **A.**    $5,000.

6    **Q.**    Did you have the money to pay that fee?

7    **A.**    At that time, I didn't have it, but later, I got it.

8    **Q.**    Did you ask if you could pay that fee with the funds

9    already in your ASX account?

10   **A.**    Yes, I did, but they told me that they cannot allow me to

11   use funds in there to pay for this management fee.

12   **Q.**    Okay.  And I think if you go to page 4 of this

13   document -- third page.  And what is the date in the middle of

14   this page?  And now it's at the top.

15   **A.**    25th November 2022.

16   **Q.**    Can you read your message at 11:14?

17   **A.**    11:14, okay.  "Yes.  God is good all the time.  I am

18   going to the bank soon to wire $5,000 to ASX for the management

19   fee.  As contrary to all odds, I got this money from an unlikely

20   source."

21   **Q.**    And where did you get the money?

22   **A.**    After I got the money, I took it from my 401(k) account.

23   **Q.**    Where did you tell Rachel you got the money from?

24   **A.**    I didn't disclose that source of the money to her.  I

25   didn't tell her.

*Danso-Fordjour - Direct - Bedell*

1    **Q.**    And can we look at page 176 a little further down?  So

2    you wired the $5,000, and did you text her a picture of the wire

3    transfer form?

4    **A.**    Yes.

5    **Q.**    And that's it there?

6    **A.**    Yeah.

7    **Q.**    Could we look at Exhibit 1-2, page 4?  Now, is this the

8    wire transfer form you executed on November 25th?  And we'll

9    have to zoom in.  Unfortunately, it's a little blurry, too.

10   **A.**    Please, can you go up?  The date is 11 --

11   November 11th -- sorry, November 25, 2022.

12   **Q.**    November 25th?

13   **A.**    Yes, it's November 25, 2022.

14   **Q.**    And did you make this transfer in person?

15   **A.**    Yes.

16   **Q.**    In Falls Church?

17   **A.**    Yes.

18   **Q.**    And how much money did you send?

19   **A.**    I think it's five -- it looks blurred, so -- it's $5,000.

20   **Q.**    Yes, it is a little blurry.  I apologize.

21        Scrolling down a little bit, who did you send this money

22   to?

23   **A.**    As I've been saying, the address -- all the addresses

24   that I sent money to -- I wire transferred money to were

25   provided to me from ASX customer service.  So I didn't have any

1    one address.  Anytime, they give me different address or bank

2    account to send that money to.

3    **Q.**    And what bank account did they give you for this

4    particular transfer?

5    **A.**    It's Sea Dragon Remodel Incorporated.

6    **Q.**    And what bank?  That's a little bit blurry on the right

7    there, but can you see what bank you sent it to?

8    **A.**    It's Bank of America.

9    **Q.**    And going back to that other view of it, what was the

10   last four of the account number?  And we'll have to scroll --

11   what was the last four digits of the account number?

12   **A.**    I got the number of 9529.

13   **Q.**    And what purpose did you put for the payment?

14   **A.**    I put here "services" because that was the instruction

15   given to me, so I had to follow the instructions.

16   **Q.**    And did you execute other wires to ASX beyond the ones

17   we've looked at here?

18   **A.**    Yes.  I think my -- okay, go ahead.  Yes, I did.

19   **Q.**    And are those wires captured on the pages -- the next two

20   pages in this exhibit?

21   **A.**    Yeah.

22   **Q.**    And could we turn to what should be page 7 of this

23   exhibit?  Is this a wire transfer form you filled out on

24   December 12th -- or you executed on December 12th?

25   **A.**    Yes.

1   **Q.**    And it's from Bank of America?

2   **A.**    Bank of America, yes.

3   **Q.**    And how much did you send for this one?

4   **A.**    Here, it's 6,911.85.

5   **Q.**    And who did you send this transfer to?

6   **A.**    It was sent to Y2X [*sic*] Luxury LLC.

7   **Q.**    Did you ever recover any of your money from ASX?

8   **A.**    No.

9   **Q.**    How much did you lose in total?

10  **A.**    $50,000.

11  **Q.**    Where did you get the money that you invested?

12  **A.**    It was from my Roth and 401(k).

13  **Q.**    How much do you owe on your outstanding loan?

14  **A.**    As we are speaking now, it's roughly $11,500 more.

15  **Q.**    And how are you paying that off?

16  **A.**    I'm using my retirement accounts to pay.

17  **Q.**    What effect does this have on your life?

18  **A.**    First of all, I was very sad.  One time, I had to borrow

19  money from my daughter who was a student at that time.  It was a

20  very low point on my life to borrow money from my daughter, who

21  was a student.  And apart from that, I planned to come back on

22  but couldn't come on because I have to save the money I have to

23  pay the loan because it was very, very important.

24        And apart from this, I've learned a lesson.  I don't have

25  to trust anybody, because I trusted Rachel, then not knowing

*Danso-Fordjour - Cross - Kamens*

 1    that she was defrauding me.  I didn't know that, and I feel

 2    naive when I think about all these things.

 3    **Q.**    If you had known from the beginning that this was a

 4    scam --

 5    **A.**    No, no, I wouldn't go for it.

 6    **Q.**    You wouldn't go for it?

 7    **A.**    Not at all.

 8    **Q.**    If you had known that this was a scam, would you have

 9    taken out the loan?

10    **A.**    No, I wouldn't, I wouldn't.  So this time, one thing, if

11    somebody calls me and I don't know their number, I don't pick

12    it, I won't pick it.  It's a lesson to me.

13           MS. BEDELL:  No further questions, Your Honor.

14           THE COURT:  Thank you.

15           Cross-examination, Mr. Kamens?

16                     CROSS-EXAMINATION

17    BY MR. KAMENS:

18    **Q.**    Good afternoon, Mr. Danso-Fordjour.  Am I pronouncing

19    that correctly?

20    **A.**    Yes, Danso-Fordjour.

21    **Q.**    My name is Geremy Kamens.  I'm an attorney, and I'm going

22    to ask you just a few questions, all right?

23    **A.**    Okay.

24    **Q.**    What you've told us today is about your communications

25    with a person who called themselves Rachel; is that right?

*Danso-Fordjour - Cross - Kamens*

```
 1   A.      Exactly.

 2   Q.      Rachel called you out of a mistake, is your testimony?

 3   A.      According to her.

 4   Q.      According to her, her story, was that it was a mistaken

 5   call in May of 2022; is that right?

 6   A.      Yes.

 7   Q.      And it was a random call?

 8   A.      Yes.

 9   Q.      And you picked it up?

10   A.      (Nonverbal response.)

11   Q.      You have to answer yes or no.

12   A.      Yes.  I picked it up.

13   Q.      And you began talking with her?

14   A.      Yeah.

15   Q.      And she began to talk to you, I think you said, nearly

16   every day?

17   A.      No.  The first day that we talked, she --

18   Q.      Could you say that again?

19   A.      The first day that we talked, because I was at work, we

20   couldn't complete the conversation; so later on, we continued

21   from there.

22   Q.      I see.  Later on, the conversations began to become more

23   frequent?

24   A.      Not through phone calls, but --

25   Q.      It was through Telegram?
```

1    **A.**    Through Telegram, yes.

2    **Q.**    That was the chats that we looked at?

3    **A.**    Yes, please.

4    **Q.**    And it seemed to me that all of the chats between you and

5    Rachel were in English; is that right?

6    **A.**    Yes.

7    **Q.**    All of your communications with Rachel were in English?

8    **A.**    Yes.

9    **Q.**    And your communications with the ASX platform, that was

10   in English?

11   **A.**    Yes, please.

12   **Q.**    And you said -- to back up -- Rachel began discussing

13   cryptocurrency?

14   **A.**    Mm-hmm.

15   **Q.**    You have to say yes or no.

16   **A.**    I said yes.

17   **Q.**    I know you nodded and said "mm-hmm," and for

18   the transcript --

19   **A.**    Okay.  Yeah.

20   **Q.**    On the online images that we saw, you describe your

21   online handle as Alex?

22   **A.**    Yes.

23   **Q.**    And this person you were communicating with, her online

24   profile is Rachel?

25   **A.**    Yes.

*Danso-Fordjour - Cross - Kamens*

1    **Q.**    You always communicated with her as Alex; is that right?

2    **A.**    Yes.

3    **Q.**    You didn't tell her your real name, at least at that

4    point?

5    **A.**    No.

6    **Q.**    She began talking about cryptocurrency?

7    **A.**    (No response.)

8    **Q.**    You have to --

9    **A.**    Yes, yes, yes.

10   **Q.**    You didn't know much about that?

11   **A.**    No, I didn't know much about that.

12   **Q.**    She said she'd teach you?

13   **A.**    Yes.

14   **Q.**    You began to trust her?

15   **A.**    Yes.

16   **Q.**    And that's how you got drawn into making these wires?

17   **A.**    Yes, please.

18   **Q.**    She told you that you could go to this platform, ASX?

19   **A.**    (Nonverbal response.)

20   **Q.**    You have to answer.

21   **A.**    Yes.

22   **Q.**    And at some point, you believed they were giving you --

23   or lending you $15,000; is that right?

24   **A.**    Yes, please.

25   **Q.**    And then with that $15,000 on the website, did you see

Danso-Fordjour - Cross - Kamens

1    gains or profits?

2    **A.**     After -- yes.

3    **Q.**     And then they told you you needed to pay taxes?

4    **A.**     Yes.

5    **Q.**     And that was the first wire you sent?

6    **A.**     Mm-hmm.

7    **Q.**     Yes?

8    **A.**     Yes.

9    **Q.**     And that first wire you sent was for $1,100?

10   **A.**     Yes.  Before I got the loan, you know, I had the $5,000

11   in my account before I got the 15,000.

12   **Q.**     Where did the $5,000 come from?

13   **A.**     From my own accounts.  The 1,100 you are talking about is

14   part of that.

15   **Q.**     I see.  If you look at Government's Exhibit 1-2, which I

16   think has been admitted, the first page is that wire for $1,100?

17   **A.**     Mm-hmm.

18   **Q.**     Is that right?

19   **A.**     Yes.

20   **Q.**     And the recipient for that $1,100 wire is a company

21   called Haights Kim Trading; is that right?

22   **A.**     Yes.

23   **Q.**     And you said that all of the recipients for these wires,

24   they were given to you by the ASX platform?

25   **A.**     Yes.

1   **Q.**   You'd never heard of these companies before they gave

2   them to you?

3   **A.**   No, no, I had not heard of them.

4   **Q.**   So you testified that you've sent seven wires in total?

5   **A.**   I believe so.

6   **Q.**   Well, they're in Government's Exhibit 1-2, right, that

7   you've looked at; the first one for 1,100, there's a second one

8   for 3,100, and that is to Charles Schwab Digital Solution

9   Limited?

10  **A.**   Yes.

11  **Q.**   The third one was for 15,100?

12  **A.**   Mm-hmm.

13  **Q.**   Yes?

14  **A.**   Yes.

15  **Q.**   And that was to PBB International Consulting Corporation?

16  **A.**   Yes.

17  **Q.**   And each one of these wires, under the name of the

18  recipient, it has an account number; is that right?

19  **A.**   Yes.

20  **Q.**   And you reviewed one account number with the prosecutor

21  just now?

22  **A.**   Mm-hmm, yes, yes.

23  **Q.**   So then on October 18th, you sent a wire for $2,420?

24  **A.**   Yes.

25  **Q.**   And that was to Liyutai Trading Corporation?

Danso-Fordjour - Cross - Kamens

A.      Yes.

Q.      And then 11/17/2022, you sent a $5,000 wire to Jishun
Limited?

A.      Yes.

Q.      Then -- this was the one I was trying to get to -- on
11/25/2022, you sent a $5,000 wire to Sea Dragon Remodel Inc.?

A.      Mm-hmm.

Q.      And if we could pull up -- that's page 4 of Government's
Exhibit 1-2 -- and focus in on the background information for
the recipient.  Again, this is a little bit blurry.

A.      Yes.  I said yes.  When I nod, it means yes.

Q.      I understand.

        I'd ask you to look at the screen.  Can you see the
recipient information there?

A.      Yes.  It's Sea Dragon --

Q.      -- Remodel Inc.  And then the words under that are
"account number."

A.      Account number.

Q.      Right.  And then there's an account number under that.

A.      Yes.

Q.      And that account number, I'm going to read it out to you,
and you tell me if I'm wrong, is 325141439529?

A.      That's correct.

Q.      That's correct, right?

A.      Yes.

*Danso-Fordjour - Cross - Kamens*

1   **Q.**   That is the account number for the recipient of this wire

2   from you?

3   **A.**   Yes.

4   **Q.**   Okay.

5         MR. KAMENS:  I'm going to ask the government --

6   **A.**   Yes.

7   **Q.**   You're fine.  I'm going to ask the government to do

8   something.

9         MR. KAMENS:  Could you pull up Government's

10   Exhibit 5-12?  And it is line 1,801.

11         Your Honor, this is an exhibit that just has an account

12   number.  The government had previously discussed it.  I'm not

13   asking that it be shown to the jury; I just want the witness to

14   see it to see if the number is the same.

15         THE COURT:  All right.  Well, he should look at the

16   binder.

17         MR. KAMENS:  Right.  It's Government's Exhibit 5-12 --

18         MS. BEDELL:  We don't object.

19         MR. KAMENS:  The government doesn't object to

20   publishing.  It's just a number.

21         THE COURT:  All right.

22         MR. KAMENS:  It's Government's Exhibit 5-12,

23   line 1,801, page 7.

24   BY MR. KAMENS:

25   **Q.**   Do you see an account number on that page?

1    **A.**    Yes, please.

2    **Q.**    And that account number is 325141439529?

3    **A.**    Yes, please.

4    **Q.**    That is the same account number --

5    **A.**    Yes.

6    **Q.**    -- that is on the wire that you sent; is that right?

7    **A.**    Yes.

8    **Q.**    After that wire, you sent one more for $6,911 -- I'm

9    sorry -- about the Sea Dragon, that was about management fees?

10   I think they were saying you owed management fees of $5,000; is

11   that right?

12   **A.**    Yeah.

13   **Q.**    And then the last one was for the $6,911.85?

14   **A.**    Yes.

15   **Q.**    And that was the last wire you sent?

16   **A.**    Yes.

17   **Q.**    And that was all because of the lies that this person who

18   called herself Rachel told you?

19   **A.**    Yes.

20   **Q.**    That is, you believed that you were investing in

21   cryptocurrency investments?

22   **A.**    Yes.

23   **Q.**    And that's why you took money from your account --

24   **A.**    Yes.

25   **Q.**    -- and wired it to these recipients that you were told to

1    send to?

2    **A.**      Yes.

3    **Q.**      And that's why you went and got the SoFi loan?

4    **A.**      Yes.

5    **Q.**      And when the money got to your account at M&T Bank --

6    **A.**      Yes.

7    **Q.**      -- you took that money from your own account and you

8    wired it?

9    **A.**      Yes.

10   **Q.**      It didn't go to Sea Dragon Remodel; it went to some other

11   recipient, PBB or something; is that right?

12   **A.**      Well, I can't say, I can't say.

13   **Q.**      No problem.  But you did all of these things because you

14   believed the lies that Rachel told you?

15   **A.**      I didn't know that she was telling me a lie.

16   **Q.**      Right.  You were deceived by this person who called

17   herself Rachel?

18   **A.**      Yes.

19   **Q.**      And that's why you sent money from your own account?

20   **A.**      Yes.

21   **Q.**      Thank you.

22              THE COURT:  Any redirect?

23              MS. BEDELL:  No, Your Honor.

24              THE COURT:  Thank you.  Do you need to recall him?

25              MS. BEDELL:  No, Your Honor.

 1          THE COURT:  He's excused?

 2          MS. BEDELL:  Yes.

 3          THE COURT:  You may step down now, and you're free to

 4  go.

 5          (Whereupon, the witness exits the stand.)

 6          THE COURT:  Are you prepared to call your next witness?

 7          MS. BEDELL:  Yes, Your Honor.

 8          MR. KAMENS:  Your Honor, we have shown that page to the

 9  jury.  Can we admit that page of 15-12 [*sic*], line 1,801.

10          THE COURT:  Is there an objection?

11          MS. BEDELL:  No, Your Honor.

12          THE COURT:  It will be admitted, then.

13          (Government's Exhibit No. 5-12, Line 1,801, received in

14  evidence.)

15          MS. SCHWARTZ:  United States calls Secret Service

16  Special Agent George Jasek to the stand.

17          MR. KAMENS:  I want to correct the record.  I said

18  "15-12"; I meant 5-12.  Sorry.

19      (GEORGE JASEK, ON BEHALF OF THE GOVERNMENT, SWORN)

20          (Whereupon, the witness takes the stand.)

21                        DIRECT EXAMINATION

22  BY MS. SCHWARTZ:

23  **Q.**    Good afternoon.

24  **A.**    Good afternoon.

25  **Q.**    Please state your name and spell it for the record.

*Jasek - Direct - Schwartz*

1    **A.**      My name is George Jasek, J-A-S-E-K.

2    **Q.**      And where do you work?

3    **A.**      I'm a Secret Service agent, special agent.

4    **Q.**      How long have you worked with the Secret Service?

5    **A.**      Approximately five years.

6    **Q.**      What is your title in the Secret Service; is it special

7    agent?

8    **A.**      Special agent with the United States Secret Service, yes.

9    **Q.**      Are you assigned to a particular unit?

10   **A.**      I am, yes.

11   **Q.**      What unit?

12   **A.**      The criminal investigative division at Secret Service

13   headquarters in Washington, D.C.

14   **Q.**      What are your primary duties and responsibilities in that

15   unit?

16   **A.**      Our duties are to investigate financial crimes that

17   affect the United States of America.  I've conducted

18   investigations, and continue to conduct investigations, into

19   money laundering, access device fraud, bank fraud, wire fraud,

20   and money laundering.

21   **Q.**      And do you have training to conduct those duties?

22   **A.**      I do, yes.

23   **Q.**      What kind of training?

24   **A.**      I started my training at the Federal Law Enforcement

25   Training Center where I completed the criminal investigative

*Jasek - Direct - Schwartz*

1    training program.  It's a 12-week training in Glynco, Georgia.

2    I followed up that training at the Secret Service training

3    academy where I completed an 18-week training academy in Laurel,

4    Maryland.

5    **Q.**    I would like to move to the events of March 21, 2023;

6    were you involved in a law enforcement operation relevant to

7    this case?

8    **A.**    I was, yes.

9    **Q.**    Generally speaking, what was the overarching law

10   enforcement operation you were involved with?

11   **A.**    It was to conduct three search warrants in California.

12   **Q.**    Was there a particular residence that was going to be

13   searched in the operation?

14   **A.**    Yes.

15   **Q.**    What was that?

16   **A.**    2220 Falling Leave Avenue in Rosemead, California.

17   **Q.**    Why was this residence of interest in your investigation?

18   **A.**    Investigation had come up as -- it was believed to be a

19   residence that -- a target of this investigation, Joseph Wong,

20   was residing at.

21   **Q.**    And why were you interested in Mr. Wong?

22   **A.**    He had been seen with the defendant conducting banking

23   activity during the course of this investigation.

24   **Q.**    And what was your assigned role during the search?

25   **A.**    I went out to California mainly because I was familiar

*Jasek - Direct - Schwartz*

1    with the case.  I basically went out as a liaison to work with

2    our Los Angeles Field Office to execute these three warrants.

3    **Q.**    Did you go to the residence?

4    **A.**    Yes.

5    **Q.**    What steps did law enforcement take when they got to the

6    residence?

7    **A.**    Law enforcement announced themselves as law enforcement,

8    advised that we were the police, and that we had a warrant.  We

9    made entry into the residence and encountered several

10   individuals, and we subsequently searched that residence.

11   **Q.**    Were any photos taken at the time of the search or

12   afterwards of the items seized during the search?

13   **A.**    Yes, they were.

14   **Q.**    I would now like to show you what has been marked for ID

15   as Government's Exhibits 15-4 to 15-7.

16          In preparing for trial, have you had a chance to review

17   these exhibits?

18   **A.**    Yes.

19   **Q.**    What are they?

20   **A.**    This -- these are banking documents and documents that

21   were located while executing the search warrant at Falling Leaf

22   Ave. in Rosemead, California.

23   **Q.**    These are photos of those documents and items found at

24   the residence?

25   **A.**    They are, yes.

*Jasek - Direct - Schwartz*

1  Q.    Are they fair and accurate photos that depict the items

2  found during the search at 2200 [*sic*] Falling Leaf Ave.?

3  A.    Yes.

4        MS. SCHWARTZ:  The United States now moves

5  Exhibits 15-4 through 15-7 into evidence.

6        MR. KAMENS:  No objection.

7        THE COURT:  They will be admitted without objection.

8        (Government's Exhibit Nos. 15-4 through 15-7 received

9  in evidence.)

10 BY MS. SCHWARTZ:

11 Q.    Generally speaking, what were some of the items that law

12 enforcement found in the resident that were relevant to your

13 investigation?

14 A.    Law enforcement located eight cell phones while securing

15 the search warrant, SIM cards, various banking documents that

16 include statements, credit debt cards, various mailings.

17       MR. KAMENS:  Excuse me, is the witness reading from the

18 inventory, or is he doing this from memory.

19       THE WITNESS:  From memory.

20       MR. KAMENS:  From the inventory.

21       MS. SCHWARTZ:  No; he's doing it from memory.

22       THE WITNESS:  I was just looking down.  Sorry.

23 BY MS. SCHWARTZ:

24 Q.    Now showing you Government's Exhibit 15-4, the first

25 page.

*Jasek - Direct - Schwartz*

1          MS. SCHWARTZ:  If we could publish that.

2          THE COURT:  You may.

3          (Exhibit published.)

4    BY MS. SCHWARTZ:

5    **Q.**    You mentioned you found bank statements at the residence?

6    **A.**    Yes, we did.

7    **Q.**    Is this one of the bank statements that was found?

8    **A.**    Yes.

9    **Q.**    What is the name of the company that the statement is for

10   at the top there?

11   **A.**    Mingxing Remodel LLC.

12   **Q.**    And moving to -- I'm sorry.  What was the address of

13   Mingxing Remodel, as listed on this document?

14   **A.**    4661 District Boulevard, Vernon, California 90058.

15   **Q.**    Moving to page 2 -- actually, to page 3 of this document,

16   and zooming in on the top left-hand corner, what is this

17   document?

18   **A.**    This is a Cathay Bank statement for an account titled Sea

19   Dragon Trading LLC.

20   **Q.**    And what is the address on this statement?

21   **A.**    1140 South El Molino Street, Alhambra, California 91801.

22   **Q.**    What is the date of the statement on the top right-hand

23   corner?

24   **A.**    October 31, 2022.

25   **Q.**    Moving to page 4 of this document, and zooming in on the

*Jasek - Direct - Schwartz*

1    address at the top left, what is this document?

2    **A.**    This is an East West Bank account statement for an

3    account titled Sea Dragon Trading LLC.

4    **Q.**    And what is the address on the statement?

5    **A.**    1140 South El Molino Street, Alhambra, California 91801.

6    **Q.**    And on the top right, what is the date of this statement?

7    **A.**    It's between October 27, 2022, and October 31, 2022.

8    **Q.**    Moving to page 5 of this document, and zooming in on the

9    document on the right, what is this document?

10   **A.**    This is a document from the Internal Revenue Service, or

11   the IRS.  It is paperwork assigning an employer identification

12   number.

13   **Q.**    And what is the company on this form?

14   **A.**    Mingxing Trading LLC.

15   **Q.**    Moving to page 6, and zooming in on the form on the left,

16   what is this document here on the left?

17   **A.**    A state of California articles of incorporation document.

18   **Q.**    And can you read the company name here?

19   **A.**    YZX Trending LLC.

20   **Q.**    And then zooming back out and back into the document on

21   the right, and scrolling up a little bit, what is this document?

22   **A.**    This is paperwork from the Internal Revenue Service for

23   the assignment of an employer identification number.

24   **Q.**    What is the company on this document?

25   **A.**    ZCD Beauty LLC.

*Jasek - Direct - Schwartz*

1   **Q.**     And moving to page 8 of this document, zooming in, what

2   is -- what is this depicted here?

3   **A.**     This is mail from East West Bank.

4   **Q.**     And what is the company listed on this mail?

5   **A.**     Sea Dragon Remodel Incorporated.

6   **Q.**     And on the bottom, zooming out, there's another envelope

7   on the bottom of this page; what is the company listed on that

8   document?

9   **A.**     Mingxing Lyu.

10  **Q.**     And what is the address listed under that name?

11  **A.**     2220 Falling Leaf Avenue, Rosemead, California 91770.

12  **Q.**     I'm sorry.  Going back one page now, if we could, can you

13  zoom in on this envelope?  What is depicted here?

14          MR. KAMENS:  I'm sorry, what page.

15          MS. SCHWARTZ:  Page 7, I think it is.

16          THE WITNESS:  An envelope containing mail from Citi,

17  COSTCO Wholesale.

18  BY MS. SCHWARTZ:

19  **Q.**     And what is the name listed -- addressed on this

20  envelope?

21  **A.**     Hailong Zhu.

22  **Q.**     If we can go to -- I think it's page 9 -- actually,

23  sorry, page 10, and zooming out a little bit; what is this

24  document?

25  **A.**     This is a bank statement from JPMorgan Chase for an

*Jasek - Direct - Schwartz*

1   account titled Sea Dragon Remodel Incorporated.

2   **Q.**    Going to the next page of this exhibit, please, and

3   zooming in on this form in the middle, what is this form?

4   **A.**    This is a funds transfer request form from Bank of

5   America.

6   **Q.**    And what is the company listed on this form?

7   **A.**    Sea Dragon Remodel Incorporated.

8   **Q.**    And what is the -- zooming in on the middle of this form,

9   where did this wire -- what are the -- where was this wire going

10  to?

11  **A.**    The recipient is O Diamonds Trading Limited.

12  **Q.**    And was this form signed?

13  **A.**    Yes.

14  **Q.**    Can we scroll down to the bottom?  What was the date this

15  form was signed on?

16  **A.**    October 31, 2022.

17  **Q.**    And on this same form, is there a purpose -- scrolling up

18  a little bit to the middle of the page, sorry -- is there a

19  purpose listed on this wire form?

20  **A.**    Yes.

21  **Q.**    And what is that purpose?

22  **A.**    Goods.

23  **Q.**    Can we go to page 15 of this document, please?  I'm

24  sorry, let's start with 14.  Apologies -- 13.  Sorry.

25        Can we zoom in on the top left-hand corner of this page?

*Jasek - Direct - Schwartz*

1    What is the name listed here on this document?

2    **A.**    Hong Sun.

3    **Q.**    And what is the company name?

4    **A.**    Good Luck Trading LLC.

5    **Q.**    And then back to page 15, if we could, what is depicted

6    in this picture?

7    **A.**    Picture contains various plastic credit, debit cards that

8    were obtained during the search warrant.

9    **Q.**    And can you read some of the names on the cards?

10   **A.**    Yes.  Hailong Zhu, Sea Dragon Remodel; Hailong Zhu, Sea

11   Dragon Trading LLC; Mingxing Lyu.

12   **Q.**    Moving to Government's Exhibit 15-5, page 1, what is

13   depicted here?

14   **A.**    This is United States currency, or cash, that was located

15   during the search warrant.

16   **Q.**    And where was it located?

17   **A.**    It was located in a bedroom of the residence in a jacket

18   pocket.

19   **Q.**    And did you count it?

20   **A.**    Yes.

21   **Q.**    And about how much was it?

22   **A.**    It was approximately $6,800.

23   **Q.**    If we can move to the next page of this exhibit, please,

24   and zooming in on the checks in the bottom; what's depicted in

25   this picture?

*Jasek - Direct - Schwartz*

1   **A.**   Various checks from East West Bank that are all signed.

2   **Q.**   And are you able to read the names of the accounts that

3   these addresses -- that these checks are from?

4   **A.**   Sea Dragon Remodel Incorporated, Sea Dragon Trading LLC,

5   and Hailong Zhu.

6   **Q.**   And then page 4 of this exhibit, what is depicted here?

7   **A.**   This is more checks from East West Bank that are all

8   signed.

9   **Q.**   What is the name -- who signed these checks?  What is the

10  name that's signed on there?

11  **A.**   Hailong Zhu.

12  **Q.**   Did law enforcement search -- I'm sorry.  Did you find

13  anything else of significance in the room that you identified as

14  Wong's bedroom?

15  **A.**   Yes.  Four passports were located in that bedroom.

16  **Q.**   What was interesting about those passports, if anything?

17  **A.**   Each of the passports depicted photographs of

18  Joseph Wong; however, there were different names on the

19  passports.

20          MR. KAMENS:  What was the last part.

21          THE WITNESS:  There were different names on the

22  passports.

23  BY MS. SCHWARTZ:

24  **Q.**   Did law enforcement search anywhere else in addition to

25  the house?

*Jasek - Direct - Schwartz*

1   **A.**    Yes.

2   **Q.**    Where was that?

3   **A.**    The person of Joseph Wong as well as a vehicle, a Honda

4   Accord, that was registered to Joseph Wong.

5   **Q.**    And did you find anything in the vehicle?

6   **A.**    Yes.

7   **Q.**    Now showing you Government's Exhibit 15-6, page 1; what

8   is depicted here?

9   **A.**    There's -- these are casino markers made payable to Wynn

10  casino.

11  **Q.**    Who were they made payable from?

12  **A.**    Hailong Zhu.

13  **Q.**    And can you see how much these were for?

14  **A.**    Each of them are for $50,000.

15  **Q.**    You mentioned you encountered Mr. Wong during your

16  search?

17  **A.**    Yes.

18  **Q.**    If presented a picture, do you think you'd be able to

19  recognize Joseph Wong?

20  **A.**    Yes.

21  **Q.**    I would now like to show you Government's Exhibit 16-19.

22  It's on your screen as well.

23           (Exhibit published.)

24  BY MS. SCHWARTZ:

25  **Q.**    Do you recognize the man in that photo?

239

*Jasek - Direct - Schwartz*

1    **A.**    Yes.

2    **Q.**    Is that the same man that identified himself to you as

3    Joseph Wong?

4    **A.**    Yes.

5    **Q.**    Did you find anything else in the residence?

6    **A.**    In the residence or the vehicle?

7    **Q.**    In the residence.  Sorry.

8    **A.**    (No response.)

9    **Q.**    You mentioned that you also found some device; is that

10   right?

11   **A.**    Yes.

12   **Q.**    Did Wong have a cell phone on him when you encountered

13   him?

14   **A.**    Yes.  When he was encountered, he had a cell phone, which

15   he subsequently dropped on a couch in the residence.

16   **Q.**    I'm now going to show you what has been premarked for ID

17   as Government's Exhibit 5-1.  This is a physical exhibit.  Do

18   you recognize this exhibit?

19   **A.**    Yes, I do.

20   **Q.**    What is it?

21   **A.**    This is the cell phone that Joseph Wong had in his hand

22   that he dropped when encountered by law enforcement.

23   **Q.**    How do you know that it's the same cell phone?

24   **A.**    It was logged as Item 1 as Secret Service evidence.

25   **Q.**    Is this cell phone in substantially the same condition as

*Jasek - Direct - Schwartz*

1   when law enforcement seized it?

2   **A.**    Yes.

3   **Q.**    You said this item was marked as Item 1 in your

4   investigation; is that right?

5   **A.**    Yes.  This item was obtained at the residence,

6   inventoried, brought back to the Secret Service office where it

7   was assigned an item number, and has remained in Secret Service

8   evidence.

9   **Q.**    Did Wong direct you to any other devices?

10  **A.**    Yes.

11  **Q.**    And where was another device found?

12  **A.**    In the bedroom belonging to Joseph Wong.

13  **Q.**    I would now like to show you physical -- what has been

14  marked as Government's Exhibit 6-1.  Do you recognize this

15  exhibit?

16  **A.**    Yes.

17  **Q.**    And how do you recognize it?

18  **A.**    This is Item 10, an Apple iPhone, that was located on the

19  bed in the bedroom belonging to Joseph Wong.

20  **Q.**    And is this cell phone in substantially the same

21  condition as when you seized it?

22  **A.**    Yes, it is.

23  **Q.**    And you said this item was marked as Item 10 in your

24  investigation?

25  **A.**    Yes.

*Jasek - Direct - Schwartz*

1    **Q.**    Did you find any other devices during your search?

2    **A.**    Yes.

3    **Q.**    I would now like to show you what -- I would now like to

4    show you Government's Exhibit 15-16, which is in the book, and I

5    think we can probably publish it on the screen.  Sorry, 15-7.

6            (Exhibit published.)

7    BY MS. SCHWARTZ:

8    **Q.**    What is depicted here?

9    **A.**    It's a photo of five cell phones, Apple iPhones, that

10   were located in a backpack in the bedroom belonging to

11   Joseph Wong.

12   **Q.**    I would now like to show you what's been marked as

13   Government's Exhibit 7-1, which is a physical exhibit.  Do you

14   recognize this object?

15   **A.**    I do, yes.

16   **Q.**    And what is it?

17   **A.**    It's an Apple iPhone cell phone logged in evidence as

18   Item No. 5, which is one of the cell phones depicted in one of

19   the photograph you just showed me.

20   **Q.**    And how do you recognize it's the same cell phone?

21   **A.**    Because it was logged as Item 5 and remained in Secret

22   Service evidence as Item No. 5.

23   **Q.**    Is this cell phone in substantially the same condition as

24   when you seized it?

25   **A.**    Yes.

242

*Jasek - Direct - Schwartz*

1   **Q.**   Did you find an additional device during your search?

2   **A.**   Yes.

3   **Q.**   I'm now showing you what's been marked as Government's

4   Exhibit 8-1, another physical exhibit; do you recognize this

5   object?

6   **A.**   Yes.

7   **Q.**   And what is it?

8   **A.**   It's an Apple iPhone that was logged as Item 8 and

9   remained in Secret Service evidence since it was located during

10  the search warrant in California.

11  **Q.**   You said this is Item 8?

12  **A.**   Yes.

13  **Q.**   And is this cell phone in substantially the same

14  condition as when you seized it?

15  **A.**   Yes.

16  **Q.**   What did you do with the phones after the search -- or

17  what did Secret Service do with the phones after the search?

18  **A.**   The phones were all brought back to the Los Angeles Field

19  Office where they were logged and sealed into evidence.

20       MS. SCHWARTZ:  Your Honor, at this time, I would like

21  to read Stipulation 11 the parties have agreed to.

22       THE COURT:  You may.

23       MS. SCHWARTZ:  "The following items were seized from

24  2220 Falling Leaf Drive, Rosemead, California, on March 21, 2023,

25  and were maintained through a proper chain of custody from the

*Jasek - Cross - Kamens*

1    time of seizure to the time introduced at trial:  iPhone 12 Pro

2    Max, Government's Exhibit 5-1; iPhone 11 Pro Max, Government's

3    Exhibit 6-1; iPhone 13 Pro Max, Government's Exhibit 7-1; and

4    iPhone 13, Government's Exhibit 8-1."

5              (Government's Exhibit Nos. 5-1, 6-1, 7-1, and 8-1

6    received in evidence.)

7              MS. SCHWARTZ:  Court's indulgence.

8              (Whereupon, there was a brief pause in the

9    proceedings.)

10             MS. SCHWARTZ:  Nothing further, Your Honor.

11             THE COURT:  Thank you.

12             Cross-examination?  And we can, perhaps, take a break

13   briefly to stretch our legs depending on how long this goes, but

14   we may as well start.

15             MR. KAMENS:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17   BY MR. KAMENS:

18   **Q.**    Agent Jasek, this was not the first time you had been to

19   that Rosemead address; is that right?

20   **A.**    No, sir, it was not.

21   **Q.**    You had been involved in this investigation for some

22   time?

23   **A.**    Yes.

24   **Q.**    You had engaged in surveillance of that specific

25   residence?

1    **A.**    Yes.

2    **Q.**    You did that on February 6th of 2023?

3    **A.**    Sounds about right, yes.

4    **Q.**    More than a month before you executed the search warrant?

5    **A.**    Yes.

6    **Q.**    You first went on that day to 1140 South El Molino

7    Street, Alhambra, California?

8    **A.**    During the surveillance?

9    **Q.**    During the surveillance.

10   **A.**    Yes, sir.

11   **Q.**    And you did that because that's an address that's listed

12   on a lot of the documents that are related to Sea Dragon Trading

13   and Sea Dragon Remodel; is that right?

14   **A.**    It is, yes.

15   **Q.**    And you did some surveillance there, I think, with this

16   gentleman, Mr. Saunders; is that right?

17   **A.**    That is correct, yes.

18   **Q.**    And nothing much happened while you were watching that

19   residence; is that right?

20   **A.**    No.

21   **Q.**    And so where did you go; you went to Rosemead?

22   **A.**    Yes.

23   **Q.**    That's the Falling Leaf address?

24   **A.**    Yes, sir.

25   **Q.**    And that's also the address for -- well, I'm sorry --

*Jasek - Cross - Kamens*

```
1    that Alhambra address that you had already surveilled, that's

2    also the address for the Bank of America accounts?

3    A.    (No response.)

4    Q.    You have to answer.

5    A.    The Elmo Leo address?

6    Q.    Yes.

7    A.    Yes, it is.

8    Q.    For the Chase accounts?

9    A.    Yes.

10   Q.    For the U.S. Bank accounts?

11   A.    Yes, sir.

12   Q.    For East West?

13   A.    Yes.

14   Q.    And you were trying to see if the individuals that you

15   believed engaged in this crime were at that address?

16   A.    Correct.

17   Q.    And then you went to the Rosemead address on that day?

18   A.    Yes, we did.

19   Q.    2220 Falling Leaf Avenue?

20   A.    Yes.

21   Q.    Rosemead?

22   A.    Yes.

23   Q.    California?

24   A.    Yes.

25   Q.    And you observed a man named Joseph Wong; is that right?
```

*Jasek - Cross - Kamens*

```
1    A.    Yes.

2    Q.    And he wasn't alone during surveillance?

3    A.    During surveillance, he was not alone, no.

4    Q.    He was with a woman?

5    A.    Yes.

6    Q.    You identified a woman?

7    A.    Yes.

8    Q.    And they went to a bank?

9    A.    Yes.

10   Q.    They went to another bank?

11   A.    Yes.

12   Q.    And then I think they went to another bank?

13   A.    Yes.

14   Q.    Doing the same thing?

15   A.    Yes.

16   Q.    It appeared that Mr. Wong was engaged in the same

17   activity of herding someone to multiple banks; is that right?

18   A.    It did, yes.

19   Q.    Now, in your surveillance of these locations, you didn't

20   see Mr. Hailong Zhu, did you?

21   A.    We did not, no.

22   Q.    And your investigation had already determined that

23   Mr. Zhu had taken a one-way trip back to Chicago in January; is

24   that right?

25   A.    While we were in California, we did not know that, no.
```

*Jasek - Cross - Kamens*

1  **Q.**    At some point, you learned that he had gone back to

2  Chicago on January 27th; is that right?

3  **A.**    Yes.

4  **Q.**    And so when you surveilled these residences, you didn't

5  see Mr. Zhu?

6  **A.**    We did not, no.

7  **Q.**    And then when you went to the Rosemead address to execute

8  the search warrant, you didn't find Mr. Zhu?

9  **A.**    We did not, no.

10 **Q.**    But you found a lot of bank documents related to Sea

11 Dragon Trading and Sea Dragon Remodel?

12 **A.**    Yes.

13 **Q.**    You found a lot of bank cards related to Sea Dragon

14 Trading and Remodel?

15 **A.**    We did, yes.

16 **Q.**    You found a lot of bank documents related to people who

17 were not Mr. Zhu?

18 **A.**    Correct.

19 **Q.**    You found a lot of cards related to people who were not

20 Mr. Zhu?

21 **A.**    Yes.

22 **Q.**    And the photos that you just discussed with this

23 prosecutor, those are not all of the photos that you found or

24 that you took when you executed that search warrant; is that

25 right?

1    **A.**    They are not, no.

2    **Q.**    Take a look, if you would -- I have a book here; it's 10A

3    through 10J -- no, 10K -- hold on, I'm going to give you my

4    book.  I'm sorry this is not as pretty as it would have been

5    tomorrow; but if you can, sir, take a look at 10A through 10L.

6         Sir, do those appear to be fair and accurate depictions

7    of the items that you observed during the execution of that

8    search warrant at the Rosemead address on March 21, 2023?

9    **A.**    They do, yes.

10        MR. KAMENS:  We move for admission of 10A through 10L,

11   Your Honor.

12        THE COURT:  Any objection?

13        MS. SCHWARTZ:  Your Honor, there are two photos in this

14   group that we would object to that we don't believe are relevant

15   to the charge.  We can show those to --

16        MR. KAMENS:  Let's go to sidebar.

17        MS. SCHWARTZ:  It looks like they're 10C and 10B.

18        THE COURT:  All right.  Come forward.

19        (Whereupon, a conference was held at the bench.)

20        THE COURT:  What's your objection?

21        MS. SCHWARTZ:  The relevancy, Your Honor.  These are

22   not relevant to the investigation, Your Honor.  They don't depict

23   bank documents.  They don't depict anything related to this

24   particular crime or this particular case.  We just don't think

25   it's relevant.

*Jasek - Cross - Kamens*

1    MR. KAMENS:  Your Honor, they don't depict bank

2  documents, that's true, but the part of the cross-examination of

3  this witness is the thoroughness of the government's

4  investigation with respect to Mr. Wong as the leader and the

5  person who is responsible for this conduct.  It's not just that

6  he had firearms; he also had drugs, it appears -- we'll ask the

7  witness -- he has passports.  This is someone who appeared to be

8  engaged in sophisticated organized crime, very different from

9  Mr. Hailong Zhu.  And so the fact that law enforcement found

10  these items and the government is trying to keep them from the

11  jury, it is concerning.  We should be able to depict what law

12  enforcement found at the residence.

13    THE COURT:  I will overrule the objection.  It's fair

14  game to discuss what was found at the residence.  That was the

15  scope of the direct, and I am not going to exclude it because

16  it's not related to the financial enterprise.  It was in the

17  residence.  He has a right to ask the agent about what he found

18  during the search.

19    (Whereupon, the following occurred in open court.)

20    THE COURT:  The objection is overruled.  The documents

21  will be admitted.  You may continue.

22    (Defendant's Exhibit Nos. 10A through 10L received in

23  evidence.)

24  BY MR. KAMENS:

25  Q.    Before we discuss these specific images, you also sought

*Jasek - Cross - Kamens*

1    to find out where Mr. Wong engaged in activities in California

2    not simply related to this bank fraud; is that right?

3    **A.**    Sorry, I don't understand the question.

4    **Q.**    Well, you interviewed witnesses, neighbors, friends, or

5    family that knew Mr. Wong?

6    **A.**    Before the search warrant?

7    **Q.**    Before and after the search warrant.

8    **A.**    I'm sorry?

9    **Q.**    Before and after the search warrant.

10   **A.**    Yes.

11   **Q.**    You searched for witnesses who knew Wong so that you

12   could identify the degree to which he was engaged in this

13   criminal conduct?

14   **A.**    Yes.

15   **Q.**    One witness was a man named Kenneth Cummings; is that

16   right?

17   **A.**    Yes.

18   **Q.**    And he's a Nordstrom employee in California?

19   **A.**    Yes, sir.

20   **Q.**    You also were trying to determine whether Wong had other

21   legitimate sources of income; is that right?

22   **A.**    Yes.

23   **Q.**    But when you went to the residence on March 21st, you

24   uncovered, as you said, a large amount of cash, and that's --

25          MR. KAMENS:  If we can publish Defendant's Exhibit 10B.

*Jasek - Cross - Kamens*

```
 1              (Exhibit published.)
 2   BY MR. KAMENS:
 3   Q.     Do you see that?
 4   A.     Yes, I do.
 5   Q.     Was that the cash that was found in the envelope that you
 6   discussed with the prosecutor?
 7   A.     Yes.
 8   Q.     And you put it out on the bed to count it; is that right?
 9   A.     Yes.
10   Q.     You also found stacks of bank cards?
11   A.     Correct.
12   Q.     And not just the ones that the prosecutor showed you; is
13   that right?
14   A.     Correct.
15   Q.     If you could look at 10A.
16              MR. KAMENS:  Will you publish it?
17              (Exhibit published.)
18   BY MR. KAMENS:
19   Q.     Do you see that stack?
20   A.     Yes.
21   Q.     If we could look at 10G; do you see there's a bunch of
22   cards and an identification document for Mr. Wong; is that
23   right?
24   A.     Correct.
25   Q.     And are these cards that were found in Mr. Wong's wallet?
```

*Jasek - Cross - Kamens*

1   **A.**     They are, yes.

2   **Q.**     And is that Mr. Wong's wallet that's at the bottom of

3   10G?

4   **A.**     Yes.

5           MR. KAMENS:   I'm sorry.   Can we move that up so the

6   jury can see?

7   BY MR. KAMENS:

8   **Q.**     So that's a wallet there at the bottom; is that right?

9   **A.**     Yes.

10  **Q.**     And on the wallet, it looks like a little baggy of a

11  white, powdered substance?

12  **A.**     Yes.

13  **Q.**     Is that cocaine?

14  **A.**     I don't know.

15  **Q.**     You didn't test it?

16  **A.**     I did not, no.

17  **Q.**     Did anybody on the prosecution team test to see if

18  Mr. Wong had drugs?

19  **A.**     Not that I know of, sir, no.

20  **Q.**     Okay.   The cards that are listed here that were in

21  Mr. Wong's wallet, they all don't say Mr. Wong, do they?

22  **A.**     They do not, no.

23  **Q.**     So there's his California driver's license and his Social

24  Security card which does say Joseph Wong, right?

25  **A.**     Yes.

*Jasek - Cross - Kamens*

1    **Q.**    If you can look at 10H -- it's a little clearer --

2          (Exhibit published.)

3    BY MR. KAMENS:

4    **Q.**    In the upper right-hand corner of that image up there on

5    the screen, that's a card that says a Chinese name Jin Shuo; is

6    that right?

7    **A.**    That is, yes.

8    **Q.**    And then below that is a Wells Fargo card in the name of

9    Joseph Wong; is that right?

10   **A.**    Correct.

11   **Q.**    Correct?

12   **A.**    Correct.

13   **Q.**    And below that is a Chase card, a Visa card, in the name

14   of Jian Long; is that right?

15   **A.**    Yes.

16   **Q.**    And then next to those cards, there's an automobile card

17   in the name of Joseph Wong, right?

18   **A.**    I am not seeing that.

19   **Q.**    Well, there it is.

20   **A.**    Automobile card?

21   **Q.**    Yeah, it looks like an automobile, Triple A.

22   **A.**    Oh, sorry.  Yes.

23   **Q.**    And then below that is a Chase card, a Visa debit, in the

24   name of Jin Shuo?

25   **A.**    Yes.

*Jasek - Cross - Kamens*

1   **Q.**    And then at the very bottom is a Bank of America card in

2   the name of Zhicui Ding; do you see that?

3   **A.**    I do, yes.

4   **Q.**    So in Mr. Wong's wallet, you found that he had multiple

5   cards in multiple names; is that right?

6   **A.**    Yes, it is.

7   **Q.**    And you also testified that you found identification

8   documents, that is, passports?

9   **A.**    Yes.

10   **Q.**    And, if you would, look at, let's say, 10K; do you see

11   that?

12         (Exhibit published.)

13   BY MR. KAMENS:

14   **A.**    I do, yes.

15   **Q.**    And that appears to be a United States visa in a

16   passport; and what is the name?

17   **A.**    Jian Long.

18   **Q.**    And if you would look at 10L --

19         (Exhibit published.)

20   **A.**    I don't have an L.

21   **Q.**    It's on the screen.  You see L?

22   **A.**    Yes.

23   **Q.**    And that name is not Joseph Wong.  What is it?

24   **A.**    No.

25   **Q.**    What is it?

*Jasek - Cross - Kamens*

1    **A.**      Shuo Jin.

2    **Q.**      S-H-U-O J-I-N.

3            And then there's another one, 10I.  We'll just put it on

4    the screen.

5              (Exhibit published.)

6    BY MR. KAMENS:

7    **Q.**      Do you see that one?

8    **A.**      Yes.

9    **Q.**      And that is in the name of?

10   **A.**      Yang Liu.

11   **Q.**      Y-A-N-G L-I-U?

12   **A.**      Yep.

13   **Q.**      So you found these bank documents; you found

14   identification documents; you also found bank records, did you

15   not?

16   **A.**      I'm sorry, can you repeat it?

17   **Q.**      You also found bank records?

18   **A.**      We did, yes.

19   **Q.**      You've gone through some of them with the prosecutor just

20   now.  I'm just going to show you some general pictures.  10E.

21              (Exhibit published.)

22   BY MR. KAMENS:

23   **Q.**      Do you see that?

24   **A.**      I do, yes.

25   **Q.**      And 10F?

*Jasek - Cross - Kamens*

1          MR. KAMENS:  Publish that one.

2          (Exhibit published.)

3  **A.**    Yes.

4  **Q.**    And so these were all over this apartment -- this house;

5  is that right?

6  **A.**    Yes.  Mainly in the bedroom, yes.

7  **Q.**    Mainly in the bedroom.  Mr. Wong's bedroom?

8  **A.**    Yes.

9  **Q.**    And these bank documents were in the names of multiple

10  different people?

11  **A.**    They were, yes.

12  **Q.**    Multiple different companies?

13  **A.**    Yes.

14  **Q.**    And they all were in Mr. Wong's bedroom, correct?

15  **A.**    Yes.

16  **Q.**    On top of that, you also found what's depicted in 10C?

17          (Exhibit published.)

18  BY MR. KAMENS:

19  **Q.**    Do you see that?

20  **A.**    I do, yes.

21  **Q.**    What is that?

22  **A.**    It's a Stag Arms and some sort of long gun.

23  **Q.**    It's a rifle?

24  **A.**    Yes.

25  **Q.**    Is it an assault rifle?

*Jasek - Cross - Kamens*

1    **A.**    Yes.

2    **Q.**    Like a -- I don't really know firearms maybe like you,

3    but is it an AR-15 style?

4    **A.**    Yes.  I didn't see it during the search warrant, but,

5    yes, it was an assault-type rifle.

6    **Q.**    And 10D, take a look at that.

7         (Exhibit published.)

8    BY MR. KAMENS:

9    **Q.**    Is that a pistol?

10   **A.**    Yes, a SIG Sauer pistol.

11   **Q.**    I'm sorry?

12   **A.**    A SIG Sauer pistol.

13   **Q.**    Do you know the caliber?

14   **A.**    I do not, sir, no.

15   **Q.**    Were those in Mr. Wong's bedroom?

16   **A.**    Yes.

17   **Q.**    You testified that you found cell phones?

18   **A.**    Yes.

19   **Q.**    Eight cell phones?

20   **A.**    Correct.

21   **Q.**    And we've introduced some of the physical cell phones

22   here today?

23   **A.**    Yes, sir.

24   **Q.**    And the information in those cell phones has been

25   extracted?

*Jasek - Cross - Kamens*

1  **A.**     Yes.

2  **Q.**     You have obtained a lot of the information in those cell

3  phones?

4  **A.**     Yes.

5  **Q.**     Some of those cell phones, or at least Mr. Wong's cell

6  phone, contained chats; is that right?

7  **A.**     It did, yes.

8  **Q.**     And when we talk about chats, we're talking about

9  communications that he had in particular with two other people?

10 **A.**     Yes.

11 **Q.**     One that we call Nikki?

12 **A.**     Yes.

13 **Q.**     And the other is called Little 7 or Xiao Qi?

14 **A.**     Yes.

15 **Q.**     And you translated some of -- the prosecution translated

16 some of those chats?

17 **A.**     We have, yes.

18 **Q.**     But not all of them?

19 **A.**     No, sir, no.

20 **Q.**     There were just too many?

21 **A.**     Yes.

22 **Q.**     But those chats did come from these phones that you found

23 in Mr. Wong's bedroom?

24 **A.**     Yes.

25 **Q.**     You also found videos?

*Jasek - Cross - Kamens*

1   **A.**     On phones?

2   **Q.**     On the phones, yes.

3   **A.**     Yes, we did.

4   **Q.**     You found videos on the phones of Joseph Wong talking to

5   banks?

6   **A.**     We did, yes.

7   **Q.**     You found videos of Joseph Wong talking to banks where he

8   was saying he was Hailong Zhu?

9   **A.**     Yes.

10  **Q.**     You've seen those?

11  **A.**     Some, not all, but, yes.

12          MR. KAMENS:  Your Honor, I think that the foundation

13  has been laid to play a video from these phones, but I'm happy to

14  have the witness see one of the videos and confirm that it's from

15  the phone.  They've been on our exhibit list.  The government

16  knows what they are.  I think we should just play them.

17          THE COURT:  Does the government have any objection?

18          MS. SCHWARTZ:  Court's indulgence.

19          (Whereupon, there was a brief pause in the

20  proceedings.)

21          MS. SCHWARTZ:  No objection, Your Honor.

22          THE COURT:  Very good.

23          MR. KAMENS:  We're just having some technical issues

24  here, Your Honor.

25          THE COURT:  Well, let me ask you this:  Would it be

*Jasek - Cross - Kamens*

1  appropriate to take a five-minute break to give everyone a chance

2  to stretch their legs, make sure that the technology is ready,

3  and then resume the cross-examination?

4        MR. KAMENS:  That will be fine, Your Honor.

5        THE COURT:  Let's do that.  Court will be in recess.

6        (Whereupon, a recess in the proceedings occurred from

7  5:37 p.m. until 5:44 p.m.)

8        (Jury out at 5:37 p.m.)

9        THE COURT:  Please bring the jury in.

10        (Jury in at 5:45 p.m.)

11        THE COURT:  Let's resume.  Are you ready to play the

12  video?

13        MR. KAMENS:  I am, Your Honor.  We would move to admit

14  Defense Exhibit 6 and play it for the jury.

15        THE COURT:  And there's no objection?

16        MS. SCHWARTZ:  No objection.

17        THE COURT:  It will be admitted, and it may be played.

18        (Defendant's Exhibit No. 6 received in evidence.)

19        (Whereupon, video was played.)

20  BY MR. KAMENS:

21  **Q.**    So you spoke with Mr. Wong when you executed the search

22  warrant; is that right?

23  **A.**    I did, yes.

24  **Q.**    And he speaks English?

25  **A.**    Yes.

*Jasek - Cross - Kamens*

1   **Q.**     So that's his voice?

2   **A.**     Yes.

3   **Q.**     And you interviewed him?

4   **A.**     Yes.

5   **Q.**     You also -- let me back up just one second.  You found,

6   as you said, eight cell phones, and the government showed you a

7   picture of five; is that right?

8   **A.**     Yes, they did.

9   **Q.**     There was a cell phone, or maybe more than one, that was

10  found in a backpack; is that right?

11  **A.**     Yes.

12  **Q.**     And each of these cell phones has a device name, correct?

13  **A.**     Yes.

14  **Q.**     And one of the cell phones that was found in the

15  backpack, the device name is hailongiPhone; is that right?

16  **A.**     Yes.

17  **Q.**     And that is Government's Exhibit 7-1 that the government

18  admitted today?

19  **A.**     I believe so.  Let me just double-check.

20  **Q.**     Well, let me ask you this:  Is that name listed on the

21  exhibit that was entered, or does it just say Government's

22  Exhibit 7-1?

23  **A.**     Item 5, yes; Item 5 is hailongiPhone.

24  **Q.**     So hailongiPhone was in Mr. Wong's custody when you

25  executed the search warrant?

*Jasek - Cross - Kamens*

```
 1   A.      Yes.

 2   Q.      So you found multiple IDs?

 3   A.      Yes.

 4   Q.      And some of them were fake?

 5   A.      Yes.

 6   Q.      You found passports?

 7   A.      Yes, sir.

 8   Q.      For Mr. Wong?

 9   A.      Yes.

10   Q.      Some of those were fake?

11   A.      Yes.

12   Q.      You found eight different phones?

13   A.      Yes.

14   Q.      You found cash?

15   A.      Yes.

16   Q.      Found bank statements?

17   A.      Yes.

18   Q.      You found what looks to be a small amount of cocaine?

19   A.      Potentially.

20   Q.      Potentially?

21   A.      Yes.

22   Q.      You found an assault rifle?

23   A.      Yes.

24   Q.      You found a pistol?

25   A.      Yes.
```

*Jasek - Cross - Kamens*

1    **Q.**     And you didn't arrest Mr. Wong?

2    **A.**     No, we did not.

3    **Q.**     I see.

4          Nothing further, sir.

5              THE COURT:  Any redirect?

6              MS. SCHWARTZ:  No, Your Honor.

7              THE COURT:  Do you need to retain this witness to be

8    called later?

9              MS. SCHWARTZ:  No, Your Honor.

10             THE COURT:  You may step down.  Thank you.

11             MR. KAMENS:  Your Honor, if I can just interject.  It

12   may be that we would want to call this witness again.  I just

13   have to look at all of our stuff.  We'd called him on direct.  It

14   would be limited, but I wouldn't want to release him until we

15   make that decision.

16             THE COURT:  Very good.  You may step down now.  You're

17   still subject to the rule on witnesses.  You may not discuss your

18   testimony with anyone at this time.

19             THE WITNESS:  Thank you.

20             (Whereupon, the witness exits the stand.)

21             THE COURT:  You may call your next witness.

22             MS. SCHWARTZ:  The United States calls Special Agent

23   Jeffrey Shi to the stand.

24          (JEFFREY SHI, ON BEHALF OF THE GOVERNMENT, SWORN)

25             (Whereupon, the witness takes the stand.)

DIRECT EXAMINATION

BY MS. SCHWARTZ:

**Q.**     Good afternoon, Special Agent Shi.

**A.**     Good afternoon.

**Q.**     Please state your name and spell it for the record.

**A.**     Jeffrey Shi, J-E-F-F-R-E-Y; last name S-H-I.

**Q.**     And where do you work?

**A.**     I'm a special agent with the Secret Service.

**Q.**     How long have you worked with the Secret Service?

**A.**     Over five years now.

**Q.**     And what is your title within the Secret Service?

**A.**     I am a special agent with the Secret Service currently
assigned to the criminal investigative division, CID.

**Q.**     How long have you been assigned to that unit?

**A.**     I've worked with CID for over four years now.

**Q.**     What are your primary duties and responsibilities for
that unit?

**A.**     My primary responsibilities in CID are financial and
cybercrime, cyber-enabled fraud, and organized crime with a
high-tech link.

**Q.**     What kind of training have you had?

**A.**     I've attended three months of criminal investigator
training at the Federal Law Enforcement Training Center and four
months of special agent training at the Secret Service academy.

         I've also attended numerous on-the-job trainings

*Shi - Direct - Schwartz*

1    and continuing education on investigating white-collar crime,

2    and I keep myself constantly up to date on the latest

3    investigative techniques and criminal trends.

4    Q.    I would now like to move to the events of March 21, 2023;

5    were you involved in a law enforcement operation relevant to

6    this case?

7    A.    I was.

8    Q.    Generally speaking, what was the law enforcement

9    operation you were involved with?

10   A.    The goal of the operation was to arrest the defendant,

11   conduct a search of his home for items of evidentiary value.

12   Q.    And was there a particular residence that was going to be

13   searched for this operation?

14   A.    There was.

15   Q.    What was that residence?

16   A.    If I recall the address, it was 25W171 Essex Avenue,

17   Naperville, Illinois, which is a suburb outside of Chicago.

18   Q.    Why were you interested in this particular residence?

19   A.    This was a residence where the defendant was known to be

20   residing at the time.

21   Q.    And did you go to the residence?

22   A.    I did.

23   Q.    And what steps did you take when you arrived at the

24   residence?

25   A.    I was with the entry team when we made entry into the

*Shi - Direct - Schwartz*

1   home where the defendant was known to be residing.  We quickly

2   located the defendant in the first-floor bedroom and placed him

3   under arrest.  We then proceeded to conduct a search of the

4   home, focusing on his bedroom, for evidence.

5   **Q.**    And what was your assigned role, just generally, during

6   the search?

7   **A.**    I was with the entry team, and I also provided trans- --

8   Mandarin Chinese translation, because all the individuals in the

9   home, including the defendant, were known to speak Chinese.

10  **Q.**    And you said you did find Mr. Zhu and arrested him that

11  day?

12  **A.**    We did.

13  **Q.**    And do you see the defendant in the courtroom today?

14  **A.**    I do.

15  **Q.**    Can you identify him by what he's wearing and where he's

16  sitting?

17  **A.**    He's the gentleman sitting at defense's table wearing the

18  blue shirt.

19          MS. SCHWARTZ:  And let the record reflect that the

20  witness has identified the defendant.

21          THE COURT:  It will so reflect.

22  BY MS. SCHWARTZ:

23  **Q.**    Did Mr. Zhu have anything on him when you arrested him?

24  **A.**    No, he did not.

25  **Q.**    What did you do after he was placed under arrest?

*Shi - Direct - Schwartz*

1   **A.**   After we arrested him, we placed him in the back of our

2   police car temporarily while we conducted a search of the

3   residence.

4   **Q.**   And while searching the residence, did law enforcement

5   find any objects relevant to your investigation?

6   **A.**   We did.

7   **Q.**   And, just generally speaking, what were those?

8   **A.**   Among other things, we found the defendant's iPhone,

9   iPad, his bookbag, and his wallet, which was located inside his

10  bookbag.

11  **Q.**   And were any photos taken --

12       THE INTERPRETER:  Your Honor, may the interpreter

13  humbly ask the witness to speak loudly on the mic and slow down

14  the speech?  I appreciate it.

15       THE COURT:  Yes.  If you will just slow down a little

16  bit, we can try and make sure that everything is heard clearly.

17       THE WITNESS:  Apologies, Your Honor.  I will.

18  BY MS. SCHWARTZ:

19  **Q.**   Were photos taken of the objects found during the search?

20  **A.**   They were; photos were taken.

21  **Q.**   I would now like to show you what's been marked for ID as

22  Government's Exhibit 15-3.  In preparing for trial, have you had

23  a chance to review Exhibit 15-3?

24  **A.**   I did.

25  **Q.**   What are they?

Shi - Direct - Schwartz

1   **A.**    Various bank cards, identification documents of the

2   defendant, and a note scribbled in a notepad on a piece of

3   paper.

4   **Q.**    Were these found during your search?

5   **A.**    They were.

6   **Q.**    Are these fair and accurate photos that depict the items

7   found during the search at Essex Avenue?

8   **A.**    Yes, they are.

9          MS. SCHWARTZ:  The United States moves Exhibit 15-3

10  into evidence.

11         THE COURT:  Any objection?

12         MR. NI:  No objection.

13         THE COURT:  It will be admitted without objection.

14         (Government's Exhibit No. 15-3 received in evidence.)

15         MS. SCHWARTZ:  If we could publish the first page of

16  this exhibit.

17         (Exhibit published.)

18  BY MS. SCHWARTZ:

19  **Q.**    You mentioned you found some documents in his wallet.  Is

20  that what's reflected in this photo?

21  **A.**    Yes.  These were the items that were found in his wallet.

22  **Q.**    And if we could go to the second page of this exhibit;

23  are these the same photos that we saw in the first photo?

24  **A.**    They are.

25  **Q.**    The same cards, rather, that we saw in the first photo?

1   **A.**     Yes.

2   **Q.**     What are the banks identified on these cards?

3   **A.**     These are bank cards belonging to Bank of America and

4   U.S. Bank.

5           MS. SCHWARTZ:  And if we could go to the next page of

6   this exhibit, please, and if we could zoom in a little bit on the

7   card.

8   BY MS. SCHWARTZ:

9   **Q.**     What are the names listed on these cards?

10  **A.**     On both cards, the name that is listed is Hailong Zhu.

11  **Q.**     And what is the last four of the card on top?

12  **A.**     2222.

13  **Q.**     And what is the last four of the card on the bottom?

14  **A.**     1061.

15          MS. SCHWARTZ:  And if we could go to the next page of

16  this exhibit, please.

17  BY MS. SCHWARTZ:

18  **Q.**     Is this the note that was depicted on the first page of

19  this exhibit?

20  **A.**     Yes, it is.

21  **Q.**     And was this found in his wallet as well?

22  **A.**     Yes, it was.

23  **Q.**     And what is depicted on this note?

24  **A.**     It appears to be login information that's scribbled on

25  the note.

*Shi - Direct - Schwartz*

1    Q.    And what is listed next to what is scribbled, looks like,

2    "user ID"?

3    A.    HZHU0923.

4    Q.    On the bottom, there's two other names written; is that

5    right?

6    A.    Yes.

7    Q.    And what are those?

8    A.    Zhuhailong123, zhuhailong923.

9    Q.    Was cash found in the residence?

10   A.    There was.  The cash was found in his wallet.

11   Q.    Is that what's depicted here?

12   A.    It is.

13   Q.    Did you count it?

14   A.    I didn't count it, but my colleagues did.

15   Q.    And do you know how much it was determined to be?

16   A.    It was a bit over $5,000 in cash.

17   Q.    Did the defendant have a cell phone on him when you

18   encountered him?

19   A.    Not on his immediate person; however, we found his iPhone

20   next to his bed as well as his iPad.

21         MS. SCHWARTZ:  Actually, before we get to that, can we

22   show the last exhibit -- or the last page of this exhibit,

23   please?

24   BY MS. SCHWARTZ:

25   Q.    What is depicted here?  I know it's a little hard to see.

*Shi - Direct - Schwartz*

1  **A.**    Various bank receipts:  One of Western Union as well as

2  receipts from the Venetian, which is a casino in Las Vegas.

3  **Q.**    So those two documents that are on the bottom of the

4  screen, those are from the Venetian, you said?

5  **A.**    The Venetian, correct.

6  **Q.**    You said you did find a device -- back to the device that

7  you found, you did find two devices at the residence?

8  **A.**    Yes, an iPhone and an iPad.

9  **Q.**    I'd now like to show you what's been premarked for ID as

10  Government's Exhibit 9-1, a physical exhibit.  And what is this?

11  **A.**    This was the iPhone that we found next to the defendant's

12  bed.

13  **Q.**    How do you recognize it?

14  **A.**    I was the one that found the iPhone.  I was the one that

15  handled it.  I was the one that brought the phone to the

16  defendant, who was seated in our police car at the time.  I

17  asked him whose phone this was, and he said it was mine.

18  **Q.**    And is this cell phone in substantially the same

19  condition as when you seized it?

20  **A.**    Yes, it is.

21  **Q.**    And what is on the back of the iPhone?

22  **A.**    A SIM card.

23  **Q.**    And you said you asked him if it was his phone?

24  **A.**    I did.

25  **Q.**    And what did he say?

*Shi - Direct - Schwartz*

1    **A.**    He said, Yes, this is my phone.

2    **Q.**    And what did you do after you found the phone and he

3    identified it for you?

4    **A.**    I placed the phone in airplane made.  As an extra

5    precaution, I placed it in a Faraday bag so no signals can came

6    in and out.  I then handed it over to one of our agents that was

7    collecting evidence, and he bagged and tagged the phone.

8           MS. SCHWARTZ:  Your Honor, at this time, I would like

9    to read a stipulation into the record the parties have agreed to.

10          THE COURT:  You may do so.

11          MS. SCHWARTZ:  "The following items were seized from

12    25W171 Essex Avenue, Naperville-DuPage, Illinois, on

13    March 21, 2023, and were maintained through a proper chain of

14    custody from the time of seizure to the time introduced at trial.

15    IPhone 11 Pro Max, Government's Exhibit 9-1, and two SIM cards,

16    Government's Exhibit 9-5."

17          MR. NI:  No objection.

18          (Government's Exhibit Nos. 9-1 and 9-5 received in

19    evidence.)

20          MS. SCHWARTZ:  I think we're done with the exhibit

21    there.

22    BY MS. SCHWARTZ:

23    **Q.**    Once you left the residence, what did you do?

24    **A.**    We transported the defendant to the Chicago Field Office

25    for questioning.

*Shi - Direct - Schwartz*

1    **Q.**    And what happened after you arrived at the field office?

2    **A.**    After we arrived, we read him his rights.  After that, we

3    started questioning him.

4    **Q.**    That's fine, but what did you learn about his ability to

5    speak English?

6    **A.**    He told me he had -- he spoke little to no English, which

7    I believed.

8    **Q.**    So how were you able to communicate with him?

9    **A.**    I spoke to him entirely in Mandarin Chinese.

10   **Q.**    Where did you learn Chinese?

11   **A.**    I grew up in China.  I speak Chinese on a regular basis

12   with my wife, friends, and family.

13   **Q.**    So would you say you're fluent?

14   **A.**    I would say I am conversationally fluent where I can

15   easily carry on a conversation on various topics as well as on

16   topics related to my work.

17   **Q.**    Did he agree to speak with you?

18   **A.**    He did.

19   **Q.**    And you said you read him his rights in Chinese?

20   **A.**    I did.  I read him his *Miranda* rights in Chinese as well

21   as handed him his *Miranda* rights on a piece of paper that said

22   the same.

23   **Q.**    I would now like to show you Government's Exhibit 15-1.

24            (Exhibit published.)

25   /////

*Shi - Direct - Schwartz*

1    BY MS. SCHWARTZ:

2    **Q.**    Do you recognize this?

3    **A.**    I do.

4    **Q.**    What is it?

5    **A.**    This is the *Miranda* rights in Chinese that we read to him

6    and that we had him read as well.

7    **Q.**    Did he sign this form?

8    **A.**    He did.

9    **Q.**    And how do you know this is the form he signed?

10   **A.**    Because that's his signature in English and Chinese as

11   well as my and my colleague's signature as well on the bottom.

12          MS. SCHWARTZ:  Your Honor, I believe this was

13   conditionally admitted, but now the government would like to move

14   this exhibit into evidence.

15          THE COURT:  Any objection?

16          MR. NI:  No objection.

17          THE COURT:  It's admitted.

18          (Government's Exhibit No. 15-1 received in evidence.)

19   BY MS. SCHWARTZ:

20   **Q.**    Did Mr. Zhu take time to read this form?

21   **A.**    He certainly did.

22   **Q.**    And then he signed it?

23   **A.**    Correct.

24   **Q.**    And what happened next?

25   **A.**    After that, we started asking him questions.

*Shi - Direct - Schwartz*

1    **Q.**    Did you have any trouble understanding him throughout the

2    conversation?

3    **A.**    Not for the most part.  For the vast majority of the

4    interview, I could understand him just fine.  There were a

5    couple of places here and there where he said something that I

6    didn't quite pick up.  I asked him to clarify, and then

7    understood what he was saying to me.

8    **Q.**    But generally, were you able to understand most of what

9    he was saying?

10   **A.**    Yes.

11   **Q.**    And did he seem to understand what you were saying?

12   **A.**    Yes, he did.

13   **Q.**    Did you record the interview?

14   **A.**    We did.

15   **Q.**    And what did you do with the recording after the

16   interview was done?

17   **A.**    My colleague provided the recording to a translator for

18   translation into English.

19   **Q.**    And did the translator translate both the questions you

20   asked in Chinese and also the defendant's responses?

21   **A.**    Yes, he did.

22   **Q.**    I'm now showing you what has been marked as Government's

23   Exhibit 15-2B.

24               (Exhibit published.)

25   /////

1    BY MS. SCHWARTZ:

2    **Q.**    What is this -- or do you recognize it, I should say?

3    **A.**    I do.  This is the English translation of the interview.

4    **Q.**    Did you get a chance to review these excerpts before

5    today?

6    **A.**    I did.

7    **Q.**    And do these excerpts match your recollection of what was

8    said during the interview?

9    **A.**    Yes, they do.

10   **Q.**    I would now like to direct you to page 2 of this exhibit.

11            MS. SCHWARTZ:  If we could publish.

12            (Exhibit published.)

13   BY MS. SCHWARTZ:

14   **Q.**    On the left-hand side of this exhibit, there's an

15   individual listed as Chris; who is that?

16   **A.**    Chris is Special Agent Chris Saunders, my colleague, who

17   conducted the interview with me.

18   **Q.**    And Shi is, presumably, referring to you?

19   **A.**    That's my name, Jeffrey Shi.

20   **Q.**    So directing you to the top of page 2, did you ask the

21   defendant any initial questions about when he came to the U.S.?

22   **A.**    I did.  I asked him simple, basic questions, such as when

23   he first came to the U.S.

24   **Q.**    And what did he say?

25   **A.**    He told me he first came to the U.S. around mid to late

1    January of 2018.

2    **Q.**    And directing you to the bottom of page 2, did you ask

3    him what he'd been doing since he's been in the U.S.?

4    **A.**    I did.

5    **Q.**    What did he say?

6    **A.**    He told me he was doing construction, remodeling,

7    exterior remodeling.

8    **Q.**    And directing you to the top of page 3, did he say he did

9    anything else besides remodeling?

10   **A.**    He did.

11   **Q.**    What did he say?

12   **A.**    He told me that prior to what he was currently doing, he

13   worked at a restaurant.

14   **Q.**    Directing you to the bottom of page 3 and the top of

15   page 4, did you ask him what locations he had been to in the

16   U.S.?

17   **A.**    I did.

18   **Q.**    And what did he say?

19   **A.**    He told me he's been to other cities:  Illinois; he's

20   been to Kentucky, Iowa; and later in the interview, I believe he

21   also told me he's been to Las Vegas, Nevada, and California as

22   well.

23   **Q.**    And directing you to the middle of the page, did you ask

24   him about opening bank accounts?

25   **A.**    I did.

*Shi - Direct - Schwartz*

1    **Q.**    And what did he say?

2    **A.**    He told me that, I didn't open up the bank accounts

3    myself; other people did it using my information.

4    **Q.**    And did you ask him when he met these other people?

5    **A.**    I did.

6    **Q.**    And directing you to line 194, what did he say?

7    **A.**    Zhu, quote, September, about September, October last

8    year.

9    **Q.**    Directing you to the top of page 5, how did he meet them?

10   **A.**    He told me that a fellow villager, a fellow acquaintance

11   from his hometown in China introduced him to his recruiters.

12   **Q.**    And on the middle of page 5, did he say whether he opened

13   accounts in his name?

14   **A.**    He did.  He stated that he opened accounts in his name as

15   well as in the name of various corporations.

16   **Q.**    Did you ask him if he -- at the bottom of page 5, top of

17   page 6, did you ask him about creating a company?

18   **A.**    Yes, I did.

19   **Q.**    And what did he say about the company?

20   **A.**    He said he had created a couple of companies.  One of the

21   names is trading and remodeling -- Sea Dragon Trading was the

22   name.

23   **Q.**    And at the bottom of page 6, you asked him if he

24   recognized the name Sea Dragon --

25   **A.**    Yes, I asked if he recognized the name.

*Shi - Direct - Schwartz*

**Q.**      And what did he say?

**A.**      He said, Yes, yes, yes.

**Q.**      Directing your attention to page 7, did you ask him why

he agreed to open up bank accounts?

**A.**      I did.

**Q.**      And what -- the top of page 7, if we look at lines 287

and 288, what is going on in those two lines?

**A.**      I asked him -- I asked the defendant how much money -- I

asked the defendant how much money he was given by his

recruiters to open up these bank accounts, and he told me he was

promised $70,000.

**Q.**      And directing you to the bottom of this same page, did he

say that he would get paid over time or it would be a one-time

payment?

**A.**      It would be payments made -- it would be multiple

payments, not a one-time payment.

**Q.**      Did he say how much he eventually got paid?

**A.**      He told me he received -- he told me he ultimately

received less than $20,000.

**Q.**      Directing your attention to the bottom of page 8, other

than opening the accounts -- rather, can you explain what's

going on in these messages at the bottom of page 8, lines 312

through 316?

**A.**      312, he tells me that he had no parts in opening up the

accounts; he had no idea what was going on; that everything was

*Shi - Direct - Schwartz*

1  done by other people, not him.  I asked him, on line 315, Aside

2  from opening the bank accounts, have you been to the bank to do

3  anything else, such as withdraw or deposit money?  On line 316,

4  the defendant states to me, quote, I have both withdrawn and

5  deposited money, end quote.

6  **Q.**    And on top of page 9, lines 317 through 320, did you ask

7  him if there were other people with him when he was doing that

8  activity?

9  **A.**    I did.

10  **Q.**    And what did he say?

11  **A.**    He said there were other people accompanying him at the

12  bank.

13  **Q.**    In the middle of page 9, lines 337 and 338, did he tell

14  you what he did with the money?

15  **A.**    He did.

16  **Q.**    And in line 338, what did he say?

17  **A.**    He told me, quote, I went to the casino sometimes, end

18  quote.

19  **Q.**    And on the bottom of page 9, did you ask him -- did you

20  ask him anything else about the casino trips?

21  **A.**    I did.

22  **Q.**    What did he say he was doing in Las Vegas?

23  **A.**    He told me he was gambling with the people he worked

24  with, gambling with the people who recruited him.

25  **Q.**    And is that also what he's saying on the top of page 10?

*Shi - Direct - Schwartz*

1  **A.**    Yes, it is.

2  **Q.**    Did you ask him how many accounts he opened?

3  **A.**    I did.

4  **Q.**    And directing you, I guess, to lines 367 to 375, did he

5  tell you how many accounts he opened?

6  **A.**    He did.  The defendant told me he opened several bank

7  accounts.  On line 374, he states, quote, There must be several,

8  three to five, end quote.

9  **Q.**    And directing you to the top of page 11 -- or, really,

10 the entirety of page 11, did you ask him about how much the

11 deposits or withdrawals were from the accounts that he opened?

12 **A.**    I did.

13 **Q.**    And did he give you any specific amounts?

14 **A.**    He told me the deposits range from -- several deposits

15 ranging from $19,000 one day to $75,000 another day to $100,000

16 another day.

17 **Q.**    And can you read what his response was in line 380?

18 **A.**    Zhu:  "Went to the bank.  For example, we go to Vegas

19 tomorrow.  He would deposit $100,000 today."

20 **Q.**    And in lines 381 to 382, did you ask him whether some of

21 the deposits were done in the bank?

22 **A.**    I did.

23 **Q.**    And what did he say?

24 **A.**    He said that he deposited money in the bank; he took cash

25 to the bank; deposited money there.

*Shi - Direct - Schwartz*

1   **Q.**    Throughout the interview, did you ask him when he stopped

2   working with the others?

3   **A.**    I did.

4   **Q.**    And did you ask him that question multiple times?

5   **A.**    Yes, I did.

6   **Q.**    So directing your attention to page 12, can you review

7   this conversation and what was being discussed here between you

8   and the defendant?

9   **A.**    Generally speaking, I was asking the defendant when he

10  stopped working for these individuals, when he stopped

11  depositing money, and he told me he stopped during October to

12  November of 2022.

13  **Q.**    And at the top of page 13, did he say anything about why

14  he eventually stopped?

15  **A.**    He did.  He told me he eventually stopped because he

16  wasn't getting the money that he was promised.  He also --

17  **Q.**    Can you read the exchange from lines 497 through 502?

18  **A.**    "Shi:  Mhm, you didn't know how to do it.

19          Zhu:  It is true.  I didn't know what was going on in

20  that place.  Later -- they said -- I realized I didn't get any

21  money, why should I have anything to do with you?  I would not

22  do it anymore.

23          Shi:  Did you feel it was strange?  They --

24          Zhu:  Later, I felt --

25          Shi:  Yes.

*Proceedings*

1      Zhu:  It is true.  I felt something was wrong.  It was

2  not what they said it was.  I refused to do it.  He said, You

3  are fine."

4  **Q.**    Directing your attention to the bottom of page 13, did

5  you ask him whether he realized that his accounts were being

6  closed?

7  **A.**    I did.

8  **Q.**    And in line 532, can you read his response?

9  **A.**    "Zhu:  He -- he said the bank was closed and wanted me to

10  go to the bank in person.  He asked me to take him to the bank.

11  Later, I said I would not go.  The accounts were closed, and I

12  didn't get any money, why bother going to the bank.  He said:

13  You had to go and you go with me.  Once the accounts were

14  opened, I would take out money for you.  So we went to the --

15  for the second time, but still no money for me -- forget about

16  it.  I stopped doing it."

17      THE COURT:  Let me stop you there, Counsel.  We're

18  almost at 6:30.  Everybody has worked very hard today, but I

19  don't want to push our limit, so maybe we need to stop.  I

20  realize that there's not, maybe, a natural break.

21      But, ladies and gentlemen of the jury, are you ready to

22  go?

23      (Jurors nod.)

24      THE COURT:  I can understand.

25      So let's pause right here.  And I'm also sensitive to

*Proceedings*

1    the timing for our interpreters who have been working a very long

2    day as well.

3            Ladies and gentlemen of the jury, we'll take our break.

4    Just as I did yesterday, let me remind you that it's extremely

5    important when you go home, to put this out of your mind; don't

6    discuss this matter with each other; don't discuss it at home;

7    don't think about it.  Certainly, don't conduct any research on

8    your own; don't seek out any information on the internet or

9    otherwise, and I will ask you tomorrow morning if you've been

10   able to follow my instructions.  And given all of the effort

11   you've put into this and counsel has put into this, I ask you to

12   follow the instructions so that we can get to the finish line.

13           We will begin tomorrow at 9:00 a.m. if you're

14   agreeable.  Everyone's nodding their head.  So we will do our

15   best to be ready to start with this direct examination as soon as

16   we can so that the government can get through their final

17   witnesses and so that we can try and keep our word to push this

18   matter as quickly as possible to the point where you can consider

19   it.

20           So with that, I'll let you leave.  We'll see you

21   tomorrow at 9:00 a.m.  If you can be here a couple of minutes

22   beforehand, then we can be ready to go right on time.

23           (Jury out at 6:28 p.m.)

24           THE COURT:  Agent Shi, you may step down.  You will

25   remain under oath and subject to the rule on witnesses.  You

*Proceedings*

1    cannot discuss your testimony with anybody, but you can step down

2    at this time and exit the courtroom while we address some matters

3    before we leave.

4           I do want to thank our interpreters because this has

5    been an awfully long day for everyone, but especially for them,

6    and I appreciate you staying late.  We could not do it without

7    you staying late, so we're appreciative.  And I appreciate that

8    we have to find a way to get through the traffic and be ready to

9    start at 9:00 a.m.  I don't know who's on the agenda, but we

10   couldn't start without you, so it's very important.

11          I also want to take a second to thank our wonderful

12   paralegals here, Ms. McNeill and Ms. Morrell, especially you,

13   Ms. McNeill, assisting your opposing counsel here without

14   complaint.  I appreciate it.  And as we all know, we don't have

15   the mechanisms for switching back and forth; and so I appreciate

16   that cooperation, and I'm sure counsel do as well.

17          I don't think we can do anything more now, and I want

18   everyone to go to get to the parking lots.  Are there any matters

19   we need to raise?  I think we have to put off jury instructions

20   to tomorrow morning.  I want to make sure we get back to

21   finishing Agent Shi's testimony.  I don't know whether there's

22   any discussion you can have to expedite whatever is left.  I know

23   there are a couple of witnesses still on the list.  I would like

24   to think that we might be able to get to a point where we can be

25   addressing the final stages of the case.  Again, I don't know

1    what the defense intends to do, and we have to deal with all of

2    the interim matters.  But this jury has worked hard; and if

3    there's a way for them to have the opportunity to start

4    deliberating tomorrow, that would be ideal.

5           Again, I'm not trying to foreclose anybody presenting a

6    case and whatever they want, and we do have Friday as well, but I

7    think we all imagined that maybe there would be a way for this

8    matter to be considered by the jury, and even resolved, before

9    the end of the week; so if we can make that happen, I know it

10   would be in everyone's interest.

11          Is there anything we need to address before we close

12   court?

13          MS. BEDELL:  No, Your Honor.

14          MR. KAMENS:  No, Your Honor.

15          THE COURT:  Why don't we try and be ready to meet by

16   8:45 or 8:50 tomorrow morning in case there are any preliminary

17   matters, but I think the goal, really, is simply to resume our

18   direct examination of Agent Shi at 9:00 a.m. promptly.

19          Court will be in recess.

20          (Whereupon, the proceedings concluded at 6:32 p.m.)

21                *       *       *       *       *

22

23

24

25

1                          CERTIFICATE OF REPORTER

2          I, Diane Salters, hereby certify that the foregoing

3   transcript is a true and accurate record of the stenographic

4   proceedings in this matter.

5

6                                        /s/ Diane Salters

7                              _____

8                              Diane Salters, CSR, RCR, RPR
                               Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25