```
 1                   UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3     UNITED STATES OF AMERICA,         :
                                         :
 4                  Plaintiff,           :   Criminal Action
                                         :   No. 1:23-cr-00081
 5            v.                          :
                                         :
 6     HAILONG ZHU,                       :   September 7, 2023
                                         :   8:56 a.m.
 7                                         :
                    Defendant.           :   Volume 3
 8                                         :
       ............................. :
 9
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
             UNITED STATES DISTRICT JUDGE, AND A JURY
11
       APPEARANCES:
12
         For the United States:       UNITED STATES ATTORNEY'S OFFICE
13                                     Alexandra Zoe Bedell, AUSA
                                       Stefanie Schwartz, AUSA
14                                     2100 Jamieson Avenue
                                       Alexandria, VA 22314
15
         For the Defendant:           OFFICE OF THE FEDERAL PUBLIC
16                                     DEFENDER
                                       Geremy Kamens, Federal Defender
17                                     Nathaniel Wenstrup, AFPD
                                       1650 King Street, Suite 500
18                                     Alexandria, VA 22314

19                                     AFN LAW PLLC
                                       Angus Fei Ni, Esquire
20                                     504 2nd Ave
                                       14th Floor
21                                     Seattle, WA 98104

22       Also Present:                Mandarin Interpreters:
                                       Judith Shapiro
23                                     Renee Wang

24

25       (Continued)
```

1      (Continued)

2      Court Reporter:              Diane Salters, B.S., CSR, RPR, RCR
                                    Official Court Reporter
3                                   United States District Court
                                    401 Courthouse Square
4                                   Alexandria, VA 22314
                                    Email: Dianesalters.edva@gmail.com
5                                   Telephone: (301) 338-8033

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Proceedings reported by machine shorthand.  Transcript produced by
        computer-aided transcription.

1          **<u>TABLE OF CONTENTS</u>**

2

3                  **<u>EXAMINATION</u>**

   <u>WITNESS</u>                    <u>DIRECT</u>    <u>CROSS</u>    <u>REDIRECT</u>   <u>RECROSS</u>

4

   JEFFREY SHI

5

        BY MS. SCHWARTZ        9
6       BY MR. NI                      13

7  RICHARD CRUZ

8       BY MS. BEDELL          31

9  CHRISTOPHER SAUNDERS

10      BY MS. BEDELL          45
        BY MR. WENSTRUP               130
11
                **<u>GOVERNMENT'S EXHIBITS</u>**
12
   <u>NUMBER</u>                                           <u>PAGE</u>
13
   5-2, 5-3, 5-4, 5-5, 5-7, 5-9, and 5-15            39
14 16-2                                              48
   16-4                                              51
15 16-5                                              53
   16-13                                             54
16 10-15A and 10-16A                                 60
   5-6, 5-8, and 5-10                                85
17 5-11 and 5-13                                     87
   5-12                                              88
18 5-14                                              98
   6-2, 6-3, and 6-5                                 99
19 6-4 and 6-6                                       101
   7-2 through 7-7                                   102
20 8-2 through 8-5                                   107
   9-2, 9-3, 9-4, 9-6, 9-6A, and 9-7                 111
21 16-10 and 16-11                                   123
   16-9 and 16-9B                                    126
22

23

24

25

*Proceedings*

1          THE COURTROOM DEPUTY:  *United States of America v.*

2     *Hailong Zhu*, Case Number 1:23-cr-81.  Will the parties please

3     note their appearances for the record.

4          MS. BEDELL:  Good morning, Your Honor.  Zoe Bedell and

5     Stephanie Schwartz for the United States.

6          THE COURT:  Good morning.

7          MR. KAMENS:  Good morning, Your Honor.  Geremy Kamens,

8     Nate Wenstrup, and Angus Ni for Mr. Zhu, who's present.

9          Can I ask the Court's indulgence for one moment?

10         THE COURT:  Yes.

11         (Whereupon, there was a brief pause in the

12     proceedings.)

13         MR. KAMENS:  This is a small point, Your Honor:

14     Yesterday during the testimony of Yang Wen, the linguist, the

15     government pointed him to a portion of the transcript in, I

16     believe, 15-2A where the linguist had put a note where he

17     identified a misunderstanding between Agent Shi and Mr. Zhu.

18     That portion of the transcript is not in the portion that was

19     admitted, 15-2B, and I would just ask that that portion be added.

20     The government opposes that request, but if the jury, having

21     heard that testimony, goes to look to see where is that, it won't

22     be there.  So we would ask, since the government pointed that

23     out, that it be added, that even that line be added with the

24     translator's note.

25         MS. BEDELL:  Given a second to think about it more, I

*Proceedings*

1    think if we just limited it to that very narrow line or -- I

2    might need to look at that whole excerpt that we were looking at,

3    but I think we would be okay with that, Your Honor, if we could

4    have a moment to look at that before that ultimately is added.

5                 MR. KAMENS:  I just mentioned it to the government now,

6    so --

7                 THE COURT:  That's fine.  You can raise it later.  I'm

8    certainly not inclined, and I did not understand Mr. Kamens to be

9    asking, to admit the entire large item, but to the extent he's

10   asking for that one paragraph where those particular lines were

11   discussed be admitted and the government doesn't object, I'd

12   permit a redacted version of 15-2A to be admitted, but you can

13   address that to me jointly after you've had a chance to think

14   about it.

15                Are there any other issues that either side needs to

16   raise?

17                MS. BEDELL:  No, Your Honor.

18                MR. KAMENS:  No, Your Honor.

19                THE COURT:  I am hopeful, and, maybe, unrealistically

20   so, that, perhaps, we'll be able to move to the rest of this case

21   and get to the jury instructions sooner rather than later.  I

22   will have jury instruction for you to review.  I've looked at,

23   carefully, your briefs and the disputed instructions.  We've also

24   looked very carefully at the joint instructions, and I will be

25   giving the bulk of them, but there are some changes, but

*Proceedings*

1    stylistic and substantive, that I've made and I want you-all to

2    be aware of those.

3           I believe that, perhaps, we've sent a verdict form.  If

4    not, we will do so this morning.  Again, this is a very simple

5    case, so I don't imagine there will be controversy about that.  I

6    don't know whether the parties have asked or considered whether

7    or not some version of the indictment should go back with the

8    jury; but if so, then I wanted to address that, because it would

9    obviously have to be redacted in an appropriate way.  I'm not

10   suggesting that it should or shouldn't.  I just want to think

11   about it in the event that either the jury asks about it or the

12   parties believe that it should go back in some form, because it

13   will need to be redacted if that's the case.  So you-all can talk

14   about that and get back to me on it.

15          Let me thank our interpreters who are here with us this

16   morning.  They remain under oath from the beginning of the trial,

17   so we don't need to put them under oath again.

18          We're missing one juror.  Let me just think about any

19   other matters.  I saw the updated witness list, so as I

20   understand it, after Agent Shi is finished, there are two more

21   law enforcement officers that will make up the government's case

22   in chief, and then we'll see whether the defense wishes to

23   present any evidence in their case.

24          I'm also going to want the parties to confer about what

25   exhibits have come in with each other and then with Ms. Creek so

*Proceedings*

 1   that we have no confusion before the government rests as to

 2   exactly what's coming in and what is not.

 3            MS. BEDELL:  Your Honor, do you send an exhibit list

 4   back with the jury?  Is that something that you consider?

 5            THE COURT:  Well, again, that's not a bad idea.  My

 6   view is that anything that helps the jury sift through an

 7   enormous amount of material will be helpful, but you would have

 8   to provide an updated and redacted index, which I would want

 9   you-all to confer on before that.

10            MS. BEDELL:  Yes, Your Honor.

11            MR. KAMENS:  We're certainly not opposed to an index as

12   long as there's not substantive information in the titles that

13   would --

14            THE COURT:  And to be clear with the parties, my

15   practice is to give the jury instructions prior to closing

16   arguments so that you have the opportunity to, essentially, have

17   the last word with the jury.  I'll give some very final

18   instructions about picking the foreperson and the standard

19   language, but I will give the bulk of the instructions prior to

20   closing arguments.

21            MR. KAMENS:  Understood.

22            THE COURT:  We're missing one juror.  It's just nine

23   o'clock now.  If you can have Agent Shi available and ready to

24   start, I'll take a brief recess; and as soon as the final juror

25   is here, we'll bring them in.

*Proceedings*

1              Court will be in recess.

2              (Whereupon, a recess in the proceedings occurred from

3      9:03 a.m. until 9:05 a.m.)

4              (Whereupon, the witness takes the stand.)

5              THE COURT:  You may bring in the jury.

6              (Jury in at 9:06 a.m.)

7              THE COURT:  Good morning, ladies and gentlemen of the

8      jury.  Welcome back.  Thank you for coming early.  We appreciate

9      it.  We handled some preliminary matters, and we'll take up the

10     testimony of Agent Shi in one moment.

11             Let me first confirm that you were able to follow all

12     of the instructions of the Court, and that between last night and

13     this morning, you did not discuss the case with each other or

14     with anyone else; that you did not conduct any independent

15     research on the internet or learn anything about the case and

16     otherwise follow the Court's instructions; is that correct?

17             I see you are all nodding your heads.  Thank you very

18     much.

19             Hopefully, we'll be able to get through a lot today,

20     and we appreciate your patience and your devotion to this matter.

21             Are the parties ready to proceed?

22             MS. BEDELL:  Yes, Your Honor.

23             THE COURT:  Agent Shi, you remain under oath, and

24     counsel may continue direct examination.

25     /////

*Shi - Direct - Schwartz*

1      (JEFFREY SHI, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN)

2              CONTINUED DIRECT EXAMINATION

3    BY MS. SCHWARTZ:

4    **Q.**    Good morning, Special Agent Shi.

5    **A.**    Good morning.

6    **Q.**    I would like to direct your attention back to

7    Exhibit 15-2B, page 14.  So towards the bottom of page 14, you

8    mentioned earlier that you asked him repeatedly when he stopped

9    working with others; is that correct?

10   **A.**    I did.

11   **Q.**    And directing your attention to lines 564 through 566 and

12   then line 568, what was his response?

13   **A.**    [As read]:  Zhu:  When I first got there about two months

14   ago, I decided not to do it.  I started to refuse to do it

15   because he said -- for the first month after I got there, he

16   said he'd give me the money, but he didn't.  He said he would

17   give me the next month.  Then later, still no money.  I said I

18   would not do it.

19          Shi:  Mhm, it was during -- during October to

20   November 2022?

21          Zhu:  Yes, yes.  They promised the money, but they ended

22   up not giving me the money.  I then said I will not do it.

23   **Q.**    Directing your attention to the top of page 15, did you

24   ask him anything about his living arrangements while he was in

25   Los Angeles?

*Shi - Direct - Schwartz*

1   **A.**     I did.

2   **Q.**     What did he tell you?  I direct you to line 603.

3   **A.**     He told me that the people he worked with paid his rent.

4   **Q.**     And directing you to the middle of the page, did you ask

5   him during the interview how he communicated with the people he

6   was working with?

7   **A.**     I did.

8   **Q.**     And how did he tell you he communicated with them?

9   **A.**     He told me he communicated with them through WeChat,

10  which is a Chinese social media messaging app.

11  **Q.**     Did he say whether he still had the WeChats between him

12  and the people he was working with?

13  **A.**     He told me he deleted the chats.

14  **Q.**     Did he say they communicated in other ways besides

15  WeChat?

16  **A.**     He did.

17  **Q.**     And directing you to the bottom of page 15, lines 683 to

18  686, what did he say -- what other means did he say they used to

19  speak?

20  **A.**     He told me that they sometimes talked over the phone.

21  **Q.**     Directing you to the top of page 16, did you ask him

22  about the two businesses he opened and whether he had ever

23  performed services for those businesses?

24  **A.**     I did.

25  **Q.**     And directing you to line 722, what did he say?

11

*Shi - Direct - Schwartz*

1   **A.**     "Never."

2   **Q.**     And 724?

3   **A.**     "Never."

4   **Q.**     At the bottom of page 16, can you characterize what these

5   few lines -- what you're discussing with him in these few lines?

6   **A.**     I asked him whether he thought it was normal to open a

7   business, labeling as a business in construction but not

8   actually performing any construction work with these businesses.

9   I asked him whether or not he thought it was -- it was an odd

10  thing, a wrong thing to do, and he told me that, at first, he

11  didn't know; but, later, he realized it was wrong and stopped

12  doing it, and he stopped because he wasn't getting the money

13  that he was promised.

14  **Q.**     And can you read line 737?

15  **A.**     "Zhu:  Later, I realized I didn't get the -- later, I

16  realized that this was not a legitimate thing.  Later -- they

17  didn't give me the money.  I didn't get any money."

18  **Q.**     Directing you to the top of page 17, did you ask him

19  about whether after that October/November time frame he's

20  mentioned repeatedly, whether he worked with them at all again?

21  **A.**     I did.

22  **Q.**     What did he say?

23  **A.**     He said after November -- October to November of 2022, he

24  opened one more bank account because he was promised $5,000.

25  **Q.**     And directing you to the bottom of page 17, did he say

*Shi - Direct - Schwartz*

1   whether he got that $5,000?

2   **A.**     Yes.  He never got the $5,000.

3   **Q.**     And can you read lines 786 through 789?

4   **A.**     "Shi:  Isn't it -- you just told us that in 2022, around

5   October and November, when you realized that the business, the

6   thing you were doing, was against law, illegal, right?

7          Zhu:  Right.

8          Shi:  So, then why did you wait another few months before

9   helping them again, helped them do it a couple of times?  Oh,

10  they gave you that $5,000.

11         Zhu:  He said -- he said he would give me the money.  But

12  he waited so long, he never gave me -- never give me money."

13  **Q.**     So, generally, during this interview, about how long was

14  it?  How long were you speaking with Mr. Zhu?

15  **A.**     It was approximately two hours.

16  **Q.**     And over that two hours, how would you characterize your

17  interactions with him?

18  **A.**     I would say the defendant was polite and respectful,

19  smart and well spoken.  I would say he was being truthful with

20  me in some things, such as when he told me that he was recruited

21  by people higher up to commit the fraud, and that they scammed

22  him and didn't pay him the full money he was promised.  I don't

23  think he was being as truth- --

24         MR. NI:  Objection; speculation.

25         THE COURT:  Sustained.

*Shi - Cross - Ni*

1   BY MS. SCHWARTZ:

2   **Q.**     At any point, did you show the defendant a picture of

3   anyone you believed him to be working with?

4   **A.**     I did.

5   **Q.**     I would now like to show you what's been admitted as

6   Government's Exhibit 16-18.

7              MS. SCHWARTZ:  If we could publish that.

8              (Exhibit published.)

9   BY MS. SCHWARTZ:

10  **Q.**     Is this the photo you showed him?

11  **A.**     It is.

12  **Q.**     And was he able to identify who the person in the photo

13  was?

14  **A.**     He was.

15  **Q.**     What did he say about the person in the photo?

16  **A.**     He identified the individual to be one of the people who

17  recruited him and who worked with him.

18             MS. SCHWARTZ:  Nothing further, Your Honor.

19             THE COURT:  Thank you.

20             Cross-examination?

21                      CROSS-EXAMINATION

22  BY MR. NI:

23  **Q.**     Good morning, Agent Shi.

24  **A.**     Good morning.

25  **Q.**     First, I want to talk about the picture that was just up

1   there.  When Hailong identified the man and said he knew him,

2   did he say what his name was?

3   **A.**     He did.

4   **Q.**     What was his name?

5   **A.**     I don't recall the Chinese name he identified himself as

6   at this moment, but it's on my report.

7   **Q.**     But was it -- did he identify him as Joseph Wong?

8   **A.**     He didn't.

9   **Q.**     Let's talk about the search of Hailong's house.  You only

10  found bank cards in his own name there; is that correct?

11  **A.**     I personally found bank accounts in his own name,

12  correct.

13  **Q.**     You didn't find bank cards in other people's names in his

14  possession?

15  **A.**     I can't speak to what my colleagues did, but I personally

16  didn't find those.

17  **Q.**     You only found identification in his own name; is that

18  correct?

19  **A.**     Yes, correct.

20  **Q.**     No fake passports?

21  **A.**     Not to my knowledge.

22  **Q.**     No fake IDs?

23  **A.**     Not to my knowledge.

24  **Q.**     You found no drugs?

25  **A.**     No.

*Shi - Cross - Ni*

1   **Q.**     You found no guns?

2   **A.**     No.

3   **Q.**     You found no bank statements of other people's bank

4   accounts?

5   **A.**     I personally didn't find any bank statements.

6   **Q.**     You testified earlier that Hailong told you that he

7   deleted all of his chats with Joseph Wong and blocked him when

8   they didn't pay him.  Did you review Joseph Wong's phones?

9   **A.**     I personally didn't review his phones.

10  **Q.**     You don't know whether or not the government has in its

11  possession Joseph Wong's WeChat records with Hailong, do you?

12  **A.**     I personally don't know.  You'd have to ask the case

13  agent.

14  **Q.**     Let's talk about your interrogation of Mr. Hailong.  You

15  were born in China, and you came here at the age of four; is

16  that correct?

17  **A.**     That's correct.

18  **Q.**     And you testified yesterday you were fluent in Chinese

19  and you speak at home regularly and you spoke it with your

20  parents; is that correct?

21  **A.**     Correct.  I testified that I'm conversationally fluent in

22  Chinese and I speak it at home.

23  **Q.**     And you can -- you attended Chinese language school for

24  ten years; is that right?

25  **A.**     Correct.

*Shi - Cross - Ni*

1   **Q.**     Where you learned to speak, read, and write; is that

2   correct?

3   **A.**     Correct.

4   **Q.**     And you can read and write Chinese today?

5   **A.**     No.  I'm a bit out of practice in reading and writing,

6   but I can speak Chinese.

7   **Q.**     If I were to put some Chinese language text in front of

8   you, would you be able to recognize some of it?

9   **A.**     I wouldn't be able to recognize the Chinese characters,

10  but I can read -- I can recognize and read Chinese pinyin, which

11  is a phonetic way of speaking Chinese, and it's the way that

12  people commonly type on their keyboards on their phone.

13  **Q.**     Understood.  Would you mind speaking up a little bit

14  more?  It's hard for me to hear you.

15  **A.**     Sure.

16  **Q.**     And if I were to read Chinese to you, just directly, you

17  would be able to understand it?

18  **A.**     Correct.

19  **Q.**     In your interrogation, it was obvious that Hailong does

20  not speak any English, correct?

21  **A.**     Little to no English, correct.

22  **Q.**     And you spoke to him exclusively fluent in Chinese?

23  **A.**     I'm sorry, can you repeat that?

24  **Q.**     And you spoke to him exclusively in Chinese?

25  **A.**     Yes, in Mandarin Chinese.

Shi - Cross - Ni

1   **Q.**     And you had no trouble understanding him?

2   **A.**     I could understand fine, for the most part.

3   **Q.**     You testified yesterday and today that he told you he was

4   being promised $70,000 but only got $20,000 -- that's page 7 of

5   Government's Exhibit 15-2B -- is that right?

6   **A.**     Correct.  That is correct, he was promised $70,000, but

7   he had got around $20,000.

8   **Q.**     And you testified that he told you they were telling him

9   that he would get paid in a month or so and didn't pay him --

10  that's lines -- at page 14 of Government's Exhibit 15-2B -- is

11  that right?

12  **A.**     I'm sorry, can you repeat?  You said that a little bit

13  fast.

14  **Q.**     So take a look at page 14 of Government's Exhibit 15-2B.

15  **A.**     Okay.

16  **Q.**     You testified that this was him telling you that the

17  people he was working with told him he would get paid in a month

18  or so, didn't pay him; is that right?

19  **A.**     Correct.

20  **Q.**     That's also on page 16, line 737 --

21  **A.**     Correct.

22  **Q.**     -- where he said, "Later, I realized -- I didn't get --

23  later, I realized that this was not a legitimate thing --

24  later -- they didn't give me the money, I didn't get any money,"

25  right?

*Shi - Cross - Ni*

1   **A.**      (No response.)

2   **Q.**      Do you understand that, essentially, what he was trying

3   to convey to you was that he was being scammed by these people

4   when he didn't get paid?

5   **A.**      I think these people did scam, but I think he was also

6   trying to get the money that they promised him.

7   **Q.**      Can you say again?

8   **A.**      I think these people did scam him by not giving him the

9   entirety of the money he was promised, but I also think that his

10  greed, he decided to open up more bank accounts even after the

11  fact he realized that this was the wrong thing to do; even after

12  the fact that he repeatedly sought reassurances from the people

13  he worked with that this was legal; even after the fact that the

14  people he worked with told him that, Hey, you will lose all

15  credibility with the banks if you do this, you will go bankrupt;

16  in the future, you will only be able to use cash.

17          So, yes, he was scammed, but I think, also, he kept

18  opening accounts because he wanted to get all the money he was

19  promised.

20  **Q.**      I want to zoom in on that a little bit.  So you believe

21  that he was scammed?

22  **A.**      I believe that he didn't get all the money that his

23  recruiters promised him.

24  **Q.**      Let's talk about your understanding that he continued to

25  do things for these people out of greed, you said, right, even

*Shi - Cross - Ni*

1    after he realized he was doing something illegal; that's your

2    understanding?

3    **A.**    Yes.

4    **Q.**    Maybe let's zoom in on lines 786 to lines 791.  Is this

5    an example of an exchange where you came to understand from the

6    exchange that he was admitting to knowing he was doing something

7    illegal?

8    **A.**    Yes.  This is when the defendant told me that around --

9    during October/November of 2022, he realized that what he was

10   doing was against the law.

11   **Q.**    And that's 786?

12   **A.**    Correct.

13   **Q.**    And 787?

14   **A.**    Correct.

15   **Q.**    Where in English -- well, the English transcription is --

16   you just told us that 2022, around October and November, when

17   you realized that the business, the thing you were doing, was

18   against the law, illegal, right?"

19          And your response, 787, is "Right"; is that correct?

20   **A.**    Correct.

21   **Q.**    You can't read the Chinese text, the transcription of

22   what you asked him, can you, in 786?

23   **A.**    I can't read the Chinese characters of what I asked him,

24   correct.

25   **Q.**    Can I read them to you?

1    **A.**     Yes.

2          MS. SCHWARTZ:  Objection, Your Honor.  This translation

3    was done by the linguist who was on the stand yesterday, and the

4    defense raised no objection to the way the linguist translated

5    what the conversation was, and so this is an inappropriate

6    question.

7          MR. NI:  Your Honor, he testified he speaks Chinese

8    fluently.  He was communicating with this guy.  He's using the

9    English translation, and I want him to read his own Chinese

10   statement to him.  He speaks Chinese.

11         THE COURT:  I'll overrule the objection, but we have to

12   stay focused on asking questions and answering questions.  So if

13   you have a question, ask it; if he can answer it, he'll answer

14   it.

15         MR. NI:  I won't translate the Chinese text.

16   BY MR. NI:

17   **Q.**     So, Agent Shi, I'm going to read exactly what you said to

18   him in Chinese to you, and you tell me if the words "the thing

19   you were doing" is in the Chinese.

20         (Foreign language spoken.)

21   **A.**     I'm sorry, are you reading from the very beginning?

22   because in the beginning, it says (foreign language spoken).

23   Are you reading my -- are you reading from the very beginning,

24   or are you starting from the middle somewhere?

25   **Q.**     So you can read it?

1  **A.**     I can read some characters here and there.

2  **Q.**     I'll work with you.

3  **A.**     Okay.

4  **Q.**     I'll start at the beginning.  (Foreign language spoken).

5       So my question is, in the section that corresponds to

6  "the thing you were doing," is the words "the thing you were

7  doing" in there?

8  **A.**     It is.

9  **Q.**     How is it in there?

10  **A.**     It's in here because I said (foreign language spoken),

11  (foreign language spoken), which means "the thing."  That's what

12  (foreign language spoken) means.  It means "the thing,"

13  referring to the fraud that he was committing.

14  **Q.**     Is the word "you" --

15       MS. SCHWARTZ:  Objection, Your Honor.  Our agent is not

16  the one that we certified as a linguist.

17       THE COURT:  I'm going to sustain the objection.  This

18  is not going to be a Chinese language lesson for the jury.  We

19  need to focus on what we're doing here at the trial.

20       You can continue, Mr. Ni.

21       Objection sustained.

22  BY MR. NI:

23  **Q.**     Let me skip to something that's, perhaps, a little more

24  straightforward.  You testified that the text between 786

25  through 791 meant that he was admitting to doing something

*Shi - Cross - Ni*

1    illegal, is that right; he kept doing it because --

2    **A.**    I asked him if he realized what he was doing was illegal

3    during October/November 2022, if it was illegal, why he

4    continued opening up bank accounts for his recruiters after that

5    date when he realized it was wrong, and he said it was because

6    they promised him $5,000.

7    **Q.**    Can you take a look at Government's Exhibit 15-2A,

8    please, the complete transcript?

9           THE INTERPRETER:  Is the exhibit on the monitor?

10          THE COURT:  Are you asking about the exhibit?

11          THE INTERPRETER:  Yes.

12          MS. SCHWARTZ:  We would object to that being shown,

13   Your Honor.  It hasn't been admitted into evidence.

14          THE COURT:  No, no, I think the interpreter just wants

15   to make sure she's understanding what's happening.  And I'm not

16   sure what's happening either, so it's a good question.

17          Does the interpreter need a copy of this exhibit,

18   Mr. Ni?

19          MR. NI:  Maybe.  I don't know if it's better for her to

20   translate, but I guess not.  I'll just read from it.

21          THE COURT:  Well, that's improper.  Go ahead and ask

22   your question and see whether there's anything that can be done

23   here.

24   BY MR. NI:

25   **Q.**    Mr. Shi, would you mind looking at -- the government's

1   exhibit ends at line 791; is that right?

2   **A.**    I'm not on that page, but if you say so.

3   **Q.**    It's page -- it's the last page of -2B.

4   **A.**    Yes, 791.

5   **Q.**    And you said -- you testified that that segment of the

6   interrogation revealed to you that he admitted that he knew what

7   he was doing at the time was illegal.

8   **A.**    Yes, he admitted to me that he knew what he was doing was

9   wrong.

10   **Q.**    And if you take a look at page 68 of the full transcript,

11   literally, the next line, can you -- the next two lines

12   immediately following 791, where the government's transcript

13   ends.  My question is, didn't you explicitly ask him if he knew

14   what he was doing was illegal?

15   **A.**    Which line are you referring to?

16   **Q.**    792 and 793.

17   **A.**    792, I asked him if he knew it was illegal.

18   **Q.**    Yeah, so can you read those two lines for me?

19           MS. SCHWARTZ:  Objection, Your Honor; this is hearsay.

20           MR. NI:  Your Honor --

21           THE COURT:  Ask your question directly and let him

22   answer it directly.  If the point you're trying to make is that

23   the government has chosen to stop at one point and there's

24   something else that's relevant that happened later, just ask the

25   question.  We don't need to go through what's on the paper.

1          MR. NI:  Understood.

2    BY MR. NI:

3    **Q.**    Mr. Shi, didn't you ask him explicitly whether he knew

4    what he was doing was illegal, and didn't he deny it to you?

5          MS. SCHWARTZ:  Objection, Your Honor.  His response

6    would be hearsay.

7          THE COURT:  Overruled.

8          THE WITNESS:  I asked him at the start of the interview

9    whether or not he knew what he was doing was illegal and wrong.

10   He said, I didn't know that was illegal at first, but after,

11   during October/November 2022 when I wasn't being paid the money,

12   he knew what he was doing was wrong, he knew something was wrong,

13   but he continued to open more bank accounts because he wanted the

14   money that he was promised; he wanted the money that they said

15   that they would give him but that they didn't.

16   BY MR. NI:

17   **Q.**    Mr. Shi, my question is very limited to where the

18   government's transcript ends and the next two lines immediately

19   afterwards where the government's transcript ends.  Did you or

20   did you not ask him explicitly whether he knew what he was doing

21   was illegal, and didn't he deny it; yes or no?

22   **A.**    I asked him if he knew it was illegal, and he said, No, I

23   didn't know at the time.

24   **Q.**    I want to go back to your overall understanding that he

25   was trying to communicate he knew something was wrong and still

1    did it anyway for money.  Earlier, you testified you had no

2    trouble understanding him at all; is that right?

3    **A.**    I didn't say I had no trouble.  I said that I could

4    understand him fine, for the most part.

5    **Q.**    But didn't you say in the transcript -- when you were

6    interrogating him, you said to him that, I'm sorry, my Chinese

7    is not very good, didn't you?

8    **A.**    Which line are you referring to?

9    **Q.**    You said it a couple of times:  Line 83, page 10, and

10   line 211, page 20.

11   **A.**    I did.  I do recall telling him that my Chinese isn't the

12   best, isn't that of a native speaker, but we were able to

13   understand each other just fine, and we went back and forth and

14   were able to understand each other.

15   **Q.**    And didn't you conclude, even while you were

16   interrogating him, that you couldn't nail down whether or not he

17   was saying he knew he was doing something illegal?

18   **A.**    I don't recall, but which line are you referring to?

19   **Q.**    Can you take a look at line 796, please, of the

20   transcript, just the next page after -- page 69; do you see

21   that?

22   **A.**    I do.  I'm reading it.  Yes.

23   **Q.**    So my question is, right after that exchange where you

24   asked him if he knew what he was doing was illegal, and he said

25   no, you concluded on the transcript that you couldn't nail him

Shi - Cross - Ni

1    down with this issue; isn't that right?

2    **A.**    I believe what you are referring to is -- this was after

3    he admitted to me that he realized during October/November of

4    2022, he realized that what he was doing was wrong and that it

5    was illegal; and then when I asked him, Hey, if you knew during

6    this time it was illegal, how come afterwards, you kept on still

7    opening up bank accounts?  And then he told me, I didn't know it

8    was illegal.  So he backtracked on his initial answer, and so we

9    went back and forth on that a few times, and that's when I told

10   my colleague Chris, Hey, we have to nail down the timeline, we

11   have to nail down why he keeps on contradicting himself.  I

12   think that's what you are referring to in that line.

13   **Q.**    Mr. Shi, did you prepare for your testimony with the

14   U.S. Attorney's Office?

15   **A.**    I did.

16   **Q.**    And during your preparation, did they tell you that the

17   linguist that translated your interrogation identified a

18   critical fundamental misunderstanding between you and Hailong

19   during your interrogation?

20   **A.**    I wasn't aware of that.

21   **Q.**    So the U.S. Attorney's Office never told you that the

22   linguist had identified an issue?

23   **A.**    Identified critical -- a critical language issue?  I

24   wasn't aware of that.

25   **Q.**    Yes.  I don't know if you can remember this, but I can

1    show you the email where he identifies it.

2    **A.**    Sure.

3           MS. SCHWARTZ:  Objection.  I don't even know what he's

4    showing.

5           MR. NI:  Sorry, I'm giving a copy to --

6           THE COURT:  Are you refreshing his recollection?

7           MR. NI:  Your Honor, yes.

8           MS. SCHWARTZ:  Objection, Your Honor.  First, I would

9    just like to see it before he's handed it and, perhaps, a second

10    of the Court's indulgence just to review what he's looking at.

11           THE COURT:  All right.

12           (Whereupon, there was a brief pause in the

13    proceedings.)

14           MS. SCHWARTZ:  Objection, Your Honor.  This document

15    he's trying to refresh recollection never went to the witness, so

16    it's an improper tool to refresh his recollection because he's

17    never seen it.

18           THE COURT:  Well, refreshing recollection can be done

19    by anything.  That objection is overruled.  It may not succeed in

20    refreshing his recollection, but it's not improper to give him

21    the opportunity to look at it.

22    BY MR. NI:

23    **Q.**    So, Mr. Shi --

24           THE COURT:  All right; let's keep this moving, Mr. Ni.

25    Your next question is, does that document refresh your

*Shi - Cross - Ni*

1    recollection?

2    BY MR. NI:

3    **Q.**    Mr. Shi, does this document refresh your recollection

4    about the fundamental misunderstanding between you two?

5    **A.**    I've never seen that document.

6            MS. SCHWARTZ:  Your Honor, if I may, I think counsel is

7    referring to the paragraph that we talked about before,

8    paragraph --

9            THE COURT:  There's no pending question.  Is there an

10   objection?

11           MS. SCHWARTZ:  No, Your Honor.

12           THE COURT:  Mr. Ni, ask your next question.

13   BY MR. NI:

14   **Q.**    So, Mr. Shi, when you went to interview Hailong, he

15   agreed to speak with you voluntarily, right?

16   **A.**    He did.

17   **Q.**    And he sat with you for over an hour and a half?

18   **A.**    Correct.

19   **Q.**    He was cooperative?

20           THE INTERPRETER:  The interpreter did not hear the

21   question.

22           MR. NI:  Oh.  He sat with you for an hour and a half?

23           THE WITNESS:  Correct.  Close to two hours, we talked.

24   BY MR. NI:

25   **Q.**    He was cooperative?

1    **A.**    He was.

2    **Q.**    He admitted that he opened accounts?

3    **A.**    He did.

4    **Q.**    He admitted that he used his own name to do so?

5    **A.**    He did.

6    **Q.**    He admitted that he went to Las Vegas and gambled with

7    these people?

8    **A.**    He did.

9    **Q.**    He admitted that he withdrew money and gave it to others?

10   **A.**    Yes.

11   **Q.**    All that is true, correct?

12   **A.**    Correct.

13   **Q.**    He also told you he wasn't being paid what he was

14   promised?

15   **A.**    Correct.

16   **Q.**    You understood that -- and, in fact, you believed that he

17   was scammed?

18   **A.**    I believe that he wasn't given the money that they

19   promised him.

20   **Q.**    But in questioning Hailong, you never asked him whether

21   he knew where the money came from that was deposited into his

22   accounts, correct?

23   **A.**    I don't believe I asked that question.  If I did, he

24   probably told me he did not know where the money came from, the

25   money that they handed him to deposit.

Shi - Cross - Ni

1    **Q.**    So your testimony is that if you asked him, he wouldn't

2    have told you where it came from because he didn't know?

3    **A.**    I believe I might have asked him that question.  I

4    believe his response -- I will have to review the record, but I

5    believe his response was, I didn't know where the money came

6    from.

7                MR. KAMENS:  Court's indulgence.

8                (Whereupon, there was a brief pause in the

9    proceedings.)

10   BY MR. NI:

11   **Q.**    You testified earlier that Hailong identified Joseph Wong

12   by the name Joseph Wong?

13   **A.**    I don't believe so.  I believe he referred to

14   Joseph Wong's Chinese name.

15   **Q.**    So you are correcting earlier testimony; he never

16   identified Joseph Wong as Joseph Wong?

17   **A.**    I'm not correcting it.  I told you initially that he

18   identified the individual in the photo who he knows to be

19   Joseph Wong by his Chinese name.

20   **Q.**    And do you recall what that Chinese name was?

21   **A.**    I do not, but it's in my report.  Might have been

22   (foreign language spoken), I believe, but it's in my report.

23   **Q.**    Was it Zhen He, Z-H-E-N H-E?

24   **A.**    That sounds correct, Zhen He, I believe.

25   **Q.**    But he didn't identify him by the name Joseph Wong?

1    **A.**     He did not.

2           MR. NI:  No further questions.

3           THE COURT:  Any redirect?

4           MS. SCHWARTZ:  No, Your Honor.

5           THE COURT:  Thank you.

6           And is Agent Shi released at this time?

7           MS. SCHWARTZ:  Yes, Your Honor.

8           THE COURT:  Agent Shi, you may step down.  You are now

9    released and free to go.

10          You may call your next witness.

11          (Whereupon, the witness exits the stand.)

12          MS. BEDELL:  The government calls Richard Cruz, Your

13   Honor.

14      (RICHARD CRUZ, ON BEHALF OF THE GOVERNMENT, SWORN)

15          (Whereupon, the witness takes the stand.)

16                        DIRECT EXAMINATION

17   BY MS. BEDELL:

18   **Q.**     Good morning.

19   **A.**     Good morning.

20   **Q.**     Could you please state your name and spell it for the

21   record?

22   **A.**     Yes.  It's Richard Cruz, R-I-C-H-A-R-D; Cruz, C-R-U-Z.

23   **Q.**     Where are you employed?

24   **A.**     I'm employed with the United States Secret Service.

25   **Q.**     How long have you worked for the Secret Service?

*Cruz - Direct - Bedell*

1    **A.**     Since 2018.

2    **Q.**     What is your title there?

3    **A.**     Network intrusion forensic analyst, otherwise known as a

4    NIFA.

5    **Q.**     Are you assigned to a particular unit?

6    **A.**     I currently work out of Chicago in our digital evidence

7    forensic laboratory.

8    **Q.**     For how long have you been assigned there?

9    **A.**     Since 2021.

10   **Q.**     Where were you prior to that?

11   **A.**     I was here in D.C. at the WFO, the Washington Field

12   Office.

13   **Q.**     What work did you do prior to working for the Secret

14   Service?

15   **A.**     I was employed with the Michigan State Police.  I was a

16   road trooper in 1995.  I worked five years as a road trooper,

17   and then I assisted standing up our computer crimes unit.  That

18   occurred in the year 2000.  And from 2000 to 2018, I was

19   assigned to that cyber -- that computer section.

20   **Q.**     You stated that you are a NIFA; what does that job

21   entail?

22   **A.**     It's a digital forensic analyst.  It's the extraction

23   processing and analyzing of data.

24   **Q.**     Do you receive training for that role?

25   **A.**     Yes.

*Cruz - Direct - Bedell*

1   **Q.**     What's that?

2   **A.**     My training began in 2000.  Since then, I have attended

3   numerous trainings, thousands of hours in data extraction,

4   processing, analysis of phones, computers, vehicles, et cetera.

5   **Q.**     Are you familiar with the system GrayKey?

6   **A.**     I am.

7   **Q.**     And what is that?

8   **A.**     It is a data extraction device.

9   **Q.**     And what sort of data are you extracting from what?

10  **A.**     From GrayKey, we'll extract data from iPhones and Android

11  phones.

12  **Q.**     And how do you use GrayKey?

13  **A.**     It's rather easy.  You connect the device to GrayKey.

14  GrayKey detects what's connected to it and advises what you can

15  do with that device.  There are different types of extractions

16  you can do depending on the phone that you have, and you select

17  the type of extraction that you want, and it extracts the data

18  and places that data in a file that we can then use to process.

19  **Q.**     Okay.  And does GrayKey let you know if the extraction

20  was successful?

21  **A.**     It does.  If there's an issue or an error, there's a log

22  file.  There's visual queues on the screen.  It will advise you

23  that there were issues, yes.

24  **Q.**     When GrayKey generates its extraction, is that readable

25  to a human?

*Cruz - Direct - Bedell*

1   **A.**    It is not.  There's stuff that is readable, but it's not

2   very friendly in terms of looking at it and really knowing what

3   you're looking at.

4   **Q.**    So once you have that extraction, what do you do to make

5   it more user friendly?

6   **A.**    Once we have the data extraction, we use something to

7   process it, either like Magnet AXIOM or Cellebrite's physical

8   analyzer.

9   **Q.**    And Magnet AXIOM and Cellebrite, do those work similarly?

10  **A.**    They do, yes.

11  **Q.**    And how do they work?

12  **A.**    They work in the sense that you point the application at

13  a data extraction; it reads the data extraction; it ingests it;

14  it detects what's there; and it parses data that it knows what

15  to look for, for example, digital images or text messages or

16  phone calls.  It parses that information out, and then it puts

17  it in a human readable format to be able to review.

18  **Q.**    Do they have methods for confirming the accuracy of their

19  parsing?

20  **A.**    They do.  There are, again, visual queues if there are

21  issues.  Part of the process as well is hashing the data.  When

22  we perform the original extraction, there's a calculation that's

23  made on that data, and it's a very large alpha numeric number.

24  And when it's finished, it provides that to the examiner, and we

25  use that to ensure the integrity of that data.  At any time, we

*Cruz - Direct - Bedell*

1    should be able to run that data through a program and be able to

2    retrieve that same hash value.  That just ensures to us that

3    that data has never changed from the point that we took the

4    extraction to today.

5    **Q.**    If there is an error, what does the program return?

6    **A.**    Again, a lot of times, it will be a visual queue.  If

7    it's unable to parse something at times, it will just not

8    include it in the report.  It just won't be something that you

9    see.

10   **Q.**    But it won't just make up data?

11   **A.**    No, it does not make up data, no.

12   **Q.**    Do you have any experience imaging and analyzing SIM

13   cards?

14   **A.**    I do.

15   **Q.**    What is a SIM card?

16   **A.**    A SIM card is a -- it's a small electronic card that is

17   used in mobile devices, and it contains information which allows

18   that mobile device to connect to a cellular network.

19   **Q.**    Which would you use to image a SIM card?

20   **A.**    Usually, I would use UFED 4PC.

21   **Q.**    Can you explain the process for analyzing a SIM card?

22   **A.**    It's much like a phone.  We have a reader which is

23   connected to a computer that is running the Cellebrite software;

24   connect the SIM into the reader.  Cellebrite detects that the

25   SIM card is present.  It reads the data from the SIM and places

1    it in a folder.  Unlike the data from the phone, which has to be

2    processed and put in human readable form, the process of looking

3    at the data from a SIM, it's seamless.  It reads the data, and

4    it places it into a human readable format for you right away.

5    **Q.**    What kind of data can you retrieve from a SIM card?

6    **A.**    You can retrieve -- there's a unique number assigned to

7    the SIM, known as an ICCID.  There's information such as that.

8    There's what's called an MSISDN, which is a multi [*sic*] station

9    international subscriber directory number, otherwise known as a

10   telephone number.

11           MS. BEDELL:  Your Honor, the United States now moves to

12   qualify NIFA Cruz as an expert in instructing, parsing, and

13   analyzing data from cell phones and SIM cards.

14           MR. WENSTRUP:  No objection, Your Honor.

15           THE COURT:  He would be so qualified without objection.

16   BY MS. BEDELL:

17   **Q.**    I would like to move to discussing the present case; how

18   did you come to be involved in this case?

19   **A.**    I was in the office, and I was asked if I would be

20   available to extract data from a phone.

21   **Q.**    And what role have you played in the case then?

22   **A.**    It was that exactly:  Receiving the phone, extracting the

23   data from the phone, placing it into a human readable format,

24   placing that on a -- and turning that back over for the

25   investigators.

1    **Q.**    So once you created the extraction in a readable format

2    of the extraction, did you review that extraction yourself for

3    the phone?

4    **A.**    Yes.  I browsed through it and made sure that there were

5    no issues with it.  I don't want to hand something off to an

6    investigator that they can't get into in case there are issues.

7    So, sure, I did, yes.

8    **Q.**    So quality control, but not substantive review?

9    **A.**    Yes.

10   **Q.**    Did you review the report for the SIM cards in this case?

11   **A.**    Yes, I did, yes.

12   **Q.**    Could you take a look at Exhibits 9-1 and 9-5, which are

13   actually together?  I'm sorry, it's a physical object -- I'm

14   sorry, a cell phone, physical object.

15        Do you recognize these items?

16   **A.**    I recognize the bag.  Yes, this is the phone which I

17   extracted data from that day.

18   **Q.**    And how do you recognize it?

19   **A.**    I photographed the phone.  I recall the phone, the case,

20   the SIM card on the case; and the label that's on the phone was

21   placed there by myself.

22   **Q.**    So is there -- does the phone currently have a SIM card

23   or SIM cards associated with it?

24   **A.**    Yes, there would be a SIM card in it, and there's another

25   SIM card on the back of the case.

*Cruz - Direct - Bedell*

1    **Q.**    And when you received that SIM card that's not inside the

2    phone, where was that when you --

3    **A.**    When I received the phone, the phone was just a phone.

4    Our analysis requires us to remove the SIM card that's in the

5    phone, and I did that; and what I had noticed was, between the

6    phone itself and the case, this SIM card was between the phone

7    and the case.

8    **Q.**    And did you create extractions of this phone and those

9    SIM cards?

10   **A.**    Yes, I did.

11   **Q.**    And you used the processes for imaging phones and SIM

12   cards that you discussed earlier?

13   **A.**    Yes.

14   **Q.**    And were you able to identify the phone numbers

15   associated with these two SIM cards?

16   **A.**    I did, yes.

17   **Q.**    And what were they?

18   **A.**    One telephone number was 1 (312) 493-4646, and the other

19   telephone number was 1 (773) 828-1816.

20   **Q.**    Okay.  I'd like to direct you to a report for another one

21   of the phones seized in this case.

22          MS. BEDELL:  Your Honor, at this point, I would like to

23   read one of the paragraphs from one of our stipulations.

24          "The following exhibits are true and accurate

25   depictions of data extracted from the iPhone 12 Pro Max at

*Cruz - Direct - Bedell*

1    Exhibit 5-1, through the use of GrayKey, a reliable forensic

2    access tool, that extracted data from the cell phone."

3          Those exhibits are 5-2, 5-3, 5-4, 5-5, 5-7, 5-9, and

4    5-15.  At this point, I would move to admit those exhibits.

5          THE COURT:  Any objection?

6          MR. WENSTRUP:  No objection.

7          THE COURT:  They will be admitted without objection.

8          (Government's Exhibit Nos. 5-2, 5-3, 5-4, 5-5, 5-7, 5-9

9    and 5-15 received in evidence.)

10   BY MS. BEDELL:

11   **Q.**    Could we take a look then at Exhibit 5-2?  That's in the

12   binder.  And what is this document?

13   **A.**    This is what is produced from Cellebrite.

14   **Q.**    And what phone is this report -- this particular report

15   for?

16   **A.**    This is for an iPhone 12 Pro Max.

17   **Q.**    Now, to clarify, you did not create the image of this

18   phone?

19   **A.**    I did not.

20   **Q.**    But you're familiar with these reports?

21   **A.**    I am.  This is produced by Cellebrite.  Yes.

22   **Q.**    And so you're familiar with the data that's generally in

23   these reports?

24   **A.**    Yes, I am.

25   **Q.**    And so does this look to you like a fairly typical type

*Cruz - Direct - Bedell*

1   of report for this phone?

2   **A.**      Very.

3   **Q.**      Do you see on this report that, when it provides a time,

4   it says UTC+0?

5   **A.**      Yes.

6   **Q.**      What does UTC mean when it appears in front of data?

7   **A.**      UTC is a universal coordinated time, otherwise a

8   Greenwich Mean Time.  Here, what where we are right now, we're

9   in the eastern time zone.  We're currently four hours from UTC.

10  This means that there has been no alteration made to the dates

11  and times in this report; that they are UTC time.

12  **Q.**      Further down the page, it lists MSISDN, you testified

13  that that's essentially the phone number?

14  **A.**      Yes.

15  **Q.**      So this is assigned to a SIM card and not a phone, just

16  in general, the MSISDN?

17  **A.**      Yes.

18  **Q.**      And is it possible to tell if a device has used multiple

19  SIM cards?

20  **A.**      Yes.  The software -- again, depending on the make and

21  model of the device.  But, yes, the phone will store that

22  information, and the software that we use will read that

23  information and provide that to you in the report, the

24  additional telephone numbers that that phone has used.

25  **Q.**      Taking a look at the heading "physical SIM," there's a

*Cruz - Direct - Bedell*

1   line MSISDN a little bit above that and a couple below, is that

2   an indication -- with different numbers -- is that an indication

3   that this phone has used multiple SIM cards at different times?

4   **A.**    Yes.

5   **Q.**    I will just ask you some general questions about the sort

6   of data that might be pulled from a phone.

7         Let's say that you locate a picture that was on a phone,

8   how can you know where the picture was stored on that device?

9   **A.**    There will be a folder system or -- the file would have a

10  name.  The file itself will be in a folder.  And so when the

11  data is parsed and the information about that photo is provided,

12  it will be part of a file name and within a folder naming

13  convention.

14  **Q.**    What does DCIM indicate if it is in that file path?

15  **A.**    That file path is a common file path for photos that have

16  been taken by that device.

17  **Q.**    And are there other ways that you might know if a photo

18  has been taken with a specific device that it was found on?

19  **A.**    Aside from where it's located, there's metadata within

20  that file.  You have the file itself; and in that file is data

21  for the image.  Well, with that is also metadata, and that

22  metadata will include information such as when the photo was

23  taken, the aperture setting of the phone, whether a flash was

24  used and fired off, the size -- the size of the actual photo

25  itself.  Sometimes you can get latitude and longitude and serial

*Cruz - Direct - Bedell*

1    numbers.  But, yeah, there's metadata as well as what took the

2    photo, whether it was an iPhone or an Android phone.

3    **Q.**     Could the name of the file give any indication about

4    whether it was likely taken with that device?

5    **A.**     It can be an indication, yes.  Different phones have

6    different methods of naming files, and the iPhone uses a

7    convention, and it names the images sequentially.  It begins --

8    I'm not sure what it begins with, but when it names it, it's

9    sequential.  You'll see img_1023, img_1024, img_1025.  So those

10   will be sequential.

11   **Q.**     And if an image or a video doesn't have this metadata

12   associated with it, what might that mean?

13   **A.**     It could mean -- it could mean several things.  One, it

14   could just be a format that doesn't have metadata, doesn't

15   provide metadata.  Many times when files are sent using

16   applications, like texting applications or any applications or

17   things over the internet, a lot of times, that metadata will be

18   stripped out for security and privacy.

19   **Q.**     And then backing up a second, if you see a file that

20   includes the file path SplashBoard/Snapshots, what does that

21   signal?

22   **A.**     That's -- on iPhones, when you're in an application and

23   you either close that application -- I'll use the term "swipe it

24   away" or "move it away," you get into another application or

25   even lock the phone.  The iPhone, the operating system will take

*Cruz - Direct - Bedell*

1    a snapshot of whatever application it was that they were using.

2    That's for user experience.  When you go and you look at your

3    open applications, rather than it showing you the actual

4    application, it will show you that snapshot, and then you can

5    see which one you want to get into.  You say, Okay, there's

6    where I want to get into, and you press it.

7         So it's a photo that's taken by the operating system, not

8    controlled by the user at all, taken by the operating system,

9    and it's just a snapshot of the way that that application

10   existed when you did something with it, got into another

11   application or whatever.

12   **Q.**    What is a .heic file?

13   **A.**    That is a -- it's an image file.  Apple started using it

14   a few models ago -- iPhone models ago, and it is very similar to

15   like a PMG or a JPEG image.  It's just another file format that

16   Apple uses, and it's capable of storing still images as well as

17   auto and video.

18   **Q.**    And what is a .mov file?

19   **A.**    A video file.

20   **Q.**    What might it mean if an image is labeled "recently

21   deleted"?

22   **A.**    When --

23             THE INTERPRETER:  Repeat.

24             MS. BEDELL:  What might it mean if an image is labeled

25   "recently deleted"?

*Cruz - Direct - Bedell*

**A.**     When a file is deleted, many times, it's not deleted right away; the phone will maintain that file, whatever has been deleted, and hang onto it.  And then at a time that it deems it wants to delete it, it will delete it.  So a recently deleted file is exactly that; it's a file which has been deleted, may or may not be accessible or visible to the user any longer.  The software detects that it's there and says it's recently deleted. At some point, the operating system will flush that file and delete that file for good.

**Q.**     Could that also appear if an application in which a file was found was deleted even if the file itself hadn't been specifically deleted?  Like, say, something was -- a text messaging app or a text message was deleted, would the images in it, maybe, have that marking?

**A.**     Yes.  When we store files on our phone, the operating system may take copies of that file and place it in different folders and do different things with it, but when the original is deleted or if the application is deleted, that file or a copy of that file, it may exist in different parts on the phone, so it will get flagged as deleted.

            MS. BEDELL:  No further questions at this time, Your Honor.

            THE COURT:  Thank you.

            Cross-examination?

            MR. WENSTRUP:  No, Your Honor.

1          THE COURT:  Very good.

2          You may step down, and you're released at this time.

3          (Whereupon, the witness exits the stand.)

4          MS. BEDELL:  Your Honor, at this time, we call Special

5     Agent Chris Saunders.

6          MR. KAMENS:  When does the Court plan to take a break?

7          THE COURT:  I thought maybe we could take a break a

8     little bit early since we started at 9:00, but, perhaps, we could

9     try and get through the direct examination or go till 10:30 or

10    10:45.  Is that agreeable?

11          (Jurors nod.)

12          MR. KAMENS:  Thank you, Your Honor.

13     (CHRISTOPHER SAUNDERS, ON BEHALF OF THE GOVERNMENT, SWORN)

14          (Whereupon, the witness takes the stand.)

15                      DIRECT EXAMINATION

16    BY MS. BEDELL:

17    Q.    Good morning.  Could you please state your name and spell

18    it for the record?

19    A.    Christopher Saunders, C-H-R-I-S-T-O-P-H-E-R

20    S-A-U-N-D-E-R-S.

21    Q.    Where do you work?

22    A.    At the United States Secret Service.

23    Q.    How long have you been with the Secret Service?

24    A.    About five years.

25    Q.    What is your title there?

*Saunders - Direct - Bedell*

1   **A.**    Special agent.

2   **Q.**    What unit are you assigned to?

3   **A.**    I'm out of our headquarters in the global investigative

4   operations center.

5   **Q.**    How long have you been with that unit?

6   **A.**    Close to two years.

7   **Q.**    What are your duties in that role?

8   **A.**    We support field offices with large cases and work cases

9   that have an international nexus.

10  **Q.**    Have you received training for your job?

11  **A.**    I have.

12  **Q.**    What's that?

13  **A.**    I've received basic law enforcement training at the

14  Federal Law Enforcement Training Center.  I've received Secret

15  Service training.  I've received training in cryptocurrency

16  through Chainalysis, and cyber training as well.

17  **Q.**    Where were you assigned prior to your current position?

18  **A.**    At the Washington Field Office with the Secret Service.

19  **Q.**    Where did you work before you joined the Secret Service?

20  **A.**    At Department of Commerce.

21  **Q.**    What is your educational background?

22  **A.**    I have an undergrad in accounting, a master's in

23  accounting, and I'm a CPA.

24  **Q.**    Are you the lead case agent assigned to this case?

25  **A.**    I am.

*Saunders - Direct - Bedell*

1   **Q.**     How did the Secret Service first become involved in this

2   case?

3   **A.**     Our field offices were receiving a lot of cryptocurrency

4   scam reports, and we got involved in investigation around some

5   of the fake websites.

6   **Q.**     Was there a particular website that came to your

7   attention relatively early in the process?

8   **A.**     Yes, there was.  The website was SIMEX, S-I-M-E-X.

9   **Q.**     Did you visit the SIMEX website?

10  **A.**     I did.

11  **Q.**     Did you engage in an undercover operation on that

12  website?

13  **A.**     I did.

14  **Q.**     Could you take a look at Exhibit 16-2, please?

15  **A.**     Okay.

16  **Q.**     Do you recognize this exhibit?

17  **A.**     I do.

18  **Q.**     What is it?

19  **A.**     This is the home page of one of the SIMEX fake websites.

20  **Q.**     And did you -- does the exhibit contain other images --

21  are there screenshots of other pages within that website?

22  **A.**     Yes, it does.

23  **Q.**     And are these screenshots a fair and accurate

24  representation of what the website looked like?

25  **A.**     They are.

1          MS. BEDELL:  At this point, we would move to admit and

2    publish 16-2.

3          MR. WENSTRUP:  No objection.

4          THE COURT:  Admitted without objection.

5          (Government's Exhibit No. 16-2 received in evidence.)

6          (Exhibit published.)

7    BY MS. BEDELL:

8    Q.    So what are we looking at here?

9    A.    This is the home page of the fake SIMEX website.  It

10   mimics the Singaporean international monetary change.

11   Q.    What is the website address here?

12   A.    This one is simexlua.com.

13   Q.    Were there other websites that had similar SIMEX-related

14   names?

15   A.    Yes, there were.  There were at least seven of them, and

16   they just changed last three letters, so they would have SIMEX

17   and then a different three letters, and they were all the exact

18   same website.

19   Q.    So taking a look at this screenshot, then, is there an

20   "about" tab here?

21   A.    There is.

22   Q.    And did you visit that tab?

23   A.    I did.

24   Q.    What did you find there?

25   A.    We found that this website had pulled language from the

*Saunders - Direct - Bedell*

1    Singaporean -- website.

2    **Q.**    So it was pulled from the real crypto -- website?

3    **A.**    Yes.

4    **Q.**    Did you visit the registration page on this page?

5    **A.**    I did.

6    **Q.**    Could we turn to page 2 of the exhibit?  And is this the

7    registration page?

8    **A.**    Yes, it is.

9    **Q.**    What did you do from here?

10   **A.**    From here, I used an undercover profile and created an

11   account.

12   **Q.**    And could you turn to page 3, please?  What is this?

13   **A.**    After you create an account, when you go to execute

14   trades and make investments, the website provides you with a

15   deposit address.  You can choose between USDC, which is -- which

16   mimics the U.S. dollar.  You can choose between Bitcoin and a

17   couple other cryptocurrency coins.

18   **Q.**    Did you invest through this route?

19   **A.**    I did.

20   **Q.**    Did you ever get your money back?

21   **A.**    I did not.

22   **Q.**    Did you also access a SIMEX website on your phone?

23   **A.**    I did.

24   **Q.**    And do you remember the name of that particular website?

25   **A.**    Simexwim was the mobile version of this particular

1    website.

2    **Q.**    And when you were on the mobile version, at some point,

3    did you begin speaking to customer service?

4    **A.**    I did.

5    **Q.**    And why did you do that?

6    **A.**    Because I had had some interviews with some of the other

7    victims who said that that's where they were receiving some of

8    their instructions.

9    **Q.**    And what did you discuss with customer service?

10   **A.**    I discussed with customer service how to make an

11   investment via bank wire.

12   **Q.**    Could you look at Exhibit 16-4, please?

13   **A.**    I'm there.

14   **Q.**    Do you recognize this exhibit?

15   **A.**    I do.

16   **Q.**    What is it?

17   **A.**    This was their response to me asking -- or me informing

18   them I'd like to make a ten -- maybe I said a $9,000 investment.

19   I don't recall the exact amount I told them I was going to

20   invest.  I told them I would like to invest in a traditional

21   bank wire, and this is what the website gave me.

22   **Q.**    Okay.  And is this a fair and accurate screenshot of your

23   chat?

24   **A.**    It is.

25              MS. BEDELL:  At this point, we would move to admit and

1    publish Exhibit 16-4.

2              MR. WENSTRUP:  No objection.

3              THE COURT:  It's admitted without objection.

4              (Government's Exhibit No. 16-4 received in evidence.)

5              (Exhibit published.)

6    BY MS. BEDELL:

7    Q.    Can you describe what happened here and what information

8    you received back?

9    A.    So, again, this is the wire details that simexwim online

10   customer service provided me when I requested to make an

11   investment.

12   Q.    What is the name of the company that you were directed to

13   send the money to?

14   A.    Sea Dragon Remodel Inc.

15   Q.    What was the last four of the account number?

16   A.    5581.

17   Q.    Did you investigate the website SIMEX?

18   A.    I did.

19   Q.    And what did you learn about who had registered it?

20   A.    We learned that the registrar did the -- the registrar,

21   which is the company you go to to register a domain, was

22   PublicDomainRegistry.com, and they utilized an address of

23   hongkong123456.  There was a phone number.  There was an email

24   address.  Anytime you register a website, the registry captures

25   some of that subscriber information, and then reports it to a

1    public database called Whois.

2    **Q.**     Could you look at Exhibit 16-5, which is a physical

3    exhibit, a CD --

4           MS. BEDELL:  If we could request assistance with the CD

5    part of it.

6    BY MS. BEDELL:

7    **Q.**     -- and then, also, there's a paper part.

8           While we're working on the CD, do you recognize the paper

9    portion of the exhibit?

10   **A.**     I do.

11   **Q.**     What is that?

12   **A.**     This is the full list of websites that were linked to the

13   same identifiers as SIMEX.

14   **Q.**     What is contained on the CD, once you have a chance to

15   take a look at it?

16   **A.**     What's contained on this CD is, this report came from a

17   tool that we use called "domain tools," and so the CD contains

18   an Excel spreadsheet that has these domains plus the subscriber

19   information next to it.

20   **Q.**     And so all of that data is publicly available

21   information?

22   **A.**     Correct.

23          MS. BEDELL:  At this point, we would move to admit and

24   publish 16-5.

25          MR. WENSTRUP:  No objection.

*Saunders - Direct - Bedell*

1          THE COURT:  It's admitted without objection.

2          (Government's Exhibit No. 16-5 received in evidence.)

3          (Exhibit published.)

4    BY MS. BEDELL:

5    **Q.**     This one has a lot of words on it, but do the SIMEX

6    domains appear on this list?

7    **A.**     They do.

8    **Q.**     And did you visit any of these other websites?

9    **A.**     I did.

10   **Q.**     And did you find any that were similar to the SIMEX site?

11   **A.**     Yes.

12   **Q.**     And how so?

13   **A.**     Well, the subscriber information from the registrar was

14   the same, but just the website layout looked the same.  They all

15   had a feature to chat with online customer service.  It was

16   typically that green button in the bottom right of the

17   home screen.  You click on that, and then a box pops up and you

18   can start chatting.

19   **Q.**     So we've looked at a number of bank materials today, and

20   I'm going to cover a few additional points.

21          MS. BEDELL:  But before that, Your Honor, I'd like to

22   read into the record Stipulation No. 12.

23          "The United States and the defendant, Hailong Zhu,

24   stipulate and agree that at all times relevant to this case, the

25   deposits at JPMorgan Bank Chase, N.A., ("JPMC"); Bank of America,

54

*Saunders - Direct - Bedell*

1    N.A.; Manufacturers and Traders Trust Company, ("M&T Bank");

2    Lakeland Bank; U.S. Bank N.A.; Wells Fargo Bank, N.A.; and SoFi

3    Bank, N.A., including their main offices and domestic branch

4    offices, were insured by the Federal Deposit Insurance

5    Corporation ("FDIC"), and, therefore, were federally insured

6    depository institutions.

7              The United States and the defendant, Hailong Zhu,

8    further stipulate and agree that the exhibit set forth below is

9    comprised of authentic, accurate copies of business records of

10   the FDIC that meet the requirements of Federal Rule of

11   Evidence 902(11) and 803(6)."

12             And that's Exhibit 16-13.  At this point, I would move

13   to admit that exhibit.

14             MR. WENSTRUP:  No objection.

15             THE COURT:  It's admitted without objection.

16             (Government's Exhibit No. 16-13 received in evidence.)

17   BY MS. BEDELL:

18   Q.    Have you reviewed exhibit -- or could you take a look at

19   Exhibit 16-13?

20   A.    I'm there.

21   Q.    Does this exhibit include certificates from the FDIC of

22   those banks' insurance that I just read off?

23   A.    Yes, it does.

24             MS. BEDELL:  Let's look at Exhibit 10-12.

25             (Exhibit published.)

1    BY MS. BEDELL:

2    **Q.**     This has already been admitted.  When you have a chance,

3    let me know what that document is.

4    **A.**     All right.

5    **Q.**     What is this document?

6    **A.**     This is a bank statement or credit card statement for

7    account ending 2222 in the name of Hailong Zhu at Bank of

8    America, the period August 22nd through September 21st of 2022.

9    **Q.**     And whose credit card is this?

10   **A.**     This is Mr. Zhu's credit card.

11   **Q.**     So it's not a business credit card?

12   **A.**     Correct.

13   **Q.**     And what is the address on the account?

14   **A.**     The address is 1140 South El Molino Street, Alhambra,

15   California.

16   **Q.**     Did you review other months of this statement?

17   **A.**     Yes, I did.

18   **Q.**     What address appeared on prior statements?

19   **A.**     It was an Illinois address.

20   **Q.**     Did you find other evidence that Zhu lived at 1140 South

21   El Molino Street?

22   **A.**     Yes, I did.

23   **Q.**     What evidence was that?

24   **A.**     In his phone, we also saw an image of an Edison Power

25   bill.  My understanding is Edison Power is the power utility

*Saunders - Direct - Bedell*

1   company that services this area, and his name was on it with the

2   address.

3   **Q.**    And if we could look at page 3 of this exhibit; what are

4   we looking at here?

5   **A.**    This is a listing of transactions -- credits and

6   purchases -- for the period of August 22nd through September 21,

7   2022.

8   **Q.**    And what is listed for the two charges on September 9th?

9   **A.**    September 9th is -- there's a California Secretary of

10  State for $355, and then another California Secretary of State

11  for $25.

12          MS. BEDELL:  Could we look at Exhibit 10-9, please?

13          (Exhibit published.)

14  BY MS. BEDELL:

15  **Q.**    This has been admitted, but could you just refresh on

16  what this exhibit is?

17  **A.**    You said 10-9?

18  **Q.**    10-9.

19  **A.**    This is a Bank of America statement, Hailong Zhu's

20  personal account ending 6689, for the period of September 28th

21  to October 22nd of 2021.

22  **Q.**    And have you reviewed these statements?

23  **A.**    I have.

24  **Q.**    When was this account opened?

25  **A.**    This account was -- looks like it appears to be opened on

1    September 28th of 2021.

2    **Q.**    And what did the spending pattern look like for the first

3    year after this account was opened?

4    **A.**    It was relatively low.

5    **Q.**    In the sense that it wasn't high dollar amounts?

6    **A.**    Correct, yes.

7            MS. BEDELL:  Could we look at Exhibit 10-10?

8            (Exhibit published.)

9    BY MS. BEDELL:

10   **Q.**    What is this document?

11   **A.**    This is the same bank statement that we just looked at

12   ending in 6689, but for the period October 25th to November 22nd

13   of 2022.

14           MS. BEDELL:  And can we look at page 3 of this exhibit,

15   please?

16   BY MS. BEDELL:

17   **Q.**    And can you describe any significant transaction activity

18   during this period and the deposits and withdrawals?

19   **A.**    Yeah.  On 10-27 of '22, there's a teller transfer of

20   30,000.  On 10/28, there's a counter credit of 2,800; on 10/31,

21   there's an ATM deposit of 2,000.

22   **Q.**    And let me jump in.  So you said there was a 10/27

23   deposit of 30K.  Does there appear to be a sort of similar

24   transaction going out of the account also on October 27th?

25   **A.**    Yes.

1    **Q.**    Could you flag that, please?

2    **A.**    Yeah.  On 10/27, there's a customer withdrawal of 30,015.

3    **Q.**    And what happens in the account this month?

4          Let me rephrase that question.  Was this activity

5    consistent with what you had seen in the prior months?

6    **A.**    No, not at all.

7    **Q.**    And how did it differ?

8    **A.**    The dollar values were much higher.

9          MS. BEDELL:  Could we look at Exhibit 10-11?

10          (Exhibit published.)

11          THE WITNESS:  I'm there.

12   BY MS. BEDELL:

13   **Q.**    What is this document?

14   **A.**    This is the same personal Bank of America account ending

15   in 6689 for the period November to December of 2022.

16   **Q.**    And does this account continue to see larger transactions

17   in this month?  We can take a look at page 3.

18   **A.**    Yes, it does.

19   **Q.**    And specifically on page 3, what is the only transaction

20   listed in the deposits?

21   **A.**    On 12/9/22, there's $75,000 deposit, a wire in from an

22   individual named Robert Kessler.

23   **Q.**    What bank did this transaction come from?

24   **A.**    Alaska U.S.A. Federal Credit Union.

25   **Q.**    Did you investigate this transaction?

1   **A.**     I did.

2   **Q.**     And where does Mr. Kessler live?

3   **A.**     Anchorage, Alaska.

4   **Q.**     And was there any follow-up from the bank regarding this

5   transaction?

6   **A.**     Yes, there was.

7   **Q.**     What was that?

8   **A.**     Bank of America said they received a hold harmless claim

9   on this wire.

10  **Q.**     Do you know if the victim -- excuse me -- if Mr. Kessler

11  eventually received his funds back?

12  **A.**     Yes.  I spoke with Mr. Kessler, who said he did receive

13  his funds back.

14  **Q.**     Could we look at the CDs that are marked 10-15, 10-15A,

15  10-16, 10-16A, and 10-17?

16  **A.**     I'm sorry, you said 10-15?

17  **Q.**     10-15 to 10-17.  I believe it's all on one CD, but there

18  might be actually several CDs.

19  **A.**     Yes.

20  **Q.**     What materials are on -- could you remind me if it is one

21  CD or multiple CDs?

22  **A.**     One CD.

23  **Q.**     What is on this CD?

24  **A.**     This is the Bank of America surveillance for -- so this

25  was surveillance footage provided to us by Bank of America.

*Saunders - Direct - Bedell*

1  **Q.**    And do Exhibits 10-15, 10-16, and 10-17 contain full

2  videos from Bank of America?

3  **A.**    Yes, they do.

4  **Q.**    And then do Exhibits 10-15A and 10-16A contain edited

5  clips of those surveillance videos?

6  **A.**    Yes, they do.

7  **Q.**    Are those clips fair and accurate depictions of the

8  content of the videos?

9  **A.**    They are.

10         MS. BEDELL:  At this time, we would move to

11  admit 10-15A and 10-16A, which, I believe, they're the only ones

12  that have not yet been admitted, Your Honor.

13         MR. WENSTRUP:  No objection.

14         THE COURT:  They will be admitted without objection.

15         (Government's Exhibit Nos. 10-15A and 10-16A received

16  in evidence.)

17         MS. BEDELL:  Could we look at Exhibit 10-15A, please?

18         (Exhibit published.)

19  BY MS. BEDELL:

20  **Q.**    Is 10-15A the clipped version of 10-15?

21  **A.**    It is.

22  **Q.**    And what is this video depicting?

23  **A.**    This is depicting a transaction on 12/9/2022 in a Bank of

24  America account.  Hailong Zhu is interacting with the teller,

25  and Joseph Wong is standing in the background on his phone.

1  **Q.**     And just to clarify what we're looking at, does this

2  video contain two different camera angles of the same

3  transaction?

4  **A.**     Yes, it does.

5  **Q.**     Do you recall what account this transaction was

6  associated with?

7  **A.**     I don't.

8  **Q.**     Do you recall if at any point Mr. Wong approaches the

9  window and participates directly in this transaction?

10  **A.**     On this one, I do not believe that he does.

11          MS. BEDELL:  We can pause here and move on to 10-16A,

12  please.

13          (Exhibit published.)

14  BY MS. BEDELL:

15  **Q.**     What is the date on this video?

16  **A.**     Does it get any bigger?

17  **Q.**     No, I don't think it does.

18          Are you able to see the date?  You can also look at

19  10-17A, which has stills.  I believe 10-17A was admitted

20  yesterday through the defense.  If you want to look at 10-17A in

21  the binder as this is continuing to play.

22  **A.**     10/31/2022, in Alhambra, an ATM machine.

23  **Q.**     Who are the three people depicted in this video?

24  **A.**     From left to right, Small 7, and then in the center is

25  Joseph Wong, and then on the right is Hailong Zhu.

*Saunders - Direct - Bedell*

1   **Q.**    And it does seem to be pausing a little bit as we're

2   going through here.

3        You mentioned Small 7.  Yesterday, I think we heard

4   testimony, the translator translated his name as Little 7.  Is

5   that the same --

6   **A.**    Yes.

7   **Q.**    -- person that is in those chats?

8   **A.**    The same.

9        MS. BEDELL:  Could we look at Exhibit 10-17, please?

10       (Exhibit published.)

11  BY MS. BEDELL:

12  **Q.**    One final question from that video we just were looking

13  at:  Is there any interaction with a bank representative during

14  that transaction?

15  **A.**    There's no interaction.  This transaction is at an ATM

16  machine.

17       MS. BEDELL:  If we could play 10-17, please.

18       (Video played.)

19  BY MS. BEDELL:

20  **Q.**    Who is depicted in this video?

21  **A.**    We believe this to be Nikki.

22  **Q.**    And who else is there?

23  **A.**    And Hailong Zhu.

24  **Q.**    How long does this video go on, total?

25  **A.**    I do not recall the total length of the video.

1    **Q.**     And is that cash depicted in Mr. Zhu's hands?

2    **A.**     Yes, that is cash.

3              MS. BEDELL:  Could we -- we can stop that -- the video

4    goes on for quite a bit ways more, so we will move through this

5    quickly.

6              Could we pull up 10-17A, please?

7              (Exhibit published.)

8    BY MS. BEDELL:

9    **Q.**     And what is this exhibit?  And that is in both your

10   binder and --

11   **A.**     These are stills from the video surveillance that we just

12   observed.

13   **Q.**     And what is in this first image?

14   **A.**     They appear to be looking at the ATM.

15             MS. BEDELL:  Can we flip to the next page, please?

16   BY MS. BEDELL:

17   **Q.**     This is still from the transaction?

18   **A.**     Yes, this is from the same video.

19             MS. BEDELL:  And then the next page, please.  And then

20   on to the next page.

21   BY MS. BEDELL:

22   **Q.**     And what is this screenshot from?

23   **A.**     This is from the video that we just observed with Nikki

24   on the left and Hailong Zhu on the right coming in with the cash

25   in the bag.

1    **Q.**    And what is the date on this video?

2    **A.**    10/28/2022.

3    **Q.**    And on page 5, what's happening here?

4    **A.**    Page 5 is published?

5    **Q.**    Page 5 is published.

6    **A.**    So they -- after the conclusion of the transaction, Nikki

7    appears to be putting some cash in the bag.

8              MS. BEDELL:  Could we look at page 6?

9    BY MS. BEDELL:

10   **Q.**    What is happening here?

11   **A.**    So if we had watched the full video, Nikki leaves the

12   bank and Hailong is there by himself.

13             MS. BEDELL:  And could we look at page 7 and then

14   page 8?

15   BY MS. BEDELL:

16   **Q.**    And what happens at the end of the video?

17   **A.**    At the end of the video, Hailong Zhu departs the bank

18   branch with the bag with the cash in it.

19             MS. BEDELL:  And could we look at Exhibit 10-18,

20   please?

21             (Exhibit published.)

22   **A.**    I'm there.

23   **Q.**    What is this document?

24   **A.**    This is a -- Bank of America calls it a "TRMS report."

25   It is a report that is filed inside of a branch when

Saunders - Direct - Bedell

1    something -- when there's a potential fraud flag.

2    Q.    And what account is this associated -- is this report

3    associated with?

4    A.    This is on the account ending 6689, which is Hailong

5    Zhu's personal Bank of America account.

6    Q.    What is the date this document was submitted?

7    A.    12/10 of 2022.

8          MS. BEDELL:  Could we pull this document up?  It should

9    have been admitted through the stipulation.

10          (Exhibit published.)

11   BY MS. BEDELL:

12   Q.    And what is the reason that it states on this document

13   that it was submitted?

14   A.    Potential fraud -- reason.  Sorry.  The referral reason

15   is fraud prevented at a banking center.

16   Q.    And who was the party who was involved?

17   A.    Hailong Zhu.

18   Q.    We'll just give a minute to allow the jury to take a look

19   at this first page.

20          Now, taking a look at page 2, was ID provided?

21   A.    A passport.

22   Q.    So whose ID was provided?

23   A.    Hailong Zhu's passport.

24   Q.    Where was that passport from?

25   A.    China.

*Saunders - Direct - Bedell*

1   **Q.**     And where did this transaction occur?

2   **A.**     It occurred -- the cost center is Spring Mountain/Wynn,

3   which Wynn is a casino.

4   **Q.**     What city?

5   **A.**     Las Vegas.

6   **Q.**     What was the transaction type?

7   **A.**     A withdrawal.

8   **Q.**     And what was the transaction amount?

9   **A.**     74,988.

10  **Q.**     And on page 3, could you -- can you read the narrative

11  here?

12  **A.**     "Hailong Zhu visited our FC" -- which we learned is a

13  financial center -- "12/10/2022 around 9:50 a.m. requesting to

14  withdraw $74,988 in cash.  He received a wire transfer for

15  $75,000 the day prior on 12/9/2022.  When we asked him who was

16  sending the funds, he seemed confused and was not able to

17  provide a name.  He then said he needed to check his phone to

18  find out.  We then asked him what the purpose of the payment

19  was, and he said it was for some remodeling he did for someone.

20  I asked what he needed the cash for, and he said he was using it

21  for gambling.  The transaction was declined."

22          And then it says, "This account involves the following

23  account(s):"  [As read]:  account ending in 6689, belonging to

24  Hailong Zhu.

25  **Q.**     And the deposit that it is referring to on December 9th,

1    what deposit is that?

2    **A.**    The $75,000 wire from Robert Kessler.

3    **Q.**    Does the report mention that anyone was with him?

4    **A.**    It does not.  It just says he received.

5           MS. BEDELL:  Could we look at Exhibit 13-2, please?

6           (Exhibit published.)

7    BY MS. BEDELL:

8    **Q.**    What is this document?

9    **A.**    This is a Wells Fargo statement for Sea Dragon Remodel

10   Inc.

11   **Q.**    What is the last four on this account?

12   **A.**    6778.

13          MS. BEDELL:  Could we look at page 2?

14   BY MS. BEDELL:

15   **Q.**    What were the total deposits into the account during this

16   period?

17   **A.**    2,500.

18   **Q.**    And what is this period?

19   **A.**    The month of November.

20          MS. BEDELL:  Could we look at page 6, please?

21   BY MS. BEDELL:

22   **Q.**    What is depicted on page 6?

23   **A.**    These are -- this is the transaction history for the

24   month of December.

25   **Q.**    What were the deposits into the account?

*Saunders - Direct - Bedell*

**A.**      71,825.

**Q.**      And could you describe those two transfers, please?

**A.**      Yes.  The first transaction is on 12/18.  It's what appears to be a wire from an individual named Charlene Dunn. And then the second transaction, also on 12/16, is what looks like a wire from Edwardsville United Methodist Church for 41,850.

**Q.**      And what are the two largest withdrawals?

**A.**      There's a -- on 12/19, it says withdrawal made in a branch, slash, store for 40,000.

**Q.**      And the next biggest one?

**A.**      And then on 12/22, there's a wire out for 30,835.51.

             MS. BEDELL:  Could we look at Exhibit 14-2, please?

             (Exhibit published.)

             THE WITNESS:  I'm there.

BY MS. BEDELL:

**Q.**      What is this exhibit?

**A.**      This is the account statement at East West Bank for Hailong Zhu for --

        Go ahead.

**Q.**      What is the last four of the account number?

**A.**      9074.

**Q.**      What is the date of this particular page -- the statement for this page?

**A.**      This is October 31st through November 30th of 2022.

*Saunders - Direct - Bedell*

1   **Q.**     Can you describe the credits into the account covered on

2   this statement?

3   **A.**     Yes.  There are four [*sic*] deposits:  10/31, $500; 11/8,

4   $4,000; 11/9, $10,000.

5   **Q.**     What was the outgoing wire on 11/16?

6   **A.**     On 11/16, there's a $13,000 outgoing wire to Hailong Zhu.

7   **Q.**     And you're familiar with the U.S. Bank account records in

8   this case, correct?

9   **A.**     Yes, I am.

10  **Q.**     Does this transfer out of this account correspond with

11  the transfer that went into the -- Mr. Zhu's U.S. Bank account

12  on November 16th?

13  **A.**     It does.

14  **Q.**     Looking at 14-2 on page 3, please; what are the credits

15  into the account during this period?

16  **A.**     There's a $102,000 deposit on 12/1.

17  **Q.**     And what is the most significant transfer out of this

18  account?

19  **A.**     There's a 102,128 transfer out to Yunzhu Xie.

20  **Q.**     On what date?

21  **A.**     On 12/12.

22  **Q.**     And did you come across the name Xie anywhere else in

23  this investigation?

24  **A.**     Yes, I did.

25  **Q.**     Where was that?

1    **A.**      Xie was -- we found some documents at Wong's house with

2    Yunzhu Xie and her business entity.

3    **Q.**      Did you come across the name in any of Mr. Wong's phones?

4    **A.**      Yes, I did.

5             MS. BEDELL:  Could we look at Exhibit 14-3?

6             THE COURT:  Ms. Bedell, let me stop you there.  We just

7    hit 10:45.  I don't know if this is a natural place --

8             MS. BEDELL:  This is the perfect spot, yes, Your Honor.

9             THE COURT:  Ladies and gentlemen, why don't we take our

10   morning break.  We'll resume in 15 minutes, at the latest, right

11   at 11:00.  Please remember my admonitions not to discuss the

12   matter or engage in any independent research.  Just take a few

13   minutes to relax, and we'll resume promptly.

14            You're free to go now.

15            (Jury out at 10:47 a.m.)

16            THE COURT:  Agent Saunders, you may step down.  You

17   remain under oath.

18            How much longer do you think you anticipate,

19   Ms. Bedell, that you have for direct?

20            MS. BEDELL:  Your Honor, this is a fairly long one.

21   I'm probably a quarter of the way through, but I have been

22   speeding through things.  Some of the exhibits that I know are

23   coming up, we already looked at with Defense, so we'll be able to

24   get through this a little bit faster.  So I am conscious of

25   trying to get through this as quickly as possible, but we do have

1    a ways to go.

2              THE COURT:  All right.  I understand.  And I think that

3    may put us on a track to then have, perhaps, an early lunch and

4    address whatever comes next so that we can prepare for the

5    afternoon.  But let's just see how it goes, then, when we come

6    back at 11:00.  We can, hopefully, move quickly through this

7    final government witness.

8              Court will be in recess.

9              (Whereupon, a recess in the proceedings occurred from

10   10:48 a.m. until 11:00 a.m.)

11             THE COURT:  Bring the jury in.

12             (Jury in at 11:00 a.m.)

13             THE COURT:  I'm going to ask you the familiar question

14   to make sure that you were able to follow the Court's

15   instructions and not discuss the case or engage in any

16   independent research during the break.

17             I see you're nodding your heads.

18             We'll resume with the direct examination.

19             Agent Saunders, you remain under oath.

20   BY MS. BEDELL:

21   Q.    We were taking a look at 14-3.  And what is this?

22   A.    This is our screenshot from East West Bank of various

23   deposit slips and checks.

24   Q.    At the bottom of page 1, what is depicted there?

25   A.    It's a check to Hailong Zhu for $4,000 from Sea Dragon

*Saunders - Direct - Bedell*

1   Remodel Inc. on 11/8/2022.

2   **Q.**    And looking at page 2, at the top of page 2, what is

3   depicted there?

4   **A.**    This is a deposit slip for $10,000 into Hailong Zhu's

5   East West account ending in 9074.

6   **Q.**    What was deposited then?  Was that cash?

7   **A.**    Yes, it was cash, and it says the source of funds is from

8   BofA, and the purpose is payments.

9   **Q.**    The purpose is payments?

10  **A.**    Yes.

11  **Q.**    And I'm sorry, did you read the date on this transfer?

12  **A.**    Yes, but I can say it again:  11/9/2022.

13  **Q.**    Does this indicate whether the transaction was done in

14  person?

15  **A.**    It does.  It was stamped, but -- at Branch 8, Teller 11.

16  **Q.**    Did they check an ID?

17  **A.**    Yes; down at the bottom left, an Illinois ID.

18  **Q.**    The third item on page 2, what is that?

19  **A.**    This is a cash deposit slip for $102,000 on 12/1/2022.

20  **Q.**    What was the breakdown of that $102,000?

21  **A.**    83,000 in currency; looks like eight hundred thirty

22  100-dollar bills, and then a check for 19,000.

23  **Q.**    Does the slip indicate the source of the funds?

24  **A.**    Yeah.  Down -- it does.  It says it's cash from casino,

25  from the Wynn.

*Saunders - Direct - Bedell*

1   **Q.**     What's the date on this transaction?

2   **A.**     12/1/2022.

3   **Q.**     Is this the same date the defendant tried to deposit

4   $83,000 in cash and a $19,000 check at U.S. Bank?

5   **A.**     Yes, it is.

6   **Q.**     Does the slip note if the funds are immediately

7   available?

8   **A.**     It says that they're on hold for seven days.

9   **Q.**     What do you understand to have happened here?

10  **A.**     At the U.S. Bank when he was unable to send the funds

11  wherever he wanted to send them overseas and we called them

12  back, they were then brought to East West Bank and deposited

13  there.

14  **Q.**     Could you look at Exhibit 1-4B?

15          (Exhibit published.)

16          THE WITNESS:  Would you say that again?

17  BY MS. BEDELL:

18  **Q.**     1-4B.  It might be in another binder.  We're going to

19  switch that first binder anyway.  And it's also pulled up on the

20  screen.

21  **A.**     I am here.

22  **Q.**     What is this document?

23  **A.**     This is the SoFi personal loan agreement with Mr. Kwadwo

24  Danso-Fordjour.

25  **Q.**     Did you receive a clean copy of this document without

*Saunders - Direct - Bedell*

1  that copy view watermark written on it?

2  **A.**     Yes, I did.

3  **Q.**     Is that document otherwise identical to this one?

4  **A.**     Yes, it is.

5             MS. BEDELL:  Could we look at 1-4?

6             (Exhibit published.)

7  BY MS. BEDELL:

8  **Q.**     Is this the clean version of the document?

9  **A.**     It is.

10 **Q.**     But is Mr. Danso-Fordjour's signature on the last page of

11 this one?

12 **A.**     It's not on this one, no.

13 **Q.**     But all the text in between is identical?

14 **A.**     Yes.

15 **Q.**     Could you turn to page 5 of this document?  Could you

16 read paragraph 6?

17 **A.**     Paragraph 6:  "I may not assign my loan (including my

18 application) or any of its benefits or obligations.  You may

19 assign my loan agreement (including my application) at any time.

20 The terms and conditions of my loan agreement apply to, bind,

21 and inure to the benefits of your successors and assigns."

22 **Q.**     Also on page 5, section O, paragraph 1, could you read

23 the second sentence?

24 **A.**     Starting with "I certify"?

25 **Q.**     Yes.

*Saunders - Direct - Bedell*

1   **A.**     "I certify that the loan proceeds will only be used for

2   unsecured personal, family, or household expenses and not for

3   real estate, business purposes, investment, purchases of

4   securities, post-secondary education, or short-term bridge

5   financing."

6   **Q.**     And on page 7, please, in the second column under the

7   heading "Notice to Borrowers Regarding Loan Sales," can you read

8   the first sentence there?

9   **A.**     [As read]:  I understand that you may sell, transfer, or

10  assign my agreement without consent.

11  **Q.**     Does it say "without my consent"?

12  **A.**     "Without my consent."  I'm sorry.

13          MS. BEDELL:  Can we look at Exhibit 5-1, which is a

14  cell phone, please?  And, actually, if you could hand up 5-1,

15  6-1, 7-1, 8-1.

16  BY MS. BEDELL:

17  **Q.**     Do you recognize these items?

18  **A.**     Yes, I do.  These are iPhones that were seized from

19  Joseph Wong.

20  **Q.**     Joseph Wong?

21  **A.**     These were iPhones that were seized from Joseph Wong.

22  **Q.**     Okay.  Did you receive and analyze forensic copies of all

23  four of these phones?

24  **A.**     I did.

25  **Q.**     Let's start with Item 5-1, which is labeled Item 1.  So

*Saunders - Direct - Bedell*

1    taking a look at Exhibit 5-2 -- and these exhibits have been

2    admitted, so we can publish -- do you recognize this item?

3    **A.**     Yes.  This is the preliminary device report that was

4    generated during the exam from the examiner.

5    **Q.**     What is the device name?

6    **A.**     The device name is josephiPhone.

7    **Q.**     And what is the model?

8    **A.**     The model is iPhone 12 Pro Max.

9    **Q.**     What is the MSISDN associated with the phone?

10   **A.**     It ends in 6045.

11   **Q.**     And then are there other MSISDNs?

12   **A.**     There are.

13   **Q.**     What are those?

14   **A.**     There's one that ends in 1044, and then there's one that

15   ends in 6466.

16   **Q.**     What appears on the second and third pages of this

17   exhibit?

18   **A.**     These are a list of accounts that were linked to this

19   device.

20   **Q.**     And on page 2, is there an entry for WeChat?

21   **A.**     Yes, there is.

22   **Q.**     And what is the username and the user ID associated with

23   the WeChat entry?

24   **A.**     The username is Joseph, and the ID is a long string of

25   numbers ending in 1922.

*Saunders - Direct - Bedell*

1   Q.      From this data and your review of the phone, what did you

2   determine this device to be?

3   A.      Well, we determined this to be his primary phone.

4   Q.      His -- whose?

5   A.      Sorry.  Joseph Wong's primary device.

6           MS. BEDELL:  Could we look quickly at Exhibit 5-3?

7           (Exhibit published.)

8   BY MS. BEDELL:

9   Q.      What is this exhibit?

10  A.      These are notes that were in Joseph Wong's primary

11  device.

12  Q.      And when you say "notes," is that from the Notes

13  application?

14  A.      Yes, I believe so.

15  Q.      Could you just characterize the type of information found

16  in the first three notes?

17  A.      Yeah.  The first note is a list of Sea Dragon entities.

18  The second note is a list of Mingxing entities; so Mingxing

19  Trading, Mingxing Remodel.  And then the third note is another

20  list of entities:  The Yunzhu Xie, with the YZX Luxury and YZX

21  Trending entities.

22  Q.      What is contained in Notes 4 and 5?

23  A.      These are wire instructions.

24  Q.      And what is Note 4?

25  A.      Note 4 is wire instructions for O Diamonds Trading

1     Limited.

2     **Q.**     And then what is Note 5?

3     **A.**     Note 5 is wire instructions to Mitsubishi UFJ, and it

4     also includes the additional details:  For further credit to

5     Axis Digital Limited and GTAL, G-T-A-L.

6     **Q.**     Could you look at Note 8?

7     **A.**     These are wire instruction to Mitsubishi that further

8     credited to Axis Digital Limited.

9            MS. BEDELL:  Could we look at Exhibit 5-4, please?

10    BY MS. BEDELL:

11    **Q.**     The first page of this exhibit -- I'm sorry.  What is

12    this exhibit, generally, contained broadly in here?

13    **A.**     This is the details, or metadata, of a particular image.

14    **Q.**     And Exhibit 5-4, does this just contain a number of

15    images found on the device?

16    **A.**     Yes.

17    **Q.**     And then page 1, you said, is the metadata associated?

18    **A.**     Correct.

19    **Q.**     And for this first file, what is the file name?

20    **A.**     It is a file ending 3571.jpeg.

21    **Q.**     What is the created date on this file?

22    **A.**     11/3/2022.

23    **Q.**     And the file type?

24    **A.**     J-P-E-G, JPEG.

25    **Q.**     And on the right of the screen, is that just a small

*Saunders - Direct - Bedell*

1    version of the image?

2    **A.**    Yes, that's the thumbnail version of the larger image.

3          MS. BEDELL:  Could we look at page 2?

4    **A.**    Yep.

5    **Q.**    Is this the larger version of that image?

6    **A.**    It is.

7    **Q.**    Does this exhibit follow the pattern where the first page

8    has this metadata information and the second page is the image

9    itself?

10   **A.**    Yes.

11   **Q.**    As I'm going to review this document, I'm just going to

12   skip the data pages and just look at the big images.  If you

13   need the data, you can refer back to that there.

14        So on page 2, what is depicted in this image?

15   **A.**    This is a Bank of America wire form from Sea Dragon

16   Remodel Inc. out of account 9529.

17   **Q.**    Who is the form going to?

18   **A.**    O Diamonds Trading Limited.

19   **Q.**    For how much money?

20   **A.**    $94,000 on 11/3/2022.

21   **Q.**    According to the form, how was this transfer executed?

22   **A.**    In person.

23   **Q.**    How did they verify ID?

24   **A.**    Two IDs:  One is a U.S. nondriver's license ID -- the

25   state is cut off -- and then second is Bank of America debit

1    card, ATM card.

2    **Q.**    What is listed as the purpose of the transfer?

3    **A.**    Goods.

4    **Q.**    And we've reviewed Bank of America records for these

5    accounts.  Is this wire reflected on the statement for the 9529

6    account?  And if you need to refresh, it's Exhibit 10-6, which I

7    think might be in the other binder.

8    **A.**    Let me --

9    **Q.**    You want to refresh?

10    **A.**    Yes.

11    **Q.**    I would recommend you look at page 13.

12         MS. BEDELL:  And, actually, Ms. McNeill may have helped

13    you out here.

14    **A.**    Yes.  On 11/3, $94,000.

15    **Q.**    If we could return to Exhibit 5-4, page 4, what is on

16    page 4?

17    **A.**    Page 4 is a Chase wire form, Sea Dragon Trading LLC.

18    **Q.**    What is the last four on the account that it's coming out

19    of?

20    **A.**    3886.

21    **Q.**    What's the date?

22    **A.**    The date is 10/25/2022 for $152,000.

23    **Q.**    And who's it going to?

24    **A.**    O Diamonds Trading.

25    **Q.**    From the top section, how was this transfer executed?

*Saunders - Direct - Bedell*

1    **A.**    In person.

2    **Q.**    And did they confirm the ID?

3    **A.**    Yes, a state-issued ID from Illinois, and then a

4    secondary type, a Chase bank issued credit/debit card.

5    **Q.**    Let's look at page 6.  What is this?

6    **A.**    Page 6 is another Bank of America wire form, Sea Dragon

7    Remodel Inc., account ending 9529.

8    **Q.**    And how much is the transfer for and the date, please?

9    **A.**    $108,000 on 10/31/2022.

10    **Q.**    What is the destination?

11    **A.**    The destination is O Diamonds Trading Limited.

12    **Q.**    How was this transfer executed?

13    **A.**    In person.

14    **Q.**    What was the confirmation used, if any?

15    **A.**    A U.S. nondriver's license and a Bank of America debit

16    card, or ATM card.

17    **Q.**    What is the purpose of the payment that's provided?

18    **A.**    Goods.

19    **Q.**    And is the form signed?

20    **A.**    It is.

21    **Q.**    Whose name is on it?

22    **A.**    Hailong Zhu.

23           MS. BEDELL:  Could we look at page 8, please?

24    BY MS. BEDELL:

25    **Q.**    What is this image?

*Saunders - Direct - Bedell*

1   **A.**      This is a Cathay Bank wire transfer form for $63,000.

2   **Q.**      What is the originator account?

3   **A.**      It is Mingxing Remodel LLC.

4   **Q.**      In the top left corner, what does it say is the purpose

5   of the wire?

6   **A.**      Merchandise payment.

7   **Q.**      Who does the transfer go to?

8   **A.**      It goes to Mitsubishi UFJ Trust, and it includes the "for

9   further credit" account details to Axis Digital Limited.

10  **Q.**      What is the date on this form?

11  **A.**      12/19/2022.

12  **Q.**      Who signed this form?

13  **A.**      Mingxing Lyu.

14  **Q.**      Did you find other images of wire transfers with Mingxing

15  Lyu's name on them in this exhibit?

16  **A.**      Yes, I did.

17  **Q.**      Could we jump ahead to page 12?  And what is this?

18  **A.**      This is a bank card bearing the name Yunzhu Xie, YZX

19  Luxury LLC.

20  **Q.**      Let's look at page 16.  What is this?

21  **A.**      This is a Bank of America wire form from Kais Tea Sets

22  Supplies LLC.

23  **Q.**      Did you find other transfer forms for other companies

24  within the images on Joseph Wong's phone?

25  **A.**      Yes.

*Saunders - Direct - Bedell*

1   **Q.**    Let's jump -- did you find other details related to the

2   individual bofacai on the phone?

3   **A.**    Yes, I did.

4   **Q.**    Let's jump ahead to page 22, please.

5   **A.**    Which --

6   **Q.**    That is going to be another wire transfer form.  What is

7   pictured here?

8   **A.**    This is an outgoing wire form from an individual named

9   Lori Collingwood.

10  **Q.**    Can you make out her full name there?

11  **A.**    Yes.  Lori Collingwood-Foehlinger.

12  **Q.**    Where is she located?

13  **A.**    Lancaster, Pennsylvania.

14  **Q.**    Who is the beneficiary?

15  **A.**    The beneficiary is Jian Long.

16  **Q.**    Did you come across that name in your investigation?

17  **A.**    I did.

18  **Q.**    Where was that?

19  **A.**    It was one of the fake aliases of Joseph Wong.

20  **Q.**    How much is this transfer for?

21  **A.**    39,450.

22  **Q.**    And what is the date?

23  **A.**    The date is March 13, 2023.

24  **Q.**    Could we jump to page 24 -- it should be the last page in

25  the document -- and what is this?

1    **A.**    This is the driver's license of Lori Collingwood on top

2    of the wire form that we just looked at.

3    **Q.**    What do you understand to be happening here?

4    **A.**    I understand that this is likely a victim, and she was

5    able to send a successful wire, as we've seen some of the other

6    victims; after they send a wire, they send their driver's

7    license and a picture of the wire form.

8    **Q.**    Let's take a look at Exhibits 5-5 through 5-10, which are

9    CDs.  What is this exhibit?

10   **A.**    These are calls to Bank of America from Item 1, which is

11   Joseph Wong's primary device.

12   **Q.**    Does the CD also contain shortened clips of these videos,

13   Exhibits 5-6, 5-8, and 5-10?

14   **A.**    Yes.

15   **Q.**    And what was shortened in these?

16   **A.**    Times in which he was on hold with the bank was clipped

17   out.

18   **Q.**    Did you also sometimes remove multiple entries of account

19   information?

20   **A.**    Yes.

21   **Q.**    And are 5-6, 5-8, and 5-10 [*sic*] fair and accurate clips

22   of Exhibits 5-5, 5-7, and 5-10 respectively?

23   **A.**    Yes.

24          MS. BEDELL:  At this time, I would move -- excuse me, I

25   think I meant to say 5-9 on this last one.  I move to admit 5-6,

1    5-8, and 5-10, Your Honor.

2            MR. WENSTRUP:  No objection, Your Honor.

3            THE COURT:  They're admitted without objection.

4            (Government's Exhibit Nos. 5-6, 5-8, and 5-10 received

5    in evidence.)

6            MS. BEDELL:  Could we look at Exhibit 5-6?

7            (Exhibit published.)

8    BY MS. BEDELL:

9    Q.    What is the date on the video?

10   A.    November 29th.

11   Q.    We're just going to play the first 50 seconds or so.

12           (Audio played.)

13           MS. BEDELL:  If we could pause there.

14   BY MS. BEDELL:

15   Q.    Whose face is reflected in the video there?

16   A.    Joseph Wong.

17   Q.    So what seems to be going on in this video?

18   A.    He is accessing Hailong Zhu's account.  He's taking a

19   video from his primary device of a phone that he's made a call

20   from a different phone, so he's actually recording himself

21   making a phone call to the bank.

22   Q.    In your investigation, did you determine why he might do

23   this?

24   A.    Yeah.  There appears to be direction from Nikki to send

25   these videos.

—*Saunders - Direct - Bedell*—

1   **Q.**    And why were they sending them?

2   **A.**    I think they were sending them to just -- it was part of

3   a scheme to make sure that all of the accounts are accounted

4   for.

5   **Q.**    Okay.  Exhibit 5-8, you were in the courtroom yesterday

6   when Defense played their Defense Exhibit, I believe it was, 6.

7   Is Exhibit 5-8 the same as Defendant's Exhibit 6?

8   **A.**    It is.

9   **Q.**    We won't need to review that one again here.

10          Exhibit 5-10, is that a call into the Mingxing account?

11  **A.**    It is.

12  **Q.**    Can you describe generally what happens in that video?

13  **A.**    Yeah.  Same type of phone call here.  He called the bank.

14  He was pretending to be Mingxing Lyu; provided Mingxing Lyu's

15  identifiers to get through the verification process, and then, I

16  think, on that call, he attempted to retrieve funds.

17          MS. BEDELL:  Court's indulgence.

18          (Whereupon, there was a brief pause in the

19  proceedings.)

20          MS. BEDELL:  Could we look at Exhibits 5-11 and 5-13,

21  which, I believe, are CDs?

22  **A.**    5-11 is a CD.

23  **Q.**    So 5-11 and 5-13 should be CDs.  Do you recognize those

24  CDs?

25  **A.**    I do.  These are chats from Item 1, which is Wong's

1    primary device.

2    **Q.**    And we heard testimony from Ms. Alex Liu yesterday about

3    translating these chats?

4    **A.**    Yes.

5    **Q.**    And the chats were originally in Mandarin?

6    **A.**    They were.

7         MS. BEDELL:  I will now read, I believe it's

8    Stipulation 11, paragraph 3.

9         "The following exhibits are translations of text

10   messages.  The translations of the text messages were not found

11   on the phone itself.  However, the underlying Chinese language

12   versions of the text messages and accompanying data are true

13   and accurate depictions of chats and data extracted from the

14   iPhone 12 Pro Max at GX 5-1, through the use of GrayKey, a

15   reliable forensic access tool, that extracted data from the cell

16   phone."

17        That's 5-11 and 5-13.

18        And I think we discussed these -- are these already

19   admitted?  I've lost track.  At this point, then, I would move to

20   admit 5-11 and 5-13.

21        THE COURT:  Any objection?

22        MR. WENSTRUP:  No objection.

23        THE COURT:  They're admitted without objection.

24        (Government's Exhibit Nos. 5-11 and 5-13 received in

25   evidence.)

1   BY MS. BEDELL:

2   **Q.**    And Exhibit 5-12, which is in the binder, what is this

3   exhibit?

4   **A.**    This is a chat between Joseph, Nikki, and Little 7.

5   **Q.**    And is this an excerpt of the full chat found at

6   Exhibit 5-11?

7   **A.**    Yes, it is.

8   **Q.**    Is 5-12 a fair and accurate representation of the chats

9   on Wong's device, plus the translations?

10  **A.**    Yes.

11          MS. BEDELL:  I just want to move to admit and publish

12  5-12, Your Honor.

13          MR. WENSTRUP:  No objection.

14          THE COURT:  It's admitted without objection.  You may

15  publish it.

16          (Government's Exhibit No. 5-12 received in evidence.)

17  BY MS. BEDELL:

18  **Q.**    All right.  You mentioned this, but could you let us know

19  who are the participants in this chat?

20  **A.**    Yeah.  The participants are Joseph, Nikki, and Little 7.

21  **Q.**    Which Joseph do you believe this to be?

22  **A.**    It's Joseph Wong.

23  **Q.**    And Hailong Zhu is not a participant in this chat?

24  **A.**    He is not.

25  **Q.**    One question:  We're looking at two chats from this

1    phone; how many chats did you find on this phone, generally,

2    approximately?

3    **A.**    Um --

4    **Q.**    Was it a large number of chats?

5    **A.**    Thousands, terabytes of information.

6    **Q.**    What language was these chats in?

7    **A.**    Predominantly, they were in Mandarin.

8    **Q.**    How did you identify which ones you wanted to look at

9    more closely?

10   **A.**    We looked at whether there were any, like, phone numbers

11   that we needed to look into.  He did most of his chatting

12   through WeChat, so we looked at the chats with Nikki; we looked

13   at the chats with Little 7; and then we searched for other,

14   like, keywords to try to identify any other chats that would be

15   relevant.

16   **Q.**    And did you use any machine translations?

17   **A.**    Yeah.  Initially, we tried to get some bulk translation

18   done through Cellebrite.  Cellebrite has a feature where you

19   can, like, bulk translate everything from Mandarin into English,

20   but it was -- it wasn't very useful.

21   **Q.**    But using that process, you did narrow down on a number

22   of chats, and those two -- 5-11 and 5-13 -- are two particular

23   ones?

24   **A.**    Yes, correct.

25   **Q.**    So looking at the first page of the exhibit, what is the

*Saunders - Direct - Bedell*

1   date on these chats?

2   **A.**     This date is on December 2, 2022.

3   **Q.**     And what is the general nature of these conversations?

4   **A.**     So Little 7 and Joseph and Nikki here are talking about

5   taking people to the bank.  They're talking about getting

6   personal checks out of accounts, making appointments to go to

7   banks.

8   **Q.**     Can you turn to page 3, please?  What does the gray bar

9   at the end of this mean?

10  **A.**     This means there's a break in the chat.

11  **Q.**     Turning to page 4, what is the date on the first chat on

12  page 4?

13  **A.**     12/9/2022.

14  **Q.**     And can you read through that chat?

15  **A.**     Yes.

16          "Nikki:  Send me a photo of Ms. Xie's Chase personal

17  account checks.

18          Nikki:  It says void."

19          Joseph then sends a pic, 1517.pic.

20          "Joseph:  Is this check okay?"

21  **Q.**     I think you may have missed the third message from Nikki.

22  **A.**     Oh, I'm sorry.

23              THE INTERPRETER:  Your Honor, I didn't hear that.

24              MS. BEDELL:  We may have missed the third message from

25  Nikki.

Saunders - Direct - Bedell

1    **A.**    Yes.  The third message:  "In the future, record the

2    address of the bank where the account is opened."

3    **Q.**    Okay.  And then going back to that blank, you said that

4    meant that a picture had been sent?

5    **A.**    That's correct.

6    **Q.**    And how do you know that?

7    **A.**    Because it has a .pic file, and the .pic file is also in

8    a phone.

9    **Q.**    Could you read the second excerpt on page 4, please?

10   **A.**    "Joseph:  Everyone received 75,000 received in personal

11   accounts."

12   **Q.**    And what is the date on that?

13   **A.**    12/9/2022.

14   **Q.**    Did Mr. Zhu, in fact, receive $75,000 into his personal

15   account that day?

16   **A.**    Yes; that is the one from Robert Kessler.

17   **Q.**    Could you read the third excerpt on page 4, please?

18   **A.**    "Nikki:  At 9:30 a.m. tomorrow morning, cash needs to be

19   withdrawn from Hailong's BoA.

20        Joseph:  Okay.

21        Nikki:  And then Hailong's East West, withdraw what you

22   can.

23        Joseph:  Okay.

24        Nikki:  If you can't withdraw, remit 99,800 to Ms. Xie.

25        Joseph:  Okay."

*Saunders - Direct - Bedell*

1   **Q.**     And what is the date of that?

2   **A.**     12/10/2022.

3   **Q.**     Now, were there chats that then explained why that

4   transfer ultimately happened a few days later?

5   **A.**     Will you repeat the question?

6   **Q.**     Were there chats that aren't included here that did

7   ultimately explain why the transfer happened a few days later?

8   And if you don't remember, that's fine.

9   **A.**     Can you refresh?

10  **Q.**     Can you read the fourth excerpt on page 4?

11  **A.**     "Nikki:  Hailong just asked, Don't we go to Wynn this

12  time?  Laughing emoji.

13          Joseph:  Ha ha!  He's got an idea.

14          Little 7:  Chuckling, chuckling, chuckling emojis."

15  **Q.**     What do you understand to be happening here?

16  **A.**     We have evidence showing that Hailong's been to casinos

17  with these people, and so it appears that he's learned the

18  pattern of behavior what to do after cash is withdrawn.

19  **Q.**     Could we turn to page 5, please?

20  **A.**     I'm there.

21  **Q.**     I think -- could you just explain what's happening in

22  this chat?

23  **A.**     Seems like they're trying to talk to a manager about how

24  much money to get, and then to say that it's from gambling.  The

25  chat is on 12/10/2022; so, presumably, it was when they were at

1    the Bank of America withdrawing -- trying to withdraw the

2    approximate 75,000.

3    **Q.**    Could we skip to page 7 now?  Can you read the first line

4    of this excerpt?

5    **A.**    On 12/12/2022, Nikki says, "Give me Chase personal

6    account information, BofA private account, Wells Fargo public

7    account and private account."

8    **Q.**    What does "public" and "private account" refer to here?

9    **A.**    We believe that public account is referring to the

10   business accounts and private accounts are referring to the

11   individual's personal accounts.

12   **Q.**    And then what does Small 7 provide in response?

13   **A.**    Small 7 provides the account information for Mingxing

14   Lyu.

15   **Q.**    What does Nikki say in response to that?

16   **A.**    Nikki says -- again, on 12/12/2022 -- "I need the address

17   too."  Nikki then says again, "I'll give you the pattern," and

18   then Nikki provides the Sea Dragon Remodel Bank of America

19   account.

20   **Q.**    And what is the last line of the chat?

21   **A.**    The last line is, "This is the address for all," from

22   Nikki on 12/12/2022.

23            MS. BEDELL:  Could we look at page 8, please?

24   BY MS. BEDELL:

25   **Q.**    Could you describe what's happening in this excerpt?

1    **A.**    Yeah.  Nikki appears to be giving Small 7 and Joseph Wong

2    instructions on exactly what to ask the bank.

3    **Q.**    Let's go back to page -- oh, excuse me.

4         At the end, it looks like Small 7 sends an attachment.

5    Can you describe what happens there?

6    **A.**    Oh, yeah.  So this is a video thumbnail.  So what appears

7    to have happened is, like we saw Joseph Wong sending videos of

8    himself calling the bank, we believe that Small 7 also sent a

9    video of himself calling the bank.  We didn't actually see the

10   video on Joseph Wong's phone.  We just saw this video thumbnail

11   image come through.

12   **Q.**    And was there a transfer into Zhu's personal Bank of

13   America account at around this time?

14        THE INTERPRETER:  Counsel, if you could slow down, that

15   would be helpful.

16        THE COURT:  Please just slow down a little bit for the

17   interpreters.

18   BY MS. BEDELL:

19   **Q.**    Was there a transfer into Zhu's personal Bank of America

20   account at around this time?

21   **A.**    On 12/12?

22   **Q.**    Yes, around that time.

23   **A.**    Yes.  On 12/9, there was a transfer from Robert Kessler.

24   **Q.**    Okay.  Let's go back to page 6.  What is the date on this

25   chat?

*Saunders - Direct - Bedell*

1    **A.**      12/10/2022.

2    **Q.**      And can you read this chat?

3    **A.**      Starting from the top?

4    **Q.**      Starting from the top.

5    **A.**      "Nikki:  The card can't be used at the ATM?

6          Small 7:  No.

7          Nikki:  BofA won't be able to unlock it, I guess.

8          Small 7:  Try calling.

9          Nikki:  Mm-hmm.

10         Nikki:  Can you log into online banking?

11         Nikki:  You can't be so anxious to collect the money from

12   now on.

13         Nikki:  Split it in two.

14         Small 7:  Mm-hmm.

15         Small 7:  Online banking works.

16         Nikki:  Here's the video.

17         Small 7:  I'm on the phone.

18         Nikki:  Okay."

19         And then Nikki sends a 1794.pic, and then Nikki also

20   sends 1795.pic, and then Nikki says, "75,000 sender information.

21         Small 7:  Okay.

22         Small 7:  I can't unlock it today.  I need to call on

23   Monday.

24         Nikki:  Mm-hmm."

25            MS. BEDELL:  Could we look at Exhibit 5-15, please?

*Saunders - Direct - Bedell*

```
 1                (Exhibit published.)

 2    BY MS. BEDELL:

 3    Q.    And what is this?

 4    A.    This is that Cellebrite report that captures the details

 5    of this image here, 1794.pic.

 6    Q.    And 1794.pic, what was the create date here?

 7    A.    12/10/2022.

 8    Q.    And is that the same picture title as we just saw in the

 9    chat we were just looking at?

10    A.    It is.

11          MS. BEDELL:  Could we look at page 2?

12    BY MS. BEDELL:

13    Q.    What is this?

14    A.    This is Robert Kessler's Alaska driver's license.

15    Q.    And is this the individual who sent 75,000?

16    A.    This is.

17          MS. BEDELL:  Could we look at page 3 of this exhibit?

18    BY MS. BEDELL:

19    Q.    And what is the title of this image?

20    A.    The title?

21    Q.    Or name.  Excuse me.

22    A.    The name of this image is 1795.pic.

23    Q.    When was it created?

24    A.    On 12/10/2022.

25    Q.    This is the same image that we just saw in the exhibit
```

1    with the chats?

2    **A.**     Yes, it is.

3             MS. BEDELL:  Could we look at page 4?

4    BY MS. BEDELL:

5    **Q.**     And what is this?

6    **A.**     This is a wire form showing that Robert Kessler sent

7    $75,000 on 12/9/2022 to Hailong Zhu's Bank of America account

8    ending 6689.

9    **Q.**     And on page 5, please, what is this?

10   **A.**     This is the Cellebrite details metadata over this image

11   1517.pic.

12   **Q.**     Created what date?

13   **A.**     On 12/9/2022.

14   **Q.**     On page 6, what is the image itself?

15   **A.**     These are checks.  They're blank checks.  They're from

16   Chase account -- from Yunzhu Xie's Chase account, and they're

17   signed.

18   **Q.**     And remember when we were looking at 5-12, is this the

19   image that Nikki had asked for and Joseph sent in the chat on

20   12/9?

21   **A.**     Yes.

22             MS. BEDELL:  Could we look at Exhibit 5-14?

23             (Exhibit published.)

24   BY MS. BEDELL:

25   **Q.**     And do you recognize this exhibit?

*Saunders - Direct - Bedell*

1   **A.**      Yes, I do.  This is an excerpt of one of the chats.

2   **Q.**      Is it an excerpt of the full chats that were at 5-13?

3   **A.**      Yes.

4   **Q.**      Is 5-14 a fair and accurate representation found on

5   Wong's device?

6   **A.**      Yes.

7   **Q.**      And the translations later provided?

8   **A.**      Correct.

9           MS. BEDELL:  At this time, we'd move to admit and

10  publish 5-14, Your Honor.

11          MR. WENSTRUP:  No objection.

12          THE COURT:  It will be admitted without objection.

13          (Government's Exhibit No. 5-14 received in evidence.)

14  BY MS. BEDELL:

15  **Q.**      Who are the participants in this chat?

16  **A.**      This one is between Nikki and Joseph Wong.

17  **Q.**      Were there dates on these chats?

18  **A.**      There were not on these chats.  We later learned that

19  they were in February.

20  **Q.**      Okay.  Are the chats in Exhibit 5-13 similar to the other

21  chats that we read?

22  **A.**      Yes.

23  **Q.**      And do these excerpts reflect the nature of the chats?

24  **A.**      They do.

25  **Q.**      I will direct your attention to the second excerpt on

1   page 1; what is going on here?

2   **A.**     I think he says -- so Nikki says, "Tomorrow, clear the

3   checks from Hailong, Mingxing, and Ms. Xie, and write a check

4   for the rest that cannot be withdrawn."

5   **Q.**     Had law enforcement found anything in search relevant to

6   this discussion?

7   **A.**     Yes.  We saw pre-signed checks from Hailong and Ms. Xie

8   as well.

9   **Q.**     And you said you were able to determine that these chats

10  were from February; do I have that correct?

11  **A.**     Yes, correct.

12  **Q.**     Let us look at -- move to Item 10.  So you've already

13  looked at Exhibit 6-1, which is the phone.

14          MS. BEDELL:  So at this point, I will read another

15  stipulation, Your Honor.

16          "The following exhibits are true and accurate

17  depictions of data extracted from the iPhone 11 Pro Max at

18  Government Exhibit 6-1, through the use of GrayKey, a reliable

19  forensic access tool, that extracted data from the cell phone."

20          Exhibits 6-2, 6-3, and 6-5; at this time, we move to

21  admit those exhibits.

22          MR. WENSTRUP:  No objection.

23          THE COURT:  Admitted without objection.

24          (Government's Exhibit Nos. 6-2, 6-3, and 6-5 received

25  in evidence.)

*Saunders - Direct - Bedell*

1          MS. BEDELL:  Could we look at Exhibit 6-2?

2          (Exhibit published.)

3   BY MS. BEDELL:

4   **Q.**    And what is the Apple ID associated with this phone?

5   **A.**    The Apple ID is josephwong954734@icloud.com.

6   **Q.**    And what are the last four of the phone numbers

7   associated with this phone?

8   **A.**    There's a 7846, a 1044, and a 6466.

9   **Q.**    And on page 2, what's depicted on page 2?

10  **A.**    These are user accounts that are associated with this

11  device.

12  **Q.**    Are most of them associated with that iCloud account that

13  you just read?

14  **A.**    Yes.

15  **Q.**    Based on your investigation, what did you determine that

16  this phone was?

17  **A.**    We determined that this phone was likely his secondary

18  phone.

19  **Q.**    Could we look at Exhibits 6-3 through 6-6, which are CDs?

20  **A.**    Okay.

21  **Q.**    What are depicted on these CDs?

22  **A.**    These are videos taken from that secondary phone.

23  **Q.**    And does the CD also contain Exhibits 6-4 and 6-6, which

24  are shortened clips of the videos at 6-3 and 6-5?

25  **A.**    Yes, it does.

Saunders - Direct - Bedell

1    **Q.**    And were they shortened in the similar ways to the other

2    videos?

3    **A.**    Correct.

4    **Q.**    Are they fair and accurate clips of the longer videos at

5    6-4 and 6-6?

6    **A.**    Yes.

7          MS. BEDELL:  At this time, we would move to admit 6-4

8    and 6-6, Your Honor.

9          MR. WENSTRUP:  No objection.

10          THE COURT:  Admitted without objection.

11          (Government's Exhibit Nos. 6-4 and 6-6 received in

12    evidence.)

13          MS. BEDELL:  Could we play just the very beginning of

14    6-6, please?

15          (Audio played.)

16    BY MS. BEDELL:

17    **Q.**    What is depicted going on here, depicted in this video?

18    **A.**    This is another phone call where Joseph Wong is calling

19    the bank representing himself as Hailong Zhu.

20    **Q.**    I apologize, I believe I misspoke earlier.  I think this

21    one was actually Defense Exhibit 6 yesterday, so we did watch

22    this in full yesterday.

23          So it was Joseph Wong calling the bank -- excuse me.

24          Is that also what's contained in Exhibit 6-4?

25    **A.**    It is.

*Saunders - Direct - Bedell*

1   **Q.**   And is he again pretending to be Hailong Zhu on this

2   call?

3   **A.**   He is.

4         MS. BEDELL:  Moving to exhibits from Item 5, which is a

5   phone, Exhibit 7-1.  At this point, I will read the stipulation.

6         "The following exhibits are true and accurate

7   depictions of data extracted from the iPhone 13 Pro Max at

8   Government's Exhibit 7-1, through the use of GrayKey, a reliable

9   forensic access tool, that extracted data from the cell phone."

10        It's Exhibits 7-2, 7-3, 7-4, 7-5, 7-6, and 7-7.  At

11  this time, we would move to admit those exhibits, Your Honor.

12        MR. WENSTRUP:  No objection.

13        THE COURT:  They will be admitted without objection.

14        (Government's Exhibit Nos. 7-2 through 7-7 received in

15  evidence.)

16  BY MS. BEDELL:

17  **Q.**   Could we take a look at Exhibit 7-2, please?  Do you

18  recognize this item?

19  **A.**   Yes, I do.

20  **Q.**   What is depicted here?

21  **A.**   This is a preliminary device report from Cellebrite

22  regarding this device, Item 5.

23  **Q.**   What is the device name of this device?

24  **A.**   The device name is hailongiPhone.

25  **Q.**   Is this the same as the name of the device that was

1    accessing the Sea Dragon JPMorgan accounts?

2    **A.**    It was.

3    **Q.**    And, again, this was found in Joseph Wong's possession?

4    **A.**    Correct.

5    **Q.**    What phone numbers are associated with this phone?

6    **A.**    Phone numbers 1024 and 1546.

7    **Q.**    Is that 1546 number the one used on the Sea Dragon bank

8    accounts?

9    **A.**    It is.

10    **Q.**    Was the 1024 number also associated with Wong's primary

11    phone?

12    **A.**    It was.

13           MS. BEDELL:  Could we look at Exhibit 7-3?

14           (Exhibit published.)

15    BY MS. BEDELL:

16    **Q.**    What's depicted here?

17    **A.**    These are applications that were installed on this

18    device.

19    **Q.**    And what were the applications installed on this device,

20    generally?

21    **A.**    Generally, they were banking applications.

22    **Q.**    Could you look at Exhibit 7-4?  What is this document?

23    **A.**    These are accounts that are associated with this device.

24    **Q.**    And in creating this exhibit, did you just select the key

25    accounts that had recognizable information with them?

*Saunders - Direct - Bedell*

1   **A.**     Yes, I did.  I believe there were three accounts that

2   were not linked to any type of email address or that was

3   recognizable that I excluded from this report.

4   **Q.**     What is the user account associated with the last entry?

5   **A.**     Zhuhailong923@gmail.com.

6   **Q.**     Did you come across this email anywhere else in the

7   investigation?

8   **A.**     I did.

9   **Q.**     Do you recall where?

10  **A.**     Yeah.  There's a sticky note that was found in his wallet

11  during the search warrant.

12  **Q.**     Whose wallet are you referring to there?

13  **A.**     Hailong Zhu's wallet.

14  **Q.**     Could you look at Exhibit 7-5, please?  What is this

15  document?

16  **A.**     These are notes that were in the Notes app of this phone,

17  and it appears to be showing account -- last four digits of

18  account numbers associated with Mingxing Trading LLC and the Sea

19  Dragon Remodel at Chase.

20  **Q.**     Could you look at Exhibit 7-6, please?  What is this

21  document?

22  **A.**     These are various text messages to this device.

23  **Q.**     What do these chats primarily consist of?

24  **A.**     They consist of banks sending verification codes to this

25  phone number.

1  **Q.**     And so basically your review of the phone, what did you

2  conclude this phone was primarily used for?

3  **A.**     This phone was primarily used to access Hailong Zhu's

4  online banking account at Sea Dragon -- the Sea Dragon accounts.

5  **Q.**     Let's take a look at 7-7, so the last one from this

6  device.  What is this exhibit?

7  **A.**     This is a Cellebrite report showing the details of this

8  PDF, seadragon.article.pdf.

9  **Q.**     More generally, does this exhibit contain numerous PDFs

10 found on the phone?

11 **A.**     Yes, it does.

12 **Q.**     If we look at page 2, what is the document?

13 **A.**     Page 2 is the State of California articles of

14 incorporation for Sea Dragon Remodel Inc.

15 **Q.**     And does the rest of this exhibit proceed similarly --

16          (Court reporter interruption.)

17          MS. BEDELL:  I'm sorry.  I'm trying to move quickly.

18 BY MS. BEDELL:

19 **Q.**     Does the rest of this exhibit proceed similarly where the

20 first page is metadata and the second page is the document

21 itself?

22 **A.**     Yes.

23 **Q.**     Let's look at page 4.  What is this document?

24 **A.**     This is an IRS notification showing that Sea Dragon

25 Remodel received an employer identification number.

*Saunders - Direct - Bedell*

1    **Q.**    And then page 8, what is this?

2    **A.**    This is the bank statement, Hailong Zhu's U.S. Bank, for

3    the period October 25th through November 22nd of 2022.

4    **Q.**    Does the account end in 4148?

5    **A.**    Yes.

6    **Q.**    And is this Mr. Zhu's personal account?

7    **A.**    Yes.

8    **Q.**    Could you look at page 13, please?  What is this?

9    **A.**    Sorry, these aren't numbered here.  This is the State of

10   California statement of information for Sea Dragon Remodel Inc.

11   **Q.**    And then page 16, please, what is this?

12   **A.**    This is the bank statement for East West Bank, account

13   ending 9074, in the name of Hailong Zhu.

14   **Q.**    And this is a personal account?

15   **A.**    That's correct.

16   **Q.**    Moving on to exhibit -- the 8 series, group 8.

17            MS. BEDELL:  I will read another stipulation.

18            "The following exhibits are true and accurate

19   depictions of data extracted from the iPhone 13 at Government's

20   Exhibit 8-1, through the use of GrayKey, a reliable forensic

21   access tool, that extracted data from the cell phone."

22            Exhibits 8-2, 8-3, 8-4, and 8-5; at this time, we would

23   move to admit those exhibits.

24            MR. WENSTRUP:  No objection.

25            THE COURT:  They will be admitted without objection.

*Saunders - Direct - Bedell*

```
1              (Government's Exhibit Nos. 8-2 through 8-5 received in

2     evidence.)

3              MS. BEDELL:  Could we look at Exhibit 8-2, please?

4              (Exhibit published.)

5     BY MS. BEDELL:

6     Q.    Do you recognize this item?

7     A.    I do.

8     Q.    And what is it?

9     A.    This is the preliminary device report showing the details

10    out of Item 8, which is one of the devices in Wong's possession.

11    Q.    What is the device name of this device?

12    A.    MingxingiPhone.

13    Q.    And what is the Apple ID associated with the phone?

14    A.    Mingxinglyn@gmail.com.

15    Q.    What phone numbers are associated with this phone?

16    A.    Phone number 5475.

17    Q.    Is there also a phone number 1024?

18    A.    Yes, there is.

19    Q.    And was that one associated with the hailongiPhone and

20    Wong's primary phone as well?

21    A.    Yes.

22    Q.    Okay.  Could you look at Exhibit 8-3?  What is this

23    page -- or what is this exhibit?

24    A.    This is a listing of user accounts associated with this

25    device.
```

1    **Q.**     Could you look at the account at the bottom of the first

2    page?

3    **A.**     Number 6?

4    **Q.**     Yes.  What is the username?

5    **A.**     The username is sunkangjun1967@gmail.com.

6    **Q.**     Is that name associated with PBB International

7    Consulting?

8    **A.**     Yes.

9    **Q.**     Does this exhibit contain user accounts associated with

10   the names of Bofa Cai, Huimin Huang, and Yunzhu Xie, among

11   others?

12   **A.**     Yes, it does.

13   **Q.**     Let's jump to Exhibit 8-5; what is this exhibit?

14   **A.**     This is the Cellebrite extraction report for -- well,

15   sorry.  These are various emails from this device.

16   **Q.**     And does the first page contain data about the email?

17   **A.**     Yes, it does.

18   **Q.**     And in the left column, what appears there?

19   **A.**     In the left column, it shows the parties and the email.

20   So this one is from Chase to Bofa Cai's email address.

21   **Q.**     And then what appears in this column labeled "content"?

22   **A.**     It has the subject, and it has the body.  The body is not

23   in a language that --

24   **Q.**     I'm sorry, I could not hear that last --

25   **A.**     It has the subject, and it has the body.  The body is not

1    in a language that we can read, so you have to pull up the

2    actual email to read it.

3    **Q.**    And so turning to page 2, is this the actual email?

4    **A.**    Yes.

5    **Q.**    Does the rest of the exhibit proceed in a similar

6    fashion, alternating pages between metadata and the email?

7    **A.**    Yes.

8              MS. BEDELL:  Court's indulgence, Your Honor.

9              (Whereupon, there was a brief pause in the

10   proceedings.)

11   BY MS. BEDELL:

12   **Q.**    We will move on to Exhibit 9-1.  Could you take a look at

13   Exhibit 9-1?  That is a phone that you have not previously

14   looked at.  Actually, I apologize.  Could you just generally

15   characterize the emails that were in the exhibit?

16   **A.**    Yeah.  So they were emails from banks noting alerts on

17   accounts.  Anytime they would, you know, add a wire payment,

18   that would be sent back to them in an email, "successful wire

19   payment added."  So mostly emails from banks.

20   **Q.**    Now we will look at Exhibit 9-1.  Do you recognize this

21   exhibit?

22   **A.**    I do.

23   **Q.**    What is it?

24   **A.**    This is the phone belonging to Hailong Zhu that was found

25   at his residence along with a SIM card.

1    **Q.**    Did you receive and analyze a forensic copy of this

2    phone?

3    **A.**    I did.

4    **Q.**    And did you find the items and information relevant to

5    your investigation on that device?

6    **A.**    Yes.

7              MS. BEDELL:  The next stipulation, Your Honor:

8              "The following exhibits are true and accurate

9    depictions of data extracted from the iPhone 11 Pro Max at

10   Government's Exhibit 9-1, through the use of GrayKey, a reliable

11   forensic access tool, that extracted data from the cell phone."

12             9-2, 9-3, 9-4, 9-6A, and 9-7.

13             And then, additionally, regarding translations of chats

14   from extraction of iPhone 12 Pro Max, "Leyou Li, a contract

15   Chinese linguist, is the translator and owner of the translations

16   of WeChat chats from the" iPhone -- excuse me -- "11 Pro Max,

17   Government's Exhibit 9-1, found at 25W171 Essex Avenue,

18   Naperville-DuPage, Illinois.  Mr. Li reviewed the chat

19   transcripts located at Government's Exhibit 9-6A and prepared a

20   translation of the chats located at Government's Exhibit 9-6.

21   The translations are fair and accurate to the best of Mr. Li's

22   knowledge and ability as a Chinese linguist.  A copy of Mr. Li's

23   *curriculum vitae* is at Government's Exhibit 16-17 and is

24   admissible."

25             And so at this point, Your Honor, we would move to

1    admit 9-2, 9-3, 9-4, 9-6, 9-6A, and 9-7.

2              THE COURT:  Any objection?

3              MR. WENSTRUP:  No objection.

4              THE COURT:  They will be admitted without objection.

5              (Government's Exhibit Nos. 9-2, 9-3, 9-4, 9-6, 9-6A,

6    and 9-7 received in evidence.)

7              MS. BEDELL:  Could we look at Exhibit 9-2?

8    BY MS. BEDELL:

9    Q.    What is this device -- what is this exhibit?

10   A.    This is the GrayKey progress report showing some of the

11   details of this device during the extraction.

12   Q.    What is the device name here?

13   A.    Device name is iPhone.

14   Q.    And the model?

15   A.    iPhone 11 Pro Max.

16   Q.    What are the accounts associated with the phone?

17   A.    Hailongzhu666@icloud.com, hailongzhu1983923@icloud.com.

18   Q.    Does Exhibit 9-3 contain user accounts associated with

19   this phone?

20   A.    Yes, it does.

21   Q.    And are the user accounts associated with the phone

22   mostly those two iCloud accounts that you just read?

23   A.    Yes.

24   Q.    Let's take a look at Exhibit 9-4.  What is this exhibit?

25   A.    9-4 is the metadata around a screenshot that was found on

1    the device.

2    **Q.**    And in backing up a little bit, does 9-4 contain a number

3    of images found on Mr. Zhu's phone?  You can flip through the

4    pages of 9-4 and just confirm that.

5    **A.**    Yes.  There are two -- are you asking for the total

6    number of --

7    **Q.**    No, no, just general -- what does it generally contain

8    within 9-4?

9    **A.**    It's images found in Hailong Zhu's phone.

10   **Q.**    Looking at page 1 here, you said this was the metadata,

11   but there's an image at the top.  Is this a capture of what the

12   image is?

13   **A.**    Yes.

14   **Q.**    And what is on the -- in looking at that image itself,

15   what is depicted there?

16   **A.**    This is the O Diamonds Trading Limited wire instructions.

17   **Q.**    What is on the left in that image?

18   **A.**    On the left is the -- is who the messages are coming in

19   from.

20   **Q.**    So a list of other text messages that came in?

21   **A.**    Yes.

22   **Q.**    What is the text that came in from 66719?

23   **A.**    That's a text message from U.S. Bank on the account

24   ending 4148.

25   **Q.**    And that's his personal account?

*Saunders - Direct - Bedell*

1    **A.**    Yes.

2    **Q.**    What is the creation date associated with this image?

3    **A.**    1/24/2023.

4    **Q.**    Looking down at the file path here, it's a bit long, but

5    does it contain the location SplashBoard/Snapshots?

6    **A.**    Yes, it does.

7            MS. BEDELL:  Could we look at page 2, please?

8    BY MS. BEDELL:

9    **Q.**    And what is depicted here?

10   **A.**    This is the metadata associated with an image found in

11   this phone.

12   **Q.**    What is included in -- what is the file path?

13   **A.**    The file path is IMG_1069.PNG.

14   **Q.**    Is that, perhaps, the file name?

15   **A.**    Yes, that's the file name.  You asked for the file path?

16   **Q.**    Yes, at the top.

17   **A.**    The directory?

18   **Q.**    Yes.

19   **A.**    DCIM.

20   **Q.**    What is depicted on this sheet of paper?

21   **A.**    1140 South El Molino, Alhambra, California, and then a

22   phone number ending in 1546, and then that email address

23   zhuhailong.

24   **Q.**    Have you seen this email address before?

25   **A.**    Yes, I have.

1  **Q.**    Where was it?

2  **A.**    I don't recall.

3  **Q.**    Could you look at page 4, please?  And is this just the

4  image itself that we had looked at the metadata for?

5  **A.**    Yes.

6  **Q.**    Do the rest of the images here proceed in the same

7  fashion?

8  **A.**    Yes.

9  **Q.**    For this one, we'll focus on the pages that actually

10  contain the metadata.  So if we could look at page 5.  Zooming

11  in on this top part, so we can see some of the opening

12  information, what is depicted here?

13  **A.**    This is the IRS notification of an employer

14  identification number for Sea Dragon Trading LLC.

15  **Q.**    What is the name of the file?

16  **A.**    The name of the file is -- it's 1103.HEIC, and the DCIM

17  directory.

18  **Q.**    Could we scroll down?  What is the create date?

19  **A.**    The --

20  **Q.**    I'm sorry, you're right, it's right there.

21  **A.**    The creation date is 12/14/2022.

22        MS. BEDELL:  Can we look at page 8, please?

23  BY MS. BEDELL:

24  **Q.**    And looking at the top, what is depicted here?

25  **A.**    This is image 1105.HEIC, also in the DCIM directory.  It

─── *Saunders - Direct - Bedell* ───

1   is the California Secretary of State business filing for Sea

2   Dragon Trading, LLC.

3   **Q.**     And what is the create date?

4   **A.**     12/14/2022.

5          MS. BEDELL:  Can we look at page 8 -- I'm sorry --

6   page 11, please?  And zooming in at the top again.

7   BY MS. BEDELL:

8   **Q.**     What are we looking at here?

9   **A.**     File name 1106.HEIC, also in the DCIM directory, on

10  12/14/2022.  It is an image of the California Secretary of State

11  certified copy filing for Sea Dragon Trading LLC.

12  **Q.**     Looking at page 14, what is depicted here?

13  **A.**     1107.HEIC, also in the DCIM directory, created on

14  12/14/2022.  This is the state of California articles of

15  organization for Sea Dragon Trading LLC.

16  **Q.**     Page 17, please, what is depicted here?

17  **A.**     Image 1108.HEIC, in the DCIM directory, on 12/14/2022.

18  This is the state of California statement of information for Sea

19  Dragon Trading LLC.

20  **Q.**     Page 20, please what is depicted here?

21  **A.**     1113.HEIC is the file name in the DCIM directory on

22  12/17/2022.  It's an image of Hailong Zhu's Sea Dragon Remodel

23  Wells Fargo card and his, presumably, Illinois state ID card.

24  **Q.**     And does that card depict his signature as well?

25  **A.**     Yes.

1          MS. BEDELL:  Could we look at page 23, please?

2    BY MS. BEDELL:

3    **Q.**     And what is -- what are we looking at here?

4    **A.**     This is a 1124.PNG file in the DCIM directory created on

5    1/7/2023.  This is a screenshot, looks like a screenshot of a

6    chat with Nikki, and the green text is Hailong Zhu.

7    **Q.**     How do you know that that is Hailong Zhu?

8    **A.**     The image for the profile of the ammunition and the

9    lighters seen elsewhere in his phone chatting with other

10   individuals.

11   **Q.**     And what application is this chat from?

12   **A.**     Excuse me?

13   **Q.**     What application is this chat from?

14   **A.**     We don't know -- I don't know the application, if this

15   was just a screenshot.  We think it's WeChat because that's the

16   same picture on his WeChat, but this was a screenshot.

17   **Q.**     Can we go to page 25?  I think it will be easier to look

18   at.  It's a close-up there.  You mentioned that the picture

19   associated with Zhu's screenshot -- could we zoom next to that

20   first bubble so we can see what that is?  Are you able to make

21   out what this is, Special Agent Saunders?

22   **A.**     This image?

23   **Q.**     Yes.

24   **A.**     Yeah.  There are handgun rounds, ammunition, three of

25   them, and then a lighter.

*Saunders - Direct - Bedell*

1    Q.    Could you look at the chat that was sent on 10/17, the

2    first image?

3           MS. BEDELL:  Could we zoom in on that?

4    BY MS. BEDELL:

5    Q.    And what is depicted in this image?

6    A.    This appears to be Chase username and password.

7    Q.    And can you see any names or recognizable words there?

8    A.    Yeah.  There's Sea Dragon and the password.

9           MS. BEDELL:  Could we zoom back out and go to the

10   second chat?

11   BY MS. BEDELL:

12   Q.    Who sent this image?

13   A.    This image came from Hailong Zhu, and it's his Bank of

14   America card and it's the card number ending 8943 and his name

15   Hailong Zhu.

16          MS. BEDELL:  Could we look at page 26, please?

17   BY MS. BEDELL:

18   Q.    What is depicted here?

19   A.    This is a -- this is an image of a boarding pass from

20   L.A. to Chicago.

21   Q.    And what is the date?

22   A.    The date is January 27th.

23   Q.    And what is the name on the boarding pass?

24   A.    The name?  Zhu Hailong -- Hailong Zhu.

25          MS. BEDELL:  Could we look at Exhibit 9-6, please?

1    BY MS. BEDELL:

2    **Q.**    What is this?

3    **A.**    This is various WeChats found in Hailong Zhu's device.

4    **Q.**    And which messages are from Zhu?

5    **A.**    The ones that are in blue.

6    **Q.**    And are those the ones ending 2812 as well?

7    **A.**    Correct.

8           MS. BEDELL:  Could we look to page 2, please?

9    BY MS. BEDELL:

10   **Q.**    What is the first message from Zhu on this page?

11   **A.**    This is what appears to be a screenshot with Mingxing's

12   itinerary for his flight.  It says, "Your flight is booked."

13   **Q.**    What is the date that this message was sent?

14   **A.**    9/2/2022.

15          MS. BEDELL:  Could we turn to page 3?

16   BY MS. BEDELL:

17   **Q.**    And does page 3 depict the bottom half of the screenshot?

18   **A.**    Yes.

19   **Q.**    And what are the additional details that are visible in

20   this bottom half of the screenshot?

21   **A.**    It shows the actual flight information from Chicago to

22   Los Angeles on the United Airlines flight at 1:58 p.m.

23   **Q.**    And on what date is the flight?

24          MS. BEDELL:  Actually, sorry, I apologize.  Going back

25   to the chats that you had previously pulled up.

1   BY MS. BEDELL:

2   **Q.**    Can you read what these messages say?

3   **A.**    You mean to read after the image here starting with, "I'd

4   like you to book" -- so Hailong Zhu says on 9/2/2022, "I'd like

5   you to book me on a flight on the 6th at 1:48."  And then user

6   ending in 021 says, "Didn't you already book this flight?"

7          Hailong Zhu:  "Please check if there are the lights on

8   the 6th that is one or two hours later than the one already

9   booked."

10   **Q.**    When it references "lights," what do you understand has

11   happened there?

12   **A.**    We understand a typo, and that should be "flights."

13   **Q.**    Could you look at page 5, please?  Can you read the

14   second chat on page 5?

15   **A.**    "My town fellow has already booked me a flight."

16   **Q.**    Then what happens below that?

17   **A.**    And then there was a screenshot of the flight

18   information.

19   **Q.**    And what numbers are at the top there -- sorry.

20          MS. BEDELL:  Scroll down a little bit.

21   BY MS. BEDELL:

22   **Q.**    The date 9/6.

23          MR. WENSTRUP:  Your Honor, just a point of

24   clarification.  I know we're looking at English messages, but I

25   just wanted to clarify that these were -- the original messages

*Saunders - Direct - Bedell*

```
1    were in Mandarin, and these have been subsequently translated by

2    a translator.

3    BY MS. BEDELL:

4    Q.    Is that correct?

5    A.    Yes, that's correct.

6    Q.    And are the original Mandarin messages at Exhibit 9-6A?

7    A.    Yes.

8          THE COURT:  To be clear, Agent, there was no

9    communication between these individuals in the English language;

10   is that correct?

11         THE WITNESS:  That's correct.

12         THE COURT:  Let me be clear:  What you're seeing is

13   translated versions of the original messages?

14         MS. BEDELL:  Thank you, Your Honor.

15         Can we take a look at Exhibit 9-7, which is a CD?

16         (Video played.)

17   BY MS. BEDELL:

18   Q.    What is the date on this video -- or what is this

19   exhibit?

20   A.    This is -- the date is 12/10.  It's a video from Hailong

21   Zhu's phone.

22         THE COURT:  Counsel, let me ask you to stop just for

23   one second.  I just need to speak with my clerks for a moment, so

24   if you could put on the noise machine, please.

25         (Whereupon, a discussion was held off the record.)
```

1          THE COURT:  You may continue.

2          MS. BEDELL:  I'm sorry, could we just play 9-7 again?

3          (Video played.)

4    BY MS. BEDELL:

5    **Q.**     Do you recognize the location that this video is filmed?

6    **A.**     Yes.  This is near Caesar's Palace on the Las Vegas

7    strip.

8    **Q.**     This is -- this is the shot at the end of this video.

9    Who are the people depicted here?

10   **A.**     The people that I recognize from this angle:  In the blue

11   jean shirt is Joseph Wong, and then in the sweatshirt with the

12   white hood is Little 7, or Small 7.

13   **Q.**     Is there one who appears to be standing in front of Wong?

14   **A.**     Yes.  You can make out her hair right there right in

15   front of Wong.

16   **Q.**     Just to be clear, all of these exhibits in this 9 group

17   that we've gone through, these are all items that were found on

18   Hailong Zhu's iPhone?

19   **A.**     That's correct.

20   **Q.**     And where was that iPhone seized from?

21   **A.**     The residence that he was staying in when we made the

22   arrest.

23   **Q.**     And what city was that in?

24   **A.**     Naperville, Illinois, off of Essex Avenue.

25   **Q.**     As part of your investigation, did you look into various

1    phone numbers that appeared in this case?

2    **A.**    Yes, I did.

3    **Q.**    And did you look into the phone number, that

4    (773) 828-1816?

5    **A.**    I did.

6    **Q.**    And was that the same phone number that was listed on

7    Mr. Zhu's personal bank account -- excuse me -- personal

8    U.S. Bank account?

9    **A.**    The U.S. Bank account, yes.

10   **Q.**    Is it the same number that was associated with the phone

11   seized from Zhu?

12   **A.**    Yes.

13   **Q.**    Did you receive records from T-Mobile regarding this

14   number?

15   **A.**    I did.

16          MS. BEDELL:  I want to read Stipulation No. 7.

17          "The United States and the defendant, Hailong Zhu,

18   stipulate and agree that the exhibits set forth below are

19   authentic, accurate copies of business records of T-Mobile, Inc.

20   that meet the requirements of Federal Rule of Evidence 902(11)

21   and 803(6).  The defendant reserves his right to object to

22   admissibility on other grounds."

23          Exhibits 16-10 and 16-11; at this point, we would move

24   to admit those exhibits, Your Honor.

25          MR. WENSTRUP:  No objection.

1          THE COURT:  Admitted without objection.

2          (Government's Exhibit Nos. 16-10 and 16-11 received in

3   evidence.)

4          MS. BEDELL:  Could we look at Exhibit 16-10, please?

5   Actually, that's a CD, I believe.  I apologize.  That might be

6   16-11.

7          THE WITNESS:  There's a 16-11 in here.

8          (Exhibit published.)

9   BY MS. BEDELL:

10  Q.    What is contained on this CD?

11  A.    It is the T-Mobile records for that 773 number.

12  Q.    And is there a subscriber name listed when you reviewed

13  those records?

14  A.    There was not.

15  Q.    And why do you understand that to be?

16  A.    It was a wholesale provider of a prepaid -- wholesale

17  providers, they oftentimes don't require you to provide

18  subscriber information.

19  Q.    Now we can look at 16-10, which is in the binder.

20         MS. BEDELL:  And if we could publish that, please.

21         (Exhibit published.)

22  BY MS. BEDELL:

23  Q.    And what is this document?

24  A.    16-10 is the call detail records provided by T-Mobile for

25  this phone number ending in 1816.

1    **Q.**    And when do the call records start?

2    **A.**    On January 5, 2022.

3    **Q.**    Is that when this account was activated?

4    **A.**    Yes.  That's what the subscriber information says.

5    **Q.**    Did you review these records?

6    **A.**    I did.

7    **Q.**    Are the calls with Wong's phone numbers ending in 1044

8    and 6466 numbers highlighted in red?

9    **A.**    Yes.

10           MS. BEDELL:  Could we turn to page 30?

11   BY MS. BEDELL:

12   **Q.**    And in looking at page 30, is this the first time you saw

13   the 1816 number communicating with a number known to belong to

14   Joseph Wong?

15   **A.**    Yes, on September 9th of 2022.

16   **Q.**    And which number was that he was communicating with?

17   **A.**    6466.

18   **Q.**    And does the 1816 number continue to be fairly regularly

19   in contact with the two numbers associated with Wong through

20   early January as reflected in these records?

21   **A.**    Yes.

22   **Q.**    And when do the records end?

23   **A.**    They end on January the 20th, 2023.

24   **Q.**    And why do they end on that date?

25   **A.**    That was the date that we served the subpoena to

1    T-Mobile.

2    **Q.**    And did you find any other records of Zhu's calls with

3    this phone number?

4    **A.**    Yes.  In his phone, we saw the call records from his

5    actual device.

6    **Q.**    And did you identify any other calls with Joseph Wong or

7    Nikki?

8    **A.**    I did.  Into February, there were calls with both

9    Joseph Wong and to Nikki.

10   **Q.**    And can you describe -- do you know the duration of those

11   calls, approximate duration?

12   **A.**    The call with Nikki was over three minutes long.  The

13   call with Wong, I don't think was very long.

14   **Q.**    Okay.  Did you receive records from The Venetian that

15   were relevant to this investigation?

16   **A.**    I did.

17   **Q.**    What is The Venetian?

18   **A.**    It's a casino in Las Vegas.

19          MS. BEDELL:  At this point, I would read Stipulation

20   No. 8.

21          "The United States and the defendant, Hailong Zhu,

22   stipulate and agree that the exhibits set forth below are

23   authentic, accurate copies of business records of The Venetian

24   Resort and The Venetian Las Vegas Gaming that meet the

25   requirements of Federal Rule of Evidence 902(11) and 803(6).  The

1    defendant reserves his right to object to admissibility on other

2    grounds."

3              Exhibits 16-9 and 16-9B; at this point, we move to

4    admit those exhibits, Your Honor.

5              MR. WENSTRUP:  No objection.

6              THE COURT:  Admitted without objection.

7              (Government's Exhibit Nos. 16-9 and 16-9B received in

8    evidence.)

9              MS. BEDELL:  Can we look at 16-9, please?

10   BY MS. BEDELL:

11   **Q.**    What is this document?

12   **A.**    This is the account information for Hailong Zhu that was

13   provided to The Venetian.

14             MS. BEDELL:  And could we turn to page 2?

15   BY MS. BEDELL:

16   **Q.**    What is reflected here?

17   **A.**    This is a summary of his plays at The Venetian.

18   **Q.**    How many trips did he make to Vegas where he visited The

19   Venetian?

20   **A.**    There were five trips.  The one on 12/23, it says he did

21   not play.

22   **Q.**    Okay.  And how are you understanding -- can you help us

23   understand what we're looking at in these records a little bit?

24   **A.**    Yeah.  So the first column here on 11/10/2022 was a

25   six-day play, as shown by the 6D there, and then it continues

1    on.

2    **Q.**    And so on that, it says -- excuse me.  So just taking an

3    example of the 12/9 trip in the second column that's currently

4    on the screen, it says "12/09/22 4D"; what does that mean?

5    **A.**    Four days of playing.

6    **Q.**    And then above that, it says "2NP"; what does that mean?

7    **A.**    Two days of not playing within that four-day time period.

8    **Q.**    And for this trip, what was the cash deposit for that

9    trip?

10   **A.**    $75,000.

11   **Q.**    And what were -- okay.  Excuse me.

12         Could we look at the trip on, I believe, 11/10?  It's the

13   first column on the top section.  How long was this trip?

14   **A.**    It was a six-day trip with three days of not playing.

15   **Q.**    And what was his cash deposit for this trip?

16   **A.**    50,000.

17   **Q.**    And then was there a cash buy-in at all?

18   **A.**    Yes, of 2,000.

19   **Q.**    What were his winnings on this trip?

20   **A.**    He won a little over 13,000 -- 13,088.

21   **Q.**    Did you review other records that reflect what he cashed

22   out from this trip?

23   **A.**    Yes.  Other Venetian records show his cash out of

24   approximately $63,000.

25   **Q.**    And what date was that on?

1   **A.**      It was around this same time frame.

2   **Q.**      Did you see a large deposit into one of his bank accounts

3   following this trip?

4   **A.**      Yes, I did.

5           MS. BEDELL:  Can we look at Exhibit 12-2, please?  If

6   we could pull that up, and then if we could --

7   BY MS. BEDELL:

8   **Q.**      So what is that large deposit that is around this time

9   frame?

10  **A.**      There was a large cash deposit of $75,000 on

11  November 15th, and we know it's cash because of the currency

12  transaction report that was filed.

13  **Q.**      Is that the currency transaction report at Exhibit 12-4?

14  **A.**      Yes.

15  **Q.**      Apologies.  Returning back to 16-9; and on page 2, the

16  final column on that bottom screen, what is that column

17  depicting?

18  **A.**      The accumulated figures for these five visits.

19  **Q.**      What is the total cash that was deposited across these

20  visits?

21  **A.**      The cash deposits are $275,000.

22          MS. BEDELL:  Could we look at Exhibit 16-9B, please?

23          (Exhibit published.)

24  BY MS. BEDELL:

25  **Q.**      What are these reports -- or what is this document?

*Saunders - Direct - Bedell*

1   **A.**     These are surveillance notes taken by The Venetian.

2   **Q.**     Could we go to the synopsis on the first note?  What is

3   the activity reflected here?

4   **A.**     It says that Hailong Zhu, his account ending in 110 at

5   spot 3, in 20,000 marker, table limits.  Joseph Wong account

6   ending in 468.  Spot 5 is pushing for Mr. Zhu.

7           So from talking to The Venetian, what we know what that

8   means is Joseph Wong is actually betting on behalf of Hailong

9   Zhu.

10  **Q.**     And if we go to page 2, what is the synopsis of the

11  activity reflected there?

12  **A.**     It says that Hailong Zhu is pushing for Joseph Wang.

13  **Q.**     Is the account number for this Joseph Wang the same as

14  the account number we've seen for Joseph Wong on the previous

15  page?

16  **A.**     It is.

17  **Q.**     What is the date of this log?

18  **A.**     12/10/2022.

19          MS. BEDELL:  Court's indulgence, Your Honor.

20          (Whereupon, there was a brief pause in the

21  proceedings.)

22  BY MS. BEDELL:

23  **Q.**     One final question:  You were here yesterday when we

24  reviewed evidence of guns that were found at Joseph Wong's home,

25  correct?

1    **A.**      Correct.

2    **Q.**      Did you investigate those guns?

3    **A.**      My understanding is that the agents found that the

4    weapons were lawfully registered.

5    **Q.**      Okay.

6            MS. BEDELL:  No further questions at this time, Your

7    Honor.

8            THE COURT:  Thank you.

9            Ladies and gentlemen of the jury, would you like to

10   stand up and stretch for a moment while we switch to

11   cross-examination, and then try and push forward?  Feel free to

12   stand up and stretch.

13           Mr. Wenstrup, if you're ready for cross-examination,

14   you can come forward.

15           MR. KAMENS:  Your Honor, can counsel do the same?

16           THE COURT:  Yes, and the witness as well.

17           MR. WENSTRUP:  May I proceed, Your Honor?

18           THE COURT:  You may.

19                         CROSS-EXAMINATION

20   BY MR. WENSTRUP:

21   **Q.**      Good afternoon --

22   **A.**      Good afternoon.

23   **Q.**      -- Special Agent Saunders.

24           Now, I'm going to take you back to the beginning of your

25   direct examination.  You mentioned that you investigated a

Saunders - Cross - Wenstrup

1    platform called SIMEX?

2    **A.**     That's correct.

3    **Q.**     And that was the platform the scammers used to take money

4    from Ms. Chavez?

5    **A.**     It wasn't on SIMEX.  Ms. Chavez was a different one.  I

6    think it was Gamma.

7    **Q.**     Was that associated?

8    **A.**     It was.

9    **Q.**     And based on your investigation, there's no evidence that

10   Hailong had anything to do with managing or operating SIMEX?

11   **A.**     Absolutely no evidence.

12   **Q.**     And then earlier on direct, you also mentioned a man

13   named Kessler, I believe his last name was?

14   **A.**     (No response.)

15   **Q.**     That's correct?

16   **A.**     That's correct.

17   **Q.**     And there's no evidence that Hailong ever contacted

18   Mr. Kessler, correct?

19   **A.**     None.

20   **Q.**     And just like there's no evidence that he had contacted

21   any of the other victims?

22   **A.**     Correct.

23   **Q.**     Again, back on direct examination, there was -- you

24   reviewed three clips of video surveillance with Ms. Bedell; do

25   you remember that?

*Saunders - Cross - Wenstrup*

1   A.      Yes.

2   Q.      Now, in those clips, someone was with Hailong during each

3   bank interaction, correct?

4   A.      Correct.

5   Q.      And the first interaction, Wong was just a couple of feet

6   behind him, correct?

7   A.      That's right.

8   Q.      While Hailong was at the teller?

9   A.      That's right.

10  Q.      And then the second surveillance footage was from the

11  ATM, correct?

12  A.      That's right.

13  Q.      And, there, Wong and Hailong are basically next to each

14  other?

15  A.      And Small 7 was also there as well.

16  Q.      Thank you.

17          And then at the third surveillance footage, the woman

18  we've kind of referred to that you've identified as Nikki was

19  next to him at the teller window?

20  A.      Yes; we believe that to be Nikki.

21  Q.      And on the surveillance footage, you can see that while

22  she's at the teller window, Nikki is actually putting cash into

23  a bag?

24  A.      Yes.  It looks like Hailong's pulling the cash out of the

25  bag at the beginning, and then Nikki is putting the cash in the

1    bag, and then she exits without the bag.

2    **Q.**    So during the transaction, Nikki is actually handling the

3    money during that transaction -- she is handling money during

4    that transaction?

5    **A.**    She is handling money in addition to Hailong, yes.

6    **Q.**    Now, you and Ms. Bedell also referred to a transaction

7    that I believe it was at the Bank of America at the Wynn casino;

8    am I remembering that correctly?

9    **A.**    Yes.  You're talking about the TRMS report from the bank?

10   **Q.**    Yes.

11   **A.**    Yes.

12   **Q.**    Just so we're clear, was that at a Bank of America at the

13   Wynn casino?

14   **A.**    That, I don't know.  In that report, it said Wynn.  In

15   terms of if the bank was inside the casino or not, that, I

16   wouldn't know.

17   **Q.**    Got it.  But it's a Bank of America location?

18   **A.**    Correct.

19   **Q.**    And that was an attempted withdrawal, correct?

20   **A.**    Attempted, that's right.

21   **Q.**    And we didn't see any CCTV from that account, right?

22   **A.**    Any what?

23   **Q.**    Any surveillance footage from that interaction, correct?

24   **A.**    Not from that one.

25            MR. WENSTRUP:  I would ask if the government can pull

1    up Exhibit 10-18.

2              (Exhibit published.)

3    BY MR. WENSTRUP:

4    **Q.**    Do you mind, just in your binder, taking a look at

5    Exhibit 10-18?

6    **A.**    Sure.  Okay.

7    **Q.**    So toward the end of that document, after the transaction

8    was declined, the notes there say that Hailong was confused,

9    correct?

10   **A.**    I'm sorry, are you talking about the last page under the

11   narrative?

12   **Q.**    Yes.  Thank you.

13   **A.**    Let me read it.  Do you want me to read the whole thing?

14   **Q.**    Go ahead and read it, sure.

15   **A.**    [As read]:  Hailong Zhu visited FC 12/10/2022 around

16   9:50 a.m. requesting to withdraw 74,988 in cash.  He just

17   received a wire transfer of 75,000 the day prior, on 12/9/2022.

18   When we asked him who was sending the funds, he seemed confused

19   and he was not able to provide a name.

20   **Q.**    When the decline occurred, the report describes Hailong

21   is confused, correct?

22   **A.**    Correct.

23   **Q.**    And he told them that he would need to check his phone,

24   correct?

25   **A.**    That's correct, and then he said it was for some

*Saunders - Cross - Wenstrup*

1   remodeling he did for someone.

2   **Q.**    All right.  And then -- if you recall, there was also an

3   occurrence where Hailong had attempted to make a withdrawal with

4   a Ms. Andrea Pozos, correct, from U.S. Bank?

5   **A.**    At U.S. Bank, yep.

6   **Q.**    And in that interaction, she said she also declined his

7   transaction, correct?

8   **A.**    That's right.

9   **Q.**    And at that point, she -- in that interaction, she said

10   that he asked her what to do at that point, correct?

11   **A.**    (No response.)

12   **Q.**    I can just be a little more clear.  In this interaction,

13   once the transaction was declined, he said he was -- the report

14   says that Hailong was confused and had to check his phone.  In

15   the interaction with Ms. Pozos, she said that after she declined

16   the international transfer, he then asked her if there was

17   anything that he could do?

18        MS. BEDELL:  Objection, Your Honor; he's just repeating

19   the other witness' testimony at this point.

20        THE COURT:  Just ask a simple question.  Let him answer

21   if he remembers the testimony.  The jury's recollection will

22   recall.

23        MR. WENSTRUP:  I think the point was made, Your Honor.

24   We can save time and move on.

25   /////

*Saunders - Cross - Wenstrup*

BY MR. WENSTRUP:

Q.     And then -- actually, I want to go back.  You mentioned with Ms. Bedell a picture of a power bill with Hailong's name on it, correct?

A.     Correct.

Q.     And I think you testified that that image was found on his phone?

A.     Correct.

Q.     And it was your belief, based on that power bill, that he resided at the house?

A.     Yes.  Typically, if your name --

Q.     It was just yes or no.

A.     Yes.

Q.     So you did conduct some surveillance operations in this case, correct?

A.     We did.

Q.     Okay.  But no Secret Service agent ever observed Hailong at that address, correct?

A.     When I did the surveillance, it was after he had already left L.A.

Q.     I appreciate that.  I'm asking during any surveillance at any time, did any Secret Service agent observe Hailong at that address?

A.     No.

Q.     And did you ever conduct a search on this address?

*Saunders - Cross - Wenstrup*

1  **A.**     On which address?

2  **Q.**     The El Molino address where you were saying he lived.

3  **A.**     Like, a search warrant?

4  **Q.**     Yes.

5  **A.**     No.

6  **Q.**     So the Secret Service never searched the inside of this

7  house?

8  **A.**     No.

9  **Q.**     So the Secret Service never found any of Hailong's

10  belongings in this house?

11  **A.**     No.

12  **Q.**     The Secret Service never found a bedroom for Hailong at

13  this house?

14  **A.**     No.

15  **Q.**     The Secret Service never found a phone or electronics of

16  his at this house?

17  **A.**     No.

18  **Q.**     The Secret Service never found pictures of his or his

19  loved ones at this house?

20  **A.**     No.

21  **Q.**     So there was no evidence from the house itself that

22  Hailong lived there?

23  **A.**     Later on when we were looking for Wong, we did speak with

24  someone at that residence, and that individual did say that she

25  recognized his name and that he did reside there.

1    **Q.**    Who was this person?

2    **A.**    She said to have lived there.  There's an interview

3    report on it.

4    **Q.**    I'm just asking do you remember who this person was that

5    said that he lived there?

6    **A.**    I don't.

7    **Q.**    Do you remember -- did you do an identification

8    procedure?

9    **A.**    No.

10   **Q.**    What race was this person?

11   **A.**    What race was she?

12   **Q.**    Yes.

13   **A.**    She appeared to be, like, Asian.

14   **Q.**    Like, Asian?  Do you know where she was from?

15   **A.**    No.

16   **Q.**    Did you talk to her at all about identifying people of

17   Asian origin?

18   **A.**    No.  She just said that she recognized Hailong Zhu's

19   name.

20   **Q.**    She recognized his name?

21   **A.**    Yeah.

22   **Q.**    She didn't say that she had ever seen him there?

23   **A.**    She said that he used to stay there.

24   **Q.**    Did she say that she had seen him there?

25   **A.**    I guess not exactly like that.  I don't recall.  I just

1    know that she said that --

2    **Q.**    Let me back up and save us some time.  I'm asking -- she

3    told you that he resided there?

4    **A.**    That's correct.

5    **Q.**    And I'm just asking did you ask follow-up questions about

6    whether she had seen him there, whether she had seen his

7    belongings there?  Did you ask those kind of follow-up

8    questions?

9    **A.**    She couldn't remember the time period that he was there,

10    and so we did not ask any additional follow-up questions on

11    that.

12    **Q.**    So after -- so when you asked follow-up questions, she

13    just said she couldn't remember when he resided there, and no

14    more follow-up questions about whether he lived there or not?

15    **A.**    No more follow-up questions about Hailong Zhu, correct.

16    **Q.**    We've also established that other people possessed

17    Hailong's bank documents and papers and account information for

18    Hailong, correct?

19    **A.**    Correct.

20    **Q.**    And so it's certainly possible that someone put his name

21    on the power account and he didn't live there, correct; that's

22    possible?

23    **A.**    I presume that is possible, yeah.

24    **Q.**    Now, I guess just thinking about these accounts a little

25    more broadly, if Mr. -- if Hailong was in control or -- if he

1   was in control of his bank accounts, he would have had the

2   ability to withdraw money from the accounts anytime there was

3   money in them, correct?

4   **A.**   Yes.  Are we talking about his Sea Dragon accounts or his

5   personal accounts?

6   **Q.**   Let's start with the Sea Dragon accounts.

7   **A.**   Okay.

8   **Q.**   So if he was in control of the Sea Dragon accounts, then

9   anytime there was money in them, he would have had the capacity

10  to withdraw the money, correct?

11  **A.**   That's correct.

12  **Q.**   For example, if he thought he was owed money by the

13  conspiracy and he had control of the bank accounts, he could

14  have just -- he would have had the capacity to just make a

15  withdrawal and keep that money, correct?

16  **A.**   That's correct.

17  **Q.**   To your knowledge, he never did that, correct?

18  **A.**   To my knowledge --

19  **Q.**   To your knowledge, he never withdrew a large amount of

20  money and kept it for himself, kept it for his personal use,

21  correct?

22  **A.**   Correct.  Cash is hard for us sometimes to verify where

23  it goes after that, so --

24  **Q.**   Let me stop you there.  Do you believe, based on the

25  totality of your investigation, that at any point, Hailong had

*Saunders - Cross - Wenstrup*

1   withdrew large amounts of money from these Sea Dragon accounts

2   and then kept it for himself?

3   **A.**     Large amounts, no.

4   **Q.**     So I want to go to -- talk a little bit about the chats

5   between Nikki, Little 7, and Joseph Wong; and in those chats,

6   Nikki is repeatedly giving instructions to Wong, correct?

7   **A.**     Yes, sir.

8   **Q.**     She's giving instructions to him to take people to banks,

9   correct?

10  **A.**     Right.

11  **Q.**     She's giving him instructions about how to handle the

12  accounts?

13  **A.**     Right.

14  **Q.**     Nikki is giving instructions to Joseph about how to

15  problem-solve when problems come up with the accounts?

16  **A.**     Yes.

17  **Q.**     Obviously, Hailong is not on these chats, correct?

18  **A.**     He's not.

19  **Q.**     And so Nikki wasn't giving instructions to Hailong about

20  how to problem-solve with these accounts, correct?

21  **A.**     She was not.

22          MR. WENSTRUP:  I'd ask if the government could publish

23  Exhibit 5-12, page 4.

24          (Exhibit published.)

25  /////

1   BY MR. WENSTRUP:

2   **Q.**    And I would like -- I would just ask that you take a look

3   at the chat excerpts on the bottom.  Now, would you mind reading

4   the first line of the English translation?

5   **A.**    Yes.

6        "Nikki:  Hailong just asked, Don't we go to Wynn this

7   time?  Laughing emoji."

8   **Q.**    And then can you read Joseph's response?

9   **A.**    "Joseph:  Ha ha!  He's got an idea."

10   **Q.**    And so, there, he is comment- -- Joseph is commenting

11   that Hailong has an idea that's of his own to go to Wynn, and

12   he's laughing at that idea, correct?

13   **A.**    Yeah, that's what the chat says.

14   **Q.**    And then after that -- we'll save you from reading

15   emojis -- but Little 7 also sends chuckling emojis, right?

16   **A.**    Right.

17   **Q.**    And those are in response that Hailong has an idea of his

18   own, correct?

19   **A.**    Correct.

20   **Q.**    Essentially, they're laughing at him for having an idea?

21   **A.**    I mean, I don't know that the context -- if they're

22   laughing at the idea.  It appears that they are, though, yes.

23   **Q.**    And so you talked a little bit about the contents of

24   Joseph's phone.  You mentioned that there was an enormous amount

25   of chats on that phone?

*Saunders - Cross - Wenstrup*

1    **A.**     Right.

2    **Q.**     I think you said terabytes of chats?

3    **A.**     Yeah, on all his phones combined, yeah.

4    **Q.**     And those chats that -- those terabytes included chats

5  between Nikki, Joseph, and Little 7, correct?

6    **A.**     Correct.

7    **Q.**     Okay.  And so some of the chats between Nikki, Joseph,

8  and Little 7 were translated into English, correct?

9    **A.**     Correct.

10    **Q.**     But there were so many chats that there are actually

11  chats between those three people that weren't translated,

12  correct?

13    **A.**     We attempted to get all of them, all of the chats with

14  Nikki and Small 7 -- or Little 7.  I keep calling him "Small 7"

15  because that's what I've been calling him the whole time.

16    **Q.**     No problem.

17    **A.**     We attempted to get all of them.

18    **Q.**     So, I guess, "attempted," just for clarity:  Did you get

19  all of them translated?

20    **A.**     I mean, we might not have, but we attempted to locate all

21  of them.  If there were other WeChat usernames that we didn't

22  recognize, that's where it became hard to figure out who's on

23  the other side of that WeChat.

24    **Q.**     Sure.  So after your attempts to identify all of the

25  chats between these three people, it's possible that there are

*Saunders - Cross - Wenstrup*

1    even more chats between them out there?

2    **A.**    Sure.

3    **Q.**    I just want to review --

4         MR. WENSTRUP:  I'd ask if the government wouldn't mind

5    publishing starting at 5-12, page 1, just some of the photographs

6    found on Hailong's phone.

7         (Exhibit published.)

8    **A.**    You said 5-12?  I don't believe that's Hailong's phone.

9    **Q.**    I apologize.

10        MR. WENSTRUP:  Court's indulgence just for a second.

11        (Whereupon, there was a brief pause in the

12   proceedings.)

13        MR. WENSTRUP:  I appreciate the Court's indulgence.

14   It's the wrong exhibit.

15   BY MR. WENSTRUP:

16   **Q.**    So we're looking at 9-4, page 1, and so there's a

17   screenshot there up at the top, correct?

18   **A.**    Yes, there is.

19   **Q.**    And that's got O Diamonds Trading Limited Room B2 --

20   there's a bank name -- I'm sorry -- there's an account name and

21   address --

22   **A.**    Right.

23   **Q.**    -- on that screenshot, correct?

24   **A.**    That's correct.

25   **Q.**    I have a little trouble seeing beneath that, but it

1    appears beneath that there are two numbers, correct?

2    **A.**    Correct.

3    **Q.**    So we've got a bank name -- I'm sorry -- an account name,

4    an address below it, and two numbers beneath that, correct?

5    **A.**    Correct.

6    **Q.**    I appreciate -- do you read Mandarin?

7    **A.**    Not at all.

8    **Q.**    I don't either.

9         So is it possible that those two numbers might be an

10   account number and a routing number?

11   **A.**    It is possible.

12   **Q.**    And so this account name, account address, potentially

13   account number, and routing number, that's all information a

14   person would need if they were asked to complete a bank

15   transfer, correct?

16   **A.**    That's correct.

17   **Q.**    Now, I'd like to -- I know we mentioned this briefly on

18   direct.

19        MR. WENSTRUP:  I apologize.  If we could just go to

20   page 4.

21   BY MR. WENSTRUP:

22   **Q.**    So, there, we've got a picture of what appears to be an

23   address, phone number, and an email address, correct?

24   **A.**    That's correct.

25   **Q.**    Now, I guess -- Agent Saunders, in your day-to-day life,

Saunders - Cross - Wenstrup

1    do you write down a note to yourself with your own phone number?

2    **A.**      I do not.

3    **Q.**      With your own email?

4    **A.**      I do not.

5    **Q.**      With your own address?

6    **A.**      Nope.

7    **Q.**      And do you ever write down phone numbers, addresses,

8    email addresses that are not yours?

9    **A.**      If I need to --

10   **Q.**      In your day-to-day life, do you ever write those things

11   down?

12   **A.**      That are not mine?

13   **Q.**      That is not yours.  Someone gives you a phone number to

14   call later, do you ever write it down?

15   **A.**      I put it in my phone, so no.

16   **Q.**      Never.  All right.  You're beyond handwritten notes?

17   **A.**      Yes.

18   **Q.**      Do you think it's possible that someone might write down

19   information that they need to remember later?

20   **A.**      Yes.

21   **Q.**      I know some of these things, I think, we can move through

22   quickly.  You and Ms. Bedell reviewed an IRS form, California

23   Secretary of State paperwork in Hailong's phone, correct?

24   **A.**      That's correct.

25   **Q.**      And all of those documents were in English, correct?

*Saunders - Cross - Wenstrup*

1    **A.**     They were what?

2    **Q.**     In English.

3    **A.**     Yes.

4    **Q.**     And then you also reviewed that there was a picture of a

5    Wells Fargo card in his phone, correct?

6    **A.**     That's correct.

7    **Q.**     And, actually, the account number wasn't visible in that

8    picture, correct?

9    **A.**     Correct.

10           MR. WENSTRUP:  Court's indulgence just for a moment.

11           (Whereupon, there was a brief pause in the

12   proceedings.)

13   BY MR. WENSTRUP:

14   **Q.**     I'm going to consult with Lorraine here, just because

15   we're so deep into the page numbers that I lost count.

16           MR. WENSTRUP:  I'm going to ask that the government

17   publish the screenshot without the metadata, a screenshot of the

18   text.  I ask that we not -- without the metadata so we can see

19   it.  It will be a little bigger.

20           (Exhibit published.)

21   **A.**     I don't know if there is one; is there?  Oh, yeah, there

22   is.  I see it right here.

23   **Q.**     And so I guess rather than have us skip around pages,

24   this is a blown-up image that is sent by Nikki to Hailong,

25   correct?

*Saunders - Cross - Wenstrup*

1  **A.**    Correct.

2  **Q.**    I assume you've looked at a close-up of this image,

3  correct, in the course of your investigation?

4  **A.**    Yes.

5  **Q.**    Okay.  And this image is Nikki sending Hailong

6  information about his own bank accounts, correct?

7  **A.**    Are you talking about the first image?  Oh, this one?

8  Sorry.  I thought -- yes, correct.

9  **Q.**    And just to be clear, the image we're looking at is,

10  that's Nikki sending Hailong information about his own accounts,

11  correct?

12  **A.**    Yes.  It appears to be -- obviously, we don't know what

13  the passwords -- like, what accounts they go to, but it appears

14  to be online login information.

15  **Q.**    Okay.  And that is information that, clearly, Nikki has,

16  correct?

17  **A.**    It came from her.

18  **Q.**    It came from her.  And she has to send it to Hailong?

19  **A.**    That's correct.

20        MR. WENSTRUP:  Court's indulgence just for a moment.

21        (Whereupon, there was a brief pause in the

22  proceedings.)

23        MR. WENSTRUP:  Thank you.

24  BY MR. WENSTRUP:

25  **Q.**    Just a quick point of clarification about the phones.

*Saunders - Cross - Wenstrup*

1    We've heard -- we just saw all these images from Hailong's

2    phone, correct?

3    **A.**    Correct.

4    **Q.**    And I think -- I just want to make sure that we're clear,

5    because when we were talking about Hailong's phone, we're not

6    talking about hailongiPhone, correct?

7    **A.**    Correct, yes.

8    **Q.**    Because Hailong's phone, we're talking about the one that

9    was recovered from the search of him in Chicago?

10   **A.**    Right.

11   **Q.**    And hailongiPhone was the one that accessed his bank

12   accounts and was found in the search of Wong's -- and was found

13   in Wong's backpack?

14   **A.**    That's correct.

15   **Q.**    And so to take us back a little bit to the entirety of

16   the investigation here --

17            THE COURT:  Mr. Wenstrup, I'm going to interrupt.  I'm

18   sensitive to how long we've been sitting here.  I was, perhaps,

19   in my own mind, optimistically thinking we could finish

20   cross-examination and redirect and be able to take our lunch

21   break, but I'm beginning to think that that may not be realistic.

22   I don't want to rush you.

23            MR. WENSTRUP:  I imagine we're in the ballpark of ten

24   minutes.

25            THE COURT:  Ladies and gentlemen, I'm going to take an

*Saunders - Cross - Wenstrup*

1    informal poll.  If you can make it another 20 minutes, it may be

2    a logical place to stop, but have a little bit longer lunch

3    break, are you willing to do that?  I don't want anyone to feel

4    they have to.

5              I'm seeing nodding heads and thumbs up.

6              Counsel, you're both challenged to try and accommodate

7    the jury's generosity here.

8              If anyone at any point really needs a break, let us

9    know, but that will, I think, help us all.

10             You may continue.

11             MR. WENSTRUP:  Thank you, Your Honor.

12   BY MR. WENSTRUP:

13   **Q.**    So relatively early on in this investigation, you came

14   upon Hailong's name?

15   **A.**    That's correct.

16   **Q.**    And --

17   **A.**    Well, I came upon the Sea Dragon bank account first.

18   **Q.**    Thank you.

19             So one of Marisol Chavez's wire transfers went to a Sea

20   Dragon account?

21   **A.**    Correct.

22   **Q.**    Of course, when you looked at the account name on that

23   bank account, the account was in the name of Sea Dragon LLC or

24   Trading or --

25   **A.**    Right.

*Saunders - Cross - Wenstrup*

1    **Q.**    Or something like that?  That's right?

2    **A.**    Correct.

3    **Q.**    And then when you looked at the signatory on the account,

4    the name on that was Hailong Zhu, correct?

5    **A.**    That's correct.

6    **Q.**    And so because the account in his name, or where he was

7    the signatory, received funds from a scam, you suspected he

8    could be involved in the scam?

9    **A.**    Correct.

10   **Q.**    And as a result, you also looked into the business of Sea

11   Dragon Remodelling [*sic*] or -- you looked into the Sea Dragon

12   account, correct?

13   **A.**    Correct.

14   **Q.**    And Hailong's name was on those too?

15   **A.**    Correct.

16   **Q.**    And he was the sole accountholder?

17   **A.**    Correct.

18   **Q.**    Okay.  And you began identifying Sea Dragon bank

19   accounts?

20   **A.**    Correct.

21   **Q.**    And you spoke to officials at the banks, some of whom had

22   already started investigating the accounts?

23   **A.**    Correct.

24   **Q.**    And they identified the device that accessed the accounts

25   as hailongiPhone?

1   **A.**      On their online logins, yes.

2   **Q.**      Thank you.  The banks identified, online, the logins to

3   the Sea Dragon accounts were coming from a device called

4   hailongiPhone, correct?

5   **A.**      Yes, and that is only from the Chase accounts.  The other

6   accounts didn't capture as much information.

7   **Q.**      But when you checked the device name, it's hailongiPhone,

8   correct?

9   **A.**      That's correct.

10  **Q.**      And so Hailong's name comes up again, correct?

11  **A.**      That's correct.

12  **Q.**      And the fact that it was Hailong's iPhone used to access

13  these accounts contributed to you suspecting that Hailong could

14  be involved?

15  **A.**      Yes.

16  **Q.**      And so Hailong's name on the accounts, this is exactly

17  why Wong was recruiting people like Hailong, correct?

18  **A.**      We have not been able to speak with Wong, so I'm not -- I

19  haven't been able to, so I'm not sure why he chose, you know,

20  different types of people to manage.  But, yes, Wong does have a

21  pattern of managing other people as well.

22  **Q.**      Right.  And so because -- Hailong put his own name on the

23  company's documents, correct?

24  **A.**      Say that again.  I'm sorry.

25  **Q.**      Hailong put his own name on the company's documents?

*Saunders - Cross - Wenstrup*

1    **A.**    Yes.

2    **Q.**    And he put his own name on the bank accounts?

3    **A.**    Yes.

4    **Q.**    All right.  And Wong did not put his name on the bank

5    accounts -- I'm sorry, Wong -- you talked about Wong's pattern;

6    and in Wong's pattern, typically, on these company's bank

7    accounts, his name wasn't there?

8    **A.**    That's correct.

9    **Q.**    And as a result, when bank authorities flagged a bank

10   account for fraud, it was Hailong's name on that account,

11   correct?

12   **A.**    That's correct.

13   **Q.**    Not Wong's?

14   **A.**    That is correct.

15   **Q.**    And when bank authorities flagged a company making

16   suspicious trades, it would be Hailong's name on the company,

17   correct?

18   **A.**    That's correct.

19   **Q.**    Not Wong's?

20   **A.**    That's correct.

21   **Q.**    And, for example, when the Secret Service investigates a

22   fraud related to one of these bank accounts, it would be

23   Hailong's name on the account, correct?

24   **A.**    When we get the records back from the bank, it will show

25   Hailong's name, that's correct.

*Saunders - Cross - Wenstrup*

1   **Q.**    Not Wong's?

2   **A.**    That's correct.

3   **Q.**    And so the frauds will be tied to Hailong's name?

4   **A.**    Yes.

5   **Q.**    And the investigators, as a result, will be looking at

6   Hailong and not Wong initially?

7   **A.**    Initially, yes, but we are most definitely looking at

8   Wong.

9   **Q.**    Fair enough.  But initially when the investigation

10  starts, you're looking at Hailong and not Wong, correct?

11  **A.**    That's correct.

12  **Q.**    Now, by February 2023, you suspected Joseph Wong was

13  involved?

14  **A.**    February of '23, yes, that sounds right.

15  **Q.**    And you can -- in February 2023, you conducted

16  surveillance on Wong, right?

17  **A.**    Yes.

18  **Q.**    We heard a little of that surveillance yesterday?

19  **A.**    Yep.

20  **Q.**    On February 6, 2023, the Secret Service observed Wong

21  picking up a person and going in with them to multiple banks?

22  **A.**    Correct.

23  **Q.**    And on February 7th, the Secret Service observed Wong

24  picking up multiple people and going in with them to multiple

25  banks?

1    **A.**      Yes.

2    **Q.**      So by early February, the Secret Service had observed

3    Wong bringing multiple people to multiple banks?

4    **A.**      That's right.

5    **Q.**      But the Secret Service still believed that Hailong

6    maintained control of the Sea Dragon accounts?

7    **A.**      Yes.  At that point, we had not been able to seize Wong's

8    phones.

9    **Q.**      So you believed that before the search of Wong's home?

10   **A.**      Correct.

11   **Q.**      So we heard a little bit about that search yesterday.  We

12   just discussed the Sea Dragon accounts a couple of minutes ago,

13   and Hailong was a named accountholder on the Sea Dragon

14   accounts?

15   **A.**      Yes.

16   **Q.**      And his name on those accounts contributed to you

17   thinking he was a suspect?

18   **A.**      Yes, of course.

19   **Q.**      And during the search of Wong's house, the Secret Service

20   found the bank cards for the Sea Dragon accounts at Wong's

21   house?

22   **A.**      Yes, they did.

23   **Q.**      And I believe the Secret Service found about ten bank

24   cards in Hailong's name at Wong's house?

25   **A.**      That sounds about right.

*Saunders - Cross - Wenstrup*

1    **Q.**    And the Secret Service found account statements for the

2    Sea Dragon accounts at Wong's house?

3    **A.**    Yes, we did.

4    **Q.**    The Secret Service found videos where Wong was calling

5    banks and discussing the Sea Dragon accounts, correct?

6    **A.**    Yes.  That was found much later on because it took a

7    while to examine the phones.  I just don't want you thinking

8    that we saw it the day of.

9    **Q.**    I appreciate that.  I understand that the extraction

10   of --

11   **A.**    Yes.

12   **Q.**    -- phones, as Mr. Cruz told us about, is not

13   instantaneous.

14   **A.**    Yes.

15   **Q.**    But they -- that video, the phone where that video was --

16           THE INTERPRETER:  Your Honor, the receiver is out of

17   batteries.  May we change the batteries?

18           THE COURT:  Yes.  Thank you.

19           (Whereupon, there was a brief pause in the

20   proceedings.)

21           THE COURT:  Are you ready?

22           THE INTERPRETER:  Yes.

23   BY MR. WENSTRUP:

24   **Q.**    And on these videos of calls, Wong recorded himself

25   pretending to be Hailong?

*Saunders - Cross - Wenstrup*

1    **A.**    Yes.

2    **Q.**    And Wong recorded himself telling the banks that he was

3    Hailong Zhu?

4    **A.**    Yes.

5    **Q.**    And in those videos, the banks proceeded to discuss the

6    Sea Dragon accounts with Wong?

7    **A.**    Yes.

8    **Q.**    And, again, we discussed earlier that the device name

9    hailongiPhone contributed to you thinking that Hailong was a

10   suspect, correct?

11   **A.**    Correct.

12   **Q.**    The name of the device --

13   **A.**    Contributed to it, yes, correct.

14   **Q.**    And so during the search of Wong's home, the Secret

15   Service found that device, correct?

16   **A.**    That's correct.

17   **Q.**    They found the device hailongiPhone in Wong's room,

18   correct?

19   **A.**    Yes.

20   **Q.**    And that was one of the main phones recovered at Wong's

21   house?

22   **A.**    I believe there were eight phones.  Yes.

23   **Q.**    In that search of Wong's house, the Secret Service found

24   documents from other accounts, not just Hailong's, correct?

25   **A.**    That's correct.

*Saunders - Cross - Wenstrup*

1   **Q.**     There was a pile of bank cards that did not belong to

2   Mr. Wong?

3   **A.**     Right.

4   **Q.**     And the search of Wong and his property, the Secret

5   Service also found checks made out to other people, correct?  If

6   you're having a hard time remembering, for example, in Wong's

7   car, the Secret Service found a cashier's check for $72,000?

8   **A.**     Yes, we did.

9   **Q.**     And that check was from Bank of the West?

10  **A.**     Yes.  I think that was the Good Luck Trading.

11  **Q.**     Exactly.  So that check was made payable to the Good Luck

12  Trading LLC?

13  **A.**     Right.

14  **Q.**     And the memo on the account said "checking account

15  closure"?

16  **A.**     That's correct.

17  **Q.**     And that memo indicates it's a check sent by the bank to

18  the accountholder after the account has been closed, correct?

19  **A.**     Yes, that's right.

20  **Q.**     It was supposed to be sent to the accountholder, correct?

21  **A.**     Yes.

22  **Q.**     A check, when a bank account has been closed, is sent --

23  is supposed to be sent to the accountholder, correct?

24  **A.**     Yeah.  The bank is going to send a check to whatever

25  address is on the account, so the address on the account would

1    have been that -- presumably, would have been the 2220 Falling

2    Leaf.

3    **Q.**    And just to be clear, Joseph Wong is not the

4    accountholder for Good Luck Trading LLC?

5    **A.**    He's not.

6    **Q.**    He had not registered the Good Luck Trading business,

7    correct?

8    **A.**    No.

9    **Q.**    But your investigation showed that Good Luck Trading's

10   account address was the address where Wong resided?

11   **A.**    I believe so, yes.

12   **Q.**    And Wong was in possession of Good Luck Trading's $72,000

13   check?

14   **A.**    Correct, yes.

15   **Q.**    So after this search, Wong was questioned by the Secret

16   Service?

17   **A.**    That's right.

18   **Q.**    And he was released?

19   **A.**    That's right.

20   **Q.**    Now, on the very same day that the Secret Service

21   conducted the search of Wong, they also searched Hailong and his

22   residence, correct?

23   **A.**    Yes.

24   **Q.**    Those two searches happened on the exact same day?

25   **A.**    That's correct.

*Saunders - Cross - Wenstrup*

1   **Q.**    And that was coordinated?

2   **A.**    That's right.

3   **Q.**    You were present at the search of Hailong's residence,

4   correct?

5   **A.**    Yes.

6   **Q.**    And in that search, you did not find any identification

7   documents in other people's names?

8   **A.**    No.

9   **Q.**    You did not find any bank cards in other people's names?

10  **A.**    Nope.

11  **Q.**    You did not find any bank account documents in other

12  people's names?

13  **A.**    No.

14  **Q.**    You did not find any checking accounts made out to -- I'm

15  sorry -- you did not find any checks made out to other people?

16  **A.**    No.

17  **Q.**    You did not find an assault rifle?

18  **A.**    No.

19  **Q.**    Didn't find a pistol?

20  **A.**    No.

21  **Q.**    Didn't find any suspected narcotics at Hailong's

22  residence?

23  **A.**    No.

24  **Q.**    And after the search, Hailong agreed to speak with you?

25  **A.**    Yes.

*Saunders - Cross - Wenstrup*

1   **Q.**     And he signed a *Miranda* waiver?

2   **A.**     Yes.

3   **Q.**     And he spoke with you and Agent Shi at length?

4   **A.**     Correct.

5   **Q.**     And during that interview, Agent Shi told you that

6   Hailong said he had been scammed?

7   **A.**     Can you refresh -- I don't recall the details of that

8   interview.

9   **Q.**     Passing up page 63 of the transcript, just look up when

10  your recollection is refreshed.

11  **A.**     This is the transcript?  Which -- I'm sorry, which line?

12  **Q.**     I apologize.  I think that my colleague just passed that

13  over, and I forgot to take note of the line before passing it to

14  you.  Take a look at whatever you need to refresh your

15  recollection, but I believe it to be 730.

16  **A.**     Yes.  He said, "I felt like they were scamming me."

17  **Q.**     And, now, at the end of this conversation -- I'm sorry,

18  you can pass that back up.

19          At the end of the conversation with you and Agent Shi,

20  Hailong was arrested?

21  **A.**     That's correct.

22  **Q.**     And after the searches of Wong and Hailong's residence,

23  Hailong was in federal custody?

24  **A.**     That's correct.

25  **Q.**     And Wong was free?

*Saunders - Cross - Wenstrup*

1  **A.**      Wong was free, and then we later indicted him.

2  **Q.**      So the search of Wong's residence changed your belief

3  about the way this entire scheme worked?

4  **A.**      Yes, it did.

5  **Q.**      So after the search, you believed that Wong directed

6  Hailong and others to incorporate businesses for the sole

7  purposes -- sorry -- for the sole purpose of opening business

8  accounts?

9  **A.**      Can you repeat that again?  Sorry.  That was a long one.

10 **Q.**      Sure.  After the search, you believed that Wong directed

11 Zhu and others to incorporate businesses for the sole purpose of

12 opening business accounts?

13 **A.**      Correct, yes.

14 **Q.**      You believed that Wong directed individuals, including

15 Hailong, to incorporate businesses with names that related to

16 the name of the person opening the accounts?

17 **A.**      Yes, that's correct.

18 **Q.**      Probably to make it easier to remember, right?

19 **A.**      I think so too.

20 **Q.**      And so that's why we've got Hailong businesses were

21 called Sea Dragon?

22 **A.**      Yep.

23 **Q.**      So after the search, you believe that Wong directed

24 Hailong to open the Sea Dragon accounts?

25 **A.**      Yes, I do.

1   **Q.**   And you believe that Wong directed and supervised the

2   opening and control of Hailong's accounts?

3   **A.**   His business accounts, yes.

4   **Q.**   After the search, you believe that Wong also directed and

5   supervised the opening and control of Good Luck Trading

6   accounts?

7   **A.**   I do.

8   **Q.**   And after the search, you believe that Wong used devices

9   to conduct bank activities in the names of other people?

10   **A.**   Yes, he did.

11   **Q.**   You believe that Wong used devices to conduct bank

12   activities in the name of Hailong?

13   **A.**   Yes, I do.

14   **Q.**   You believe that Wong used devices to direct wire

15   transfers in the name of Hailong?

16   **A.**   Yes.  It does appear that he might have executed wires

17   from that device as well.

18   **Q.**   You believe that Wong used devices to direct wire

19   transfers in Hailong's name?

20   **A.**   From Hailong's accounts, yes.

21   **Q.**   Yes.

22   **A.**   Yes.

23   **Q.**   And after the search, you believe that Wong had posed as

24   Hailong and others when calling the banks about their bank

25   accounts?

*Saunders - Cross - Wenstrup*

1    **A.**      He did do that, yes.

2              MR. WENSTRUP:  No further questions.

3              THE COURT:  Thank you.

4              Any redirect?

5              MS. BEDELL:  Court's indulgence.

6              (Whereupon, there was a brief pause in the

7    proceedings.)

8              MS. BEDELL:  No redirect, Your Honor.

9              THE COURT:  Very good.

10             Special Agent, you may step down.

11             THE COURT:  Ladies and gentlemen, thank you very much

12   for your willingness to last this long.  Again, as I said, we

13   appreciate it, I know counsel appreciate it, but this provides us

14   with a good opportunity to stop for lunch.  Let's take a slightly

15   longer lunch to give you the chance to relax.  I know you want to

16   get as much done as you can, and so we will, I can assure you,

17   use the time productively while you are eating.  So let us resume

18   -- it's almost 1:30 -- plan on starting at 2:45.  If you come

19   back five minutes early and we're ready to go, we'll bring you

20   in, but take the time that you want, and that way you can plan on

21   2:45.  It's very important, even at this point in the litigation,

22   to follow all of my instructions.  Do not discuss the case; do

23   not form any opinions; wait until the point at which you are

24   directed to deliberate; and do not undertake any investigation,

25   or an effort to look into the matter any further.

*Proceedings*

1          So with that, take your break.  We'll resume at 2:45,

2     and you're free to go.

3          (Jury out at 1:27 p.m.)

4          THE COURT:  Is the government prepared to rest at this

5     time subject to a final reconciliation of the exhibits, to make

6     sure that all exhibits are agreed upon that have been entered to

7     so that we don't have any challenges with that?

8          MS. BEDELL:  Yes, Your Honor.

9          THE COURT:  We can do this one of a couple of different

10    ways.

11         Does the defense wish to address the Court?

12         MR. KAMENS:  I do, Your Honor, and I'm happy to do so

13    now.  I'm happy to let the witness stand down from the witness

14    stand.

15         THE COURT:  Yes, you may.

16         (Whereupon, the witness exits the stand.)

17         MR. KAMENS:  I'm also happy to submit to the Court a

18    written motion that I can hand to the government and give them

19    some time to prepare a response and come back for argument, if

20    the Court would prefer to do it that way.  While I'm prepared to

21    present our Rule 29 argument now --

22         THE COURT:  Let me ask you in a hypothetical sense:  If

23    the Rule 29 is not successful, does the defense intend to present

24    a defense case, or will we be moving to jury instructions and

25    closing arguments?

*Proceedings*

1      MR. KAMENS:  We anticipate that we would move to jury

2  instructions.

3      THE COURT:  Why don't we do this:  Certainly, I would

4  rather have the opportunity to look at whatever you've written in

5  writing.  I have a feeling that some of it will be similar to

6  things that are already in the record.  I don't expect the

7  government to have responded or for us to wait on the jury.  We

8  need to both be efficient and deliberate, but also move things

9  forward.

10      MR. KAMENS:  Understood.

11      THE COURT:  I also want to address jury instructions

12  and the charging conference, but everyone needs a little bit of a

13  break, so go ahead and give a copy of your written submission to

14  the government.  You can hand one up.  We will take a look at it.

15  We will endeavor to put together draft instructions for your

16  review.  Again, it requires you to do multiple things all at the

17  same time, and we will -- let's try and come back here a little

18  bit after 2:00, maybe 2:10.  I mean, I understand everyone's got

19  to take a little rest and get something to eat, but I want us to

20  have enough time so we can get through the Rule 29 and jury

21  instructions, if appropriate, and be ready to go.  My intention

22  would be, at 2:45 when they come back, if we can go straight to

23  jury instructions -- again, if that's what transpires -- that

24  then maybe we'd take a small break and be prepared to move to

25  closing arguments.  So just thinking about the schedule, but

*Proceedings*

1   we'll take everything one step at the same time and recess court

2   until 2:10.

3          Court will be in recess.

4          (Whereupon, a recess in the proceedings occurred from

5   1:30 p.m. until 2:23 p.m.)

6          THE COURT:  Were the parties able to review the

7   exhibits, and is everybody on the same page?

8          MS. BEDELL:  Yes, Your Honor.

9          MR. KAMENS:  I believe we are.

10         THE COURT:  Does the government rest at this time?

11         MS. BEDELL:  I'm sorry, Your Honor?

12         THE COURT:  Does the government rest at this time?

13         MS. BEDELL:  Yes.

14         THE COURT:  Does the defendant have a motion?

15         MR. KAMENS:  We do, Your Honor.  I've submitted a

16   written motion, and I would like to speak briefly on it.

17         Rule 29 requires the Court to enter a judgment of

18   acquittal if the evidence would not permit a rational jury to

19   find guilt as to every element of the charged offense beyond a

20   reasonable doubt.  By definition, if the evidence would permit

21   only a preponderance of the evidence with respect to all of the

22   elements, that is not a sufficient basis upon which to rule for

23   the government on a Rule 29.

24         I would like to speak about three elements that the

25   government has to prove beyond a reasonable doubt:  First,

*Proceedings*

1   knowledge of the object fraud; second, agreement to commit the

2   same crime as coconspirators; and, third, the object proved must

3   satisfy the elements of a scheme to commit bank fraud.

4          With respect to knowledge of the fraud scheme, there is

5   no evidence in this trial that Mr. Hailong Zhu had any contact

6   with the fraudulent platforms that were used to accept

7   investments from victims.  He had no communications with victims.

8   He had no communications about contacts with victims with other

9   conspirators.  There are no emails of bank information to be

10  shared with victims from him.  There's no admission that he knew

11  where the money came from.  This is not a money laundering case

12  in which willful blindness as to the unlawfulness of proceeds is

13  a sufficient basis to find that the defendant has engaged in that

14  prohibited conduct.  This is a conspiracy to commit bank fraud in

15  which the government must prove not only that Mr. Zhu knew about

16  the object fraud, but that he agreed to participate in it.  In

17  this case, there is simply no evidence that Mr. Hailong Zhu knew

18  anything about the scheme to obtain money from the victims.  For

19  that reason, the Court should grant the Rule 29.

20         A similar point is with respect to the requirement that

21  the government prove that Hailong Zhu agreed to commit the same

22  crime as his coconspirators.  It is certainly true that the Court

23  must consider the evidence at this stage on this motion in the

24  light most favorable to the government.  In considering the facts

25  in that respect, the Court has certainly heard evidence that

*Proceedings*

1    Mr. Zhu was involved in the opening of bank accounts based on

2    companies that, in fact, had no business; that large amounts of

3    money were deposited in those accounts; and that he made

4    substantial withdrawals and helped to transfer that money, but

5    none of that shows that he agreed to the fraud scheme engaged in

6    by the individuals who stole money from victims.  It is not

7    enough for Hailong to agree to help them commit some crime.  In

8    other words, it is not enough if he believed he was committing

9    money laundering if the others have agreed or are trying to

10   commit another crime, the charged crime, which is conspiracy to

11   commit bank fraud.  They must show that Hailong agreed to that

12   same conspiracy to commit bank fraud, and there is nothing in

13   this trial to show that he was a partner in that scheme to steal

14   money from victims.  The last --

15        THE COURT:  I'm having trouble following that final --

16   maybe it's the way you're saying it, but the conspiracy is not to

17   steal money from victims.  That would be wire fraud.  The

18   conspiracy is to commit bank fraud, to obtain the property of

19   banks; and we've had tons of briefing on this issue, and I'll

20   hear from the government in a second, but I'm a little confused

21   with your language.

22        MR. KAMENS:  Let me be more clear with respect to what

23   I'm specifically referring to, and that is the line of cases,

24   starting with *Rosenblatt* from the Second Circuit in which one

25   defendant engaged in fraud and obtained some fraudulent checks,

*Proceedings*

1    and then obtained the help of his rabbi, Rosenblatt, to launder

2    the proceeds of that fraud, but the rabbi who laundered the funds

3    didn't know anything about the actual fraud that had produced the

4    money.  They were both charged with the conspiracy to defraud the

5    United States.

6              THE COURT:  Well, in that case, the rabbi thought that

7    it was about evading taxes --

8              MR. KAMENS:  Correct.

9              THE COURT:  -- and so there was a question about what

10   the object of the conspiracy was.

11             MR. KAMENS:  Correct.

12             THE COURT:  So, here, there aren't multiple objects.

13   The government has elected to pursue solely bank fraud, so the

14   question is, is there sufficient evidence in the record, taken in

15   the light most favorable to the government, that there was an

16   agreement between the defendant and others to commit the crime of

17   bank fraud, to obtain bank property or property under the control

18   and custody of the bank?  So how do you respond to that argument?

19             MR. KAMENS:  That argument is based on the fact that we

20   have a difference of -- we differ on what bank fraud is, that is,

21   that bank fraud is not money laundering.  It is not engaging in

22   bank transactions with the proceeds of criminal conduct.  It is

23   not engaging in fraud that also happens to involve a bank

24   account.  It is lying to a bank to get the bank to release money

25   that is the bank's property or the property of another person's

1    account.  It is not what Mr. Zhu did, which is open up bank

2    accounts, and the proceeds of anterior criminal conduct was

3    funneled through those accounts.  That is not bank fraud.

4           THE COURT:  Well, it doesn't matter what Mr. Zhu did.

5    It matters what the object of the conspiracy was --

6           MR. KAMENS:  Absolutely.

7           THE COURT:  -- what the coconspirators did; and what

8    the coconspirators did would be attributable to Mr. Zhu even if

9    he didn't do it himself or even if he wasn't directly aware of

10   it.

11          MR. KAMENS:  The precondition for attributing the

12   conduct of coconspirators to Mr. Zhu is his knowledge and

13   agreement to what they're doing; that is, simply because Mr. Zhu

14   agrees to help them engage in money laundering is not the same

15   thing as conspiring with them to commit bank fraud.  So the point

16   of the argument is that there's nothing in this trial, no

17   evidence, to show that Mr. Zhu ever knew the source of the funds

18   going into the accounts.  That is a necessary precondition to

19   finding him guilty of conspiring to commit bank fraud.

20          Does the Court follow my argument, or am I not being

21   clear enough?

22          THE COURT:  No, I follow your argument.

23          MR. KAMENS:  The last argument is that this is not a

24   bank fraud scheme that the government has proved.  The simple

25   test for bank fraud with respect to the victims that testified in

*Proceedings*

1    this case is, Did Marisol Chavez and did Kwadwo Danso-Fordjour

2    authorize the wires that they sent?  If so, that's not bank

3    fraud.  Bank fraud does not encompass frauds to have people write

4    checks or wire money or otherwise send monies to scammers.  Banks

5    can't prevent people from doing foolish things with their money.

6    The fact that these individuals decided, even if they were

7    deceived by scammers, to send their own money, to wire their

8    money, that is not bank fraud.  Bank fraud requires a lie to the

9    bank that causes the bank to release the money, and it is

10   different than lying to a victim to get the victim to send money

11   to the scammer.  It's a very straightforward and simple argument,

12   and it's been accepted by a number of courts.  What the

13   government has here -- essentially, everything that the

14   government has presented -- is a fraud scheme that does not

15   constitute bank fraud.  The one thing they pointed to is efforts

16   to get victims to take out personal loans, and that also, in this

17   case, is not evidence of bank fraud.  Loan proceeds, once they're

18   disbursed to the borrower are no longer property of the bank.

19   And if the fraudster obtains money that has been disbursed to the

20   borrower by the bank pursuant to a personal loan, that, again, is

21   not bank fraud because they are not stealing bank property.

22            The language here is difficult to parse because when

23   we're talking about bank property, it's easy to think it's just

24   money in a bank account, that that's bank property; but the thing

25   is it doesn't encompass -- that is, specifically, bank fraud does

1    not encompass -- anything involving a bank account that is

2    connected to a crime.  It requires, specifically, lies to a bank

3    to get the bank to release its money or someone else's money;

4    like, for example, a mortgage loan application that has a lie.

5    That is material.  That would be something that would cause the

6    bank to give its own money based on a lie.  That is bank fraud.

7         Another clear example -- it's the one talked about by

8    Scott Golladay -- is a $100,000 fraudulent check.  The bank

9    doesn't know it's fraudulent; deposits it into a customer's

10   account; and within one business day, because of the UCC, the

11   bank has to give that money or make it available for withdrawal

12   to the customer.  The customer takes out the money, $100,000, and

13   the bank learns three days later the check is fraudulent.  The

14   customer no longer has the money.  The bank has to write off that

15   loss.  That is bank fraud.  It's a lie in the form of that

16   fraudulent check to the bank to get the bank to release funds.

17        What we have here is a scheme to get individuals to go

18   on cryptocurrency spoofed platforms and then decide to wire their

19   own money to the scammers.  That is not bank fraud.  That is

20   specifically what *Loughrin*, the Supreme Court case, says is not

21   bank fraud, a scammer who gets a valid check or a valid form of

22   payment from the victim; and that's why it's that simple test I

23   propose here:  Is the money that was provided by Marisol Chavez

24   and Kwadwo Danso-Fordjour, are those valid wires?  And they are

25   because they were authorized by those individuals.  It is fraud;

1    there's no doubt about that; it's just not bank fraud.

2           THE COURT:  Thank you.

3           MS. BEDELL:  Your Honor, the standard here is whether,

4    after reviewing the evidence in the light most favorable to the

5    prosecution, any rational trier of fact could have found the

6    essential elements of the crime beyond a reasonable doubt.  The

7    government gets the benefit of all reasonable inferences from the

8    facts proven to those sought to be established, and the jury, not

9    the reviewing court, weighs the credibility of the evidence and

10   resolves any conflict of the evidence presented.

11          So in this case, Your Honor, I think there is ample

12   evidence to support a conviction for bank fraud -- a conspiracy

13   to commit bank fraud here.

14          I would like to start with what the defendant agreed

15   to.  And so -- and I do want to be clear:  We are not saying that

16   his lies in opening accounts constitutes bank fraud in and of

17   themselves, but they certainly demonstrate a willingness to lie

18   to banks, and that is a critical part of the intent that needs to

19   be proven.

20          Additionally, the defendant himself actually did engage

21   in acts of bank fraud by directly lying to banks in order to

22   obtain money from them.  So a very clear example is the

23   transaction that happened on December 10th when he attempted to

24   withdraw just short of $75,000 from his personal Bank of America

25   account that had been -- the transfer from Robert Kessler on

*Proceedings*

1    December 9th.  And in this transaction, when he attempted to

2    withdraw the money, he told the bank that this was money that he

3    had received from a remodeling contract.  And we heard evidence

4    that, in fact, Mr. Kessler lived in Alaska and he had reported

5    being a victim; he submitted a hold harmless request; that money

6    was returned to him.  So those were very clearly not remodeling

7    funds.

8              THE COURT:  But how are they the funds of the bank?  In

9    other words --

10             MS. BEDELL:  So, Your Honor --

11             THE COURT:  You're absolutely right that the Court will

12   take, and must take, the facts in the light most favorable to the

13   government, but explain to me what facts there support a false

14   statement to the bank to obtain the bank's property.

15             MS. BEDELL:  So, Your Honor, the statute requires that

16   you can either be trying to obtain the property of the bank or

17   property in the custody of the bank.  So as an initial matter,

18   this falls most easily under property in the custody of the bank.

19             THE COURT:  But is there any case that you've shown me

20   that supports that theory?  Because that theory, it strikes me,

21   would mean that all customers' funds in the bank are under the

22   custody of the bank.  That's the whole nature of having your

23   money in the bank, right?  You don't have it physically; the bank

24   has it, but it's your money.  So if the bank fraud statute were

25   intended to cover that, it would mean all accountholders' funds

*Proceedings*

1    would be subject to bank fraud if somebody was trying to get the

2    accountholders' money.  But isn't that the essence of all the

3    other fraud statutes you could have brought, including wire

4    fraud, which is trying to get a customer's money, not the bank's

5    money?

6         MS. BEDELL:  No, Your Honor.  This is very much bank

7    fraud because it is making misrepresentations to the bank in

8    order to get money out of the bank's custody.  And so it has to

9    be material.  So I think maybe the point you're getting at is if

10   I, like, you know -- I think Mr. Kamens had made an example of I

11   say it's for my bills, but, really, it's my golf tee time.  The

12   bank is not going to care about that.  But we heard ample

13   evidence about why this was a material misrepresentation and how

14   banks are trying to determine whether these withdrawals are

15   legitimate, and using this information for that purpose --

16        THE COURT:  You mean because of the anti-money

17   laundering laws and bank secrecy laws, that they have an

18   obligation to look into why certain money is coming and going?

19   Is that what you're talking about?

20        MS. BEDELL:  It's not just their obligation, but the

21   fact that they do it, Your Honor, and that they are evaluating

22   this information and using it in making decisions about whether

23   to release the money.

24        THE COURT:  But it's not their money, is it?

25        MS. BEDELL:  Your Honor, it does not have to be their

*Proceedings*

money, but I will put a pin in that and say *U.S. v. Shaw* does say
that banks have an interest in accounts that -- in funds in an
account.  They do have a property interest there.

And the other thing, Your Honor, is that it's also
not -- I think this is the other point, is that you had said:  It
is my money I'm trying to get out of the account.  And maybe in
some instances if you're trying to withdraw from your own
account, but the fact is that this wasn't Mr. Zhu's money.  It
was sent to him under fraudulent pretext.  And the law is also
very clear that you don't have an unfettered right to money that
you've gotten through fraud and theft.  So the idea that the UCC
applies and that he can just pull this money out because it's in
his bank account, that's, first of all, not a reflection of the
reality.  We saw numerous instances where the defendant and his
coconspirators were not able to access the money that was in
their bank accounts, and that's because they don't have an
absolute right to it.

THE COURT:  All right.  I guess I'm focused on trying
to understand what the government's theory is.  Is it that
because the banks have the ability to freeze, either restrict or
suspend and then close an account, that that gave them control
over the accounts; and, therefore, any lies connected with trying
to get that money released constitute bank fraud?

MS. BEDELL:  Yes, Your Honor.

THE COURT:  Is that your theory?

1          MS. BEDELL:  It constitutes efforts in this case to

2     obtain the funds from the custody of the bank, and those were

3     lies directly made to the bank here.  So we're not even dealing

4     with the situation of it going through an intermediate person;

5     and that's where the cases are much more hesitant and are trying

6     to -- you know, my fake purse that I think is real, that's not

7     bank fraud because there's no direct con- -- there's no direct

8     relationship between the misrepresentation and the bank.  But,

9     here, this is -- the plain text of the statute is that it can be

10    money in the custody of the bank, and it has to be

11    misrepresentations.  And, again, I think Mr. Kamens and I

12    disagree about whether the misrepresentations have to go to the

13    bank, but in this case, they absolutely have.  And so that is

14    100 percent classic bank fraud.  And I think Mr. Kamens has

15    argued that because it's already in his bank account, you're not

16    obtaining it, but the reality is very different.  As we said, we

17    saw numerous instances where they were not able to get the money

18    out of the account.  And to think that the goal of the conspiracy

19    was to say, Let's just get the money into Hailong Zhu's account,

20    mission accomplished, we're done here, that was clearly not the

21    goal or the purpose of the conspiracy.  The goal was to continue

22    moving it on.  And so that's why we saw all of those transfers

23    sending the money overseas, and it's why we saw the

24    coconspirators -- Mr. Wong, Small 7, Nikki -- going to great

25    lengths to try to get this money out of these accounts after

*Proceedings*

1    they've been restricted and continue moving them on.  This was a

2    massive focus of the conspiracy, and it involved

3    misrepresentations by Mr. Zhu and his conspirators at nearly

4    every step, and that's why it constitutes bank fraud, Your Honor.

5           THE COURT:  All right.  Are there any other cases other

6    than *United States v. Shaw* that address this issue of the custody

7    and control in the government's theory?

8           MS. BEDELL:  I'm sure.  I will be honest, Your Honor, I

9    had not really thought -- it's the plain text of the statute, so

10   that it does say in the statute that it is efforts to obtain

11   money from the custody of a bank.  So I have not looked for

12   specific case law that would support that point because I hadn't

13   understood Mr. Kamens to be arguing that.  So I think I would

14   have to go do additional research for that specific -- I'm

15   certainly not saying there aren't cases.  I just don't

16   necessarily have them at my fingertips right now.  Frankly, some

17   of the cases that we have looked at and discussed probably do

18   cover this, and I would just need a minute to -- or more than a

19   minute -- but I would need to go through that.  That's just not

20   something that I had been totally aware was at issue given that

21   it is the plain text of the statute.

22          THE COURT:  And tell me again how you distinguish

23   between that theory of custody and control and bank fraud then

24   applying to every effort to make a false statement to obtain the

25   money that's already in accountholders' accounts.

1          MS. BEDELL:  Well, Your Honor, it seems like you're

2     concerned about situations where just an ordinary bank customer

3     is trying to get money out, and so I'm struggling to understand

4     exactly what this hypothetical looks like, but I do keep coming

5     back to materiality here because it is very difficult for me to

6     imagine what the sort of general misrepresentation that, you

7     know, me as a law-abiding citizen is going to make to my bank in

8     trying to get money out.  So, you know, I would -- like an ATM

9     transaction is not necessarily automatically bank fraud if it

10    doesn't involve a misrepresentation; and then, again, it has to

11    be a material misrepresentation.  So that, to me, it strikes me

12    as a limiting factor, is that I'm not sort of seeing cases where

13    we are charging or considering or trying to protect against

14    someone paying their tea time rather than paying their bills or

15    something like that.  I don't think that that would fall into the

16    category of material.

17          THE COURT:  Anything else?

18          MS. BEDELL:  Yes, Your Honor.  I would like to address

19    the loan aspect of the conspiracy, but if that's something

20    that -- if that's helpful, because we do believe -- actually, we

21    do believe both the efforts to obtain loans absolutely constitute

22    bank fraud; and, there, we do see misrepresentations going to the

23    bank.  We looked at Exhibit 1-4 where Mr. Danso-Fordjour

24    represented that he was not taking out the loan for the purpose

25    of investment, which was exactly what he believed he was taking

*Proceedings*

1    out the loan for.  And then, also, this is very -- as an

2    identical case to *Chittenden*, wherein, there, there was no

3    misrepresentation that went directly to the bank, but,

4    nonetheless, the misrepresentations induced the victims -- excuse

5    me -- induced the intermediary to take out a loan that was

6    immediately transferred, and that was a direct and close

7    connection.  And that's exactly what happened here.  I mean,

8    there's absolutely no basis for any of these people taking out a

9    loan other than being induced.

10          The other part of that -- and Mr. Kamens has tried to

11   present this as a third conspiracy -- but the efforts to get the

12   money from the victims that wasn't bank loans.  First of all,

13   that's an integral part of this conspiracy.  It's not like

14   there's any victim, whether we were allowed to put their

15   testimony on or not, that out of nowhere, someone said, You

16   should take out a loan.  This is all part of the same effort.

17   But, in addition, those non-loan transfers that they made also

18   frequently involved misrepresentations.  We heard

19   Mr. Danso-Fordjour testify that he invented reasons for sending,

20   in the "purpose"; and we saw in Exhibit 3-3, which was a text

21   between Marisol and Daniel, You don't need to worry that the bank

22   will refuse you because you can tell the bank that it is your

23   friend.  Basically, you don't have to tell the bank the real

24   purpose of the transfer; tell them something else and the

25   transaction will go through.  And we saw numerous transactions

*Proceedings*

1   that were labeled "construction," home goods -- that's not an

2   exact one -- but it was construction, payment for supplies,

3   things that were very clearly not the actual purpose of these

4   payments.  And we heard testimony from Mr. Campbell and

5   Mr. Golladay that these representations are material.  So we

6   absolutely believe that that is also -- and we think the evidence

7   supports -- that that is also bank fraud.

8           And then to the final point that -- maybe not the

9   final, but one other point that Mr. Kamens made here is those

10  cases -- and I think you picked up on this, Your Honor -- but the

11  *Rosenblatt* cases have found that you have to have agreed to

12  commit the same offense; and everyone here is committing bank

13  fraud, and this is an integrated and coordinated conspiracy to

14  get the money out of victims and the banks into the intermediary

15  accounts and overseas.  And everyone at all the different

16  stages -- they may be committing other crimes, too, which happens

17  frequently -- but they are definitely committing bank fraud.  And

18  the law is very clear that once Mr. Zhu has agreed to commit bank

19  fraud, he does not have to know the details of the scheme; he

20  does not have to know every participant; he does not have to know

21  every act.  And, in fact, in *United States v. Mora*, the Fourth

22  Circuit specifically says he does not need to know the

23  organization of the scheme.

24          In Rosenblatt -- and there's a whole line of cases --

25  those are all instances where, as you pointed out, one person was

1    committing tax evasion, in his mind, and the other was committing

2    some sort of fraud.  But, here, everyone has agreed to commit

3    bank fraud.  So that is what we have to prove, and that is what

4    the evidence supports here, Your Honor.

5              THE COURT:  Anything else?

6              MS. BEDELL:  Not unless there are other questions, Your

7    Honor.

8              THE COURT:  Thank you.

9              MR. KAMENS:  May I respond briefly?

10             THE COURT:  Yes.

11             MR. KAMENS:  Your Honor, banks put in place provisions

12    to protect their customers.  So if I go to a bank and say I'd

13    like to withdraw my money, and I'm really intending to invest in

14    cryptocurrency, the bank may say, That's not a good idea; we're

15    not going to let you do that.  But it's my money.  If I say,

16    then, Well, actually, I'm going to put it under my mattress, and

17    they give me the money, I can do whatever I want with it.  It is

18    my money.  The fact that I'm invading those internal controls to

19    protect the customer is not bank fraud.

20             The government's theory that they've just announced is

21    a theory that the bank fraud statute is a criminal banking

22    statute; that drug dealers who deposit money in banks commit bank

23    fraud when they withdraw money or move it and don't tell the bank

24    that they're actually drug dealers.  That is not bank fraud.  The

25    government's argument also makes bank fraud never-ending.  We

1   have argued about this.  We've cited that --

2        THE COURT:  Well, how do you respond to the argument

3   about the custody and control?  There seems to be a fundamental

4   difference over the view of what "custody and control" means.

5   And so if a bank doesn't have a property interest, generally, in

6   the money that its accountholders put there, but has certain

7   obligations and can take certain actions when, for example, they

8   think there's fraud going on or they think that they might end up

9   being liable, so that they have to restrict an account or suspend

10  it, does that not fall under the definition of bank fraud?

11       MR. KAMENS:  It doesn't if the action is authorized by

12  the accountholder.  So banks have a property interest in the

13  money that they have in their accounts, but that property

14  interest is always subsumed to the interest of the accountholder,

15  so that the two --

16       THE COURT:  Well, in this case, the accountholder is

17  alleged to have been perpetrating a fraud.

18       MR. KAMENS:  Absolutely, but that comes down to whether

19  people who engage in criminal conduct and deposit proceeds from

20  criminal conduct in banks, whether that constitutes bank fraud,

21  and it doesn't.

22       Let me explain the response in two ways:  One, it comes

23  down to, What is the occasion by which a person obtains someone

24  else's property?  Bank fraud is committed when you obtain the

25  property of the victim.  It is not when individuals engage in

*Proceedings*

1    money laundering or transactions with the proceeds of that crime.

2    That is not the occasion by which they obtain the money from the

3    victim.  Every wire fraud, bank fraud, mail fraud statute is

4    about obtaining property from the victim; and this case, it has

5    always seemed has been about the fraud that was perpetrated on

6    these victims.  But now the government has completely changed

7    what they're saying, and they're saying, essentially, that the

8    movement of those proceeds without telling the bank about what

9    this was actually about constitutes bank fraud.  And there's not

10   a single case that supports that theory.  We have argued about

11   it.  We've cited the Seventh Circuit case -- I think it's called

12   *Anderson* -- which says that the reason you can't call this a

13   fraud every time they move the money is because that would make

14   the fraud never-ending as long as the defendants have that money

15   and move it around.

16          The fraud occurs when it's stolen from the victim, not

17   when they're moving money between accounts.  And so, again, the

18   Court's question to the government was very apt, and that is, Is

19   there any case that supports the theory that the bank fraud

20   statute completely subsumes money laundering, it encompasses

21   depositing proceeds of a crime, and then trying to get that money

22   to another account?  There isn't a case that says that.  Instead,

23   what bank fraud or wire fraud or mail fraud is is stealing money

24   from a victim.  Everything that happens after the money is

25   obtained from the victim is not the fraud itself.  It may be

*Proceedings*

1    other crimes.  It may well be money laundering, which is exactly

2    what the conduct that has been alleged in this case or presented,

3    the evidence, with respect to Mr. Zhu would establish in the

4    light most favorable to the government, but that is not bank

5    fraud.  Otherwise, essentially, bank fraud is everything

6    involving the deposit of money from the criminal activity.

7             THE COURT:  Do you wish to be heard?

8             MS. BEDELL:  Briefly, Your Honor.

9             THE COURT:  All right.

10            MS. BEDELL:  Again, bank fraud is everything if you

11   omit all the other elements.  And, again, there's plenty of ways

12   to commit money laundering that don't involve bank fraud, but

13   when you are lying and making material misrepresentations to the

14   bank, that is the critical defining element here that

15   distinguishes it from just trying to conceal your money.

16            And, again, I think we've debated *Anderson* extensively,

17   but *Anderson* stands for the fact -- the specific facts of that

18   case, to be clear, the money had been at rest for ten years.

19   Though she made another transfer that the court determined

20   completely unrelated to the fraud and the scheme that was at

21   issue in that fraud, they concluded that transfer was not bank

22   fraud; and that seems entirely reasonable given the particular

23   facts of that case, but it is nothing to say about whether that

24   can never -- a transfer between accounts can never be bank fraud.

25            And then, Your Honor, we would ask you to delay ruling

1   until after the jury has returned a verdict.  I will put that on

2   the record.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Well, these issues are not being raised for the first

5   time.  They've been raised throughout this case, from the first

6   indictment, to the superseding indictment, to the motion to

7   dismiss, to the motion *in limine*, and now to the Rule 29.  I

8   appreciate the efforts of counsel to educate the Court.  I

9   appreciate the submission of the written motion for judgment of

10   acquittal.

11          I will say that it is a difficult position to be in

12   because the government doesn't have the opportunity to submit a

13   full written position; but as I said, there is plenty of evidence

14   and law in the record based on the submission of both sides.

15          I'm going to take a brief recess and then we will

16   reconvene.  Court will be in recess.

17          (Whereupon, a recess in the proceedings occurred from

18   2:55 p.m. until 3:21 p.m.)

19          MR. KAMENS:  Your Honor, can I make one small point

20   that I forgot to make?

21          THE COURT:  All right.

22          MR. KAMENS:  This is in our written pleading, but with

23   respect to the government's custody and control theory, all of

24   the conduct -- the agreements, the misrepresentations they point

25   to -- happened in California.  If that conduct, which is

*Proceedings*

1   equivalent to money laundering, is the basis for the government's

2   custody and control bank fraud theory, it is just as subject to

3   the dismissal the Court already entered in this case with respect

4   to the money laundering charge.

5        THE COURT:  Thank you.

6        This matter comes before the Court on Defendant's

7   motion for judgment of acquittal pursuant to Rule 29, and the

8   Court must determine whether, viewed in the light most favorable

9   to the prosecution, there's substantial evidence to support a

10  guilty verdict in this case.  Substantial evidence is evidence

11  that's sufficient for a reasonable juror to find proof beyond a

12  reasonable doubt of each element of the charged offense.

13       The indictment, the superseding indictment, charges one

14  count of conspiracy to commit bank fraud.  It does not charge

15  multiple-object conspiracy; it does not charge conspiracy to

16  commit money laundering, or conspiracy to commit wire fraud.  The

17  elements of conspiracy to commit bank fraud are as follows:  Two

18  or more persons agree to commit bank fraud; the defendant

19  willfully joined the conspiracy with the intent to further its

20  unlawful purpose.  Bank fraud, which was the object of the

21  alleged conspiracy, has three elements:  First, that the

22  defendant knowingly executed or attempted to execute a scheme or

23  artifice to obtain any monies, funds, credits, assets, or other

24  property owned by or under the custody or control of a financial

25  institution by means of material false or fraudulent pretenses,

*Proceedings*

1    representations, or promises; two, the defendant did so with the

2    intent to defraud; and, three, the financial institution was then

3    federally insured.  Now, there's no dispute that the banks in

4    this case that have been identified were federally insured; and,

5    really, there's no dispute that there was a scheme to defraud.

6    The cryptocurrency scheme was a wide-ranging and clear effort to

7    obtain money through false pretenses.  However, there is no

8    evidence, even in the light most favorable to the government,

9    that the defendant knew of the cryptocurrency scheme; that he

10   knew of the websites or the platforms that were used; that he

11   knew of Daniel or Rachel or the others who posed as friends or

12   others who lured the victims of that scheme; or that he even knew

13   the source of the money that came into his accounts.  There's no

14   evidence that Joseph Wong or Nikki or Little 7 ever explained or

15   shared the purpose or means of the conspiracy to the defendant,

16   that it was to defraud victims of their money.  More

17   specifically, there's no evidence that there was a meeting of the

18   minds as to the object of the conspiracy that the defendant is

19   charged with, even taking the evidence in the light most

20   favorable to the government.  There's simply nothing in the

21   record that there was an agreement to defraud banks of their

22   property or property under their custody and control.

23           *Loughrin* makes clear, as do many other cases, including

24   the *Davis* case, that not every false statement or lie to a bank

25   is bank fraud, and not every effort to get victims to part with

*Proceedings*

their money is bank fraud, even if a bank is involved.  Here,

there's no evidence that the money from the victims of the

cryptocurrency scheme involved the bank's property or put the

bank at risk in any way or implicated property under the control

of a financial institution.  The acts to restrict or suspend the

accounts after the fraudulent scheme had obtained the funds

cannot support a bank fraud theory.  And, in fact, there's no

evidence that Ms. Chavez, for example, ever got a loan.  She used

her own money and wired it as part of the fraud; and

Mr. Danso-Fordjour, likewise, used his own money, for the most

part, with the exception of the one loan that he sought from SoFi

Bank, but his statements to the bank, even taking that in the

light most favorable to the government, cannot support a theory

of bank fraud here.  They're simply too attenuated to be

attributed to the defendant in this case.

Now, the Court has no doubt that the government has

established many crimes were committed by the codefendants in

this case.  There's no doubt as well that the defendant here was

taken advantage of in many ways by the codefendants, as

recognized by the agents themselves.  Whether the defendant is

guilty of other crimes not charged in this indictment is not for

the Court to say and not before the Court, but the Court finds

that, pursuant to Rule 29, there's insufficient evidence to let

this case go forward and go to the jury; and, accordingly, the

motion for judgment of acquittal is granted.  And I don't do that

1   lightly, and I appreciate the efforts that all counsel have

2   devoted to this case, but there's simply no way for the Court to

3   reach another decision, and so this matter is dismissed pursuant

4   to Rule 29.

5           I will bring in the jury and advise them that the

6   matter has been resolved and that they are discharged from

7   further responsibilities in this case.

8           You may bring them in.

9           (Jury in at 3:28 p.m.)

10          THE COURT:  Ladies and gentlemen of the jury, I want to

11  thank you for your participation in this matter.  I know that we

12  have exceeded, by some time, the amount of time I told you we

13  would have for lunch.  The reason for that is that there were a

14  number of legal issues that the parties needed to resolve, and as

15  a result of those legal issues and a motion made by the defense,

16  which the Court has granted, the case has been dismissed; and,

17  accordingly, there will be no further requirement for you to

18  deliberate on this matter.

19          I realize, in some ways, that may be disappointing

20  because you've paid a lot of attention and your work was about to

21  begin.  I want to thank you for your attention to this matter.  I

22  want to thank you on behalf of myself as well as the counsel.

23          These cases are always difficult, and the lawyers have

24  worked very hard, and we cannot do this work and the courts

25  cannot function without citizens being willing to take the time

*Proceedings*

1    out of their day.  And I know it wasn't voluntary, but you did

2    it, and you clearly paid close attention to the matter, and the

3    matter is now resolved.  So you are released from further duty,

4    and you may go at this time.  Thank you again.

5              (Jury out at 3:30 p.m.)

6              THE COURT:  Well, this matter is now resolved.  The

7    case is dismissed.  The defendant is free to go at this time.

8              Again, I want to emphasize that I appreciate the

9    efforts that everyone has devoted to this case.  Cases are never

10   easy.  There are complicated factual and legal issues that

11   everybody has to contend with.  The Court did what it had to do.

12   The case is dismissed.  You-all are free to go.  Court will be in

13   recess.

14             (Whereupon, the proceedings concluded at 3:31 p.m.)

15                    *      *      *      *      *

16

17                    CERTIFICATE OF REPORTER

18             I, Diane Salters, hereby certify that the foregoing

19   transcript is a true and accurate record of the stenographic

20   proceedings in this matter.

21

22                                  /s/ Diane Salters

23                              _____

24                              Diane Salters, CSR, RCR, RPR
                                Official Court Reporter

25